**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| POM of Pennsylvania, LLC | : | Electronically Filed |
| | : | |
| *Plaintiff,* | : | Civil Action No. _____ |
| | : | |
| v. | : | |
| | : | |
| BMM Testlabs, Peter Nikiper, and Does 1-50, | : | JURY TRIAL DEMANDED |
| | : | |
| *Defendants.* | : | |
| | : | |

## COMPLAINT

Plaintiff, POM of Pennsylvania LLC ("POM"), by and through its attorneys, brings this complaint against Defendants BMM Testlabs ("BMM"), Peter Nikiper ("Nikiper") and Does 1-50 ("Does") (collectively, "Defendants"), and in support hereof avers as follows:

## PARTIES

1.    Plaintiff, POM is a limited liability company organized under the laws of the state of Wyoming with its principal place of business at 3870 Peachtree Industrial Blvd., Suite 340-194, Duluth GA 30096.

2.    Upon information and belief, Defendant BMM is a corporation with its principal place of business at 815 Pilot Road, Suite G, Las Vegas, NV 89119. BMM is a gaming testing laboratory under contract to perform testing for the Pennsylvania Gaming Control Board ("PGCB").

3.    Upon information and belief, Defendant Nikiper is an adult individual residing in the state of Nevada. Nikiper is an employee of BMM and its Director of Technical Compliance.

4.     Defendants Does are individuals associated with the casino gaming industry in Pennsylvania and/or New Jersey who are presently unidentified who POM alleges acted in concert with BMM and Nikiper.

## JURISDICTION AND VENUE

5.     This Court has original jurisdiction over POM's claims pursuant to the Defend Trade Secrets Act, 18 U.S.C. § 1836 (the "DTSA") and the Computer Fraud and Abuse Act, 18 U.S.C.  1030 (the "CFAA"), under 28 U.S.C. § 1331 because these claims arise under federal law.

6.     This Court has supplemental jurisdiction over POM's state law claims pursuant to 28 U.S.C. § 1367 because those claims arise out of the same operative facts as POM's DTSA and CFAA claims and "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

7.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims set forth herein took place in this District and under 28 U.S.C. §1391(b)(3) because Defendants are subject to this Court's personal jurisdiction with respect to this action.

8.     The Court has personal jurisdiction over Defendants in that they subjected themselves to jurisdiction in this matter as a result of the conduct alleged herein.

## FACTUAL ALLEGATIONS

**A.  The Skill Game**

9.       In Pennsylvania, POM distributes legal, electronic games of skill marketed with the trade name "Pennsylvania Skill" (the "Skill Game").

10.      The Skill Game is a coin-operated video machine.

11.      The Skill Game runs on proprietary software that is encrypted, highly confidential and trade secret.

12.      The primary game it offers is a "Tic-Tac-Toe" style puzzle, but the Skill Game also includes a potentially unlockable bonus session and a "Follow Me™" colored dot-matching phase of game play.

13.      The Tic-Tac-Toe game feature multiple themes that a player can select.  While the graphics and some payout amounts differ among the various themes, the gameplay is functionally equivalent in all themes.

14.      A player cannot access the bonus session or the Follow-Me™ second phase of play on the Skill Game without first playing the Tic-Tac-Toe game.

15.      When the Tic-Tac-Toe game is initiated, nine reels arranged in a three-by-three grid are spun.

16.      When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed.

17.      Once the reels are spun, the player has thirty seconds to change one of the symbols to a "Wild" symbol in order to complete one or more rows in the grid.

18.     The most advantageous spot in which to place the "Wild" symbol depends on whether multiple rows can be completed and the value of the symbols in the row or rows that were completed.

19.     Failure to place the "Wild" symbol at all within the thirty-second time limit will result in a loss, however, because the Skill Game does not generate automatic wins.

20.     The Skill Game also has a bonus session that can be triggered under certain circumstances by successful completion of the Tic-Tac-Toe game.

21.     The bonus sessions differ among the various themes that are available on the Skill Game.

22.     If a player executes perfect skill and still fails to win at least 105% of the amount paid to play the Tic-Tac-Toe game, the player is given the option of selecting the Follow-Me™ phase of play.

23.     The Follow-Me™ phase of game play begins with a three-by-three grid of colored dots.  The dots flash in a random sequence that the player must repeat.

24.     The player needs to follow the sequences for 25 rounds of play, with each sequence adding another circle.

25.     If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

26.     The Skill Game offers the skillful player the ability to win, on every play, at least 105% of the player's consideration.

27.     Therefore, on every play of the Skill Game, the skillful player may win more than the funds/points committed for play – the "Follow Me" phase of the Skill Game ensures that outcome.

28.     The Skill Game also has a preview feature, which allows the player (before committing any funds/points for game play) to see the upcoming tic-tac-toe puzzle and decide whether to commit any funds/points to play.

29.     POM, through in-state operators, places the Skill Game in small, family-owned businesses like bar and restaurants and convenience stores, as well as in fraternal organizations.

30.     Courts in Pennsylvania have held the Skill Game is legal game of skill, including Courts of Common Pleas in Dauphin, Monroe and Beaver Counties. *See In re Three Pennsylvania Skill Amusement Devices*, 2023 WL 2666472 (C.P. Dauphin Mar. 23, 2023);[1] *In re Four Pennsylvania Skill Amusement Devices and One Ticket Redemption Terminal Containing $18,692.00 in U.S. Currency*, No. 6673 Civil 2021 (C.P. Monroe 2023);[2] *In re: Pace-O-Matic Equipment, Terminal I.D. No. 142613*, M.D. No. 965-2013 (Beaver Co. C.C.P. 2014).[3]

31.     No court in Pennsylvania has held the Skill Game is an illegal gambling device.

**B.  POM's Trade Secrets**

32.     POM's parent company is Pace-O-Matic, Inc. ("Pace-O-Matic"), which is located in Georgia.

33.     Pace-O-Matic is the owner of certain intellectual property, discussed in more detail below, which protects and runs the Skill Game.

34.     POM and Pace-O-Matic have entered into an agreement whereby POM is the sole licensee of this Pace-O-Matic intellectual property.

---

[1] A copy of the Dauphin County Court of Common Pleas 3/23/23 Memorandum Opinion finding the Skill Game is a legal game of skill is attached hereto as Exhibit "A".

[2] A copy of the Monroe County Court of Common Pleas 2/8/23 Order finding the Skill Game is a legal game of skill is attached hereto as Exhibit "B".

[3] A copy of the Beaver County Court of Common Pleas 12/23/14 Memorandum Opinion and Order finding the Skill Game is a legal game of skill is attached hereto as Exhibit "C".

35.     That intellectual property is, in turn, incorporated into the Skill Game in the form of both hardware and software.

36.     Pursuant to its agreement with Pace-O-Matic, POM cannot allow "any party" to "reproduce, distribute ..., modify, translate, adapt or create derivative works based upon" the intellectual property found in the Skill Games.

37.     Pursuant to its agreement with Pace-O-Matic, POM must also prevent any effort to "reverse engineer, decode, decompile, disassemble or otherwise attempt to access or derive the source code or intellectual framework of any of the" intellectual property.

38.     The right to use Pace-O-Matic's intellectual property is the primary source of POM's revenue in Pennsylvania.

39.     The intellectual property in the Skill Game is POM's (and Pace-O-Matic's) trade secrets.

40.     For example, the Skill Game uses a proprietary and patented encryption and software program called the "dongle system" (the "Dongle"), which is the Skill Game's primary protection against software piracy.

41.     The security Dongle also performs other integral functions for accounting and software licensing.

42.     As the most important piece of hardware and firmware in the Skill Game, the security Dongle source code is highly protected.

43.     If the Dongle was reverse engineered, allowing for hard drive decryption, the entire skill gaming system would lose its internal security protections, including for the Skill Games and numerous other Pace-O-Matic games in states other than Pennsylvania.

44.     This would permit decompilation of the skill gaming software and put skill games throughout the country at risk.

45.     The patented security Dongle is not the only proprietary and trade secret aspect of the Skill Games.

46.     The source code, executable programs, and other technological resources for the Skill Game operating software also are proprietary and highly confidential.

47.     Pace-O-Matic has invested tens of millions of dollars and many years to develop its trade secret intellectual property, including the Dongle and the source code, executable programs, and other technological resources for the Skill Game operating software.

48.     In fact, Pace-O-Matic has spent in excess of $40,000,000 and more than 100,000 man hours developing the intellectual property in the Skill Game, which comprises over a half-million lines of code.

49.     POM and Pace-O-Matic also take extreme precautions to safeguard the secrecy of the Skill Game's intellectual property.

50.     The Skill Game's intellectual property and source code generally are not known to anyone outside of Pace-O-Matic or POM.

51.     Within POM itself, only POM's principals and software engineers employed by Pace-O-Matic to develop and revise the Skill Game's software have access to the Skill Game's intellectual property, including its software and source code.

52.     These individuals are all subject to strict confidentiality and non-disclosure agreements.

53.     In addition, at times experts retained by POM or Pace-O-Matic may be given access to the Skill Game's intellectual property as needed.

54.    These experts also are subject to strict confidentiality and non-disclosure agreements.

55.    POM and Pace-O-Matic require that anyone with access to the Skill Game source code sign a strict confidentiality and non-disclosure agreement.

56.    POM and Pace-O-Matic also maintain the strictest electronic security to protect the Skill Game's intellectual property from outside access.

57.    The Skill Game is encrypted and protected by the Dongle, which serves as the security system for the machine.

58.    POM and Pace-O-Matic do not disclose the Skill Game's software, security methods, and other technological resources to the in-state operators who place the Skill Games in locations like bars and restaurants, convenience stores and fraternal organizations.

59.    POM and Pace-O-Matic do not disclose the Skill Game's software, security methods, and other technological resources to the locations where the Skill Games are placed.

60.    POM and Pace-O-Matic also do not disclose the Skill Game's software, security methods, and other technological resources to other third parties, such as competitors or opponents of the Skill Game.

61.    Allowing access to the Skill Game's software, security methods, and other technological resources would allow competitors to copy POM's skill technology and market similar games to the public, thereby completely undermining POM's business.

62.    The Skill Game's software, security methods, and other technological resources also cannot be easily reproduced or reverse engineered.

63.     Without access to the Skill Game's program executables and game resources, it would likely require a competitor or other third party to expend at the least the same amount of time and resources expended by Pace-O-Matic in developing and updating this skill technology.

**C.  BLCE's Dauphin County Seizure of Skill Games**

64.     Within the Pennsylvania State Police is a unit called The Bureau of Liquor Control Enforcement (the "BLCE").

65.     The BLCE, *inter alia*, enforces the Pennsylvania Liquor Code and also regulates illegal gambling (via use of the Crimes Code) in venues other than casinos.

66.     On December 9, 2019, agents from the BLCE seized three Skill Games from Champions Sports Bar, LLC ("Champions") located in Dauphin County.

67.     BCLE seized this property without a warrant and no criminal charges were filed as a result of the seizure.

68.     Capital Vending Company, Inc. ("Capital Vending"), a business that supplies games and other amusement equipment/devices, including the Skill Games, was the lawful owner of the seized property.

**D.  The Return of Property Proceeding in the Dauphin County Court of Common Pleas and BMM's Expert Report**

69.     On August 23, 2022, Champions and Capital Vending filed a petition for return of property in the Court of Common Pleas of Dauphin County on the grounds that the seizure did not satisfy the requirements of 42 Pa.C.S. § 5803(B), and that the Skill Games are games of skill (not gambling devices) and therefore the seized property is not contraband. *See* Petition for Return of Property, No. 2022-CV-6333 (attached hereto as Exhibit "D").

70. On September 8, 2022, the Commonwealth (represented by the Pennsylvania Office of Attorney General) filed an Answer containing a Forfeiture Petition. *See* Answer with New Matter (Forfeiture Petition) (attached hereto as Exhibit "E").

71. The Dauphin County Court of Common Pleas began an evidentiary hearing on the petition for return of property on September 30, 2022.

72. Following the testimony of a Commonwealth lay witness, the hearing was adjourned and scheduled to resume on November 22, 2022, for the presentation of expert testimony from petitioners and the Commonwealth.

73. On November 4, 2022, the Commonwealth submitted an expert report from BMM authored by Nikiper (the "BMM Report"), which detailed BMM's unauthorized inspection and forensic examination of the Skill Game. *See* BMM Report (attached hereto as Exhibit "F").

74. The BMM Report is based on a detailed examination of the Skill Games that the Commonwealth seized without a warrant, including extensive review and analysis into the proprietary software at the heart of the Skill Game.[4]

75. The BMM Report detailed a troubling and unauthorized inspection of the Skill Game and the proprietary, trade secret hardware and software it uses to operate.

76. The BMM Report stated that Nikiper opened doors in the cabinets of the machines in order to access the internal contents, which included a "computer motherboard," "a USB IO Board," "a USB dongle that is of custom design by Pace-O-Matic" and storage devices that were "imaged by BMM for later analysis." *Id*. at 2-3.

77. The BMM Report further revealed that:

   a. BMM attempted to read the game terminal hard drive. *Id.* at 4.

---

[4] *See* BMM Report at 2 (explaining the report is based on examination of Skill Games "that were seized," including "on-site inspection of the seized devices" and "technical analysis and review of evidence from the seized devices").

b.            BMM ascertained the boot loader in use, the operating system, and the encryption specification. *Id.*

c.            BMM reverse-engineered the software startup sequence, discovering the software decryption key location. *Id.*

d.            BMM reviewed the Dongle, its mode of communication and the microprocessor it used. *Id.* at 5.

78.    The BMM Report also suggests that BMM intended, or intends, to decrypt (i) the "custom designed" security Dongle; and (ii) the partitions so it could review the program running the gaming terminal, but was not able to do so "due to time constraints at this point." *Id.* at 4-5.

79.    If such decryption had been successful, it would have allowed BMM access to the Skill Game's program software, thereby exposing trade secrets and risking reverse engineering of the program source code.

80.    The review and inspection undertaken by BMM was undertaken without POM's or Pace-O-Matic's knowledge or consent.

81.    Given the BMM Report's detailed explanation of the inspection undertaken of the Skill Game's software and firmware, it was evident that Nikiper and BMM had accessed the trade secrets and proprietary information at the core of the Skill Game.

82.    Defendants' conduct was all the more outrageous because BMM is a member of a coalition of casino groups that specifically oppose skill games like the Skill Game.

83.    BMM also provides services to most of the major manufacturers in the gaming industry and prepares reports for these manufacturers designed for the Pennsylvania Gaming Control Board.

84.     After reviewing the BMM Report, the petitioners in the Dauphin County proceeding promptly filed a preliminary injunction petition, seeking immediate relief enjoining the Commonwealth from directing and/or permitting its experts to examine and/or inspect the Skill Game's core technology.

85.     On November 10, 2022, the Dauphin County court issued an order prohibiting the Commonwealth from further examination of the Skill Game until further order of the court. *See* 11/10/22 Dauphin County Court Order (attached hereto as Exhibit "G").

### E.  Nikiper's Testimony During the Second day of the Evidentiary Hearing in the Return of Property Proceeding

86.     On November 22, 2022, the Dauphin County Court of Common Pleas held a second day of the evidentiary hearing, during which Nikiper testified.

87.     Nikiper's testimony revealed the full extent to which he and BMM had improperly accessed POM's and Pace-O-Matic's confidential and proprietary trade secrets.

88.     Nikiper's testified that he reviewed the three Skill Games seized from Champions as well as a number of other seized Skill Games in possession of the Pennsylvania State Police (the "PSP"). *See* Transcript of November 22, 2022 Hearing ("11/22/22 Tr.") at 163:14-20; 165:4-13; 169:3-170:7 (attached hereto as Exhibit "H").

89.     Nikiper's review of these Skill Games included "a dissection of the images that I made to try and determine how the machines work at a more computer programming level." *Id.* at 148:17-149:1.

90.     Nikiper testified: "[W]e looked at what was on the actual program storage media inside the device to try and understand how the device actually works: Is there an RNG? Is there something that is – that would tell us how the device works. And we stopped shortly due to time constraints before we dig [sic] too deeply into that." *Id.* at 151:12-17.

91.    Nikiper testified that he played the various Skill games and that after playing the Skill Games, he made forensic copies of their program storage media. *Id.* 164:10-16 ("I turned the machine off, removed the program storage media and made a forensic copy of that media for later analysis back at the office."); 173:14-19 ("So after playing the different versions, it was you shut down the machine, make a forensic copy of the program storage media.").

92.    He did this because: "[W]e can make a duplicate copy of the machine's program storage media, the hard drive, and be able to take that back to our office and later analyze it over a longer course of time. Playing on the device is easy, can be done within a couple of hours. Pulling apart a device's internal program storage, that takes a lot longer of a time frame and it's easier to do from our office than it is to do in the field." *Id.* at 175:23-176:5.

93.    Nikiper also looked at the various hardware inside the machine's cabinets. *Id.* at 174:8-20.

94.    After analyzing the program storage media he had copied, it became evident to Nikiper that the software on the Skill Games is contained in an encrypted partition, and to decrypt that he would need a decryption key, so he requested—and the PSP sent him—three Dongles from Skill Games. *Id.* at 177:1-12.

95.    While waiting for these Dongles he "was able to take apart the boot instructions of the Pace-O-Matic device and was able to identify a couple of processes where it looked like it was reading from that security key and would possibly be grabbing a decryption key from that USB dongle." *Id.* at 177:13-17.

96.    Two of the Dongles Nikiper received appeared to be from the Champions seizure and were in sealed evidentiary envelopes, but the third—which apparently was not from one of

the three Skill Games seized from Champions but was from a seizure in Fayette County—was

not and the PSP told him he could "do what I needed to" with it, so he and BMM:

> Took some high resolution pictures of the board layout. There was a plastic
> enclosure on the device. I was able to open up the device and look at that board in
> a detailed fashion to understand what was on the board. It was a custom designed
> USB device with two main chips on there. There was a USB to serial chip that
> converts to a USB signal into serial communications and then a small
> microcontroller, programmable microcontroller connected to that serial line that
> would be able to talk through the serial point to something that was plugged into.

*Id.* at 177:18-178:18.

97.     Nikiper tried to make a media copy of the Dongle but was unable to do so. *Id.* at

191:2-11.

98.     Nikiper testified he did not move past the encryptions on the internal components

of the Skill Game because of "time constraints." *Id.* at 291:25-292:7.

99.     BMM and Nikiper knew, or should have known, that they were illegally accessing

POM's confidential and proprietary trade secrets.

100.    Nikiper understood that the information on the Skill Game's internal components

was sensitive. *Id.* at 291:22-24.

101.    Nevertheless, in the Dauphin County case he analyzed the Skill Game and

attempted to decrypt its key components (in an effort to access the Skill Game's source code)

knowing he and BMM did not have a non-disclosure agreement with POM. *Id.* at 296:4-19.

102.    Nikiper also admitted to leaving forensic copies of POM Game software

unattended at his home, and to carrying copies of the media with him on a portable hard drive in

a backpack. *Id.* at 292:15-18 and 293:7-22.

103.    In addition, Nikiper's testimony and report made clear that he did not even need

to access POM's trade secret information housed in the Skill Game in order to assess whether the

Skill Game is a game of skill or a game of chance. *See* BMM Report (opining based on Skill Game gameplay); 11/22/22 Tr. at 151:4-153:8 and 197:18-21 (confirming that opinion was based on examination of gameplay and did not extend to programming or other underlying components).

104.    This ability to assess the lawfulness of the game without review of the core intellectual property is consistent with similar reviews in other Common Pleas matters.

105.    For example, when certain Skill Games were examined by a different Commonwealth expert in Monroe County, he not only did not examine the trade secrets at the heart of the machine, but he expressly opined he did not need to see them at all: "Conclusions about the functionality of a computing device like the Pace-O-Matic can be drawn without examining source code." *See* Commonwealth Expert Report of Daniel Lopresti ("Lopresti Report") (attached hereto as Exhibit "I").

106.    On March 23, 2023, the Dauphin County court issued its opinion finding that "the POM Machines are not gambling devices *per se*, and Petitioners are entitled to have the POM Machines returned to them. *See In re Three Pennsylvania Skill Amusement Devices*, 2023 WL 2666472 (C.P. Dauphin Mar. 23, 2023).[5]

107.    Notably, and like the decision from Monroe County, the Dauphin County court noted the bias and impropriety of Commonwealth witnesses in their evaluation of the Skill Games – namely, that the Commonwealth witnesses wanted to "shut down the games regardless of the actual gameplay." The Court discredited the Commonwealth witnesses for that reason.

---

[5] A copy of the Court's Memorandum Opinion is attached hereto as Exhibit "A".

<u>**COUNT I -- DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836)**</u>

108.   POM incorporates paragraph 1-107 of its Complaint as if the same were set forth at length herein.

109.   POM seeks relief pursuant to the DTSA.

110.   For many years, POM and Pace-O-Matic have devoted significant time, tens of millions of dollars and resources to developing their trade secrets that are described above in Section B of the Factual Allegations (the "Trade Secrets").

111.   POM's and Pace-O-Matic's Trade Secrets are confidential and derive independent economic value from not being generally known.

112.   POM's and Pace-O-Matic's Trade Secrets Trade Secrets are not readily ascertainable by proper means by the general public or their competitors.

113.   Others, such as competitors or opponents, who cannot readily access POM's and Pace-O-Matic's Trade Secrets would obtain economic value from their use or disclosure.

114.    As described in detail above, POM and Pace-O-Matic also take reasonable measures to protect the confidentiality of their Trade Secrets, including by:  (i) limiting access to the Trade Secrets to only persons who need them to perform their job duties; (ii) subjecting any persons who have access to the Trade Secrets to strict confidentiality and non-disclosure agreements; and (iii) encrypting the Skill Game and protecting it with the proprietary Dongle.

115.   Accordingly, POM's and Pace-O-Matic's Trade Secrets constitute trade secrets within the definition set forth in the DTSA.

116.   Defendants willfully and maliciously misappropriated POM's and Pace-O-Matic's Trade Secrets because they acquired them by improper means—i.e., by intentionally accessing them without permission or authorization from POM or Pace-O-Matic and with intent

to improperly disseminate them, after the Skill Games were unlawfully seized by the Commonwealth.

117.    Defendants did not seek to obtain POM's or Pace-O-Matic's permission even though they knew from past experience that the information in the Skill Games was sensitive and confidential.

118.    Defendants willfully and maliciously misappropriated POM's and Pace-O-Matic's Trade Secrets because they used and/or disclosed them in connection with preparing and submitting the BMM Report and testifying in the Dauphin County return of property proceeding.

119.    Upon information and belief, Defendants intend to use and disclose POM's trade secrets to advance their own business interests, including by disseminating those trade secrets to the Pennsylvania casino gaming industry.

120.    Defendants' foregoing conduct constitutes a violation of DTSA.

121.    As a direct and proximate result of Defendants' conduct, POM will suffer economic harm, as well as damage to its business in Pennsylvania that is immediate and irreparable.

122.    Defendants' conduct was sufficiently willful, wanton, reckless and outrageous and done with malicious intent so as to warrant the imposition of punitive damages.

WHEREFORE, POM requests that this Court enter judgment in favor of POM and against Defendants on this Count I, and award: (i) actual and compensatory damages; (ii) a preliminary and permanent injunction requiring Defendants to return and/or destroy all Trade Secrets that they misappropriated from POM; (iii) a preliminary and permanent injunction barring Defendants from continuing to misappropriate, possess and use POM's confidential and proprietary information; (iv) exemplary damages in an amount not more than two times compensatory damages; (v)

punitive damages; (vi) costs, disbursements and attorney's fees; and (vii) such other and further relief as the Court may deem just, proper and equitable.

## COUNT II -- VIOLATION OF FEDERAL COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030(a)(4) AND (a)(5))

123.    POM incorporates by reference the averments contained in paragraphs 1 through 122 of this Complaint as though set forth fully.

124.    POM seeks relief pursuant to the CFAA.

125.    POM's Skill Game that Defendants accessed unlawfully and without authorization, as described above, constitutes a "computer" within the meaning of 18 U.S.C. §1030(e)(1) because it is "an electronic … high speed data processing device performing logical, arithmetic, or storage functions …."

126.    POM's Skill Game that Defendants accessed unlawfully and without authorization, as described above, constitutes a "protected computer" within the meaning of 18 U.S.C.  §1030(e)(2)(B) because it is a computer "which is used in or affecting interstate or foreign commerce …."

127.    The Skill Game is used in and affects interstate commerce because the intellectual property that Defendants accessed in the Skill Game is owned by a company in Georgia (Pace-O-Matic), who licenses it to another company in Georgia (POM), who in turn distributes the Skill Game incorporating this intellectual property, through in-state operators, to Pennsylvania locations such as bars and restaurants, convenience stores and fraternal organizations.

128.    In addition, the intellectual property Defendants accessed in the Skill Game is used in Pace-O-Matic games in states other than Pennsylvania.

129.    Defendants have violated Section 1030(a)(4) of the CFAA, as described above, by knowingly, intentionally and with intent to defraud POM accessing the Skill Game, without

authorization, or by exceeding any authorized access, and by means of such conduct furthered the intended fraud and obtained one or more things of value, including but not limited to, POM's Trade Secrets and confidential information.

130.    Defendants have violated Sections 1030(a)(5)(B) and (C) of the CFAA by intentionally accessing the Skill Game without authorization, causing damage and loss to POM recklessly or without due regard for their action.

131.    POM has suffered damage and loss by reason of these violations—including without limitation harm to POM's data, exposure and potential loss of its Trade Secrets, physical damage to the Skill Games examined by Defendants and attorney's fees incurred in connection with costs of investigation and remediation, including having to file a request for a preliminary injunction in the Dauphin County return of property proceeding to stop Defendants' actions—in an amount to be proved at trial, but in any event, over $5000 aggregated over a one-year period.

132.    Defendants are liable to POM for damages under 18 U.S.C. §1030(g).

133.    Defendants' unlawful access to and theft from POM's Skill Game also has caused POM irreparable injury.

134.    Upon information and belief, unless restrained and enjoined, Defendants will continue to commit such acts.

135.    POM's remedy at law is not adequate to compensate it for the inflicted and threatened injuries, entitling POM to remedies including injunctive relief as provided in 28 U.S.C. §1030(g).

136.    Defendants' acts in accessing POM's computer were willful, malicious, oppressive, and in conscious disregard of POM's rights, and POM is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

WHEREFORE, POM requests that this Court enter judgment in favor of POM and against Defendants on this Count II, and (i) enjoin Defendants permanently from copying, downloading, using, selling and/or disseminating any confidential business information of POM or Trade Secrets, including without limitation the Skill Game's software encryption and security dongle software source code and operating code, and require them to destroy any copies of such confidential information in their possession; (ii) award POM damages to be proven at trial, including punitive damages on the basis of Defendants' willful and malicious conduct; and (iii) such other relief as the Court deems just and proper.

## COUNT III -- VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT (12 Pa.C.S. §§ 5301 *et seq.*)

137.    POM incorporates by reference the averments contained in paragraphs 1 through 136 of this Complaint as though set forth fully.

138.    POM seeks relief pursuant to the Pennsylvania Uniform Trade Secrets Act ("PUTSA").

139.    POM's confidential and proprietary business information includes its Trade Secrets described above.

140.    For many years, POM and Pace-O-Matic have devoted significant time, tens of millions of dollars and resources to developing their Trade Secrets.

141.    POM's and Pace-O-Matic's Trade Secrets are confidential and derive independent economic value from not being generally known.

142.    POM's and Pace-O-Matic's Trade Secrets are not readily ascertainable by proper means by the general public or their competitors.

143.    Others who cannot readily access POM's and Pace-O-Matic's Trade Secrets would obtain economic value from their use or disclosure.

144.     As described in detail above, POM and Pace-O-Matic also take reasonable measures to protect the confidentiality of their Trade Secrets, including by:  (i) limiting access to the Trade Secrets to only persons who need them to perform their job duties; (ii) subjecting any persons who have access to the Trade Secrets to strict confidentiality and non-disclosure agreements; and (iii) encrypting the Skill Game and protecting it with the proprietary Dongle.

145.     Accordingly, POM's and Pace-O-Matic's Trade Secrets constitute trade secrets within the definition set forth in the PUTSA.

146.     Defendants willfully and maliciously misappropriated POM's and Pace-O-Matic's Trade Secrets because they acquired them by improper means—i.e., by intentionally accessing them without permission or authorization from POM or Pace-O-Matic and with intent to improperly disseminate them, after the Skill Games were unlawfully seized by the Commonwealth.

147.     Defendants did not seek to obtain POM's or Pace-O-Matic's permission even though they knew from past experience that the information in the Skill Games was sensitive and confidential.

148.     Defendants willfully and maliciously misappropriated POM's and Pace-O-Matic's Trade Secrets because they used and/or disclosed them in connection with preparing and submitting the BMM Report and testifying in the Dauphin County return of property proceeding.

149.     Upon information and belief, Defendants intend to use and disclose POM's trade secrets to advance their own business interests, including by disseminating those trade secrets to the Pennsylvania casino gaming industry.

150.     Defendants' foregoing conduct constitutes a violation of PUTSA.

151.    As a direct and proximate result of Defendants' conduct, POM will suffer economic harm, as well as damage to its business in Pennsylvania that is immediate and irreparable.

152.    Defendants' conduct should be permanently enjoined in accordance with 12 Pa.C.S. § 5303.

153.    Under 12 Pa.C.S. § 5304, POM is entitled to recover its actual losses suffered as a result of Defendants' conduct, as well as damages to the extent Defendants have been unjustly enriched as a result of misappropriation of POM's Trade Secrets.

154.    Defendants' misappropriation and misuse of POM's trade secrets was willful, wanton, reckless, malicious, outrageous and in conscious disregard of POM's rights, and POM is therefore entitled to an award of punitive damages and attorneys' fees to punish their wrongful conduct and deter future wrongful conduct.

WHEREFORE, POM requests that this Court enter judgment in favor of POM and against Defendants on this Count III, and award: (i) actual and compensatory damages; (ii) a preliminary and permanent injunction requiring Defendants to return and/or destroy all Trade Secrets that they misappropriated from POM; (iii) a preliminary and permanent injunction barring Defendants from continuing to misappropriate, possess and use POM's confidential and proprietary information; (iv) exemplary damages in an amount not more than two times compensatory damages; (v) punitive damages; (vi) costs, disbursements and attorney's fees; and (vii) such other and further relief as the Court may deem just, proper and equitable.

### COUNT IV -- MISAPPROPRIATION AND MISUSE OF CONFIDENTIAL BUSINESS INFORMATION

155.    POM incorporates by reference the averments contained in paragraphs 1 through 154 of this Complaint as though set forth fully.

156.    At all relevant times, certain business information of POM, including without limitation the Dongle, Skill Game operating code and other software and source code, was kept in strictest confidence by POM.

157.    For many years, POM and Pace-O-Matic have devoted significant time, tens of millions of dollars and resources to developing this confidential business information.

158.    Defendants procured POM's confidential information by improper means; namely, by accessing the Skill Game and attempting to decrypt its software and source code without authorization.

159.    Defendants misappropriated POM's confidential business information at little or no cost.

160.    Upon information and belief, Defendants may use or disclose POM's confidential business information to advance their own business interests.

161.    As a direct and proximate result of Defendants' conduct, POM will suffer economic harm, as well as damage to its business in Pennsylvania that is immediate and irreparable.

162.    Defendants' misappropriation and misuse of POM's confidential business information was willful, wanton, reckless, malicious, outrageous and in conscious disregard of POM's rights, and POM is therefore entitled to an award of punitive damages to punish their wrongful conduct and deter future wrongful conduct.

WHEREFORE, POM requests that this Court enter judgment in favor of POM and against Defendants on this Count IV, and: (i) enjoin Defendants permanently from copying, downloading, using, selling and/or disseminating any confidential business information of POM, including without limitation the Pennsylvania Skill Games software encryption and security

23

dongle software source code, and require them to destroy any copies of such confidential

information in their possession; (ii) award POM actual and compensatory damages; (iii) award

POM punitive damages on the basis of Defendants' willful and malicious conduct; and (iii) such

other relief as the Court deems just and proper.

Respectfully submitted,

KLEINBARD LLC

*/s/ Matthew H. Haverstick*
Matthew H. Haverstick, Esq. (I.D. No. 85072)
Eric J. Schreiner, Esq. (I.D. No. 76721)
Edward T. Butkovitz, Esq. (I.D. No. 309565)
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, Pennsylvania 19103
Telephone: (215) 568-2000
mhaverstick@kleinbard.com
eschreiner@kleinbard.com
ebutkovitz@kleinbrad.com

*Attorneys for Plaintiff,*
*POM of Pennsylvania, LLC*

Dated:  April 5, 2023