# EXHIBIT A

IN RE:  THREE PENNSYLVANIA   :   IN THE COURT OF COMMON PLEAS OF
SKILL AMUSEMENT DEVICES, ONE   :   DAUPHIN COUNTY, PENNSYLVANIA
GREEN BANK BAG CONTAINING   :
$525.00 IN U.S. CURRENCY, AND   :   NO.  2022-CV-06333-MD
SEVEN RECEIPTS

## <u>MEMORANDUM OPINION</u>

    Presently pending before this Court is a Petition for Return of Property that was

filed by Capital Vending Company, Inc. ("Capital Vending") and Champions Sports Bar, LLC

("Champions") (hereinafter referred to collectively as "Petitioners").  The background of the case

is as follows:  Capital Vending is a business that supplies games and other amusement

equipment/devices to bars and restaurants in central Pennsylvania and elsewhere.  Champions is a

restaurant/bar located at 300 Second Street, Highspire, Pennsylvania.  Champions holds a

restaurant liquor license issued by the Pennsylvania Liquor Control Board.  At all times relevant

hereto, Champions had three Pennsylvania Skill Amusement Devices (hereinafter referred to

collectively as the "POM Machines") in its establishment that were supplied by Capital Vending.

    On December 9, 2019, at approximately 4:45 p.m., agents from the Pennsylvania

State Police, Bureau of Liquor Control Enforcement (BLCE), entered Champions and seized the

three POM Machines, one green bank bag containing $525.00 in U.S. currency (hereinafter "the

Cash"), and seven receipts (hereinafter "the Receipts").  BLCE seized this property based on

allegations that the POM Machines were gambling devices *per se*, and the Cash and Receipts were

derivative contraband.  No criminal charges were filed related to the seized property, but

Champions was issued an administrative citation on April 22, 2020 for permitting gambling.  This

citation is still pending.

On August 23, 2022, Petitioners filed a Petition for Return of Property pursuant to 42 Pa. C.S. §5806 and Pa. R.Crim. P. 588. In their filing, Petitioners claim that the POM Machines that were seized by BLCE are not gambling devices but are instead predominately skill games. The Petition also challenged the lawfulness of the seizure.[1] On September 8, 2022, the Commonwealth of Pennsylvania filed an answer to the Petition and included a new matter in the nature of a Petition for Forfeiture and Condemnation pursuant to 42 Pa. C.S. §5805. In its response, the Commonwealth claims that the POM Machines are games of predominant chance and are therefore subject to seizure and forfeiture as *per se* illegal gambling devices.

This Court held a hearing on the Petition for Return of Property over three days: September 30, 2022; November 22, 2022; and December 2, 2022. The Commonwealth called three witnesses: Dan Wentsler (liquor enforcement officer); Peter Nikiper (expert witness); and David Schoppe (supervisory liquor enforcement officer/expert witness). Petitioners only called Olaf Vancura as an expert witness. After the Hearing concluded, the Court invited the parties to submit proposed findings of fact and conclusions of law, which they did. This matter is now ripe for disposition.

A Petition for the Return of Property is governed by Pennsylvania Rule of Criminal Procedure which states, in relevant part:

> (A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
> (B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

---

[1] We did not hear testimony about the lawfulness of the seizure, and Petitioners did not address this issue in their Proposed Findings of Fact and Conclusions of Law. As such, we will not discuss it herein.

Pa. R.Crim. P. 588(A)(B).  Under this Rule, the moving party must first establish that it is entitled to lawful possession of the property by a preponderance of the evidence.  Commonwealth v. Trainer, 287 A.3d 960, 964 (Pa.Cmwlth. 2022) (citations omitted).  Once that is established, the burden then shifts to the Commonwealth to show, by a preponderance of the evidence, that the property is either contraband *per se* or derivative contraband and should not be returned to the moving party.  Id. (citations omitted).  Contraband *per se* is property that is unlawful to possess, and derivative contraband is property that can be lawfully possessed but is used in the perpetration of an unlawful act.  Commonwealth v. Irland, 153 A.3d 469, 473 (Pa.Cmwlth. 2017) (citations omitted).

In the instant matter, the parties stipulated that the three POM Machines are owned by Capital Vending.  The parties further stipulated that Champions owns the Cash and the Receipts and has a possessory interest in the three POM Machines pursuant to an agreement with Capital Vending.  As such, Petitioners are entitled to lawful possession of the three POM Machines, the Cash, and the Receipts unless the Commonwealth shows, by a preponderance of the evidence, that the POM Machines are contraband *per se* and the Cash and Receipts are derivative contraband.  The Commonwealth claims that the POM Machines are illegal gambling devices, and the money and receipts that were seized were derivative of the illegal gambling devices.

The Crimes Code states that it is a misdemeanor of the first degree if a person "(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards."  18 Pa. C.S.A. §5513(a)(1).  Unlawful gambling is defined as "gambling not specifically authorized by the Commonwealth."  Com. v. Betres, 237 Pa.Super. 361, 368, 352 A.2d 495, 498 (1975).  It is undisputed that the POM games

3

in the instant matter were not specifically authorized by the Commonwealth. However, the question remains as to whether these machines are gambling devices.[2]

"A machine is a gambling device *per se* if it can be used for no purpose other than gambling." Com. v. Irwin, 535 Pa. 524, 527, 636 A.2d 1106, 1107 (1993) (citations omitted). "The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward." Id. (citations omitted). Where all three of these elements are present, the machine will be considered "'so intrinsically connected with gambling' as to be a gambling device *per se*." Id. (citations omitted). The Commonwealth has the burden of showing that the machines are *per se* gambling devices. Id. (citations omitted).

In determining whether a machine is a gambling device, the court must examine the characteristics of the machine itself and whether the three elements are present. Com. v. Two Elec. Poker Game Machines, 502 Pa. 186, 194, 465 A.2d 973, 977 (1983). With respect to the element of chance versus skill, Pennsylvania courts have employed the "predominate-factor test" stating that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." Com. v. Dent, 992 A.2d 190, 193 (Pa. Super. Ct. 2010) (citations omitted). Simply because a machine involves a large element of chance, without more, is insufficient to find the machine to be a gambling device *per se*. Two Elec. Poker Game Machines, 502 Pa. 186 at 195, 465 A.2d at 977. Moreover, the outcome of a game does not need to be wholly determined by skill in order for the machine to fall out of the *per se* gambling device category. Id. Rather, courts must determine whether chance or skill predominates in any given machine.

---

[2] In its post-hearing submission, the Commonwealth argues that the POM Machines are illegal slot machines regardless of whether they are skill games or games of chance. However, this claim was not included in the Commonwealth's Answer to the Petition for Return of Property, nor was it included in the Commonwealth's Counterclaim for forfeiture of property. As such, the sole issue for this Court's consideration is whether the POM Machines are gambling devices.

In the instant matter, there is no dispute as to the actual gameplay of the POM Machines. As set forth in Petitioners' Proposed Findings of Fact in Paragraphs 14 through 26, each of the POM Machines has a single game with multiple game themes available for selection, although the gameplay is the same regardless of theme. Gameplay on each of the POM Machines commences after the player has inserted cash into the machine. The cash is converted into points with $1.00 being equal to 100 points. The player can adjust how many credits to commit to a given play, ranging from 8 credits, which is equal to $0.08 up to 400 credits, which is equal to $4.00. However, before initiating gameplay, the POM Machines allow a player to see the upcoming puzzle by pressing the "Next Puzzle" button, which allows the player the opportunity to see if the upcoming puzzle is a winning puzzle before committing any funds.

Once gameplay has commenced, the player is presented with nine symbols arranged in rows of three. The object is to match three like symbols in a row on as many pay lines as possible, arranged vertically, horizontally, and/or diagonally, similar to tic-tac-toe. Specifically, if possible, a player must turn one of the nine symbols wild by pressing it within thirty (30) seconds in order to complete three matching symbols in a row. Once the puzzle appears, one of three things can happen: 1) the puzzle can be correctly solved, resulting in an award equal to at least 105% of the points that were committed to play, known as a "win;" 2) the puzzle can be correctly solved, resulting in an award less than 105% of the points that were committed to play, known as a "hit;" or 3) the puzzle is incapable of being solved, known as a "loss."

If a player gets a hit or a loss, the player is always offered the opportunity to continue gameplay through the "Follow Me" feature of the game. The Follow Me feature does not require any additional points from the player but gives the player a chance to win back the money that they lost during the puzzle portion of the game plus an additional 5%. The Follow Me

feature requires the player to repeat a pattern of multiple, multi-colored circles in the same order in which the circles are displayed, similar to the electronic game "Simon." If the player successfully completes the pattern, the player is awarded with a total of 105% of the points committed to play depending on whether the player received a hit or a loss in the puzzle portion. In other words, if a player bets $4.00 and only wins $2.00 in the puzzle portion, that player can play the Follow Me game and, if completed successfully, get $2.20 in addition to the $2.00 that they won on the puzzle portion for a total of $4.20.

Once gameplay is complete, a player has the option of redeeming any remaining credits by pressing the Redeem button. Pressing this button will cause the POM Machine to dispense a ticket reflecting the dollar amount that is equivalent to the remaining credits. For instance, if a player has 1000 credits, pressing the Redeem button will result in the player getting a ticket for $10.00 which they can then exchange for cash. The POM Machines only award whole dollar amounts. Thus, pressing the Redeem button rounds the player's credits down to the nearest whole dollar and leaves any excess credits on the device. For instance, if a player has 1050 credits, pressing the Redeem button will result in a player getting a ticket for $10.00. The excess 50 credits (worth $0.50) then remain on the machine and may be used by that player or another player on future gameplay.

As stated above, in order for the POM Machines to be gambling devices *per se*, they must have the three elements of gambling, namely: 1) consideration; 2) chance; and 3) reward. We find that the first and third elements are present in the POM Machines. Specifically, you cannot play the POM Machines without depositing money and committing some of that money to a game. Additionally, a player has the opportunity to win more than they bet, thus obtaining a reward. However, the question remains as to whether the POM Machines in the instant matter are

predominately games of skill or are predominately games of chance. Based on the evidence that was presented at the Hearing, we find that the POM Machines at issue in this case are predominately games of skill.

All three of the Commonwealth witnesses opined that the three POM Machines were predominately games of chance. However, we do not find these opinions to be persuasive for a number of reasons. Initially, it is this Court's belief that the Commonwealth's investigation shows case bias. The Commonwealth is seeking to make all machines like the POM Machines into illegal gambling devices, and their whole approach and intent is to shut down the games regardless of the actual gameplay. The fact that Officer Wentsler never played the Follow Me feature while undercover is indicative of this. Thus, the Commonwealth as a whole is biased against the games, and their approach lacks case credibility.

Additionally, Officer Wentsler also showed case bias. He testified that he has conducted hundreds of investigations into these types of devices, and it is his opinion that every single machine that he investigated was a game of chance. This is not credible and shows that Officer Wentsler is biased towards finding that these machines are illegal gambling devices. It also shows that he was not objective in his investigation of the subject POM Machines. As such, we did not find his opinion persuasive.

We did find the opinion of Petitioners' expert, Olaf Vancura, to be persuasive. Dr. Olaf has worked as a consultant, author, and inventor in the gaming industry since 1995. He testified that a skillful player that plays the POM Machines can win, which is defined as making a net profit, on each and every play of the game. Furthermore, he opined that there is no feature or functionality of the game that could prevent a skillful and patient player from achieving that result in every single play. This opinion was rendered with 100% mathematical certainty.

Most importantly to our decision, all of the witnesses who testified, including the Commonwealth's expert witness, agreed that a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature. The puzzle portion of the game is predominately reliant on chance. Although a player has the opportunity to interact with the game to place a wild symbol, there is nothing that a player can do to ensure that the reels show a puzzle that can be correctly solved. However, it cannot be disputed that the Follow Me feature can only be completed by a skillful player, and it does not depend at all on chance. Additionally, the Follow Me feature shows up every time a player wins less than 105% of the amount played. This eliminates the element of chance that is present in the puzzle portion by giving a player the opportunity to win back the money that they lost by utilizing skill.

The Commonwealth argues that this Court should not look at the machines as a whole but should instead consider how players actually utilize the machines. The Commonwealth directs this Court's attention to the case of Commonwealth v. Lund, 15 A.2d 839 (Pa. Super. 1940) as supporting this argument.

In Lund, a theater operator held a "bank night" at his two theaters wherein the theater operator would maintain a register with a list of the names of those persons who would like to win a cash prize with a corresponding number next to their names. Id. at 841. It did not cost anything to have your name placed on this register. Id. The theater then held a drawing where a number was picked out of a hopper. Id. If the person whose number was chosen was present at the theater at the time of the drawing, that person would win a cash prize. Id. If that person was not present at either theater, then no winner was chosen, and the cash prize would roll over into the next week. Id. People could also purchase proxy cards in the afternoon of the day of the drawing and could win the cash by proxy even if they were not present at the theater when their

number was chosen.  Id. at 842.  The theater owner and managers occasionally gave out free proxy

cards to people, but they did not advertise this feature.  Id.

      The question that the Superior Court had to answer was whether the element of

consideration was present for these so-called bank nights.[3]  Id. at 843.  In reviewing this question,

the Court stated:

> The primary question in these "bank night" cases is not whether any
> individual attending a theatre on "bank night," paying for admission, or
> admitted free, present in person or by proxy, is acting in concert with the
> owner in operating a lottery, but rather whether the owner is maintaining
> and operating a lottery.  This is to be determined by the character and
> practical operation of the scheme as a whole, and not by rare instances of
> departure from the general scheme and practice.  The general character of
> the system is not to be determined by splitting it up into individual contracts
> between the theater owner and his patrons.  This theory applied in the cases
> hereinbefore considered is a misleading one, since it diverts attention from
> the general public effect of the practice which is the evil the law seeks to
> prevent.  It is an impractical one in that it would render extremely difficult,
> if not impossible, the control of the practice, though manifestly a public
> nuisance in its operation and effect, by permitting a few exceptional
> instances of free admissions and free chances to afford immunity to the
> whole.

Id. at 845.  The Court thus determined that the element of consideration was present, and that the

theater owner was operating an illegal lottery.  Id. at 850.

      We find that Lund is inapposite to the instant matter.  In Lund, the owner of the

theater was the one who was attempting to legitimize his "bank night" by giving away free tickets

and attempting to remove the necessary element of consideration.  However, in the instant matter,

neither Petitioner has any control over how a player utilizes a subject machine.  To hold that a

machine is either an illegal gambling machine when a player chooses not to engage with the Follow

Me feature or is a skill game when a player plays the Follow Me feature is untenable.  For instance,

if a player plays the Follow Me feature once, does that make the entire machine a skill game for

---

[3] The elements of chance and reward were conceded by the parties.  Id.

that player? Or does it require the player to play Follow Me on every occasion? If the player starts playing Follow Me and then stops playing it, does it go from a game of skill to a game of chance while that same player is playing? The questions that would need to be asked to determine how the game is played by various players are endless. Furthermore, Petitioners do not have any control over how a given player plays the game. Rather, the chance is with the player rather than with the machine. For this reason, we specifically find that the question of whether these machines are games of skill or games of chance depends solely on the machines themselves and not on how a player plays them.

Even if we were to find Lund persuasive, the Commonwealth did not provide sufficient evidence to support a finding that the majority of players do not play the Follow Me feature. Officer Schoppe testified that there are approximately 10,000 of these types of machines in Pennsylvania. He observed approximately 100 people playing the subject POM Machines. Although we believe that Officer Schoppe did not observe any of those players playing the Follow Me Feature, we find that this is too small a sample size to make any determination as to how the average player plays these machines. As such, we find that the POM Machines are not gambling devices *per se*, and Petitioners are entitled to have the POM Machines returned to them. Additionally, since the Cash and Receipts are derivative of the legal POM Machines, they should also be returned to Petitioners.

For these reasons, we hereby enter the following Order:

Copies Distributed
Date 3-23-23
Initials

| IN RE: THREE PENNSYLVANIA | : | IN THE COURT OF COMMON PLEAS OF |
|---|---|---|
| SKILL AMUSEMENT DEVICES, ONE | : | DAUPHIN COUNTY, PENNSYLVANIA |
| GREEN BANK BAG CONTAINING | : | |
| $525.00 IN U.S. CURRENCY, AND | : | NO.  2022-CV-06333-MD |
| SEVEN RECEIPTS | : | |

## ORDER

**AND NOW**, this 23RD day of _March_, 2023, upon consideration of the

Petition for Return of Property that was filed by Petitioners Capital Vending Company, Inc. and

Champions Sports Bar, LLC, and any responses thereto, and having held a Hearing on September

30, 2022, November 22, 2022, and December 2, 2022, it is hereby ORDERED as follows:

For the reasons set forth in the attached Memorandum Opinion, it is hereby

ORDERED and DECREED that the Petition for Return of Property is GRANTED.  It is further

ORDERED that, within five (5) days of the date of this Order, the Pennsylvania State Police,

Bureau of Liquor Control Enforcement shall return to Champions Sports Bar, LLC the following:

1) three Pennsylvania Skill Amusement Devices, 2) one green bag containing $525.00 in U.S.

Currency, and 3) seven receipts in the condition in which they were seized.

BY THE COURT:

_____
Andrew H. Dowling, Judge

Distribution:
The Honorable Andrew H. Dowling
Christopher D. Carusone, Esquire, COHEN SEGLIAS PALLAS GREENHALL & FURMAN,
   P.C., 525 William Penn Place, Suite 3005, Pittsburgh, PA  15217
Matthew H. Haverstick, Esquire & Edward T. Butkovitz, Esquire, KLEINBARD, LLC, Three
   LoganSquare, 5th Floor, 1717 Arch Street, Philadelphia, PA  19103
Andrew J. Jarbola, IV, Esquire, OFFICE OF ATTORNEY GENERAL, 6400 Flank Drive, Suite
   1300, Harrisburg, PA  17112

# EXHIBIT B

Monroe County Prothonotary Filed February 08, 2023 1:23 PM

**IN THE COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: FOUR PENNSYLVANIA SKILL AMUSEMENT DEVICES AND ONE TICKET REDEMPTION TERMINAL CONTAINING $18,692.00 IN U.S. CURRENCY** | : : : : : : | **No. 6673 Civil 2021** |

## ORDER

     **AND NOW**, this 8th day of February, 2023, after hearing on L&M Music Company, Inc. and Smokin' Joe's Tobacco Shop, Inc.'s (Petitioners) Joint Omnibus Petition to Return Seized Property and to Suppress Evidence, it is **ORDERED** as follows:

     1.     Petitioners' Petition to Suppress Evidence is **GRANTED**. The court finds that the Commonwealth improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.

     2.     Petitioners' Petition to Return Seized Property is **GRANTED**. The court finds that the devices at issue are legal games of skill, and that the Commonwealth has failed to establish that the devices, as designed, are games of chance.

1

3.      The Commonwealth shall, within 48 hours of the issuance of this
Order, **RETURN** the seized Skill Games and TRT to Petitioners.  Petitioners shall retain
the monies previously returned to them pursuant to prior order of court.

**BY THE COURT:**

**JENNIFER HARLACHER SIBUM, J.**

cc:   District Attorney
       George Westervelt, Esq.
       Matthew Haverstick, Esq.
       Edward Butkovitz, Esq.
       Marc Lovecchio, Esq.
       James Gorman, III, Esq.
       Court Administration

2

# EXHIBIT C

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

|   |   |   |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| PACE-O-MATIC, INC. EQUIPMENT | : | M.D. 965-2013 |
| | : | |
| | : | |
| TERMINAL I.D. NO. 142613 | : | |

## MEMORANDUM OPINION AND ORDER

H. KNAFELC, J.                                            December 23rd, 2014

### I.     PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control

Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club

located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for

Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of

Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The

sole purpose of that hearing was to gather evidence as to whether the confiscated property

constituted a gambling device per se. The evidence fails to demonstrate that the machine is a

gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device.

The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful

possession of the res; and second, whether the games installed on the device were games of

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.    STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

If, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

## III.    LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

### Rule 588. Motion for Return of Property

(A)    A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)    The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill—will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

involves a substantial element of chance is insufficient to find that a machine a gambling device.
*Ibid.*

A game decided predominately on the basis of probability rather than any real input of
skill from a player will be a game of chance. The level of interactivity and the consequences of a
player's choices in playing the game are relevant in determining whether the game is one of
chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities,
can improve a player's chances of winning a video poker game, chance ultimately determines the
outcome because chance determines the card dealt and the cards from which one can draw);
*compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can
determine the outcome in a poker game, players are still subject to defeat at the turn of the
cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011)
(noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and
not the machine, the game was one of skill rather than chance).

### A.    Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to
lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v.
Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device
at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc.
The fact that Petitioner has manufactured, designed, and provided the source code for the
machine makes it more likely than not that Petitioner is entitled to lawful possession of the video
game machine at issue.

**B.    Gambling Device Per Se**

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove

by a preponderance of the evidence that the video game machine seized is contraband. *Com. v.*

*Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video

game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the

machine must be so intrinsically connected with gambling as to constitute a gambling device per

se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result

determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have

stipulated that, because a player must insert money to begin play and is enticed to play by the

promise of a payout, the first element, consideration, and the third element, reward, are met. The

only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is

therefore the task of this Court to determine, on balance, whether skill or chance is the dominant

factor in successful play. The operation of the machine and the way a player interacts with the

machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-

Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The

extent to which chance and skill decide the outcome of each game must be evaluated.

**1.    Tic-Tac-Toe Puzzle**

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-

Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot

is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees

with the Commonwealth's position. Although there often is, as the Commonwealth points out, an

"obvious" position where placement of the wild would generate a nonzero score, several puzzles

have a position where placement of the wild will lead to a more advantageous score. It takes skill

for a player to recognize both which symbols are most advantageous to his or her payout and

which position will maximize the player's score. A player who lacks the skill to recognize that

the placement of a wild symbol in a particular position will lead to the completion of two or three

rows, columns, or diagonals will not achieve as high a score as one who does recognize those

patterns. Were the game one predominantly based on chance, one would reasonably expect that a

skilled player and an unskilled player would stand to gain roughly the same score. However, a

more skilled player is much more likely to achieve a greater score than an unskilled player,

which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random

number generator to generate the puzzle itself. However, the fact that a machine utilizes a

random generator, without more, is insufficient to push this game into the realm of chance. The

function of the random number generator is not to determine whether player wins or loses, but

merely to determine which puzzle within a finite pool of puzzles will be presented to the player.

The random number generator simply constructs the field on which the player will be playing. It

establishes the constraints in which the player must operate to receive the most points possible.

Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to

the player has the possibility of a win, and the player will not be presented with a puzzle that is

already solved. Thus, the purpose of the random number generator is only to choose, at random,

which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of

the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding

that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*,

465 A.2d 973, 977 (Pa. 1983).

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

### 2.   Bonus Game

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.    "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.    CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

Page 11 of 13

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                          :
                                                :
                                                :
PACE-O-MATIC, INC. EQUIPMENT          :        M.D. 965-2013
                                                :
                                                :
TERMINAL I.D. NO. 142613              :

**ORDER**

AND NOW, this _23rd_ of _December_ , 20_14_, it is hereby

ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to

Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED

to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

BY THE COURT

_____ J.

BY THE COURT

2014 DEC 23  A 9: 58

HARRY E. KNAFELC

Page 13 of 13

# EXHIBIT D

**IN THE COURT OF COMMON PLEAS**
**DAUPHIN COUNTY, PENNSYLVANIA**

IN RE:  THREE PENNSYLVANIA SKILL :  No. 2022-CV6333 MD
AMUSEMENT DEVICES, ONE GREEN :
BANK BAG CONTAINING $525.00 IN U.S. :
CURRENCY, AND SEVEN RECEIPTS :

## ORDER

  **AND NOW**, this _____ day of _____, 2022, upon consideration of Petitioners

Capital Vending Company, Inc. and Champions Sports Bar, LLC's Motion for Return of Property,

and any response thereto, it is hereby **ORDERED** and **DECREED** that said Motion is

**GRANTED**.

  It is further **ORDERED** that, within five (5) days of this Order, the Pennsylvania State

Police, Bureau of Liquor Control Enforcement shall return to the Champions Sports Bar, LLC

three Pennsylvania Skill Amusement Devices, one green bank bag containing $525.00 in U.S.

Currency, and seven receipts in the condition in which they were seized.


       BY THE COURT:


       _____

              , J.

**IN THE COURT OF COMMON PLEAS**
**DAUPHIN COUNTY, PENNSYLVANIA**

IN RE:  THREE PENNSYLVANIA SKILL     :     No. 2002·CV6333·MD
AMUSEMENT DEVICES, ONE GREEN         :
BANK BAG CONTAINING $525.00 IN U.S.  :
CURRENCY, AND SEVEN RECEIPTS         :

## MOTION FOR RETURN OF PROPERTY

Petitioners Capital Vending Company, Inc. and Champions Sports Bar, LLC, by and through their undersigned counsel, respectfully submit this motion for return of property pursuant to 42 Pa.C.S. § 5806 and Pa.R.Crim.P. 588.

### Background

1.     Petitioner Capital Vending Company, Inc. ("Capital Vending"), located at 807 South 27th Street, Harrisburg, Pennsylvania, is a business that supplies games and other amusement equipment/devices to restaurants and bars in central Pennsylvania and beyond.  The President of Capital Vending is Joseph Calla.

2.     Petitioner Champions Sports Bar, LLC ("Champions"), is a restaurant/bar located at 300 Second Street, Highspire, Pennsylvania.  Champions is the holder of a restaurant liquor license issued by the Pennsylvania Liquor Control Board (License No. R-15981).  It is owned by Tyler Schmidt.

3.     On December 9, 2019, at approximately 4:45 p.m., agents from the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), seized three Pennsylvania Skill Amusement Devices ("Pennsylvania Skill Games"), one green bank bag containing $525.00 in U.S. currency, and seven receipts from Champions located in Dauphin County, Pennsylvania.  See Exhibit A.

1

4.     BLCE seized this property pursuant to 42 Pa.C.S. Ch. 58 based upon its belief that the machines were gambling devices, and that the U.S. currency and receipts were derivative contraband from those machines. 18 Pa.C.S. § 5513; 42 Pa.C.S. § 5803(a)(7).

5.     BLCE seized the property without a warrant.

6.     The Commonwealth has not filed a forfeiture petition.

7.     No criminal charges were filed as a result of the seizure.

8.     The location of the seized property is believed to be in Dauphin County.

9.     Capital Vending is the lawful owner of the seized property.

10.    Champions has a possessory interest in the seized property through its business arrangement with Capital Vending.

11.    Both Capital Vending and Champions have been aggrieved by the seizure of the property and seek its return.

12.    As explained below, petitioners seek return of the seized property on the grounds that the seizure did not satisfy the requirements of 42 Pa.C.S. § 5803(b), and that the machines are games of skill (not gambling devices) and therefore the seized property is not contraband.

### Legal Standard

13.    The Pennsylvania Skill Games, U.S. currency, and receipts should be returned pursuant to Pennsylvania Rule of Criminal Procedure 588.  Rule 588 provides, in relevant part:

> (A)  A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
>
> (B)  The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines

2

> that such property is contraband, in which case the court may order
> the property to be forfeited.

Pa.R.Crim.P. 588; *see also* 42 Pa.C.S. § 5806.

14.     Rule 588 establishes a burden-shifting model. Initially, the movant must establish that it is "entitled to lawful possession of the property at issue," which is accomplished by showing ownership of the property or a right to possess the property. *See Com. v. Morelli*, 55 A.3d 177, 180 (Pa. Cmwlth. 2012); *see also Com. v. Younge*, 667 A.2d 739, 746 (Pa. Super. 1995).

15.     This burden may be satisfied by the movant alleging under oath that it is entitled to lawful possession of the property. *See Com. v. Howard*, 931 A.2d 129, 131-32 (Pa. Cmwlth. 2007).

16.     Once lawful possession is established, the Commonwealth bears the burden to prove the property is contraband. Absent a judicial determination that the property seized is contraband, it must be returned to the lawful owners. *See Younge*, 667 A.2d at 747-48.  If the Commonwealth fails to meet this burden, the property must be returned to the movant.  *See id.*

17.     The Skill Games in the possession of the Commonwealth are legal games of skill, not illegal gambling devices.  Consequently, they are not contraband and must be returned.

18.     Capital Vending is lawfully entitled to the return of the seized property because it has an ownership interest.  *See In re Firearms, Eleven*, 922 A.2d 906, 912 (Pa.Super. 2007).

19.     Champions is lawfully entitled to the return of the seized property because it has a possessory interest pursuant to its agreement with Capital Vending and lawfully possessed the property at the time it was seized.  *See Commonwealth v. Personal Property of Abendroth*, 929 A.2d 690, 694 (Pa.Super. 2007) (holding "lawful possession" element may be satisfied by evidence of "some possessory interest recognized by law.").

20.     Since the seized property is not contraband, the Commonwealth cannot meet its burden and the Pennsylvania Skill Games, U.S. currency, and receipts must be returned.

3

## Pennsylvania Skill Games

21.     Pennsylvania Skill Games are programmed using software that is licensed and distributed by POM of Pennsylvania, LLC ("POM").

22.     Pennsylvania Skill Games offer the skillful player the ability to win, on every play, at least 105% of the player's consideration.

23.     Pennsylvania Skill Games have a preview feature, which allows the player (before committing any funds/points for game play) to see the upcoming tic-tac-toe puzzle and decide whether to commit any funds/points to play.

24.     Game play on the Pennsylvania Skill Games commences after the player has inserted cash into the machine—which are then converted into points—and the resulting points have been committed to play a puzzle game resembling a tic-tac-toe board.

25.     One of three things can happen once the player is presented with the tic-tac-toe style puzzle: a) the puzzle can be correctly solved, resulting in an award equal to at least 105% of the points that were committed to play; b) the puzzle can be correctly solved, resulting in an award equal to less than 105% of the points that were committed to play; or c) the puzzle is incapable of being solved.

26.     In the latter two scenarios, the player is always offered the opportunity to continue game play through the "Follow Me" stage of the game, which requires no additional points from the player.  This stage requires the player to repeat a pattern of multiple, multi-colored circles in the same order in which the circles are displayed.

27.     If the player successfully completes the pattern, the player is awarded 105% of the points committed to play.

28.    Therefore, on every play of the Pennsylvania Skill Game, the skillful player can win more points than were committed to play.

## Improper Seizure

29.    Property subject to forfeiture may be seized by law enforcement pursuant to Section 5803(b) under six specific circumstances:

> (1) The seizure is incident to an arrest or a search under a search warrant or inspection under an administrative inspection warrant and there is reason to believe the property is subject to forfeiture.
> (2) The property subject to seizure has been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter.
> (3) There is probable cause to believe that the property is dangerous to health and safety and exigencies are likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture.
> (4) There is probable cause to believe that the property has been used or is intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction.
> (5) There is a warrant issued by a court of common pleas with appropriate jurisdiction.
> (6) There is probable cause to believe that the property is subject to forfeiture and exigencies are likely to result in the destruction or removal of the property.

42 Pa.C.S. § 5803(b).[1]

30.    The seizure of petitioners' property was not justified under subsection (a)(1).  The seizure was not incident to an arrest because no one has been arrested.  Moreover, the seizure was not pursuant to a "search under a search warrant or inspection under an administrative inspection warrant."  Finally, there is no reason to believe that the property seized is subject to forfeiture, because courts of coordinate jurisdiction have held such machines to be lawful.  See infra.

---

[1] 42 Pa.C.S. Ch. 58 was enacted by Act 13 of 2017 and became effective on July 1, 2017.  This Act was intended to reform asset forfeitures in light of reported abuses by law enforcement agencies, and abrogates prior common law. See https://www.governor.pa.gov/newsroom/governor-wolf-signs-civil-asset-forfeiture-reform-bill-into-law/.

31.     The seizure of petitioners' property was not justified under subsection (a)(2).  The property seized has not been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter.  To the contrary.  See infra.

32.     The seizure of petitioners' property was not justified under subsection (a)(3). There was no probable cause to believe that the property is "dangerous to health and safety" or that exigencies existed at the time of the seizure that made it "likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture."

33.     The seizure of petitioners' property was not justified under subsection (a)(4). There was no probable cause to believe that the property seized from petitioners was being "used or [was] intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction."

34.     The seizure of petitioners' property was not justified under subsection (a)(5) because no warrant has ever been issued by a court of common pleas with appropriate jurisdiction.

35.     The seizure of petitioners' property was not justified under subsection (a)(6). There was no probable cause to believe that the property was subject to forfeiture because courts of coordinate jurisdiction have held such machines to be lawful.  See infra.  Moreover, no exigencies existed that were "likely to result in the destruction or removal of the property."

36.     Therefore, the motion for return of property should be granted because BLCE's seizure of the machines in question was unlawful under 42 Pa.C.S. § 5803.

## The Seized Pennsylvania Skill Game Machines Are Not Contraband

37.     "The proper inquiry is whether the machine is so intrinsically connected with gambling as to constitute a gambling device *per se*." *Commonwealth v. Irwin*, 636 A.2d 1106, 1107 (Pa.Super. 1993) (internal citation omitted).  See also 18 Pa.C.S. § 5513.

38.     "A machine is a gambling device *per se* if it can be used for no purpose other than gambling." *Id*. at 1107.

39.     A determination of whether a machine is a gambling device *per se* is made by comparing the characteristics of the machine against the elements necessary to gambling, namely: (a) consideration; (b) result determined by chance rather than skill; and (c) reward. *Commonwealth v. Wintel, Inc.*, 829 A.2d 753, 757-758 (Pa.Super. 2003) (citing *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973, 977 (Pa. 1983)).

40.     In determining whether a game is one of chance or skill, a court must evaluate the relative amounts of skill and chance present in the play of the machine and the extent to which skill or chance determines the outcome. *Two Electronic Poker Game Machines*, 465 A.2d at 977-978. In order for a game to constitute gambling, it must a game where chance predominates rather than skill. *Id*. A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Id*. The mere fact that a machine involves a substantial element of chance is insufficient to find that a machine is a gambling device. *Id*.

41.     The Pennsylvania Skill Game machines seized by BLCE are games of skill.  As explained above, on every play of the Pennsylvania Skill Game, the skillful player can win more points than were committed to play.  There is nothing the Pennsylvania Skill Game can do (or does) to prevent a skillful player from winning.

7

42.    Pennsylvania Skill Games have been determined by the Beaver County Court of Common Pleas to be games of skill.  See Exhibit B (*In re: Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613*, No. M.D. 965-2013 (Beaver County C.C.P. December 23, 2014).

43.    The Clearfield County Court of Common Pleas issued Stipulated Orders – agreed to by the Pennsylvania Office of Attorney General – permitting the return of Pennsylvania Skill Games to the establishment from which they were seized.  See Exhibit C.

44.    The district attorneys of Centre and Lawrence counties have also concluded that Pennsylvania Skill Games are games of skill, not games of chance.  See Exhibit D.

45.    Moreover, the Commonwealth Court of Pennsylvania has ruled that Pennsylvania Skill Games are not "slot machines" under the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. § 1103.  See Exhibit E.

46.    No court in Pennsylvania has ever held that Pennsylvania Skill Games are games of chance.

47.    Accordingly, petitioners are entitled to possession of the Pennsylvania Skill Games.

**The Seized Currency/Receipts Are Not Derivative Contraband**

48.    "Contraband *per se* is property the mere possession of which is unlawful." *Commonwealth v. Howard*, 713 A.2d 89, 92 (Pa. 1998).  Derivative contraband is property innocent by itself, but used in the perpetration of an unlawful act." *Id.*

49.    "Property is not derivative contraband merely because it is owned or used by someone who has been engaged in criminal conduct. Rather, the Commonwealth must establish a specific nexus between the property and the alleged criminal activity." *Id.*

50.    "[S]tatutory authorization is required for the civil forfeiture of derivative contraband." *Commonwealth v. Irland*, 193 A.3d 370, 379 (Pa. 2018).

8

51.     The green bank bag containing $525.00 in U.S. Currency and seven receipts that were seized are not contraband *per se* because they are innocent by themselves.

52.     The green bank bag containing $525.00 in U.S. Currency and seven receipts that were seized are not derivative contraband because the Pennsylvania Skill Games to which they relate are legal games of skill, not illegal games of chance.

53.     Accordingly, petitioners are also entitled to possession of the one green bag containing $525.00 in U.S. currency and seven receipts seized by the Commonwealth.

WHEREFORE, petitioners respectfully request that this Court grant their motion for return of property and issue an Order requiring the Commonwealth to return all of the property seized, along with any other relief the court deems appropriate and just.

**Respectfully Submitted:**

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

*Christopher Carusone*

Christopher D. Carusone (I.D. No. 71160)
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219
(412) 434-5530
ccarusone@cohenseglias.com
*Counsel for Petitioner Champions Sports Bar, LLC*

**KLEINBARD LLC**

Matthew H. Haverstick, Esq. (I.D. No. 85072)
Edward T. Butkovitz, Esq. (I.D. No. 309565)
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-2000
mhaverstick@kleinbard.com
ebutkovitz@kleinbrad.com
*Counsel for Petitioner Capital Vending Company, Inc.*

**Date:  August 10, 2022**

## VERIFICATION

I, Joseph Calla, President of Capital Vending Company, Inc., verify that the statements contained in this motion are true and correct to the best of my knowledge, information, or belief. I understand that false statements are subject to the penalties set forth in 18 Pa.C.S. § 4902 (relating to perjury) and/or 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

Joseph Calla

Date: 8/4/22

## **VERIFICATION**

I, Tyler Schmidt, owner of Champions Sports Bar, LLC, verify that the statements contained in this motion are true and correct to the best of my knowledge, information, or belief. I understand that false statements are subject to the penalties set forth in 18 Pa.C.S. § 4902 (relating to perjury) and/or 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

Tyler Schmidt

Date: 8/2/22

.P 3-444 (7-2017)

PENNSYLVANIA STATE POLICE
**RECEIPT FOR PROPERTY SEIZED**
**PURSUANT TO § 5803 42 PA.C.S.A.**

The following property was taken/seized by Pennsylvania State Police pursuant to the
Forfeiture of Assets Act, 42 Pa.C.S.A § 5803. You are hereby notified that you have a
right to seek the return of the seized property under 42 Pa.C.S.A. § 5806.

CAD/Case No.: 2019-1273314       Property Inventory No.: _____

Investigating Member Name/Badge No.: DEUTER

Member who Seized Property Name/Badge No.: WILLIAMS #9459

Date/Time Seized: TUE 9/14/21       11:05 am

Property Taken/Seized From:       Print Name: Alexa Smith
Colony Park Lounge Inc       Signature: Alexa Smith
Brenn's Pub

The following items have been seized:

1. Pennsylvania Skill VGD labeled #1
2. Pennsylvania Skill VGD labeled #2
3. Pennsylvania Skill VGD labeled #3
4. Pennsylvania Skill VGD labeled #4
5. Pennsylvania Skill VGD labeled #5
6. Pennsylvania Skill VGD labeled #6
7. Pennsylvania Skill Redemption Center labeled #7
8. _____
9. _____
10. _____
11. _____
12. _____
13. _____
14. _____
15. _____

**EXHIBIT**
A

(Must be completed in du_____y to the report.)

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                                :
                                                      :
                                                      :
PACE-O-MATIC, INC. EQUIPMENT          :        M.D.965-2013
                                                      :
                                                      :
TERMINAL I.D. NO. 142613                 :
                                                      :

### MEMORANDUM OPINION AND ORDER

H.KNAFELC,J.                                              December 23, 2014

#### I.      PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control

Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club

located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for

Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of

Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The

Sole purpose of that hearing was to gather evidence as to whether the confiscated property

Constituted a gambling device per se. The evidence fails to demonstrate that the machine is a

gambling device per se, and Petitioner's motion for its return GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device.

The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful

Possession of the res; and second, whether the games installed on the device were games of



chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-Omatic, Inc.

## II.    STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshell," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than other depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely winnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

If during the tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If the player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

### III.   LEGAL BACKGROUND AN ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 5888; *Com. V. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)   A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)   The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner Is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole,* 986 A.2d 876, 881 (Pa. Super Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin,* 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is a countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin,* 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill—will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a Finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.,* 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* At 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chance of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which they can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb.2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.  Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

### B.  Gambling Device Per Se

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This Intrinsic connection is met where three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the game at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. A noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game, The extent to which chance and skill decide the outcome of each game must be evaluated.

### 1.  Tic-Tac-Toe Puzzle

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A Player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether the player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983).

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominately a game of chance. *Com. v. Dent,* 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold "Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold Em'. *See Ibid: see also Am. Amusements. Co. V. Neb. Dep't of Revenue,* 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominately a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines.* There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines,* whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominately by skill rather than chance.

### 2.  Bonus Game

This shooting-style game is predominately a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3. "Follow-Me" Mini-Game

Successful play of the "Follow-Me" feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me features successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV. CONCLUSION

Each of the three games installed on the confiscated machine is predominately a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                    :
                                          :
PACE-O-MATIC, INC. EQUIPMENT              :        M.D. 965-2013
                                          :
TERMINAL I.D. NO. 142613                  :

### ORDER

AND NOW, this _23rd_ of _December_____, 20_14_, it is hereby

ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to

Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED

to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

· BY THE COURT

_____ J.

BY THE COURT

2014 DEC 23   A 9 58

HARRY E. KNAFELC
JUDGE

Page 13 of 13

I hereby certify this to be a true
and attested copy of the original
statement filed in this case.

IN RE:  EIGHT PENNSYLVANIA SKILL :    COURT OF COMMON PLEAS
AMUSEMENT DEVICES, ONE TICKET :    CLEARFIELD COUNTY   MAY 27 2022
REDEMPTION CENTER, ONE :
REDEMPTION TICKET :
:    No. 2022-258-CD   **A TRUE COPY**
:              **ATTEST:** _____
:                      PROTHONOTARY CLER

## STIPULATED ORDER

AND NOW, this ____27ᵀʰ____ day of May, 2022, Motions to Return Property and

Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of

an agreement between the parties,

1. While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return

   all seized property to Petitioner.

2. Said property still in possession of the Commonwealth shall be returned forthwith.

Respectfully submitted,

_____         _____
Andrew J. Jarbola, IV (No. 314659)     Steven P. Trialonas (No. 310159)
Deputy Attorney General            The Mazza Law Group, P.C.
Office of Attorney General          2790 West College Avenue
2515 Green Tech Drive             Suite 800
State College, PA 16803           State College, PA 16801
(814) 863-6503                  (814) 237-6255
*Counsel for Comm. of Pennsylvania*    *Counsel for The After Dark Bar*

SO APPROVED AND ORDERED this ___27___ day of ___May___, 2022.

_____
P. J.



I hereby certify this to be a **true** and attested copy of the original statement filed in this case.

|   |   |   |
|---|---|---|
| IN RE: FIVE PENNSYLVANIA SKILL AMUSEMENT DEVICES, D-LINK ROUTER BOX, NETGEAR ROUTER BOX, THIRTY WEEKLY ACCOUNTING DOCUMENTS, AND $5,000 IN U.S. CURRENCY | : : : : : : | COURT OF COMMON PLEAS CLEARFIELD COUNTY |

MAY 27 2022

**A TRUE COPY**
**ATTEST:** _____

No. 2022-259-CD          PROTHONOTARY/CLERK

## STIPULATED ORDER

**AND NOW**, this ___27___ day of May, 2022, Motions to Return Property and Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of an agreement between the parties,

1. While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return all seized property to Petitioner.

2. Said property, five (5) Pennsylvania Skill Amusement Devices, D-Link router box, Netgear router box, and thirty (30) weekly accounting documents, still in possession of the Commonwealth shall be returned forthwith.

Respectfully submitted,

_____          _____
Andrew J. Jarbola, IV (No. 314659)        Steven P. Trialonas (No. 310159)
Deputy Attorney General              The Mazza Law Group, P.C.
Office of Attorney General            2790 West College Avenue
2515 Green Tech Drive               Suite 800
State College, PA 16803             State College, PA 16801
(814) 863-6503                   (814) 237-6255
*Counsel for Comm. of Pennsylvania*      *Counsel for The After Dark Bar*


**SO APPROVED AND ORDERED** this ___27___ day of ___May___, 2022

_____
P. J.

IN RE: FIVE PENNSYLVANIA SKILL    :   COURT OF COMMON PLEAS
AMUSEMENT DEVICES    :   CLEARFIELD COUNTY

    :
    :
    :   No. 2022-260-CD

*I hereby certify this to be a true
and attested copy of the original
filed of record in this case.*

MAY 2 7 2022

**A TRUE COPY**
**ATTEST:** _____
PROTHONOTARY-CLERK

## STIPULATED ORDER

AND NOW, this ____27th____ day of May, 2022, Motions to Return Property and

Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of

an agreement between the parties,

    1.  While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return

        the Five Pennsylvania Skill Amusement Devices to Petitioner.

    2.  Said property shall be returned forthwith.

Respectfully submitted,


_____      _____
Andrew J. Jarbola, IV (No. 314659)      Steven P. Trialonas (No. 310159)
Deputy Attorney General             The Mazza Law Group, P.C.
Office of Attorney General           2790 West College Avenue
2515 Green Tech Drive              Suite 800
State College, PA 16803           State College, PA 16801
(814) 863-6503                   (814) 237-6255
*Counsel for Comm. of Pennsylvania*    *Counsel for The After Dark Bar*


**SO APPROVED AND ORDERED** this ____27th____ day of ____May____, 2022

_____
(P. J.)

RECEIVED OCT 2 6 2021

IN RE: FOUR PENNSYLVANIA SKILL    :    COURT OF COMMON PLEAS
AMUSEMENT DEVICES AND ONE TICKET   :    CLEARFIELD COUNTY
REDEMPTION TERMINAL CONTAINING     :
$31,804.00 IN U.S. CURRENCY        :    NO. 2021-1327-CD
                                   :

## STIPULATED ORDER

**AND NOW,** this _____25th_____ day of October, 2021, it is hereby stipulated and

agreed by and between counsel for the parties to this action as follows:

1. The Commonwealth of Pennsylvania, by and through the Office of District Attorney for

   Clearfield County (the "Commonwealth") shall release the Ticket Redemption Terminal

   ("TRT"), and the $31,804.00 in U.S. currency contained therein, which were seized at

   Nittany Oil Company, Inc. ("Nittany Oil") in the condition in which they were seized.

   Nittany Oil stipulates that following the pendency of the Commonwealth Court actions

   captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of*

   *Revenue, et al.*, 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State*

   *Police, Bureau of Liquor Control Enforcement*, 503 MD 2018, and in the event of a

   subsequent holding by this Court that the TRT and currency are derivative contraband

   and subject to forfeiture, Nittany Oil shall remit $31,804.00 to the Commonwealth.

2. The Commonwealth shall release the TRT seized at Reno Dubois, 13 Brady St., Dubois,

   PA in the condition in which it was seized.

   The Commonwealth shall immediately release the TRT seized at Snappy's, 14543

   Clearfield-Shawville Highway, Clearfield, PA in the condition in which it was seized.

A TRUE COPY
ATTEST:
PROTHONOTARY-CLERK
OCT 26 2021
I hereby certify this to be a true and exact copy of the original statement filed in this case.

{02156298;v1 }

1

4. The Commonwealth shall immediately release $5000.00 in U.S. currency seized at the Loyal Order of Moose, Houtzdale Lodge No. 327, 607 Brisbane Street, Houtzdale, PA to the Loyal Order of Moose, Houtzdale Lodge No. 237.

5. The Commonwealth shall immediately release $8330.00 in U.S. currency seized at The After Dark, 309 N. Third St., Clearfield, PA to The After Dark.

6. The releases of property described in paragraphs 1-5 supra shall be accomplished within ten (10) days of the date this Stipulated Order is entered by the Court.

7. During the pendency of the Commonwealth Court actions captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of Revenue, et al.*, 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 503 MD 2018, the Commonwealth shall not move forward with the prosecution of any of the locations listed below regarding the operation of Pennsylvania Skill Amusement Devices:

|   | Search Warrant Docket No. | Location |
|---|---|---|
| a. | CP-17-MD-211-2021 | Snappy's<br>2807 Beeline Drive<br>DuBois, PA 15801 |
| b. | CP-17-MD-212-2021 | Snappy's<br>14543 Clearfield<br>Shawville Highway<br>Clearfield, PA 16830 |
| c. | CP-17-MD-213-2021 | Loyal Order of Moose<br>Houtzdale Lodge No. 327<br>607 Brisbin Street<br>Houtzdale, PA 16651 |
| d. | CP-17-MD-210-2021 | The After Dark<br>309 N. 3rd Street<br>Clearfield, PA 16830 |
| e. | CP-17-MD-207-2021 | Reno Dubois 1 LLC<br>9 Brady Street<br>DuBois, PA 15801 |
| f. | CP-17-MD-207-2021 | Reno Dubois 2 LLC |

| | | 13 Brady Street |
| | | DuBois, PA 15801 |

8. The Commonwealth shall not seize, cause to be seized, initiate or continue any prosecution, impose any penalties, or otherwise interfere with the use of any Pennsylvania Skill Amusement Devices in Clearfield County during the pendency of the Commonwealth Court actions captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of Revenue, et al.*, 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 503 MD 2018, provided a location maintaining a Pennsylvania Skill Amusement Device shall not be subject to seizure and/or penalties regarding that Device so long as it maintains five (5) or less Pennsylvania Skill Amusements Devices.

Respectfully submitted,

Ryan Sayers
Clearfield County District Attorney
230 E Market St.
Clearfield, PA 16833
(814) 765-2641
*Counsel for Commonwealth of Pennsylvania*

Matthew H. Haverstick, Esq. (I.D. No. 85072)
Edward T. Butkovitz, Esq. (I.D. No. 309565)
James G. Gorman III, Esq. (I.D. No. 328376)
**KLEINBARD LLC**
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
(215) 568-2000
mhaverstick@kleinbard.com
ebutkovitz@kleinbrad.com
jgorman@kleinbard.com
*Counsel for L. & M. Music Company, Inc.*

{02156298;v1 }

3

Steven P. Trialonas, Esq. (No. 310159)
THE MAZZA LAW GROUP, P.C.
2790 West College Avenue
Suite 800
State College, PA 16801
(814) 237-6255
trialonas@mazzalaw.com
*Counsel for Nittany Oil Company, Inc.*

SO APPROVED AND ORDERED this _____25_____ day of _____October_____, 2021

, J.

NO. 2021-1327-CD

civil docket.



**County of Centre**

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE DISTRICT ATTORNEY

**STACY PARKS MILLER**
District Attorney

Courthouse, Room 404
Bellefonte, PA 16823
Telephone (814) 355-6735

Victim/Witness (814) 548-1107
FAX (814) 355-6756
www.centreda.org

**MARK S. SMITH**
First Assistant District Attorney

December 3, 2015

Richard Campbell, Esquire
Law Offices of Campbell, Miller, Williams, Benson, Etter & Consiglio, Inc.
720 South Atherton Street, Suite 201
State College, PA 16801

Re: Opinion on Pace-O-Matic Machine

Dear Dick:

We received an inquiry from your client on distribution of a video game in Centre County.

Your client, Pace-O-Matic, Inc. would like to place these games in various clubs (most having liquor licenses) and/or wishes to somehow avoid their confiscation as illegal gambling devices.

As you know, the District Attorney of a county can prosecute Gambling charges, but PSP Liquor Control Enforcement (LCE) can administratively seek the suspension or revocation of a liquor license.

Your memorandum included a Common Pleas Court opinion from Beaver County where the court did NOT find that the video games were gambling devices per se.

In the past, we have worked with LCE in the confiscation and forfeiture of video poker machines, which were considered gambling devices per se because they possessed a "knock-down" switch, which allowed for the elimination of accumulated points, prior to pay-off.



Cen...                              y Pg. 1 of 2

The Pace-O-Matic video games are different and more advanced than the old video poker machines.

First Assistant District Attorney Mark Smith contacted LCE in Duncansville and the Compliance, Auditing and Gambling Enforcement (CAGE) Unit that specializes in gambling complaints.

The CAGE Unit was slow to respond, but finally conferred with Attorney Smith so that we could reconcile our position with theirs. The Supervisor in the CAGE Unit was quite familiar with Pace-O-Matic, Inc., as well as the history of the Beaver County court opinion.

The Supervisor explained the video games and how they contain both elements of skill and chance. The question with this machine was whether skill or chance is dominant factor in successful play. They recognized that the Court found the games are *predominantly a game of skill.*

Therefore, as a result of the Opinion, the CAGE Unit is not confiscating these games. Additionally, if the law changes or another county obtains a different opinion from an appellate court, then their position may change.

In addition, if their position would be changing, the LCE will give an advanced warning and time for certain establishments to remove the games from their premises.

My Office will follow the interpretation of the Beaver County Court's opinion as well as LCE's position on the machines.

I hope this opinion letter satisfies your inquiry. I apologize for the delayed response due to the slow reply of the agency. Please feel free to contact either First Assistant District Attorney Mark Smith or myself with any questions. It is always a pleasure dealing with you!

Warmly,

Stacy Parks Miller, Esquire
Centre County District Attorney

SPM/sy

Centre County District Attorney Pg. 2 of 2

JOSHUA D. LAMANCUSA
DISTRICT ATTORNEY



COUNTY OF LAWRENCE
New Castle, Pennsylvania
www.colawrence.pa.us/DA/Index.htm

Diane M. Shaffer
Luanne Parkonen
William Flannery
Jonathan Miller
Jessica Sullivan
Thomas W. Minett

Lawrence County
Government Center
430 Court Street
New Castle, PA 16101

Phone 724-656-1916
Fax: 724-656-1986

Eddy, DeLuca, Gravina & Townsend
Manor building Penthouse
564 Forbes Avenue
Pittsburgh, PA 15219

12 OCT 16

RE: Pace-O-Matic

Dear Attorney DeLuca,

I am in receipt of your correspondence regarding the lawfulness of placing Pace-O-Matic games of skill in Lawrence County. I have reviewed Judge Knafelc's Memorandum Opinion and Order regarding the Pace-O-Matic machines and I have contacted the Pennsylvania State Police and Pennsylvania Liquor Control Board regarding the possibility of appeal from Judge Knafelc's Order of Court. I have been informed that the Commonwealth will not appeal the decision. Therefore, the Pace-O-Matic machine is not considered a game of chance under Pennsylvania gaming laws and therefore is legal within the Commonwealth. This letter serves to authorize you to place only Pace-O-Matic machines in Lawrence County. Specifically the only machine that is permissible is the machine that was the subject of Judge Knafelc's Order of Court. Variations or modifications of that machine may result in criminal and/or civil sanctions. Lastly, I would strongly recommend that you refrain from serving alcohol at any establishment where you are operating Pace-O-Matic machines as this letter only serves to insulate you from criminal liability but in no way is controlling or persuasive regarding the legality of a liquor license.

Very Respectfully,

Joshua Lamancusa

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

221 A.3d 717
Commonwealth Court of Pennsylvania.

POM OF PENNSYLVANIA, LLC, Petitioner

v.

Commonwealth of Pennsylvania, DEPARTMENT OF
REVENUE, and City of Philadelphia, Respondents

No. 418 M.D. 2018
|
Argued May 8, 2019
|
Decided November 20, 2019

**Synopsis**
**Background:** Arcade game software distributor brought
petition for review in the nature of action for declaratory
and injunctive relief against Department of Revenue and city
after city seized coin-operated arcade machines and funds
based on allegation that arcade game was illegal gambling
device. Department asserted counterclaim for declaration that
distributor violated Pennsylvania Race Horse Development
and Gaming Act by manufacturing and distributing slot
machines without a license. Department applied for summary
relief in the nature of motion for partial judgment on the
pleadings with respect to counterclaim.

**[Holding:]** The Commonwealth Court, No. 418 M.D. 2018,
Patricia A. McCullough, J., held that Gaming Act did not
apply to unlicensed or illegal slot machines located outside
licensed facilities.

Motion denied.

Renée Cohn Jubelirer, J., dissented.

P. Kevin Brobson, J., did not participate in this decision.

Anne E. Covey, J., concurred in the result.

**Procedural Posture(s):** Original Jurisdiction; Motion for
Partial Judgment on the Pleadings.

West Headnotes (20)

[1]     **Pleading** ⟵ Judgment on Pleadings
        **Pleading** ⟵ Admissions by motion in general
        A motion for judgment on the pleadings is
        in the nature of a demurrer; thus, all of the
        opposing party's allegations are viewed as true
        and only those facts which have been specifically
        admitted by him may be considered against him.
        Pa. R. App. P. 1532(b).

        2 Cases that cite this headnote

[2]     **Pleading** ⟵ Matters considered
        In reviewing a motion for judgment on
        the pleadings, a court may only consider
        the pleadings themselves and any documents
        properly attached thereto.

        2 Cases that cite this headnote

[3]     **Pleading** ⟵ Judgment on Pleadings
        A motion for judgment on the pleadings should
        only be granted when the pleadings show there is
        no genuine issue of material fact and the moving
        party is entitled to judgment as a matter of law.

        2 Cases that cite this headnote

[4]     **Pleading** ⟵ Admissions by motion in general
        The party moving for judgment on the pleadings
        must admit the truth of all the allegations of
        his adversary and the untruth of any of his
        own allegations that have been denied by the
        opposing party.

[5]     **Pleading** ⟵ Judgment on Pleadings
        Where material issues of fact are in dispute,
        judgment on the pleadings cannot be entered.

[6]     **Gaming and Lotteries** ⟵ Construction and
        Operation in General



The Pennsylvania Race Horse Development and Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines. 4 Pa. Cons. Stat. Ann. §§ 1102, 1103, 1207, 1301, 1302, 1304, 1305, 1307.

[7] **Gaming and Lotteries** ⟜ Gaming commissions and boards

Although the Bureau of Investigations and Enforcement within the Gaming Control Board has the authority to investigate and inspect licensees, permittees, and licensed entities, it does not have the authority to investigate and inspect unlicensed entities. 4 Pa. Cons. Stat. Ann. §§ 1517(a.1)(2)-(3), 1517(a.1)(5), 1518(a)(3), 1518(a)(4).

[8] **Gaming and Lotteries** ⟜ Slot and pinball machines

Although the Pennsylvania Race Horse Development and Gaming Act makes it unlawful to place slot machines on the premises of a licensed facility without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an unlicensed location. 4 Pa. Cons. Stat. Ann. §§ 1518(a)(3), 1518(a)(4).

[9] **Statutes** ⟜ Statute as a Whole; Relation of Parts to Whole and to One Another

Every statute must be construed, if possible, to give effect to all its provisions.

[10] **Statutes** ⟜ Statute as a Whole; Relation of Parts to Whole and to One Another

**Statutes** ⟜ Giving effect to entire statute and its parts; harmony and superfluousness

When construing a statute, a court must attempt to give meaning to every word in a statute, as it cannot assume that the legislature intended any words to be mere surplusage.

[11] **Statutes** ⟜ Context

In construing and giving effect to statutory text, courts should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.

[12] **Gaming and Lotteries** ⟜ Slot and pinball machines

Pennsylvania Race Horse Development and Gaming Act did not apply to unlicensed or illegal slot machines located outside licensed facilities, including unlicensed arcade games located in taverns and social clubs; Gaming Act was intended to license large-scale slot machine operations at licensed facilities such as racetracks and hotels, Gaming Act specifically regulated slot machines in licensed facilities, statutory grant of authority to Gaming Control Board over authorization and operation of slot machines was contextually limited to licensed gaming and did not include power to investigate unlicensed entities, legislative history showed slot machine provisions of Gaming Act were primarily intended to apply in horseracing context, and Crimes Code otherwise encompassed illegal gambling. 4 Pa. Cons. Stat. Ann. §§ 1102(8), 1103, 1202(a)(1), 1301, 1302, 1304, 1305, 1517(a.1)(3), 1517(a.1)(5), 1518; 18 Pa. Cons. Stat. Ann. § 5513(a).

1 Cases that cite this headnote

[13] **Statutes** ⟜ Debates, speeches, and floor statements

Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. 1 Pa. Cons. Stat. Ann. § 1921(c)(7).

[14] **Statutes** ⟜ By Statute Relating to Same Subject

When a statute sets up a general or exclusive system covering the entire subject matter of a

former statute and is intended as a substitute for such former statutes upon the same subject, the former statute is impliedly repealed. 1 Pa. Cons. Stat. Ann. § 1971.

[15]   **Statutes**  Implied Repeal

There is a very strong presumption that a statute does not impliedly repeal another statute. 1 Pa. Cons. Stat. Ann. § 1971.

[16]   **Statutes**  Implied Repeal

The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent. 1 Pa. Cons. Stat. Ann. § 1971.

[17]   **Statutes**  By Statute Relating to Same Subject

Because repeals by implication are not favored, they will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter. 1 Pa. Cons. Stat. Ann. § 1971.

[18]   **Statutes**  Implied Repeal

Since implied repeals are not favored, legislative intent to repeal a statute by enacting another must be clearly shown. 1 Pa. Cons. Stat. Ann. § 1971.

[19]   **Gaming and Lotteries**  Construction and Operation in General

Enactment of Pennsylvania Race Horse Development and Gaming Act did not impliedly repeal entirety of earlier Crimes Code regulation of illegal and unlicensed gambling devices and slot machines; Gaming Act expressly provided that Crimes Code provisions governing gambling devices were only repealed to the extent they were inconsistent with Gaming Act, Gaming Act only regulated licensed slot machines in licensed facilities, and Gaming Act did not purport to set up general or

exclusive system covering entire subject matter of gambling. 1 Pa. Cons. Stat. Ann. § 1971; 4 Pa. Cons. Stat. Ann. § 1903(a)(2); 18 Pa. Cons. Stat. Ann. § 5513(a).

[20]   **Gaming and Lotteries**  Parties

Gaming Control Board was not indispensable party to Department of Revenue's counterclaim against arcade game software distributor arising out of alleged violations of Pennsylvania Race Horse Development and Gaming Act, where arcade machines at issue did not fall within purview of Gaming Act, such that Gaming Control Board had no regulatory authority over distributor. 4 Pa. Cons. Stat. Ann. §§ 1103, 1202(b)(12).

1 Cases that cite this headnote

**\*719 ORIGINAL JURISDICTION**

**Attorneys and Law Firms**

Matthew H. Haverstick, Philadelphia, for Petitioner.

Karen M. Romano, Sr. Deputy Attorney General and Inder Deep Paul, Deputy Attorney General, Harrisburg, for Respondent Department of Revenue.

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge, HONORABLE RENÉE COHN JUBELIRER, Judge, HONORABLE ROBERT SIMPSON, Judge[1], HONORABLE PATRICIA A. McCULLOUGH, Judge, HONORABLE ANNE E. COVEY, Judge, HONORABLE MICHAEL H. WOJCIK, Judge, HONORABLE CHRISTINE FIZZANO CANNON, Judge

**Opinion**

OPINION BY JUDGE McCULLOUGH

**\*720** Before this Court is the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to the Department's counterclaim to the petition for review in the nature of a complaint seeking a declaratory judgment and

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

injunctive relief, filed in this Court's original jurisdiction by POM of Pennsylvania, LLC (POM). For the reasons set forth, we deny the Department's application for summary relief.

## I. Procedural History

On June 8, 2018, POM filed a petition for review in this Court's original jurisdiction seeking a declaratory judgment and injunctive relief, naming as respondents the Department and the City of Philadelphia (City). According to POM's petition for review, POM "distributes software for a skill-based video game machine, called the Pennsylvania Skill[TM] Amusement Device 402.49 PEN" (POM Game) throughout Pennsylvania. (Petition ¶1.) The POM Game is primarily located in taverns, restaurants, and social clubs that serve alcohol under license from the Pennsylvania Liquor Control Board. (Petition ¶12.) The POM Game is a coin-operated video machine that offers several games including a tic-tac-toe style puzzle, a potentially unlockable bonus session, and a "Follow Me[TM] colored dot-matching second phase of game play." (Petition ¶¶13-14.) If a player is ultimately successful playing the POM Game he or she is awarded with a combined total of 105% of the original amount spent to play. (Petition ¶28.) POM asserts that the POM Game is not an illegal gambling device under Pennsylvania criminal law, but rather, that it is a legal game of skill. (Petition ¶29.)

POM avers that from March 2017 until June 2018, the City conducted 11 separate seizures of the POM Game and arrested employees and seized funds at each location. (Petition ¶30.) POM alleges that the City's illegal seizures of the POM Games have interfered with the Department's mission to fairly, efficiently, and accurately administer the tax laws and other revenue programs of the Commonwealth. (Petition ¶36.) POM contends that the POM Game generates revenue for the Commonwealth in various ways. (Petition ¶37.)

POM maintains that the POM Game is not an illegal game of chance under the relevant statute of the Pennsylvania Crimes Code[2] governing illegal gambling devices. (Petition ¶¶38-39.) POM also alleges that in *In re Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613* (C.P. Beaver, No. M.D. 965-2013, filed December 23, 2014), the Court of Common Pleas of Beaver County determined that a similar POM game was a game in which skill predominated and, thus, not a gambling device *per se* under Pennsylvania law.[3],[4] (Petition *721 ¶48.) Consequently, POM requests

that this Court enter a declaratory judgment in its favor and (1) declare that the POM Game is a legal device under Pennsylvania law; (2) declare that the City lacks the power and authority to seize or threaten to seize POM Games or initiate administrative or criminal proceedings regarding POM Games; (3) permanently enjoin the City from seizing or threatening to seize POM Games and/or initiating administrative or criminal proceedings regarding POM Games; and (4) grant any other relief deemed appropriate. (Petition ¶67.) POM also requests that we enter a preliminary injunction enjoining the City from (1) seizing or threatening to seize POM Games; (2) initiating administrative or criminal proceedings regarding the POM Game; and (3) arresting or prosecuting persons in connection with operation of the POM Game. *Id.*

The Department filed an answer, new matter, and counterclaim in response to POM's petition for review.[5] In its counterclaim, the Department alleges that the POM Game is considered a slot machine under section 1103 of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. § 1103. (Counterclaim ¶18.) The Department also avers that the POM Game has not been inspected or certified by the Pennsylvania Gaming Control Board (Gaming Control Board) and that POM has been acting in violation of the Gaming Act.[6] (Counterclaim ¶¶20-21.) The Department also maintains that POM is a manufacturer of slot machines under section 1103 of the Gaming Act, 4 Pa.C.S. § 1103, and that it has violated the Gaming Act by manufacturing slot machines without a manufacturer's license. (Counterclaim ¶¶25-27, 29-30.) Similarly, the Department contends that POM is a supplier of slot machines under the Gaming Act and that POM has violated the Gaming Act by distributing slot machines without a supplier license. (Counterclaim ¶¶37-40, 42.)

The Department seeks a declaration that (1) the Gaming Act regulates the manufacture, possession, and operation of slot machines; (2) the Gaming Act and its regulations prohibit any person from possessing a slot machine unless lawfully manufactured by a licensed manufacturer; (3) the Gaming Act prohibits the possession and operation of any slot machines unless on the premises of a licensed casino facility; (4) the POM Game is an illegal gambling device under the Gaming Act; (5) the POM Game is a slot machine under the Gaming Act and subject to a daily tax of 34% of its revenue; and (6) POM is a *722 manufacturer and/or supplier of slot machines and is required to obtain a license from the Gaming Control Board. (Counterclaim ¶51.) The Department also

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

requests that POM be ordered to remove its machines from all Pennsylvania establishments and cease further sale and distribution of its machines within Pennsylvania unless and until POM obtains the proper licenses from the Gaming Control Board. (Counterclaim ¶52.) While the Department repeatedly argues that the POM Games are subject to the Gaming Act and the authority of the Gaming Control Board, the Gaming Control Board has not sought to intervene in this matter.

POM filed a reply to the Department's new matter and counterclaim. Thereafter, the Department filed an application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to its counterclaim.

**[1]  [2]  [3]  [4]  [5]**  The Department raises the following issues in its application for summary relief in the nature of a motion for judgment on the pleadings: [7] (1) The POM Game is a slot machine under the Gaming Act; (2) POM is a manufacturer and/or a supplier of slot machines under the Gaming Act; and (3) POM is acting in violation of the Gaming Act.

### II. The Department's Argument

In support of its application, the Department argues that the Gaming Act sets forth a comprehensive regulatory structure that controls every aspect of gaming in the Commonwealth, including the manufacture, possession, and operation of slot machines. The Department notes that section 1102(1) of the Gaming Act provides that the primary objective of the Gaming Act is to "protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1). [8]  Consequently, the Department asserts that the General Assembly intended for the Gaming Act to regulate **all gaming** in Pennsylvania, including all slot machines, regardless of their location or whether they are "licensed" by the Gaming Control Board. The Department asserts that the Gaming Act regulates both legal and illegal gambling, including POM Games, which it contends constitute illegal gambling devices. It also avers that the General Assembly entrusted the Gaming Control Board with ***723** the authority to establish procedures for the inspection and certification of compliance of all slot machines, but that the POM Game has never been inspected or certified.

The Department argues that under the Gaming Act, a slot machine is defined as any mechanical device that is played for consideration and, whether by reason of skill or chance, provides anything of value. The Department argues that because POM admits in its petition for review that the POM Game is a skill-based game, the game is available to play upon payment of money/consideration, and the game provides a reward, POM's game is, by definition, considered a slot machine under the Gaming Act. The Department notes that in 2017 the definition of slot machine was amended to include both games of skill and of chance. Accordingly, it asserts that POM's game of skill fits squarely within the definition of slot machine under the Gaming Act. The Department alleges that POM is violating the Gaming Act because the POM Game is not being regulated and is not subject to monitoring or enforcement controls, and that POM's violations have prevented the Commonwealth from protecting the public from unregulated gaming activities, which is the primary intent of the Gaming Act.

The Department also argues that POM is, by definition, a manufacturer and supplier of slot machines under the Gaming Act. Because sections 1317 and 1317.1 of the Gaming Act, 4 Pa.C.S. §§ 1317, 1317.1,[9] require manufacturers and suppliers of slot machines to obtain licenses and POM does not hold the required licenses, the Department maintains that POM is violating the Gaming Act. Because it alleges that there are no facts in dispute relating to its counterclaim, the Department asserts that it is entitled to judgment as a matter of law on its counterclaim.

### III. POM's Argument

In contrast, POM argues that its game is not a regulated gaming device under the Gaming Act because its game is not a regulated "skill slot machine," as defined by the statute, and the amended Gaming Act was never intended to change existing Pennsylvania law regarding what is an illegal gambling device. (POM's Br. at 7.) POM attempts to distinguish "gaming" from "gambling." POM contends that "gaming" occurs in licensed facilities regulated by the Gaming Control Board pursuant to the Gaming Act, whereas the Pennsylvania Crimes Code regulates alleged illegal "gambling" devices. POM also asserts that the 2017 amendments to the Gaming Act did not expand the scope of the Gaming Act, but continued to only regulate gaming in licensed facilities. POM contends that several well-

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

established principles of statutory construction **\*724** support its interpretation of the Gaming Act.

POM maintains that the POM Game is entirely outside of the regulatory scheme of the Gaming Act because the Gaming Act only applies to licensed games located in regulated gaming locations, such as casinos and horse racing tracks. Thus, POM argues that the Gaming Act does not regulate the types of places that operate the POM Game, including taverns, bars, restaurants and convenience stores. Moreover, POM alleges that if the POM Game is subject to the Gaming Act and, hence, illegal, so are arcade games located at establishments such as Chuck E. Cheese or Dave & Buster's. In addition, POM maintains that if the Department is correct that the POM Game is subject to the Gaming Act, then the Department has failed to join an indispensable party to the counterclaim, *i.e.*, the Gaming Control Board and, therefore, the counterclaim is jurisdictionally defective.

### IV. Analysis

### A. "Slot Machine," "Manufacturer," and "Supplier" of Slot Machines Under the Gaming Act.

We first address the definitions of "Slot machine," "Manufacturer," and "Supplier" under the Gaming Act to determine whether—if the Gaming Act applies to unlicensed slot machines—the POM Game would be considered a slot machine and POM a manufacturer and/or supplier of slot machines. Thus, at the outset, we are merely deciding whether, based on the factual allegations, the POM Games are slot machines pursuant to the definitions in the Gaming Act. If the POM Games do not fit within the definitions, our analysis ends at this stage because the Gaming Act would not apply to the POM Game under any circumstances. On the other hand, if the POM Game does fit within the slot machine definitions, we will next determine whether the Gaming Act applies to unlicensed slot machines like the POM Game.

The Department argues that, based on POM's factual allegations, POM's activities vis-à-vis its game fit squarely within the definitions of "Slot Machine," "Manufacturer," and "Supplier." If the Department is correct that, based on the factual allegations in the pleadings, POM's activities fit within these definitions, then the question of whether the Gaming Act applies to POM's activities would be a pure question of law.

"Slot machine" is defined under the Gaming Act as follows:

(1) The term includes:

(i) **Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board** which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, ... is available to play or operate, **the play or operation of which, whether by reason of skill or application of the element of chance or both:**

(A) **May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever,** ....

...

(iii) **A skill slot machine, hybrid slot machine** ....

(iv) A slot machine used in a multistate wide-area progressive slot machine system and devices and associated equipment as defined by the **\*725** Pennsylvania Gaming Control Board through regulations.

(v) A multi-use computing device which is capable of simulating, either digitally or electronically, a slot machine.

Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103 (emphasis added). Further, a "Skill slot machine" is defined as "[a] slot machine in which the skill of the player, rather than the element of chance is the predominant factor in affecting the outcome of the game," and "Hybrid slot machine" is defined as "[a] slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game." *Id.* Therefore, if a player must primarily use skill to affect the game's result, it is considered a "Skill slot machine." If the skill of the player is not the primary factor, but outcome of the game is affected by both skill and chance, it is a "Hybrid slot machine."

In its petition, POM alleges that the POM Game is a coin-operated video machine that provides a reward of up to a combined total of 105% of the original amount spent to play.

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

(Petition ¶¶13, 28.) POM also states that for the purposes of its petition it does not dispute that its game requires consideration to play and provides a reward. (Petition ¶44.) POM avers that the POM Game is a game of skill because the element of skill predominates over the element of chance. (Petition ¶¶29, 47, 50.)

Section 1103 of the Gaming Act defines "Slot machine" as any mechanical or computerized machine, which upon payment of a coin or any consideration provides something of value. The definition includes what are termed "Skill slot machines," which are defined as slot machines where the skill of the player is the predominant factor in determining the outcome of the game. Because POM alleges that its game requires consideration to play, provides something of value, and is skill-based, if POM's activities are subject to the Gaming Act, then the POM Game fits within the definition of "Slot machine" under the Gaming Act. Similarly, since POM alleges that players of the POM game must use skill, if the Gaming Act applies to unlicensed games then the POM Game would fit within the definition of "Skill slot machine" under the Act.

"Manufacturer" is defined, in pertinent part, under section 1103 of the Gaming Act as, "A person who **manufactures, builds, rebuilds, fabricates, assembles, produces, programs, designs or otherwise makes modifications to any slot machine** .... *Id.* (emphasis added). Under this definition, if the Gaming Act applies to POM's activities, POM is a "Manufacturer" of slot machines because it alleges that it "designs ... the essential components" of the POM Game. (Petition ¶56.)

"Supplier" is defined, in relevant part, as follows: "A person that **sells, leases, offers or otherwise provides, distributes or services any slot machine** ... in this Commonwealth. *Id.* (emphasis added). Likewise, if the Gaming Act were to apply to POM's activities, POM's factual allegations would also establish POM as a "Supplier" of slot machines. For example, POM avers that it "sells the essential components" of the POM Game, that it distributes software for the POM Game (Petition ¶¶1, 56), and admits that it does not hold a manufacturer's license under the Gaming Act (Reply to Counterclaim ¶30). The definition of "Supplier" includes anyone that sells or distributes slot machines. As POM alleges it sells and distributes the POM Game, it would also be considered a supplier of slot machines under the Gaming Act.

Accordingly, there is one dispositive question remaining before us, which is a pure question of law: whether the Gaming *726 Act applies to POM's conduct. [10] As argued by the Department, the Gaming Act sets forth a comprehensive regulatory regime that applies to both legal and illegal gambling, including POM's allegedly illegal game. To answer the question of whether the Gaming Act applies to the POM Game, we must analyze the language of the Gaming Act to determine the overall intent of the General Assembly in enacting the Gaming Act and its amendments.

### B. Whether, As a Matter of Law, the Gaming Act Applies to POM's Activities.

#### 1. Gaming Act Statutory Framework.

We now turn to the crux of the matter, *i.e.*, whether the Gaming Act applies to the unlicensed POM Game. In order to answer this question we must first conduct a review of the statutory framework of the Gaming Act.

Section 1102 of the Gaming Act, titled "Legislative intent," provides, in part, as follows:

The General Assembly recognizes the following public policy purposes and declares that the following objectives of the Commonwealth are to be served by this part:

(1) The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful.

(2) The authorization of limited gaming by the installation and operation of slot machines as authorized in this part is intended to enhance live horse racing, breeding programs, entertainment and employment in this Commonwealth.

...

(4) The authorization of limited gaming is intended to positively assist the Commonwealth's horse racing industry, support programs intended to foster and promote horse breeding and improve the living and working conditions of personnel who work and reside in and around the stable and backside areas of racetracks.

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

...

**(8) Strictly monitored and enforced control over all limited gaming authorized by this part** shall be provided through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, practices, activities, licensees, permittees, registrants and certificate holders.

...

**(12) It is the intent of the General Assembly to authorize the operation and play of slot machines, table games and interactive gaming under a single slot machine license issued to a slot machine licensee when a slot machine licensee has been issued a table game operation certificate and an interactive *727 gaming certificate under this part.**

4 Pa.C.S. § 1102 (emphasis added). Therefore, based on the language of section 1102, the intent of the Gaming Act is to protect the public from unlawful gaming activity, enhance live horse racing, breeding programs, entertainment and employment, and to regulate **licensed** slot machines when the licensee has been issued a table game operation certificate and an interactive gaming certificate. The POM Games are not used for any of the noted activities intended to be monitored by the Gaming Board.

Section 1103 of the Gaming Act, the Act's "definitions" provision, defines a "Licensed entity," as "[a]ny slot machine licensee, manufacturer licensee, supplier licensee or other person **licensed by the Pennsylvania Gaming Control Board under this part**," 4 Pa.C.S. § 1103 (emphasis added). "Licensed facility" is defined, in part, as "[t]he physical land-based location at which **a licensed gaming entity is authorized to place and operate slot machines.**" *Id.* (emphasis added). Section 1103 also provides that a "Licensed gaming entity" or "slot machine licensee" is "[a] person that **holds a slot machine license** pursuant to this part." *Id.* (emphasis added). Thus far, we see that, a licensed entity is an entity that has **obtained a license** from the Gaming Control Board, and a licensed facility is a location where a licensed entity has been **authorized** by the Gaming Control Board to operate slot machines. These definitions, when applied here, stand in stark contrast to POM's status as an unlicensed entity.

[6]   A closer look at several of the provisions of the Gaming Act indicates the type of slot machine activities the Act

is intended to regulate. Section 1301 of the Gaming Act provides for three distinct classifications of slot machine licenses. 4 Pa.C.S. § 1301. Section 1302, titled "Category 1 slot machine license," permits licensed slot machines at certain **"licensed racetrack facilit[ies]"** that have been issued licenses by the State Horse Racing Commission or State Harness Racing Commission to conduct thoroughbred or harness races. 4 Pa.C.S. § 1302 (emphasis added). Section 1304, titled "Category 2 slot machine license," allows applicants, not otherwise available to apply for Category 1 licenses, to "seek[ ] to locate a **licensed facility** in a city of the first class, a city of the second class or a revenue—or tourism —enhanced location." 4 Pa.C.S. § 1304 (emphasis added). [11] A "licensed facility," includes any "area of a **licensed racetrack**," "board-approved interim facility or temporary facility," "area of a **hotel** which the [Board] determines is suitable to conduct table games," or "area of a licensed facility where casino simulcasting is conducted, as approved" by the Board. Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103 (emphasis added). Section 1305, titled "Category 3 slot machine license," allows applicants that have not applied for or been approved or issued a Category 1 or 2 license to obtain a Category 3 license for a "licensed facility in a well-established **resort hotel having no fewer than 275 guest rooms** under common ownership and having substantial year-round recreational guest amenities." 4 Pa.C.S. § 1305 *728 (emphasis added). *Id.* [12], [13] The Gaming Act permits, with certain exceptions, no more than seven Category 1 licensed facilities, five Category 2 licensed facilities, and two Category 3 facilities. Section 1307 of the Gaming Act, 4 Pa.C.S. § 1307. Clearly, the above enumerated sections indicate that the Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines, and there is no suggestion that the Act was ever intended to apply to devices in taverns, and/or social clubs, such as the game in question.

Further, section 1202(a)(1) of the Gaming Act states that the Gaming Control Board "shall have general and sole regulatory authority over the **conduct of gaming and related activities as described in this part**" and that the Gaming Control Board "shall ensure the integrity of the acquisition and operation of slot machines ... and shall have sole authority over every aspect of the authorization, operation, and play of slot machines." 4 Pa.C.S. § 1202(a)(1). "Conduct of gaming" is defined in the Gaming Act as "[t]he **licensed** placement, operation and play of slot machines ... **under this part, as authorized and approved by the Pennsylvania Gaming Control Board.**" 4 Pa.C.S. § 1103 (emphasis added). The

Gaming Control Board further has the specific power and duty "[a]t its discretion, to issue, approve, renew, revoke, suspend, condition or deny issuance or renewal of slot machine licenses." Section 1202(b)(12) of the Gaming Act, 4 Pa.C.S. § 1202(b)(12). While these sections state that the Gaming Control Board has general and regulatory authority over slot machines, such authority must be viewed through the lens of the limiting clause stating that the Board has authority over the "conduct of gaming," **as described in this part** and which is defined as the **licensed** placement and operation of slot machines **as authorized and approved by the Board**.

The Gaming Control Board is also given the power to, *inter alia*,

> (1) Deny, deny the renewal, revoke, condition or suspend any license, permit, certificate, registration or other authorization provided for in this part ...
>
> ...
>
> (3) Prescribe and require periodic financial reporting and internal control requirements for **all licensed entities**.
>
> ...
>
> (9) Establish procedures for the inspection and certification of compliance of each slot machine ... prior to being placed into use by a **slot machine licensee**....
>
> ...
>
> (11) **Require each slot machine license applicant** to provide detailed site plans of its **proposed licensed facility** which shall be reviewed and approved by the board for the purpose of determining **\*729** the adequacy of the proposed security and surveillance measures inside and outside the facility....
>
> ...
>
> (21.1) Authorize, at its discretion, **a slot machine licensee** to place slot machines that are used in a multistate wide-area progressive slot machine system, skill slot machines or hybrid slot machines and **make them available for play at licensed facilities**.
>
> (21.2) Adopt and promulgate regulations to govern the operation and placement of skill slot machines and hybrid slot machines by slot machine licensees at **licensed facilities** in the same manner as provided in section 13B03 (relating to regulations).

Section 1207 of the Gaming Act, 4 Pa.C.S. § 1207 (emphasis added). As already noted, the license applicants for slot machines under the Gaming Act are those that are operating or intend to operate licensed racetrack facilities, large hotels and resort hotels with casinos and section 1207 further underscores that the Board's authority mainly applies to these licensed slot machines, rather than unlicensed or otherwise illegal devices.

[7]  [8]  The Gaming Act also establishes within the Gaming Control Board a "Bureau of Investigations and Enforcement" (Bureau), which is given the power to, *inter alia*, "[i]nvestigate and review **all applicants and applications for a license, permit or registration**" and "[i]nvestigate **licensees, permittees, registrants and other persons regulated by the board for noncriminal violations** of this part." Section 1517(a.1)(2)-(3) of the Gaming Act, 4 Pa.C.S. § 1517(a.1)(2)-(3) (emphasis added). The Gaming Act further provides that the Bureau has the power to "[i]nspect and examine **licensed entities** as provided in subsection (e)." Section 1517(a.1)(5) of the Gaming Act, 4 Pa.C.S. § 1517(a.1)(5) (emphasis added). Section 1518(a)(3), titled "Prohibited acts; penalties," makes it a criminal offense for "any **licensed entity**... or any other person to permit a slot machine to be operated, transported, repaired or opened **on the premises of a licensed facility** by a person other than a person licensed or permitted by the [Board] pursuant to this part." 4 Pa.C.S. § 1518(a)(3) (emphasis added). [14] Further, section 1518(a)(4) makes it a criminal offense "for any licensed entity or other person to manufacture, supply or place slot machines into play or display slot machines **on the premises of a licensed facility** without the authority of" the Board. 4 Pa.C.S. § 1518(a)(4) (emphasis added). [15] These provisions demonstrate **\*730** that although the Bureau has the authority to investigate and inspect licensees, permittees, and licensed entities it does not have the authority to investigate and inspect unlicensed entities. More importantly, however, is the fact that although the Act makes it unlawful to place slot machines on the **premises of a licensed facility** without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an **unlicensed location**.

The Department's position is that the above statutory framework authorizes it to regulate both legal and illegal gambling. But POM argues that the Department has no such authority as the Gaming Act only repeals any provisions in the Crimes Code that are inconsistent with it. *See* section 1903(a)

(2) of the Gaming Act, 4 Pa.C.S. § 1903(a)(2) (providing that "[t]he provisions of 18 Pa.C.S. § 5513(a) are repealed insofar as they are inconsistent with this part"). The Crimes Code, under section 5513(a), titled "Gambling devices, gambling, etc.," states that a person is guilty of a first degree misdemeanor if he does any of the following:

(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

18 Pa.C.S. § 5513(a). Moreover, the Pennsylvania State Police, Bureau of Liquor Control Enforcement, when investigating whether "there are reasonable grounds to believe liquor, alcohol or malt or brewed beverages are being sold on premises not licensed," has the power to arrest any person in violation of section 5513 of the Crimes Code. Section 211 of the Liquor Code, Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. § 2-211. Thus, the Crimes Code defines what constitutes illegal gambling, and the Liquor Code gives the Pennsylvania State Police primary enforcement duties with respect to illegal gambling occurring at premises where unlicensed liquor sales are also taking place.

**2. Whether the Gaming Act was Intended to Regulate All Unlicensed and/ or Illegal Slot Machines and Other Gambling Devices in the Commonwealth.**

In light of the above statutory framework, we are faced with the question of whether the General Assembly intended that the regulation of all illegal slot machines and other gambling devices in the Commonwealth is within the purview of the Gaming Act. In other words, we must decide whether

the General Assembly intended for the Gaming Act to comprehensively regulate all gambling in the Commonwealth and, thus, apply to both legal and illegal gambling.

**[9]** **[10]** **[11]** When interpreting the Gaming Act our paramount objective must be to ascertain and effectuate the intention of the General Assembly. *See* Section 1921 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1921(a) ("The object of all interpretation ***731** and construction of statutes is to ascertain and effectuate the intention of the General Assembly."). Moreover, "[e]very statute must be construed, if possible, to give effect to all its provisions." *Id.* Thus, when construing a statute, a court "must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage." *City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek),* —— Pa. ——, 195 A.3d 197, 207 (2018). Additionally, "[i]n construing and giving effect to the text, 'we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.' " *A.S. v. Pennsylvania State Police,* 636 Pa. 403, 143 A.3d 896, 906 (2016) (quoting *Roethlein v. Portnoff Law Associates, Ltd.,* 623 Pa. 1, 81 A.3d 816, 822 (2013)).

**[12]** For the following reasons, however, we conclude that the Gaming Act does not apply to unlicensed and/or illegal slot machines. First, the Gaming Act does not give the Gaming Control Board the jurisdiction or authority it now claims. As indicated by sections 1301-1302 and 1304-1305 of the Gaming Act, 4 Pa.C.S. §§ 1301-1302, 1304-1305, the Gaming Act was intended to license slot machine operations at racetracks, casinos, hotels, and established resort hotels. Thus, its intent was to provide licenses to large, individual slot machine operations that raise millions of dollars in revenue. The POM Games are not located at any of these types of facilities and there is absolutely no suggestion in these provisions of the Gaming Act, or any other provisions of the Act, that the Gaming Act was intended to apply to the facilities where the POM Games are located, *e.g.,* taverns and social clubs, or that the Gaming Act regulates the placement of slot machines at such facilities.

Moreover, the Gaming Act specifically regulates **licensed** slot machines in **licensed facilities.** In particular, section 1103 of the Gaming Act defines slot machines as devices that are **approved** by the Gaming Control Board. 4 Pa.C.S. § 1103. Section 1103 also defines licensed entities as persons

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

licensed by the Gaming Control Board under the Gaming Act and gaming facilities as the locations at which **licensed gaming entities are authorized to place and operate slot machines.** *Id.* The definitional provisions of the Gaming Act clearly demonstrate that the General Assembly intended for the Gaming Act to regulate slot machines that are **licensed and approved by the Gaming Control Board,** not those that are illegal or unlicensed. The Department argues that the POM Games are illegal; however, even if we were to assume *arguendo* they are illegal and thus in violation of the Crimes Code, there is nothing in the Gaming Act to suggest the General Assembly intended for the Gaming Control Board to also have the authority to regulate gambling devices that are unlawful pursuant to the Crimes Code.

Further, while section 1202(a)(1) of the Gaming Act, 4 Pa.C.S. § 1202(a)(1), provides that the Gaming Control Board has sole authority over every aspect of the authorization and operation of slot machines, the preceding clause in that provision states that the Gaming Control Board only has general and sole regulatory authority over the **conduct of gaming,** which is defined in section 1103, as the "licensed placement" and "operation" of slot machines, **"under this part, as authorized and approved by the ... Gaming Control Board,"** 4 Pa.C.S. § 1103 (emphasis added). As it is a basic principle of statutory construction that a particular provision controls the general, *see* Section 1933 of the Statutory Construction Act, [FN] 1 Pa.C.S. § 1933, under section 1202 of the Gaming *732 Act the Gaming Control Board only has regulatory authority with respect to the **licensed** placement of slot machines as authorized under the Act and, thus, does not have regulatory authority over **all** slot machines in the Commonwealth.

The legislative intent outlined in the Gaming Act also demonstrates that the General Assembly only intended the Gaming Act to regulate **legal** and **licensed** gaming. Of particular importance, section 1102(8) provides that one of the objectives of the Gaming Act is to **provide strict monitoring "and enforced control over all limited gaming authorized"** by the Gaming Act. 4 Pa.C.S. § 1102(8) (emphasis added). Section 1102(8) does **not** state that it is the General Assembly's intention to provide strict monitoring and enforced control **over all gambling in the Commonwealth, whether legal or illegal,** but merely that the General Assembly intended to strictly control the limited gaming authorized by the Gaming Act.

The conclusion that the Gaming Act only regulates licensed slot machines is further bolstered by section 1517(a.1)(5) of the Gaming Act, which gives the Bureau the power to inspect and examine "**licensed entities**," 4 Pa.C.S. § 1517(a.1)(5) (emphasis added), and section 1517(a.1)(3), 4 Pa.C.S. § 1517(a.1)(3), which gives the Bureau the authority to investigate license applicants, licensees, and **permittees.** If the General Assembly had intended for the Gaming Act to regulate illegal gambling, in addition to licensed, legal gaming, the General Assembly would likely have given the Bureau the power to inspect, examine, and investigate **unlicensed** entities, such as taverns, bars, restaurants and convenience stores, where the POM Games are present. However, the General Assembly did not do so. Courts cannot assume that an agency has been bestowed additional powers that are not present in or inferable from statutory language.

Section 1518 of the Gaming Act also provides strong evidence that the General Assembly did not intend for the Gaming Act to regulate unlicensed/illegal slot machines. Section 1518, 4 Pa.C.S. § 1518, makes it unlawful for any person to permit a slot machine to be opened on the premises of a **licensed facility** unless licensed by the Board, and makes it illegal to manufacture, supply, or place slot machines into play at a **licensed facility** without the authority of the Gaming Control Board. However, neither section 1518 nor any other provision in the Gaming Act makes it unlawful for any person to manufacture, supply, or place slot machines at **unlicensed facilities** or generally unlawful to display or operate slot machines when **not authorized** by the Gaming Control Board. In contrast, section 3501 of the Gaming Act, 4 Pa.C.S. § 3501, makes it unlawful for any person to make available for play video gaming terminals unless that person is licensed by the Gaming Control Board, section 3508, 4 Pa.C.S. § 3508, requires a person seeking to manufacture video gaming terminals to apply for a license with the Board, and section 13C71, 4 Pa.C.S. § 13C71, states that sports wagering conducted by an entity that holds a sports wagering certificate does not constitute criminal activity. Accordingly, whereas the provisions of the Gaming Act dealing with video gaming terminals and sports wagering indicate that the General Assembly intended for the Board to have exclusive regulatory authority over such activities, section 1518 indicates the opposite with respect to slot machines.

Moreover, the Gaming Act bestows the Gaming Control Board with the power to, *inter alia*, deny or suspend slot machine licenses; establish procedures and financial reporting

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

requirements for **slot machine** *733 licensees; and adopt and promulgate regulations to govern the operation and placement of slot machines by slot machine licensees at **licensed facilities.** Section 1207 of the Gaming Act, 4 Pa.C.S. § 1207. There is no indication in section 1207 that the Gaming Control Board was given comprehensive authority over all illegal gambling activities in the Commonwealth, nor can we create such authority. Therefore, even if the POM Games were considered illegal gambling devices, illegal devices have been historically regulated by the Crimes Code and the Gaming Act does not provide any authority for regulating such devices.

Due to the language in the Gaming Act discussing the regulation of licensed slot machines and facilities, we simply cannot glean any intention by the General Assembly for the Gaming Act to regulate all unlicensed and illegal slot machines in the Commonwealth. Moreover, the various references to racetracks, hotels, and casinos in the Gaming Act indicate that it only regulates slot machines at these types of licensed facilities/locations, and not the locations at issue, such as taverns, social clubs, and restaurants. In addition, were we to accept the Department's argument that the Gaming Act applies to unlicensed slot machines, it would render the multiple references in the Gaming Act to **licensed** slot machines, **approved** slot machines, **licensed** entities, and **licensed** facilities mere surplusage, which is not permissible under basic statutory construction principles. *See, e.g., City of Philadelphia Fire Department,* 195 A.3d at 207 (holding that pursuant to section 1921(a) of the Statutory Construction Act of 1972, [FN] 1 Pa.C.S. § 1921(a), when "construing a statute, the courts must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage"). Accordingly, based on the overall framework and context of the Gaming Act, we hold that it only applies to licensed slot machines in licensed entities/facilities and does not apply to unlicensed and illegal devices.

[13]  Our conclusion that the Gaming Act does not apply to the unlicensed POM Game is further bolstered by comments made during the 2004 Senate floor debate for the Gaming Act. [16] During the debate, Senator Vincent Fumo made the following prepared statement:

> [A]t no time has this bill's original purpose changed. This bill was originally introduced to provide for a

manner of regulating the Pennsylvania horseracing industry. This purpose has not changed. The amendment we offered furthers the regulation of the Pennsylvania horseracing industry and funds many of the horse development functions with a direct subsidy from the legalization of gaming operations throughout the Commonwealth. The original purpose has never changed.... [T]his bill embraces only one subject as expressed in its drafting as an amendment to Title 4 of the Pennsylvania Consolidated Statutes, in this case, the subject of amusements or more specifically, Pennsylvania horseracing. *734 A new chapter to Title 4 has been added, entitled, the Pennsylvania Racehorse Development and Gaming Act, of which slot machine operations are the revenue engine through which Pennsylvania may enhance horseracing opportunities. Simply stated, though the media simplification of this issue is slot machines, the public policy purpose that carries throughout every provision of this Act is the development of the horseracing industry.

Legislative Journal—Senate, 188th Sess., July 1, 2004, at 1992. Thus, the legislative history demonstrates that when the Gaming Act was first enacted, its intent was to further regulate the horse racing industry and support the industry by providing it revenue from slot machines. The legislative history does not demonstrate that the General Assembly intended for the Gaming Act to regulate all unlicensed and/or illegal slot machines then existing in the Commonwealth.

Additionally, during the same floor debate, Senator Robert Tomlinson stated that although it would take several years before all of the racetrack facilities were up and running, the projected revenue from those facilities was $2.4 billion to $2.9 billion. *Id.* at 1954. Senator Fumo also explained that the bill would "generate an economic development fund that [would] yield $2 billion in money for projects throughout the State" and that in Philadelphia, alone, it was projected

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

that as much as $200 million to $300 million would be spent on each slot machine operation. *Id.* at 1990-1991. He noted that under the bill, Pennsylvania would be the first state to charge a $50 million fee for a gambling license. *Id.* at 1991. Senator Fumo also stated that although gambling is a problem, "We already have gambling. We have gambling at the very racetracks we are trying to save. We have gambling with the Pennsylvania Lottery, and if you have not looked in your local bar, go take a look at the illegal machines that are in there." *Id.* Senator Fumo further stated that, "As far as our horsemen are concerned, they do need help." *Id.* Thus, according to the legislative history, the Gaming Act was meant to legalize slot machines at large-scale facilities in order to aid the horse racing industry and there is no indication that the Gaming Act was intended to apply to or regulate illegal machines already existing at bars and taverns.

This conclusion is further corroborated by remarks made during the floor debate for the 2017 amendments to the Gaming Act. Specifically, during the floor debate, the following exchange occurred with Representative Jason Ortitay, the prime sponsor of the 2017 amendments:

> Mr. STURLA: Mr. Speaker, will the prime sponsor of the bill rise for brief interrogation?

> The SPEAKER. Representative Ortitay. He will stand for interrogation. He is glad to do so.

> Mr. STURLA. Thank you, Mr. Speaker. Mr. Speaker, the previous speaker said that **he believes that the language in this bill will make illegal all games of skill in the State of Pennsylvania that currently exist, all the ones that exist currently at truckstops and convenience stores and social clubs and taverns throughout the State of Pennsylvania.** Would you agree with that assessment?

> Mr. ORTITAY. **I do not believe so,** Mr. Speaker.

Legislative Journal—House, 201st Sess., October 25, 2017, at 1174 (emphasis added).

Therefore, based on both the plain language of the Gaming Act, as well as its legislative history, we conclude that unlicensed slot machines and/or slot machines **\*735** that **are not approved** by the Gaming Control Board, such as the POM Game, are not subject to the Gaming Act.[17] Consequently, we hold that even if the POM Game were considered an illegal gambling device, the Gaming Act does

not give the Gaming Control Board the power to regulate illegal gambling devices.

### 3. Whether the Gaming Act Supersedes the Crimes Code's Regulation of Unlicensed Gambling Devices.

Our conclusion is enhanced by an analysis of whether the General Assembly intended the Gaming Act to supplant the Crimes Code's regulation of unlicensed slot machines and illegal gambling devices. The Department contends that "[t]he Gaming Act sets forth a comprehensive regulatory structure that controls and provides oversight for every aspect of gaming in the Commonwealth." (Department's Br. at 9.) It argues that the General Assembly intended the Gaming Act to regulate all gaming in the Commonwealth and that, regardless of the Crimes Code, the POM Game is a slot machine pursuant to the Gaming Act. Conversely, POM maintains that there is a strong presumption that a statute does not impliedly repeal another statute and, therefore, that the Gaming Act did not displace section 5513 of the Crimes Code, as it pertains to gambling devices. We agree with POM.

Under section 1971 of the Statutory Construction Act of 1972, when a statute "purports to be a revision of all statutes upon a particular subject, [ ] sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statute," or "purports to establish a uniform and mandatory system covering a class of subjects," the statute will be construed to supply and to repeal any preexisting local or special statutes on the same class of subjects. 1 Pa.C.S. § 1971. However, "in all other cases, a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable." *Id.*

[14]  [15]  [16]  [17]  [18] Thus, "[w]hen a statute sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statutes upon the same subject, the former statute is impliedly repealed." *Licensed Beverage Association of Philadelphia v. Board of Education of School District of Philadelphia,* 669 A.2d 447, 450 (Pa. Cmwlth. 1995), *abrogated on different grounds by Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659 (2002). Yet, "there is a very strong presumption that a statute does not impliedly repeal another statute." *Borough of Emmaus v. Pennsylvania Labor Relations Board,* 156 A.3d 384, 398 n.9 (Pa. Cmwlth. 2017);

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

*see also In re Delinquent Tax Sale*, 83 Pa.Cmwlth. 411, 477 A.2d 603, 605 (1984) (noting that "implied repeals are not favored by the law"); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 3 Pa.Cmwlth. 546, 284 A.2d 808, 811 (1971) (concluding "there is a presumption against implied repeal"). "The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent." *HSP Gaming, L.P. v. City of Philadelphia*, 598 Pa. 118, 954 A.2d 1156, 1175 (2008). Because repeals by implication are not favored, they "will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter." *Id.* Moreover, since implied repeals are not favored, "legislative intent **\*736** to repeal a statute by enacting another must be clearly shown." *Id.*

**[19]** Here, section 5513(a) of the Crimes Code makes it illegal to "intentionally or knowingly make[ ], assemble[ ], set[ ] up, maintain[ ], sell[ ], lease[ ], give[ ] away, or offer[ ] for sale, loan, lease or gift any ... slot machine or any device to be used for gambling purposes." 18 Pa.C.S. § 5513(a). Further, section 211 of the Liquor Code, 47 P.S. § 2-211, gives the Pennsylvania State Police, Bureau of Liquor Control Enforcement, the power and duty to enforce section 5513 of the Crimes Code in the course of investigating Liquor Code violations. Additionally, section 1903(a)(2) of the Gaming Act, 4 Pa.C.S. § 1903(a)(2), mandates that provisions of section 5513(a) of the Crimes Code are only repealed to the extent they are inconsistent with the Gaming Act.

The Department essentially argues that the Gaming Act establishes a uniform system for all gambling in the Commonwealth, regardless of whether the gambling is legal or illegal. Under this interpretation, the Gaming Act would effectively supersede and displace section 5513(a)'s prohibition of illegal gambling. In effect, illegal gambling would be governed by the Gaming Act instead of the Crimes Code, as has historically occurred. This reading of the Gaming Act would also significantly curtail the Bureau of Liquor Control's enforcement activities with respect to illegal gambling, because many such activities would be entrusted to the Gaming Control Board.

However, there is nothing in the Gaming Act that suggests that it purported to revise all statutes governing illegal gambling, set up a general or exclusive system covering the entire subject matter of gambling, or establish a uniform and mandatory system encompassing all gambling. *See* 1 Pa.C.S. § 1971. The Gaming Act does not demonstrate that the General Assembly intended to repeal section 5513 of the Crimes Code, to the extent it continued to regulate illegal gambling. Given the strong presumption against implied repeals of statutes and the lack of an irreconcilable conflict between the Gaming Act's regulation of licensed slot machines and the Crimes Code's regulation of illegal slot machines, we decline to conclude that the Gaming Act impliedly repealed the Crimes Code's regulation of illegal gambling devices and slot machines. Therefore, pursuant to our rules of statutory construction we hold that section 5513 of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.

### V. Conclusion

**[20]** Because the plain language of the Gaming Act indicates that the General Assembly did not intend for the Gaming Act to regulate unlicensed slot machines which fall outside the ambit of the licensed facilities clearly delineated by the Gaming Act, and/or supplant the Crimes Code's regulation of the same, we conclude that the POM Game is not subject to the Gaming Act. [18] We therefore deny the Department's **\*737** application for summary relief in the nature of a motion for a judgment on the pleadings. [19]

Judge Cohn Jubelirer dissents.

Judge Brobson did not participate in this decision.

Judge Covey concurs in the result only.

### *ORDER*

AND NOW, this 20th day of November, 2019, the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings, with respect to the Department's counterclaim, is denied.

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

**All Citations**

221 A.3d 717

## Footnotes

1    This matter was assigned to this panel before September 1, 2019, when Judge Simpson assumed the status of senior judge.

2    18 Pa.C.S. §§ 101-7707.

3    In *Pace-O-Matic*, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized coin-operated video devices from a social club. *Id.*, slip op. at 1-2. Like the POM Game at issue, the devices contained tic-tac-toe style puzzles that were played for money and offered rewards and dot-matching bonus games. *Id.*, slip op. at 2-4. The court of common pleas concluded that a machine is a gambling device *per se* where three elements are present: (1) consideration; (2) a result determined by chance, instead of skill; and (3) a reward. *Id.*, slip op. at 5. Because the court of common pleas determined that the outcome of both the tic-tac-toe and bonus games was determined predominantly by skill, rather than chance, it held that the Commonwealth failed to prove that the seized devices were gambling devices *per se*. *Id.*, slip op. at 10-12.

4    Additionally, POM alleges that after the Beaver County decision, the District Attorney for Centre County issued a letter stating that, in light of the decision, her office would not confiscate POM machines. Similarly, POM avers that the District Attorney for Lancaster County issued a letter stating that for the reasons set forth in the Beaver County decision, the POM machine was not considered a game of chance under Pennsylvania gaming laws. (Petition ¶49.)

5    The City also filed a separate answer and new matter in response to POM's petition for review.

6    4 Pa.C.S. §§ 1101-1904.

7    Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which is titled "Summary relief," provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). "A motion for judgment on the pleadings is in the nature of a demurrer"; thus, "all of the opposing party's allegations are viewed as true and only those facts which have been specifically admitted by him may be considered against him." *Trib Total Media, Inc. v. Highlands School District*, 3 A.3d 695, 698 n.2 (Pa. Cmwlth. 2010).

In reviewing a motion for judgment on the pleadings we "may only consider the pleadings themselves and any documents properly attached thereto." *Id.* The motion should only be granted "when the pleadings show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* Further, "the party moving for judgment on the pleadings must admit the truth of all the allegations of his adversary and the untruth of any of his own allegations that have been denied by the opposing party." *Pfister v. City of Philadelphia*, 963 A.2d 593, 597 (Pa. Cmwlth. 2009). Where "material issues of fact are in dispute, judgment on the pleadings cannot be entered." *Id.*

8    Section 1102(1) of the Gaming Act provides, in full, as follows: "The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1).

9    Section 1317 of the Gaming Act provides, in relevant part, the following:

   A manufacturer that elects to contract with a supplier under section 1317.1(d.1) (relating to manufacturer licenses) shall ensure that the supplier is appropriately licensed under this section. A person seeking to provide slot machines, table game devices or associated equipment, interactive gaming devices or associated equipment or multi-use computing devices to a slot machine licensee, an interactive gaming certificate holder or an interactive gaming operator within this Commonwealth through a contract with a licensed manufacturer shall apply to the board for the appropriate supplier license.

   4 Pa.C.S. § 1317. Section 1317.1 of the Gaming Act provides, in pertinent part, as follows: "A person seeking to manufacture slot machines, table game devices and associated equipment or interactive gaming devices and associated equipment for use in this Commonwealth shall apply to the board for a manufacturer license." 4 Pa.C.S. § 1317.1.

10   POM argues that there are certain material issues of fact that preclude summary relief for the Department. In particular, POM maintains that (1) the Department makes several **policy** arguments that are predicated on unsupported factual assertions and (2) the Gaming Act has historically not been applied to similar circumstances, which necessitates discovery of pertinent formal guidance documents and interpretive rules in the possession of the Department and the Gaming Control Board. However, questions of policy and the potential existence of interpretive guidelines do not present genuine issues of material fact with respect to the fundamental question of whether, given the facts alleged by POM, the Gaming Act should be interpreted to apply to the POM Game.

11   The Gaming Act permits Category 1 and 2 licensees to operate up to **3,000 slot machines** at any one licensed facility and, under certain circumstances, apply to operate an additional **2,000 slot machines** at a licensed facility; such licensees, however, are required to operate and make available to play a minimum of **1,500 slot machines** at a licensed facility. Section 1210 of the Gaming Act, 4 Pa.C.S. § 1210. Successful Category 1 and Category 2 license applicants are required to pay a one-time slot machine license fee in the amount of $50,000,000. Section 1209 of the Gaming Act, 4 Pa.C.S. § 1209.

12   A maximum of **500 slot machines** are permitted at a Category 3 licensed facility, unless the licensee also holds a table game operation certificate, which entitles the licensee to operate up to **600 slot machines**. Section 1305 of the Gaming Act, 4 Pa.C.S. § 1305. Under certain circumstances, Category 3 licensees may obtain approval for an additional 250 slot machines. *Id.* Successful applicants must pay a one-time fee of $5,000,000, and an additional fee of $2,500,000 if additional slot machines are approved. *Id.*

13   In 2017, the General Assembly amended the Gaming Act to permit current slot machine licensees to submit bids for so-called "Category 4 slot machine license[s]." Section 1305.1 of the Act of October 30, 2017, P.L. 419, 4 Pa.C.S. § 1305.1. Only ten of these licenses are permitted and they may not be placed within 25 linear miles of the winning bidder's preexisting licensed facility. *Id.*

14   *Compare* Section 1518(a)(3) of the Gaming Act, 4 Pa.C.S. § 1518(a)(3), *with* section 3501 of the Gaming Act, 4 Pa.C.S. § 3501 (titled "General Prohibition," and providing that "[n]o person may offer or otherwise **make available for play in this Commonwealth** a video gaming terminal **unless the person is licensed** under this part" (emphasis added)), *and* section 13C04 of the Gaming Act, 4 Pa.C.S. § 13C04 (titled "Unauthorized sports wagering," and making it a criminal offense "for any person to operate, conduct, offer or expose sports wagering for play or to accept a bet or wager associated with sports wagering from any person physically

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

located in this Commonwealth which at the time of play that is not within the scope of a valid sports wagering certificate issued by the [Gaming Control Board] ...."), *and* section 13C71 of the Gaming Act, 4 Pa.C.S. § 13C71 (titled "Criminal activity," and providing that "Sports wagering conducted by a sports wagering certificate holder in accordance with this chapter shall not constitute a criminal activity under 18 Pa.C.S. § 5514 (relating to pool selling and bookmaking).").

15    *Compare* Section 1518(a)(4) of the Gaming Act, 4 Pa.C.S. § 1518(a)(4), *with* section 3508(a) of the Gaming Act, 4 Pa.C.S. § 3508(a) ("A person seeking to manufacture video gaming terminals, redemption terminals and associated equipment for use in this Commonwealth must apply to the [Board] for a manufacturer license.").

16    The Statutory Construction Act specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required. *See* [⌴]1 Pa.C.S. § 1921(c)(7). Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. [⌴]*Arneson v. Wolf*, 117 A.3d 374, 384 n.10 (Pa. Cmwlth.), *aff'd*, 633 Pa. 224, 124 A.3d 1225 (2015); *see also Board of Revision of Taxes v. City of Philadelphia*, 607 Pa. 104, 4 A.3d 610, 624 n.10 (2010) (noting that although legislators' statements during floor debate are not dispositive, they can be instructive to our analysis and persuasive evidence of the General Assembly's intent).

17    Of course, we do not answer the separate question of whether the POM Game qualifies as an illegal gambling device under [⌴]section 5513 of the Crimes Code, which both parties appear to acknowledge presents a question of fact that requires factual discovery to resolve.

18    Because we hold that the Gaming Act is inapplicable to the POM Game, we concomitantly conclude that the Department did not fail to join the Gaming Control Board as an indispensable party to the counterclaim, as argued by POM. "A party is generally regarded to be indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *HYK Construction Company, Inc. v. Smithfield Township*, 8 A.3d 1009, 1015 (Pa. Cmwlth. 2010) (internal quotation marks omitted). The relevant analysis of whether a party is indispensable requires consideration of the following factors: (1) whether "absent parties have a right or interest related to the claim"; (2) "[i]f so, what is the nature of that right or interest"; (3) whether that right or interest is "essential to the merits of the issue"; and (4) whether justice can "be afforded without violating the due process rights of absent parties." *Rachel Carson Trails Conservancy, Inc. v. Department of Conservation and Natural Resources*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018). Moreover, regarding cases involving the Commonwealth, "[a] Commonwealth party may be declared an indispensable party when meaningful relief cannot conceivably be afforded without the Commonwealth party's direct involvement in the action." *Id.* at 280.

Here, because the POM Game does not fall under the purview of the Gaming Act, the Gaming Control Board has no regulatory authority regarding the POM Game. Thus, the Gaming Control Board does not have a right or interest related to the counterclaim and meaningful relief can be afforded without its involvement. It is also notable that the Gaming Control Board is aware of this matter, has not sought to intervene, and takes the position that unlicensed "skill games" are not subject to the Gaming Control Board's regulation. *See* Department's Reply Br. at 17; Video, *Pennsylvania House Appropriations Committee Budget Hearing, FY 2019-20*, (February 27, 2019), https://s3.us-east-2.amazonaws.com/pagopvideo/106913203.mp4 (last visited October 15, 2019).

19    Our denial of the Department's application, however, does not decide the separate question raised in POM's claim, *i.e.*, whether the POM Game is an illegal gambling device under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

## <u>CERTIFICATE OF SERVICE</u>

I, Christopher Carusone, Esquire, hereby certify that a copy of the foregoing motion for return of property was served on August 10, 2022 *via* first class and electronic mail upon the following officers of the Commonwealth of Pennsylvania:

Michael A. Sprow
msprow@dauphinc.org
First Assistant District Attorney
Dauphin County District Attorney's Office
101 Market Street
Harrisburg, PA 17101

**Respectfully Submitted:**

**COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.**

*Christopher Carusone*

**Christopher D. Carusone, Esquire**
**ccarusone@cohenseglias.com**

**COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219**

**Date:  August 10, 2022**

Dauphin 1

Common Pleas Court

Receipt No. 457391

Receipt Date: 08/16/2022 02:01 PM

Received of:   Cohen Seglias Pallas Greenhall & Furman, PC,                          $        202.00

Two Hundred Two and 00/100

no plaintiff vs. no defendant

| Case | Amount |
|------|--------|
| 2022-CV-06333-MD | |
| Petition | 202.00 |

| | |
|------|--------|
| Total: | 202.00 |
| Balance due court:  $ | 0.00 |
| Next due date: | |

Check (Num: 1716, Exp: xx/xx)

| | |
|------|--------|
| Amount Tendered: | 202.00 |
| Overage: | 0.00 |
| Change Due: | 0.00 |

Matthew R. Krupp, Prothonotary

By:   _____

Deputy Clerk

Clerk: NCAHILL

# EXHIBIT E

**IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA**

IN RE:  THREE PENNSYLVANIA SKILL
AMUSEMENT  DEVICES,  ONE  GREEN    No.  2022-CV-6333-MD
BANK  BAG  CONTAINING  $525.00  IN
U.S. CURRENCY, AND SEVEN RECEIPTS

To:    **Champions Sports Bar, LLC, 300 2nd Street, Highspire, PA 17034**

      **Capital Vending Company, Inc., 807 South 27th Street,
      Harrisburg, PA 17111**

### NOTICE TO ANSWER PETITION FOR FORFEITURE AND CONDEMNATION

TO THE CLAIMANT OF WITHIN DESCRIBED PROPERTY: YOU ARE
REQUIRED TO FILE AN ANSWER TO THIS PETITION, SETTING FORTH YOUR
TITLE IN, AND RIGHT TO POSSESSION OF, SAID PROPERTY WITHIN THIRTY
(30) DAYS FROM THE SERVICE HEREOF, AND YOU ARE ALSO NOTIFIED
THAT, IF YOU FAIL TO FILE SAID ANSWER, A DECREE OF FORFEITURE AND
CONDEMNATION WILL BE ENTERED AGAINST SAID PROPERTY.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU
DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH
BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT
HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE
ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY
OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR
NO FEE.

**Dauphin County Lawyer Referral Service
213 North Front Street
Harrisburg, PA  17101
(717) 232-7536**

## NOTICE
## CONCERNING MEDIATION OF ACTIONS PENDING BEFORE
## THE COURT OF COMMON PLEAS OF DAUPHIN COUNTY

The Judges of the Court of Common Pleas of Dauphin County believe that mediation of lawsuits is a very important component of dispute resolution. Virtually all lawsuits can benefit in some manner from mediation.

The Court has adopted Dauphin County Local Rule 1001 to encourage the use of mediation. This early alert enables litigants to determine the best time during the life of their lawsuit for a mediation session. The intent of this early alert is to help the parties upon the requirement to consider good faith mediation at the optimal time.

The Dauphin County Bar Association provides mediation services and can be reached at (717) 232-7536. Free mediation sessions for pro bono cases referred by the MidPenn Legal Services are available through the Dauphin County Bar Association.

## AVISO

USTED HA SIDO DEMANDADO/A EN CORTE. Si usted desea defender se de las demandas que se presentan mas Adelante en las siguientes paginas, debe tomar accion dentro de los proximos veinte (20) dias despues de la notificacion de esta Demanda y Aviso radicando personalmente o por medio de un abogado u na comparencencia escrita y radicando en la Corte por escrito sus defensas de, y objecciones a, las demandas presentadas aqui en contra suya. Se le advierte de que si usted falla de tomar accion como se describe anteriomente, el caso puede proceder sin usted y un fallo por cualquier suma de dinero reclamada en la demanda o cualquier otra reclamacion o remedio solicitado por el demandante puede ser dictado en contra suya por la Corte sin mas aviso adicional. Usted puede perder dinero o propiedad u otros derechos importantes para usted.

USTED DEBE LLEVAR ESTE DOCUMENTO A SU ABOGADO INMEDIATAMENTE. SI USTED NO TIENE UN ABOGADO, LLAME O VAYA ALA SIGUIENTE OFICINA. ESTA OFICINA PUEDE PROVEERLE INFORMACION A CERCA DE COMO CONSEGUIR UN ABOGADO.

SI USTED NO PUEDE PAGAR POR LOS SERVICIOS DE UN ABOGADO, ES POSIBLE QUE ESTA OFICINA LE PUEDA PROVEER INFORMACION SOBRE AGENCIAS QUE OFREZCAN SERVICIOUS LEGALES SIN CARGO O BAJO COSTO A PERSONAS QUE CUALIFICAN.

**Dauphin County Lawyer Referral Service**
**213 North Front Street**
**Harrisburg, PA  17101**
**(717) 232-7536**

Andrew J. Jarbola, IV
Deputy Attorney General
Attorney I.D. #314659
Office of Attorney General
6400 Flank Drive, Suite 1300
Harrisburg, PA 17112
(717) 712-1206

**IN THE COURT OF COMMON PLEAS**
**DAUPHIN COUNTY, PENNSYLVANIA**

| | |
|---|---|
| IN RE: THREE PENNSYLVANIA SKILL AMUSEMENT DEVICES, ONE GREEN BANK BAG CONTAINING $525.00 IN U.S. CURRENCY, AND SEVEN RECEIPTS | No. 2022-CV-6333-MD |

**ORDER**

AND NOW, this _____ day of _____, 2022, upon consideration of Petitioners Capital Vending Company, Inc. and Champions Sports Bar, LLC's Petition for Return of Property, and the Commonwealth's Answer and New Matter thereto, IT IS HEREBY ORDERED as follows:

The Petition for Return of Property is DENIED. The Commonwealth's New Matter in the form of a Petition for Forfeiture and Condemnation is GRANTED.

All claims of right, title and interest of Capital Vending Company, Inc., Champions Sports Bar, LLC, and any other claimant(s) in the defendant/property are hereby declared to be terminated, revoked, and rendered null and void. The $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices are hereby declared to be forfeited to the Office of Attorney General, Commonwealth of Pennsylvania, pursuant to and under authority of the provisions of the Crimes Code, Gambling Device, Gambling, 18 Pa.C.S.A. Section 5513(b), and/or the Amusements Code, Prohibited Acts; Penalties, 4 Pa.C.S.A. Section 1518(f), now enacted under Judicial Code, Chapter 58, Forfeiture of Assets, Section 5803(a), 42 Pa.C.S.A. Section 5801 et seq., for use or disposition in accordance with law.

Funds received from the sale of forfeited property and/or from forfeited cash shall be deposited into an interest-bearing account held by the Office of Attorney General and the interest generated there from shall be used in accordance with the Forfeiture of Assets Act, 42 Pa.C.S.A. §5801 et seq.

BY THE COURT:

_____

J.

**Distribution**:
Andrew J. Jarbola, IV, Esquire
Office of Attorney General
6400 Flank Drive, Suite 1300
Harrisburg, PA 17112

Christopher D. Carusone, Esquire
*Attorney for Champions Sports Bar, LLC*
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219

Edward T. Butkovitz, Esquire
*Attorney for Capital Vending Company, Inc.*
Three Logan Square, 5th Floow
1717 Arch Street
Philadelphia, PA 19103

## IN THE COURT OF COMMON PLEAS
## DAUPHIN COUNTY, PENNSYLVANIA

IN RE:   THREE PENNSYLVANIA SKILL
AMUSEMENT DEVICES, ONE GREEN   No.  2022-CV-6333-MD
BANK BAG CONTAINING $525.00 IN
U.S. CURRENCY, AND SEVEN RECEIPTS

## ANSWER TO PETITION FOR RETURN OF PROPERTY
## AND NEW MATTER

AND NOW, comes the petitioner, the Commonwealth of Pennsylvania, Office of Attorney General, by Andrew J. Jarbola, IV, Deputy Attorney General, and files this Answer and New Matter to Capital Vending Company, Inc. and Champions Sports Bar, LLC's Petition for Return of Property, and in support thereof, avers the following:

1.      Based upon information and belief, Paragraph 1 is admitted in part and denied in part.  It is denied that Capital Vending's "Pennsylvania Skill" devices are legal games skill.

2.      Admitted.

3.      Admitted.

4.      It is admitted that the devices and currency were seized as they are illegal gambling devices, and the currency is proceeds from the illegal gambling.

5.      Admitted.  However, in so admitting, the Commonwealth notes that a search warrant, administrative inspection warrant, or any warrant is **not** required for the Bureau of Liquor Control Enforcement ("BLCE") to conduct inspections of licensed premises and seize property that they have reasonable

and probable cause to believe is an illegal gambling device and/or is subject to forfeiture as a result of illegal gambling. *See* 47 P.S. §2-211(a)(3).

6.     Admitted.   However, in response to this Petition for Return of Property, the Commonwealth is filing a New Matter, requesting the seized $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices be forfeited and destroyed in accordance with law.

7.     It is admitted that no criminal charges have been filed.   However, the averment in Paragraph 7 is entirely misleading.   The Petitioners are well aware that there is an active administrative citation filed against Champions Sports Bar in the Office of Administrative Law Judge for the Pennsylvania Liquor Control Board.   Additionally, this administrative citation is predicated on a Crimes Code violation of 18 Pa.C.S.A. §5513.   Specifically, BLCE issued a notice of violation for gambling on March 4, 2020, and a subsequent citation for gambling on April 22, 2020.   Lastly, the Commonwealth notes that Champions Sports Bar filed a Motion to Stay Proceedings, in conjunction with several other licensees, and the underlying administrative charge has been stayed since May 2021.

8.     Admitted.

9.     Denied.   The three (3) "Pennsylvania Skill" video gambling devices are illegal gambling devices based predominantly on chance, and the $2,053.00 U.S. currency is illegal proceeds of the unlawful gambling.

10.    Based upon information and belief, Paragraph 10 is admitted.

11.    Denied.   The property was properly seized.   Further, the property should not be returned as it is evidence in the underlying administrative charge, a case which has been stayed by Petitioner Champions Sports Bar, and as the property is subject to forfeiture as illegal gambling devices and proceeds of illegal gambling.

12.   Denied. The property was properly seized pursuant to the BLCE's statutory authority to enforce the Liquor Code and investigate and inspect licensed establishments. Further, BLCE properly seized the property pursuant to 42 Pa.C.S.A. §5803(b)(4) and (b)(6). Lastly, the devices are not games of skill, but are gambling devices with outcomes based predominantly on chance.

13.   Paragraph 13 is a conclusion of law to which no response is necessary, accordingly, is is denied.

14.   This is a correct recitation of law.

15.   This is a correct recitation of law.

16.   This is a correct recitation of law.

17.   Paragraph 17 is a conclusion of law to which no response is necessary, accordingly it is denied.   To the extent a response is required, Paragraph 17 is denied as the seized devices are illegal gambling devices in which the outcomes of gameplay are determined predominantly by chance.

18.   Paragraph 18 is a conclusion of law to which no response is necessary, accordingly it is denied.   To the extent a response is required, Paragraph 18 is denied as the seized devices are illegal gambling devices in which the outcomes of gameplay are determined predominantly by chance, and the currency is proceeds of the unlawful gambling.

19.   Paragraph 19 is a conclusion of law to which no response is necessary, accordingly it is denied.   To the extent a response is required, Paragraph 19 is denied as the seized devices are illegal gambling devices in which the outcomes of gameplay are determined predominantly by chance, and the currency is proceeds of the unlawful gambling.

20. Paragraph 20 is a conclusion of law to which no response is necessary, accordingly it is denied. To the extent a response is required, Paragraph 20 is denied as the seized devices are illegal gambling devices in which the outcomes of gameplay are determined predominantly by chance, and the currency is proceeds of the unlawful gambling.

21. Based upon information and belief, it is admitted that POM manufactures and distributes the seized gambling devices.

22. Denied. The "Pennsylvania Skill" gambling devices are simulated slot machine games in which the primary portion of the games are determined predominantly by chance. Specifically, upon pressing "Play" the reels in each game theme spin for approximately four (4) seconds and stop on their own, revealing the pre-determined outcome. In order to win, as in a traditional slot game, three of the same characters have to line up in a row vertically, horizontally, or diagonally. However, there is minimal player input involved in that the player must interact with the device to push a square next to or between two like characters within thirty seconds, in order to produce the winning combination. This is an obvious and easy task and involves nominal "skill," if any.

Additionally, if there is no potential winning combination on the screen when the reels stop, the "Play" button on the screen will illuminate right away, and a player can press the "Play" button before the thirty-second timer is up. As such, if there is no pre-determined winning outcome available, a player could continuously press the "Play" button and play the game just like a traditional slot machine. It is only when a winning outcome is available that a player is required to minimally interact with the game by selecting a square on the reels to match three characters. Further, when a winning outcome is available, the "Play" button will remain dark and cannot be pushed to re-spin the reels until the thirty-second timer is up.

As for the claim that the gambling devices "offer the skillful player the ability to win, on every play, at least 105% of the player's consideration", this is based upon the secondary "Follow-Me" game theme available to a player when the pre-determined outcome in the primary portion of the game is a losing outcome. However, the chances of winning through the optional follow-me game theme are illusory and the follow-me game theme is only offered to conceal the true nature of the devices as gambling devices.

Specifically, the follow-me feature, which is similar to the "Simon Says" game, displays nine (9) circles of various colors, and requires a player to mimic a sequence selected by the device of the colored circles. The sequence becomes longer and more complicated if the player successfully selects the circles that were played by the device. The follow-me feature involves, based upon information and belief, a total of twenty-five (25) rounds and takes approximately twelve (12) to fifteen (15) minutes to complete. Additionally, provided a player even knows of the follow-me feature, if a player chooses to play the follow-me game and successfully completes all 25 rounds, they are awarded only 105% of their original wager in the primary portion/slot machine game that they lost.

Again, this "opportunity" to win 105% of a losing wager is entirely illusory as, even if a player wagered $4.00, they would only be awarded an additional $0.20 (5%). However, based upon the software and manufacturer's settings on the gambling devices, a player will **never** actually receive the additional 5% back as all rewards/winnings are rounded to the nearest $1.00 when a player selects the redeem button to "cash out."

Therefore, the chances of winning through the optional follow-me game theme are illusory and the follow-me game theme is only offered to conceal the true nature of the devices as gambling devices, insofar as the follow-me game theme is not well publicized to the player; it takes 12 to 15 minutes to complete; and successful completion offers only nominal winnings, thus

intentionally dis-incentivizing players from playing it. In other words, the follow-me game theme is merely a means to get around the law and conceal the true nature of the game as one of chance.

Furthermore, it should also be noted that a player does not have to select the follow-me feature in order to collect their pre-determined reward or to continue playing the primary portion of the slot machine games.

Lastly, BLCE members know that players/patrons simply don't play the follow-me feature, if they are even aware of it. This is based upon the extensive time liquor enforcement officers ("LEO") have spent during investigations and inspections observing and interacting with other players/patrons and speaking with staff members at various establishments. As such, these patrons play the games like traditional slot machines to gamble.

23.   Denied as stated. It is admitted that each game theme on the gambling devices offer a "Pre-Reveal" button. This feature does nothing but show the player/patron the cash value award that would be available for the next game that is played at the selected wager level. However, knowing the outcome of a particular wager level does not change how the outcome is determined, which is based on the next ticket/game in the pre-determined finite pool. Additionally, a player/patron has no control over the available outcome at each wager level in each game, as they are pre-determined, and there is no amount of skill that can be utilized to change that set outcome in the primary portion of the game. Lastly, BLCE members know there can be occasions where every single wager level on every single game theme is a losing outcome. In such situations, there is no amount of skill a player/patron can input to change the losing outcomes displayed for each upcoming play at each wager level. The only way to see the next "Pre-Reveal" level, or to obtain **the chance** to have a winning outcome from the pre-determined finite ticket pool, is to pay to play a losing wager level.

24.    Admitted.    In so admitting, the Commonwealth denies the characterization of the primary portion of the game as a puzzle game.  It is a slot-machine-style game that involves minimal player interaction to complete an obvious and easy task of selecting the square next to or between two like characters.  Additionally, this slot-machine-style game, and the spinning of the reels, is simply the entertaining display that reveals graphically the pre-determined outcome from the finite ticket pool.

25.    Denied as stated.  The Commonwealth incorporates its averments in Paragraphs 22 through 24 in its denial of Paragraph 25.

26.    It is admitted that a player is offered the opportunity to play the secondary "Follow-Me" game theme when there is a pre-determined losing outcome.  However, as noted above in Paragraph 22, players, if they are even aware the secondary game exists as it is not overtly advertised, simply don't play the follow-me game theme as they play the devices as slot machines and to gamble, and since the follow-me game theme takes too long to play and any reward is never truly realized.  Importantly, it's not the theoretical possibilities of gameplay that controls; it's the actual practical operation of the machines, i.e. how patrons actually play, that controls.  *See **Commonwealth v. Lund***, 15 A.2d 839 (Pa. 1940) (The Supreme Court held that the key inquiry was the actual operation of the scheme, not the theoretical possibilities of isolated individuals obtaining tickets for free or seeking to purchase the purported product.).

27.    It is admitted that a player would earn 105% of the original wager from the primary portion/slot machine game that they lost.  Again, as noted above, based upon the software and manufacturer's setting on the gambling devices, a player will **never** actually receive the additional 5% back as all rewards/winnings are rounded to the nearest $1.00 when a player selects the redeem button to "cash out."

28. Denied. The Commonwealth incorporates its averments in Paragraphs 22, 23, 24, and 26 in its denial of Paragraph 28.

29. This is a correct statement of 42 Pa.C.S. §5803(b). However, it is denied that Section 5803(b) is the only statutory authority governing how and when BLCE can seize property. Specifically, BLCE is authorized to conduct inspections of establishments that possess a liquor license, and seize property that they have reasonable and probable cause to believe is an illegal gambling device and/or is subject to forfeiture as a result of illegal gambling. *See* 47 P.S. §2-211(a)(3).

30. Admitted in part and denied in part. Based upon current information and belief, the Commonwealth admits that Section 5803(b)(1) does not appear to apply. However, the Commonwealth reserves its right to change its response to Paragraph 30 upon review of additional research. Regarding the Petitioners' averment that "courts of coordinate jurisdiction have held such machines to be lawful", it is denied that any such prior decision is controlling here. Further, BLCE and the Office of Attorney General, who litigates BLCE's property seizures and forfeitures, have always held the position that the "Pennsylvania Skill" machines are illegal gambling devices as the primary portion of each game theme is determined predominantly by chance.

31. It is admitted that the seizure of the property was not authorized under Section 5803(b)(2).

32. It is admitted that the seizure of the property was not authorized under Section 5803(b)(3).

33. Denied. In addition to being proper under Section 2-211 of the Liquor Code, 47 P.S. §2-211, the devices and currency were properly seized under 42 Pa.C.S.A. §5803(b)(4). Specifically, there was probable cause to believe the property has been used or is intended to be used in violation of ...

"**another offense for which forfeiture is expressly authorized** as a sanction." 42 Pa.C.S.A. §5803(b)(4) (emphasis added). Here forfeiture is expressly authorized under 18 Pa.C.S.A. §5513(b): "Any gambling device possessed or used in violation of the provisions of subsection (a) **shall be seized and forfeited** to the Commonwealth." The gambling devices and currency were all possessed and used in violation of Section 5513; as such, they were required to be seized.

34.   It is admitted that the seizure of the property was not authorized under Section 5803(b)(5).

35.   Denied. In addition to being proper under Section 2-211 of the Liquor Code, 47 P.S. §2-211, the devices and currency were properly seized under 42 Pa.C.S.A. §5803(b)(6). Specifically, there was probable cause to believe the property is subject to forfeiture and exigencies were likely to result in the destruction or removal of the property. 42 Pa.C.S.A. §5803(b)(6). Here, the gambling devices could have been removed, the money could have been removed, or the software or data could have been erased in the time necessary to obtain a warrant following the open inspection. There have been multiple raids/inspections conducted by BLCE where word of the raids/inspections leaked out before their execution and either some of the gambling devices were removed, or the cash was taken out of the devices. As such, given the fact that open inspections were conducted on December 19, 2019, on multiple establishments located in the same county (and nearby counties) with similar machines to verify that the gambling devices were the ones previously observed and reviewed, and that they are gambling devices *per se*, exigencies existed that were likely to result in the destruction or removal of property.

36.   Paragraph 36 is a conclusion of law to which no response is necessary, accordingly it is denied. To the extent a response is required, Paragraph 36 is denied as the property was properly seized pursuant to 47 P.S. §2-211 **and** pursuant to 42 Pa.C.S.A. §5803(b)(4) and (b)(6).

37.   This is a correct statement of law.

38.   Denied as stated.  Historically, our appellate courts have held a machine is a gambling device *per se* if it can be used for no purpose other than gambling.  ***Nu-Ken Novelty, Inc. v. Heller***, 288 A.2d 919 (Pa. Super. 1972). However, our courts have also found that "[t]his broad standard must be interpreted to provide a meaningful test for judging a given machine.  If it is to be useful, it cannot mean that the machine could not possibly be used for any activity other than gambling, because almost any machine, including the ["Pennsylvania Skill" devices], **can** be used for non-gambling (e.g., pure amusement) purposes.  Instead, the inquiry must be whether the machine is 'so intrinsically connected with gambling' as to constitute a gambling device *per se.*"  ***Commonwealth v. Two Electronic Poker Game Machines***, 465 A.2d 973, 977 (Pa. 1983) (emphasis in original).  "Such a determination will turn on the characteristics of the machine when read against the three elements necessary to gambling:  consideration, a result determined by chance rather than skill, and a reward.  If the machine displays all three qualities, it will then be 'so intrinsically connected with gambling' as to be a gambling device *per se.*" ***Id***.  The *Two Electronic Poker* Court went on to hold that, "We are thus left with the task of determining in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome." ***Id***.

39.   This is a correct statement of law.

40.   This is a correct statement of the findings of the *Two Electronic Poker* Court.

41.   Paragraph 41 is a conclusion of law to which no response is necessary, accordingly it is denied.  To the extent a response is required, Paragraph 41 is denied as the outcomes of the various game themes on the

"Pennsylvania Skill" gambling devices are determined predominantly by chance. The Commonwealth incorporates its averments in Paragraphs 22, 23, 24, and 26 in its denial of Paragraph 41.

42.  It is admitted that a Beaver County Court of Common Pleas judge found similar "Pennsylvania Skill" devices to be games of skill. However, just as Pace-O-Matic finally admitted in responding to the Commonwealth's preliminary objections in the *POM of Pennsylvania, LLC, v. BLCE* case, docket 222 MD 2022, pending before the Commonwealth Court of Pennsylvania, the Beaver County decision does not forever legalize the devices, and it is not binding throughout the Commonwealth.

43.  Denied as stated.  Initially, the Commonwealth notes that Petitioners are clearly aware that the Office of Attorney General litigates the BLCE's property seizures and forfeiture cases as the undersigned and other deputy attorney generals have numerous pending forfeiture matters in several counties involving the same devices -- such as the Clearfield County matters cited here.  Nonetheless, the Office of Attorney General was never served with the instant Petition for Return of Property, nor a similar one filed in York County; instead, the petitions were served upon local District Attorney's Offices that are not familiar with the devices and are not equipped, financially or otherwise, to fully litigate these issues.  The undersigned only learned of these petitions through counterparts in the District Attorney's Offices or the BLCE. As for the cited "Stipulated Orders", the devices in Clearfield County were returned for various reasons, none of which had to do with the legality of the devices.  Again, BLCE and the Office of Attorney General have always held the position that the "Pennsylvania Skill" machines are illegal gambling devices as the primary portion of each game theme is determined predominantly by chance.

44.  Denied as stated.  Based upon information and belief, it is the Commonwealth's understanding that various District Attorney's Offices are not

willing or able to prosecute these gambling cases as they simply do not have sufficient resources. Investigations and litigations involving these claimed "skill" games require various experts, expert reviews, expert reports, and expert testimony, and can cost tens of thousands of dollars. As such, the BLCE has, instead, continued to prosecute these gambling offenses, and related offenses, through administrative citations. Lastly, the Commonwealth notes that the Monroe County District Attorney is currently prosecuting a similar gambling device case for violations of 18 Pa.C.S.A. §5513.

45.    Admitted.

46.    Admitted.   However, only one court (Beaver County) has found prior versions of the "Pennsylvania Skill" devices to be legal games of skill. Further, based upon information and belief, various Administrative Law Judges have found these devices to be illegal games of chance/gambling.

47.    Paragraph 47 is a conclusion of law to which no response is necessary, accordingly it is denied. To the extent a response is required, Paragraph 47 is denied as the outcomes of the various game themes on the "Pennsylvania Skill" gambling devices are determined predominantly by chance. The Commonwealth incorporates its averments in Paragraphs 22, 23, 24, and 26 in its denial of Paragraph 47.

48.    This is a correct statement of law.

49.    This is a correct statement of law.

50.    Admitted.

51.    Denied as stated.   The receipts are contraband as they are evidence of the underlying illegal gambling activities.

52.    Denied.  The currency is proceeds from the unlawful "Pennsylvania Skill" gambling devices.   The Commonwealth incorporates its averments in Paragraphs 22, 23, 24, and 26 in its denial of Paragraph 52.

53.    Paragraph 53 is a conclusion of law to which no response is necessary, accordingly it is denied.   To the extent a response is required, Paragraph 53 is denied as the currency is proceeds from the unlawful "Pennsylvania Skill" gambling devices, whose outcomes are determined predominantly by chance.  The Commonwealth incorporates its averments in Paragraphs 22, 23, 24, and 26 in its denial of Paragraph 53.

WHEREFORE, this Honorable Court should deny the Petitioners' Petition for Return of Property as the seized currency, gambling devices, and receipts are evidence in the underlying administrative charge, a case which has been stayed by Petitioner Champions Sports Bar, and as the property is subject to forfeiture.

## NEW MATTER IN FORM OF PETITION FOR FORFEITURE AND CONDEMNATION

COMES NOW, the Attorney General of the Commonwealth of Pennsylvania, Josh Shapiro, by and through Andrew J. Jarbola, IV, Deputy Attorney General, pursuant to and under authority of the provisions of the Crimes Code, Gambling Device, Gambling, 18 Pa.C.S.A. §5513(b), and the Amusements Code, Prohibited Acts; Penalties, 4 Pa.C.S.A. §1518(f), now enacted under Judicial Code, Chapter 58, Forfeiture of Assets, Section 5803(a), 42 Pa.C.S.A. §5801 et seq., (hereinafter referred to as "Act"), and petitions this Honorable Court setting forth a right of possession in and requesting an Order of Forfeiture for $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, and in support thereof avers as follows:

54.   The Commonwealth incorporates its averments in Paragraphs 1 through 53 herein.

55.   The defendant/property, $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, was seized by the Commonwealth, pursuant to the "Act."

56a.  The defendant/property, $50.00 U.S. currency, was seized at or about 12:05 PM on August 22, 2019.

56b.  The defendant/property, $115.00 U.S. currency, was seized at or about 12:22 PM on September 29, 2019.

56c.  The defendant/property, $80.00 U.S. currency, was seized at or about 7:30 PM on October 20, 2019.

56d.  The defendant/property, $200.00 U.S. currency, was seized at or about 12:20 PM on November 5, 2019.

56e.  The defendant/property, $100.00 U.S. currency, was seized at or about 5:52 PM on November 24, 2019.

56f.  The defendant/property, $528.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, was seized at or about 4:42 PM on December 9, 2019.

56g.  The defendant/property, $980.00 U.S. currency, was seized at or about 2:45 PM on January 2, 2020.

57a.  The defendant/property, $50.00 U.S. currency, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57b. The defendant/property, $115.00 U.S. currency, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57c. The defendant/property, $80.00 U.S. currency, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57d. The defendant/property, $200.00 U.S. currency, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57e. The defendant/property, $100.00 U.S. currency, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57f. The defendant/property, $528.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, was seized at Champions Sports Bar, 300 2nd Street, Highspire, Dauphin County, Pennsylvania.

57g. The defendant/property, $980.00 U.S. currency, was seized at the Pennsylvania State Police, Bureau of Liquor Control Enforcement Office, 3655 Vartan Way, Harrisburg, Dauphin County, Pennsylvania.

58a. The owner of the defendant/property, $545.00 U.S. currency, based upon all information currently available, is the Pennsylvania State Police, Bureau of Liquor Control Enforcement Office, 3655 Vartan Way, Harrisburg, Pennsylvania, as the currency was received as payout from the gambling devices during multiple undercover visits.

58b. The owner of the defendant/property, $1,508.00 U.S. currency, based upon all information currently available, is Champions Sports Bar, LLC,

300 2nd Street, Highspire, Pennsylvania, and Capital Vending Company, Inc., 807 South 27th Street, Harrisburg, Pennsylvania.

58c.    The owner of the defendant/property, three (3) "Pennsylvania Skill" video gambling devices, based upon all information currently available, is Capital Vending Company, Inc., 807 South 27th Street, Harrisburg, Pennsylvania.

59.    At the time of seizure, on the date and at the place of seizure, hereinbefore mentioned, the defendant/property, $2,503.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, was in the possession of Champions Sports Bar, LLC, 300 2nd Street, Highspire, Pennsylvania.

60.    The defendant/property is subject to forfeiture and condemnation and no legal right, title or interest exists in it by any owners or possessors of it pursuant to 18 Pa.C.S.A. Section 5513, and 4 Pa.C.S.A. Section 1518(f), now enacted under 42 Pa.C.S.A. Section 5803(a), based upon the following averments of material facts:

a.    A review of Champions Sports Bar, LLC's (hereinafter "Champions") file showed their liquor license was active and it expired on February 29, 2020.

b.    On July 16, 2019, at approximately 2:05 PM, LEO Daniel Wentsler entered Champions and observed two (2) full-size, stand-alone "Pennsylvania Skill" video gambling devices and one table-top "Pennsylvania Skill" video gambling device. Each device was set up for play. The games offered for play included "Pirates", "Amigos Locos", "Living Large", and/or "Wild Beasts". After inserting currency five separate times on two of the machines, and after periods of play, LEO Wentsler was unable to accumulate enough credits to receive a payout.

c.     Throughout the investigation, numerous undercover visits were conducted where LEOs were unable to obtain enough credits to receive a payout from the gambling devices.   However, on five (5) occasions, LEO Wentsler and/or LEO John Deuter were able to accumulate enough credits to receive a payout/reward, by chance, from the gambling devices/bartender. Specifically, on August 22, 2019, LEO Wentsler received a payout from the simulated slot machine games, by chance, of $50.00.

d.     On September 29, 2019, LEO Deuter received a payout from the simulated slot machine games, by chance, of $115.00.

e.     On October 20, 2019, LEO Deuter received a payout from the simulated slot machine games, by chance, of $80.00.

f.     On November 5, 2019, LEO Wentsler received a payout from the simulated slot machine games, by chance, of $200.00.

g.     On November 24, 2019, LEO Deuter received a payout from the simulated slot machine games, by chance, of $100.00.

h.     Thereafter, on December 9, 2019, LEOs conducted an open inspection of Champions, a licensed premises, to confirm whether there were gambling devices set up for play.   After confirming the devices were gambling devices, the three (3) "Pennsylvania Skill" video gambling devices, along with seven (7) payout slips and a green bank bag containing $528.00 U.S. currency was seized.

i.     Specifically, the inspection confirmed the three (3) "Pennsylvania Skill" video gambling devices offered simulated slot-machine-style games in which the primary portion of each game theme is determined predominantly by chance.   Upon touching each device, each offered four games to play: "Pirates", "Amigos Locos", "Living Large", and/or "Wild Beasts".   Each of the games offered the same style of play options, which included betting/wager levels of

40 credits ($0.40) to 400 credits ($4.00) per spin/play, with the exception of the game "Wild Beasts", which offered a minimum betting level of 8 credits or $0.08 per spin/play.

j.     Upon pressing "Play", the reels spun for approximately four (4) seconds and stopped on their own, revealing the pre-determined outcome.  In order to win, as in a traditional slot game, three of the same characters have to line up in a row vertically, horizontally, or diagonally.  However, there is minimal player input involved in that the player must interact with the device to push a square next to or between two like characters within thirty seconds, in order to produce the winning combination.

k.     Additionally, if there was no potential winning combination on the screen when the reels stopped, the "Play" button on the screen would illuminate right away, and he could press the "Play" button before the thirty-second timer was up.  As such, if there was no pre-determined winning outcome available, he could continuously press the "Play" button and play the game just like a traditional slot machine.  It was only when a winning outcome was available that he was required to minimally interact with the game by selecting a square on the reels to match three characters.  Moreover, when a winning outcome was available, the "Play" button would remain dark and was unable to be pushed to re-spin the reels until the thirty-second timer was up.

l.     Each game also offered a "Pre-Reveal" button, which does nothing but show the patron the cash value award that would be available for the next game that is played at the selected wager level.  However, knowing the outcome of a particular wager level does not change how the outcome is determined, which is based on the next ticket/game in the pre-determined finite pool.  Additionally, a patron has no control over the available outcome at each wager level in each game, as they are pre-determined, and there is no amount of skill that can be utilized to change that set outcome in the primary portion of the game.

m.      Lastly, BLCE LEOs know there can be occasions where every single wager level on every single game theme is a losing outcome.   In such situations, there is no amount of skill a patron can input to change the losing outcomes displayed for each upcoming play at each wager level.  The only way to see the next "Pre-Reveal" level, or to obtain *the chance* to have a winning outcome from the pre-determined finite ticket pool, is to pay to play a losing wager level.

n.      The different game themes also offered a secondary "Follow-Me" game theme, which was only available to play if the pre-determined outcome in the primary portion of the game was a losing outcome.  The follow-me feature, which is similar to the "Simon Says" game, displays nine (9) circles of various colors, and requires a player to mimic a sequence selected by the device of the colored circles.  The sequence becomes longer and more complicated if the player successfully selects the circles that were played by the device.  The follow-me feature involves a total of twenty-five (25) rounds and takes approximately twelve (12) to fifteen (15) minutes to complete.

o.      Additionally, if a player knows of the follow-me feature, chooses to play the follow-me feature, and successfully completes all 25 rounds, they are awarded only 105% of their original wager in the primary portion/slot machine game that they lost.  However, the chances of winning through the optional follow-me game theme are illusory and the follow-me game theme is only offered to conceal the true nature of the devices as gambling devices.

p.      Further, even if a player wagered $4.00, they would only be awarded an additional $0.20 (5%).  However, based upon the software and manufacturer's setting on the gambling devices, a player will *never* actually receive the additional 5% back as all rewards/winnings are rounded to the nearest $1.00 when a player selects the redeem button to "cash out."

q.      It should be noted that a player does not have to select the follow-me feature in order to collect their pre-determined reward or to continue playing the primary portion of the slot machine games.

r.      Lastly, LEOs know that patrons simply don't play the follow-me feature, if they are even aware of it.  This is based upon the extensive time LEOs have spent during investigations and inspections observing and interacting with other players/patrons and speaking with staff members at various establishments.  As such, these patrons play the games like traditional slot machines to gamble.

s.      It was clear to the investigating LEOs that each device offered simulated slot-style games in which the primary portion was determined predominantly by chance.

t.      Ultimately, while there is some play input or interaction involved in the primary portion of the various game themes, the game outcomes are pre-determined from a sequential finite pool of ticket outcomes, all of which are determined by the manufacturer.

61.      The defendant/property, $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices, was used in violation of 18 Pa.C.S.A. Section 5513, and/or 4 Pa.C.S.A. Section 1518(f), now enacted under 42 Pa.C.S.A. Section 5803(a), or is otherwise subject to forfeiture under the "Act".

WHEREFORE, the Commonwealth of Pennsylvania, Office of Attorney General, respectfully requests that this Honorable Court deny Capital Vending Company, Inc. and Champions Sports Bar, LLC's Petition for Return of Property as the $2,053.00 U.S. currency and three (3) "Pennsylvania Skill" video gambling devices are subject to forfeiture, and, instead, issue an Order that the defendant/property be condemned and adjudged forfeited to the

Commonwealth and that all right, title or interest in the defendant/property, except that vested in the Office of Attorney General, Commonwealth of Pennsylvania, be declared null and void and that the property be used or disposed of in accordance with law.

Respectfully submitted,

Andrew J. Jarbola, IV
Deputy Attorney General
Attorney I.D. #314659
Office of Attorney General
6400 Flank Drive, Suite 1300
Harrisburg, PA 17112
(717) 712-1206

**IN THE COURT OF COMMON PLEAS
DAUPHIN COUNTY, PENNSYLVANIA**

| | |
|---|---|
| IN RE: THREE PENNSYLVANIA SKILL AMUSEMENT DEVICES, ONE GREEN BANK BAG CONTAINING $525.00 IN U.S. CURRENCY, AND SEVEN RECEIPTS | No. 2022-CV-6333-MD |

## CERTIFICATE OF SERVICE

I do hereby certify that this date I have served a copy of the foregoing *Answer to Petition for Return of Property and New Matter* upon the following individuals by electronic mail and first-class mail, postage prepaid, at the following addresses:

Christopher D. Carusone, Esquire
*Attorney for Champions Sports Bar, LLC*
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219
ccarusone@cohenseglias.com

Edward T. Butkovitz, Esquire
*Attorney for Capital Vending Company, Inc.*
Three Logan Square, 5th Floow
1717 Arch Street
Philadelphia, PA 19103
ebutkovitz@kleinbrad.com

Date: 9/8/22

Andrew J. Jarbola, IV
Deputy Attorney General
Attorney I.D. #314659
Office of Attorney General
6400 Flank Drive, Suite 1300
Harrisburg, PA 17112
(717) 712-1206

# EXHIBIT F

bmm testlabs

## BMM FORENSIC EVALUATION REPORT

**Report Issue Date:**            4th November 2022

**Issued To:**                   Pennsylvania Office of Attorney General

**Issued By:**                   BMM Testlabs
                                 Travis Foley, Executive Vice President, Operations
                                 815 Pilot Road, Suite G, Las Vegas, NV 89119
                                 (702) 407 2420, www.bmm.com

**Forensic Evaluation By:**      BMM Testlabs
                                 815 Pilot Road, Suite G, Las Vegas, NV 89119
                                 (702) 407 2420, www.bmm.com

**Forensic Evaluation for:**

**Game:**                        Pace-O-Matic Games

**Reference Numbers:**

**BMM:**                         PAOAG.1002

**Report Number:**               PAOAG10021_E

**bmm north america, inc.**
815 pilot road, suite G, las vegas, nevada 89119   **t** +1 702 407 2420   **f** +1 702 407 2421
corporate reg: C13057-00                                                    bmm.com


Testing Certificate #2549.01

**bmm** testlabs

## BMM FORENSIC EVALUATION REPORT

### 1.  BACKGROUND

The Pennsylvania Office of Attorney General requested the inspection and forensic services of BMM Testlabs in relation to various seized gaming devices manufactured by Pace-O-Matic and provide an expert opinion on what parts of the game play and features predominantly involve the use of skill versus chance. Originally, those services involved the examination of devices in the context of two pending Pennsylvania Commonwealth Court cases, which, based on information provided by the Pennsylvania State Police, Bureau of Liquor Control Enforcement, involved the seizure of Pace-O-Matic devices bearing software version 402.50. However, in view of a recent motion for return of property that was filed in the Dauphin County Court of Common Pleas (docketed at 2022-CV-06333-MD), BMM Testlabs was also asked to examine other software versions manufactured by Pace-O-Matic that were seized and provide an expert opinion. The Dauphin County case involves three (3) Pace-O-Matic devices bearing software version 402.51 which is very similar to version 402.50 in many respects.

During the inspection, a copy of an opinion from the opposing side in a similar case from Monroe County about unspecified software versions of Pace-O-Matic's game was provided for review. It should be noted that the author of that report, Olaf Vancura, indicates that he based his opinion in part based upon interviews and "multiple discussions and/or question-and-answer sessions with Pace-O-Matic engineers" and that he was "informed of the underlying logic and algorithms that control the flow of the Pace-O-Matic game." In preparing this report for the upcoming hearing, however, I have not had the opportunity to engage in such discussions with Pace-O-Matic programmers or designers, and while it is my understanding that a request has been made for the source code, or programming, of the various software versions at issue, such has not been provided to me at this point.

### 2.  SCOPE OF WORK

The scope of work is outlined as follows:

- On-site inspection of the seized devices.

- Technical analysis and review of evidence from the seized devices.

- Source code analysis, if possible.

- Review of potential random number generators, if possible.

- Review of game play by patrons.

- Review of potential retention ratio on the devices.

### 3.  PROCESSING AND INVENTORY

Upon arrival at the State Police office, Mr. Nikiper was shown various software versions of Pace-O-Matic's devices, including the three (3) devices in question, two (2) were upright style cabinets and one (1) was in a tabletop-style cabinet. The devices in upright cabinets were not operable during the inspection. Each upright cabinet had slight differences between them and were not uniform in construction.

Generally, the exterior of the upright cabinets had two doors that were accessible, one in the middle of the device that had a bill validator and receipt printer attached to it, and one at the top with a touchscreen monitor attached. In between both doors was a mid-deck with two buttons, one to cash out credits to a receipt or ticket and one to play a game at the current options as displayed on the screen. Behind the lower door was an area that contained a power supply, speaker, two electro-mechanical counters, and a toggle switch. Behind the top door was a commercially available computer motherboard of various makes and models between the devices. Attached to the motherboard was a USB IO board, and a USB dongle

**bmm** testlabs

## BMM FORENSIC EVALUATION REPORT

that is of a custom design by Pace-O-Matic. Also connected to the motherboard was either a M.2 SATA Flash Drive, a SATADOM style storage device, or a SATA Solid State Drive. All three of the storage options appeared to be the only persistent storage available to the computer and was imaged by BMM for later analysis.

The tabletop cabinets were in their design more uniform with regards to the cabinet itself, but the internal components did have some variation. The exterior had a front and back door, and a protrusion on the top. The front had a mounted touchscreen monitor and two buttons; opening the front door provided access to the full interior of the device that contained the similar contents to the upright devices, such as a bill validator under the top protrusion, a receipt printer that printed out to the side of the device, and the power supply, electro-mechanical counters, and toggle switch. Mounted to the rear door was a computer motherboard connected to a USB IO board and USB dongle. The rear door seemed to be designed to allow convenient access to the motherboard and electronic components.

When the devices are turned on and ready for play, the player is shown a game menu screen which allows the player to select one of the featured games to play. The menu system is broken down into pages of six (6) games each and allows a player to move between the pages shown.

Each game had similar options and game play. Options include a button to review the gameplay instructions, change bet level or amount, see the next puzzle, play the next puzzle, or return to the main menu.

Pressing the "Help" option for the gameplay instructions goes to a single screen giving a summary of how to play the game. This summary only covers the base game, and not any bonuses or the "Follow Me" feature.

Pressing the "Next Puzzle" option will replace the currently shown grid of symbols, with the final state of the symbols if the player chooses to play the game for the current bet level. Pressing the button again or after a few seconds, the game will revert back to the original symbols as shown at the end of the previous game. There did not appear to be a limit to the number of times a player could look at the next grid.

There were two touch points to increase or decrease the amount of the player's wager amount. The device did not appear to have a setting exposed to set the minimum or maximum amount for play. Each different wager amount did have a different corresponding grid that could be played next.

The main part of the game is a grid of three (3) by three (3) of nine (9) symbols and the goal is to select one (1) of the nine (9) symbols to be replaced with a 'wild' symbol to make as many winning combinations as possible. A winning combination is three (3) of the same symbols or wilds in a line. There are eight (8) possible "paylines" that a player can match within each grid: three (3) horizontal rows, three (3) vertical columns and two (2) diagonal lines. This selection must be made within a period that is disclosed to the player and there is a visible countdown. If a selection is not made within the period, the game is an automatic loss.

Depending on the configuration of the device, there is an opportunity to play the "Follow Me" feature. However, this feature is not disclosed to the player before the player presses the touchpoint to initiate the feature. Regarding the touchpoint, it is only visible on a small portion of the screen, and the text itself related to the "Follow Me" feature is only visible for seconds at a time to the player before flashing to text prompting a player to play another game. The rules for the feature are to correctly mimic the pattern of flashing touchpoints over 20 rounds, and if successful, the player would receive 105% of the last amount that was wagered. There were nine (9) touchpoints arranged in a grid of three (3) by three (3) colored circles. On the first round, one circle will light up and play a sound. The player must then press the same circle. Each subsequent round will add another circle to the pattern which the player must replicate within an undisclosed amount of time. After the first five (5) rounds, an intermission of about 15 seconds occurs after which the feature continues. This happens again after ten rounds and 15 rounds, and then after each round until the feature is completed. If a player successfully completes the 20 rounds, he or she will be

**bmm** testlabs

## BMM FORENSIC EVALUATION REPORT

awarded 105% of the last amount wagered from playing the base game.  If the player does not make a selection within the undisclosed length of time after the start of the round (30 seconds or less), or misses pressing the circles in a matching sequence, the feature ends and pays nothing.

### 4.   EVALUATION:

There are two (2) parts of the base game that allow for a player to exercise some level of skill, and the "Follow Me" feature available after game play in the base game.

The first part of skill is the "next puzzle" available to the player.  This allows a knowledgeable player to make an informed decision about which game and bet level to potentially play for the highest return.  The idea with this part is that each game theme and bet level have their own grids that could be completed, and it would be a benefit for a player to examine each one to find a grid that would payout an amount greater than it cost to play the game.  The question then is what if none of the available game theme/bet level combinations have a payout greater than the cost?  Does a player then cash out and leave or do they play a losing grid for the potential opportunity to get a grid that will have a greater payout?  Without a means to apply a strategy, each potential new grid is from a player perspective a random chance.

The second part of the skill is the placement of the wild symbol.  This part requires the player to analyze the grid and which of the nine spots is the best for the wild symbol.  There may be more than one winning line that could be achieved depending on which spot is chosen.  However, the best a player can do on a particular grid with a potential winning outcome is make the best choice; some grids do not have any possibility of a winning outcome and therefore the player's choice does not matter.  In comparing this to a game like video poker in which a player must decide which cards to hold or discard, or even deciding where to place an "X" or "O" as in Tic-Tac-Toe, selecting the appropriate spot to place the wild symbol is a fairly obvious task requiring a player to simply recognize a pattern and maximize the amount that may be won based on the payout table.

When a grid has no potential winning outcome, there is nothing a player can do within the base game to turn that into a winning outcome with any amount of skill.  In this case, a player can just keep tapping the play button, and the game will halt when a potential winning grid is available, requiring the player to make a choice.  This allows for a very rapid style of play, very similar to play on slot machines.

The "Follow Me" feature is the only aspect of possible gameplay that requires any meaningful exercise of skill by a player.  This aspect, which as noted above is not made readily known to a player, requires the player to quickly memorize a sequence of nine spots to repeat and tap over a course of 20 rounds.  The successful completion of this feature pays up to 105% of the last wagered amount.  So, if the player wagered 40 credits and had a losing outcome on the last play, the most he or she could be awarded is 42 credits over what takes no less than 10 minutes to successfully complete.

From the inspection completed so far, the origin of the next grid is not known; is it derived from random selection via a Random Number Generator (RNG), or is the grid pulled from a pool of potential known grids? And if pulled from a pool of grids, are those grids sorted and randomly drawn, or randomly shuffled at some point to provide what appear to be a random arrangement of potential winning and losing grids? A review of the source code, math, and game design documents would provide the necessary information for analysis and could then be used as the determining factor in the classification of these games.

The program storage media contains a Linux boot loader, and several data partitions.  At least one of the partitions on each media reviewed is encrypted using the Linux Unified Key Setup (LUKS) encryption specification.  At time of boot, the system retrieves a decryption key from a USB serial device, most likely a security dongle attached to the motherboard.  However, due to time constraints at this point, further investigation was not able to be conducted in attempting to decrypt the partition and review the program that runs the game and device.

bmm testlabs

## BMM FORENSIC EVALUATION REPORT

The security dongle is a custom designed USB device that contains a USB to serial chip and a Microchip PIC16 microcontroller.  The traces on the custom board show connectivity from the USB port through the USB to serial chip and the two serial communication lines then wired into one of the Universal Asynchronous Receiver/Transmitter (UART) devices within the microcontroller.  However, due to time constraints at this point, further investigation on what the security dongle does was not able to be conducted, but an educated guess is that the decryption key required for the encrypted partition can be setup, retrieved and managed via the microcontroller.  Further investigation will be needed to determine if the security dongle is generic and can be used within any of the devices, or if it is tied to a specific device.

BMM also reviewed the game play and features of other versions of the Pace-O-Matic software after looking at the devices in question.  The versions of these additional games were 402.44, 402.50, 402.52, 402.54, 402.57, 402.58, and 402.59.  The overall game play was consistent with the version reviewed, with two exceptions.

The first exception is that there are criteria for when the "Follow Me" feature can be played.  The "Follow Me" feature in these other versions can only be played if one of the following criteria is met:

- No winning combination available on the base game grid, and the "Follow Me" is chosen before the time expires.

- When an optimal selection to the base game grid is made, and the total winning amount is less than 105% of the wagered amount, and the "Follow Me" is chosen before the time expires.

In one set of the 402.50 versions of software, there was no criteria for access the "Follow Me" feature, but in others of the same version, the criteria was needed to be met.  This could point out that the way the "Follow Me" feature is supposed to work can be changed by the manufacturer, Pace-O-Matic, or potentially the operator of the devices.

The second exception is an operational consideration to the devices.  On all the devices reviewed, there was a limit in the attendant/operator menus of the game.  This limit was the amount of hold percentage of the device, and once the device held enough money to exceed this limit, the device would lock up.  The value of the limit did vary between devices, some at $5,000.00 and others at $10,000.00 or other similar even values.  When talking about casino games, there is a term, Return to Player (RTP) which is a regulated value to ensure a level of player fairness.  RTP is the amount of money that is paid back to players when considering the number of wagers it takes to play every combination in the game.  Typically, this is at or above 75% that needs to be paid back to players.  The number of possible combinations available on modern slot machines is in the billions of possible combinations and playing all of them would take a significant amount of time.  The inverse of the RTP is known as the hold percentage, and this is the amount of the total money played on the game that the operator can expect to keep, mathematically speaking.  As the games are played, these two values will shift up and down but will equalize at a mathematical average.  Having such a limit implemented in the device would point to the conclusion that there is some guaranteed amount of income to an operator, which would be indicative of a game of chance, otherwise a skilled advantage player could win every play and eliminate any mathematical average possible.  The inverse would also be true that an unskilled player could potentially never win at the game, and that could incur accusations that the game is unfair or rigged.

Ultimately, without adequate information and/or the source code to analyze and review how these devices are developed and operated, it is not possible to definitely say how the hold percentages are programmed in the devices.  However, the fact that it appears the devices do have set holds strongly suggests these devices are games of chance. Similarly, there were additional operational considerations on the devices, such as "Play level percentages", which appeared to go up when a player was winning or go down when a player was losing.  It appears that the devices track how well players are playing the game, or how optimal their choices are.  This leads to an important and logical question, what do the devices do as a result of the increase or decrease in "Play Level percentages"?  Stated another way, is there programming built into the

**bmm** testlabs

## BMM FORENSIC EVALUATION REPORT

device's source code to divert the predetermined fills to produce more winning outcomes when the "Play Level percentage" decreases, or, conversely, to produce more losing outcomes when the "Play Level percentage" increases?  Unfortunately, without the source code available, it is not possible to adequately evaluate these issues.

## 5.  CONCLUSION

There is no doubt that some elements of skill do exist on these devices, however, to say that skill makes up more than 50% of the game play or the outcomes presented to the player would be extremely difficult.

The "Follow Me" feature, while it does require skill to complete, appears to be more of a way to eliminate one of the three parts of the definition of gambling which are consideration, chance or risk, and reward. By giving the player an opportunity to recover his or her consideration for every game played and lost could be argued that consideration does not exist in the game play here.  This would not be a convincing argument in that the player must first front an amount of money for consideration and then complete the "Follow Me" feature successfully each time to get the consideration back plus a little extra.  A sweepstakes is another potential form of gambling where consideration does not need to exist, but there are requirements for "No purchase necessary" to participate.  There is no such language or method in the game to accomplish the same requirement.

Another consideration that strongly suggests the devices should be classified as a game of chance is that there are losing grids that cannot be turned into winning grids.  No matter how much skill a player may exert, they cannot change a losing grid into a winning grid.  Having the "Follow Me" feature available after every losing outcome is a possible argument against this, but seeing that some of the different devices, even with the same software version have different criteria to even engage the "Follow Me" feature makes this a difficult position to defend, as the options can possibly be changed at will by the manufacturer. Further, players are not readily informed that they have a choice to even play this feature, and, as noted above, the devices allow for rapid play in which a player need not interact with the device at all until a potentially winning grid is presented.  For such players, the outcomes that are presented are based predominately on chance.  Regardless, the fact that settings on the "Follow Me" game can be changed by the manufacturer or operator certainly calls for some level of regulatory oversight to ensure that the games are configured in a certain manner.  The losing either through random selection or predetermination, point to a design of mathematical loss for the player to ensure a hold percentage can be met to make the operation of the devices profitable for the operators and manufacturer.

Without access to the source code and math that was used to create the games, the analysis can only be based on what the player can see, and not how the game may actually work.  Based on what is seen by a player, and how various skill games used in casinos are designed, based on the evidence made available that the outcomes in these games are based more on chance, and only utilize skill to effectuate an already predetermined winner.  Skill is not a primary driver in the outcome of the game.

**bmm** testlabs

BMM FORENSIC EVALUATION REPORT

## 6.  TERMS AND CONDITIONS

BMM Testlabs ("BMM") has conducted a level of testing of the gaming product which has historically been adequate for a submission of this type.  However, inherent in testing in a laboratory environment are the unavoidable limitations of not being able to verify the effects of all possible configurations and environments that occur in actual gaming venues.

This forensic report is for use by the client for the jurisdiction ("Jurisdiction") referenced in the report (the "Report") and only verifies, as of the date stated, the gaming product described in the Report subject to any conditions or limitations set forth therein.

The manufacturer named in the Report is solely responsible for possession of the appropriate license to sell, lease, service, or provide gaming supplies or gaming-related services in the Jurisdiction and for compliance with the ongoing requirements of the Jurisdiction.  It is the responsibility of the manufacturer and operators to ensure that the gaming product detailed in this Report is installed, maintained and operated correctly without defects and safely in accordance with requirements of the Jurisdiction.

The Report and testing performed by BMM is proprietary to BMM.  This Report is issued solely for the benefit of the client and shall not be reproduced, reprinted, or transmitted in whole or in part to any party not named in the Report without the written approval of BMM, other than by a regulator of the Jurisdiction.  No third party may use, rely, or refer to the Report, its contents, or any related documents, without written permission of BMM.  If BMM grants consent, BMM will send this Report via email as directed.  BMM takes precautionary measures to secure the "PDF" document, but BMM does not send the email via any encrypted methodology.

The undersigned certifies under penalty of perjury that the compliance testing of the gaming product detailed in this Report and any accompanying documents was conducted in accordance with the requirements of the Jurisdiction and that the gaming product meets the requirements of its laws and the regulations adopted thereunder, and all published technical standards, control standards, control procedures, policies, industry notices and similar requirements implemented or issued by the Jurisdiction to the best of BMM's knowledge and belief.

Notwithstanding the above, any regulator may reprint, reproduce and transmit any document or information to any party that the regulator, in their sole discretion, deems appropriate.

BMM DOES NOT MAKE, AND EXPRESSLY DISCLAIMS, ALL OTHER WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY WARRANTIES OF NON-INFRINGEMENT, MERCHANTABILITY, SUITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE.  THE LIABILITY AND OBLIGATIONS OF BMM HEREUNDER, AND THE REMEDY OF THE RECIPIENT, UNDER OR IN CONNECTION WITH THIS AGREEMENT SHALL BE LIMITED TO, AT BMM'S OPTION, REPLACEMENT OF THE SERVICES PROVIDED OR THE REFUND BY BMM OF ANY MONIES RECEIVED BY IT FOR THE SERVICES PROVIDED.  IN NO EVENT SHALL BMM BE RESPONSIBLE TO THE CLIENT OR ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INCIDENTAL, DIRECT, INDIRECT, OR SPECIAL DAMAGES, INCLUDING WITHOUT LIMITATION DAMAGES FOR LOST PROFITS OR REVENUE, BUSINESS INTERRUPTION, OR PUNITIVE DAMAGES, EVEN IF BMM HAD BEEN ADVISED OF THE POTENTIAL FOR SUCH DAMAGES.

## BMM FORENSIC EVALUATION REPORT

Please feel free to contact BMM if you have any questions with regard to this Report.


Yours sincerely,


Peter Nikiper
Director, Technical Compliance
BMM Testlabs


T/ pjn
G/ pjn

v2.5

# EXHIBIT G

IN RE:  THREE PENNSYLVANIA SKILL　　　:　IN THE COURT OF COMMON PLEAS OF
AMUSEMENT DEVICES, ONE GREEN BANK　:　DAUPHIN COUNTY, PENNSYLVANIA
BAG CONTAINING $525.00 IN U.S.　　　　:
CURRENCY, AND SEVEN RECEIPTS　　　　 :　NO.  2022-CV-06333-MD

## <u>ORDER</u>

**AND NOW**, this _10_ day of November, 2022, upon consideration of the Petition

for Preliminary Injunction that was filed by Petitioners Capital Vending Company, Inc. and

Champions Sports Bar, LLC, it is hereby ORDERED as follows:

A Hearing/Argument on the Preliminary Injunction will be heard at the November

22, 2022 continuation of the Evidentiary Hearing regarding the Petition for Return of Property.

In the meantime, it is this Court's understanding that the Commonwealth has already completed

its examination of the subject machine and submitted its expert reports to Petitioners on

November 4 and no further examination is needed.  As such, the Commonwealth is prohibited

from further examination of the subject machine until further Order of Court, which will be

entered after the November 22, 2022 Hearing.

I hereby certify that the foregoing is a　　　　　　BY THE COURT:
true and correct copy of the original
filed.

_Matthew R. Krupp_　　　　　　　　_____
Prothonotary　　　　　　　　　　　　　　Andrew H. Dowling, Judge

<u>Distribution:</u>
The Honorable Andrew H. Dowling
Christopher D. Carusone, Esquire, COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.,
　　　525 William Penn Place, Suite 3005, Pittsburgh, PA  15217
Matthew H. Haverstick, Esquire & Edward T. Butkovitz, Esquire, KLEINBARD, LLC, Three Logan
　　　Square, 5th Floor, 1717 Arch Street, Philadelphia, PA  19103
Andrew J. Jarbola, IV, Esquire, OFFICE OF ATTORNEY GENERAL, 6400 Flank Drive, Suite 1300,
　　　Harrisburg, PA  17112

# EXHIBIT H

```
IN RE:  THREE PENNSYLVANIA    : IN THE COURT OF COMMON PLEAS
SKILL AMUSEMENT DEVICES, ONE  : DAUPHIN COUNTY, PENNSYLVANIA
GREEN BANK BAG CONTAINING     :
$525.00 IN U.S. CURRENCY,     :
AND SEVEN RECEIPTS            : NO. 2022-CV-06333-MD
```

TRANSCRIPT OF PROCEEDINGS

EVIDENTIARY HEARING
VOLUME II

Pages 131 - 356


BEFORE:   HONORABLE ANDREW H. DOWLING

DATE:     TUESDAY, NOVEMBER 22, 2022

PLACE:    COURTROOM NO. 5
          DAUPHIN COUNTY COURTHOUSE
          HARRISBURG, PENNSYLVANIA



APPEARANCES:

   ANDREW J. JARBOLA, IV, ESQUIRE
   *Office of the Attorney General*

        For - Commonwealth


   CHRISTOPHER D. CARUSONE, ESQUIRE
   *Cohen Seglias Pallas Greenhall & Furman, P.C.*

        For - Champions Sports Bar


   MATTHEW H. HAVERSTICK, ESQUIRE
   EDWARD T. BUTKOVITZ, ESQUIRE
   *Kleinbard*, LLC

        For - Capital Vending


DAUPHIN COUNTY COURT REPORTERS

Reported by: Heather L. Artz
RMR, CRR, CRC

```
 1                    INDEX TO WITNESSES

 2   COMMONWEALTH                        DIRECT    CROSS

 3   Peter Nikiper
        (Qualifications)
 4        By Attorney Jarbola              141      --
          By Attorney Butkovitz            --       150
 5
     Peter Nikiper
 6      (Qualifications)
          By Attorney Jarbola              162      --
 7        By Attorney Butkovitz            --       272

 8

 9   PETITIONER                         DIRECT    CROSS

10   Olaf Vancura
        (Qualifications)
11        By Attorney Haverstick          298      --
                                                   --
12   Olaf Vancura
          By Attorney Haverstick          304      --
13        By Attorney Jarbola             --       321

14

15

16                    INDEX TO EXHIBITS

17   COMMONWEALTH                     IDENTIFIED  ADMITTED

18   1    Reporter of Peter Nikiper      165       168

19

20

21   PETITIONER                       IDENTIFIED  ADMITTED

22   1    Report of Olaf Vancura         304       321

23

24

25
```

DAUPHIN COUNTY COURT REPORTERS

<pre>
                    P R O C E E D I N G S
                         9:34 a.m.
</pre>

1
2

3      THE COURT:  Is the next witness the
4  Commonwealth's expert?  Is that where we are?

5      ATTORNEY JARBOLA:  That was where we were,
6  Judge, yes, I believe.

7      THE COURT:  You folks agree?

8      ATTORNEY HAVERSTICK:  Your Honor, that's where
9  we are, I understand, in the process.  I was not at the
10  hearing the first time.  I didn't know if the Court wishes to
11  take the injunction matter first or continue on with the
12  evidentiary.

13      THE COURT:  Is his microphone on?

14      (A discussion was held off the
15       record.)

16      THE COURT:  Well, the injunction matter is such
17  that the Commonwealth's expert's already analyzed the
18  machines and filed the report, correct?  So what's the point
19  at this juncture?

20      ATTORNEY HAVERSTICK:  Well, I think -- I think
21  a concern, perhaps a primary concern -- Matt Haverstick, Your
22  Honor, for Capital Vending.  A primary concern is some sort
23  of counting of what -- what happened:  Where is the
24  information now, who else has access to it, where else is it
25  being used.

1          Perhaps some of these things can be explored in

2     cross of Commonwealth's expert, but what's so irregular about

3     this is -- and the Commonwealth knows this because they've

4     been -- just recently, last week, the Office of Attorney

5     General offered to enter a protective order in

6     confidentiality agreements to analyze the software.  But

7     what's so unusual about the reviews that's been done here is

8     that it was done without any of those normal protections

9     which always happen in the software context.

10          And whether we do the evidentiary piece first

11     and get to the bottom of what do we do with the residue of

12     the analysis later or reverse, I don't know the order matters

13     so much as it is really understanding and getting our hands

14     around what this testing outfit did and what the rules of the

15     road are going forward.  Because as we understand it, they

16     still have our proprietary and trademarked and patented

17     material.  They purport to at least want to do some further

18     analysis of.

19          Miss Romano is here because she wants to do an

20     analysis of that in another case.  We suspect that there are

21     D.A.'s offices that may have access to this information maybe

22     want to do analyses of it.  And as Miss Romano noted, as I

23     said in our e-mail, you know, if we're going to do that, if

24     we're going to talk about that, then it has to be in the

25     context of the appropriate trade secret protections.  We

1     don't have any of that.  We just don't know what it is that

2     this expert did and who it's talking to and what it intends

3     to do this afternoon, tomorrow, the next day with our

4     trademarked IP.

5                    THE COURT:  Okay.  Mr. Jarbola.

6                    ATTORNEY JARBOLA:  Sure, Judge.  First, as far

7     as what the expert did, he went in and he downloaded, took an

8     image -- he'd be able to testify as to exactly what he did

9     and his process regarding any concern.

10                    The information was not shared with anyone

11    other than within BMM who worked on this report, has not been

12    shared outside of the Office of Attorney General or its State

13    Police Bureau of Liquor Control Enforcement.  We have no

14    intention of sharing it with anyone, no desire to share with

15    anyone.  The goal is only to use it in this case.

16                    There is also a desire to use it in the

17    separate Commonwealth Court case but that would happen in

18    that case.  But for today's purposes, there was never

19    actually review or further download of these software once it

20    was determined it was an encrypted device.

21                    There was a subpoena issued to Mr. Nikiper

22    who's from BMM -- he is one of our experts -- to bring

23    various documents and things.  There was some requests

24    regarding documents that are conversations or what led to

25    making his report.  That would be all, we would submit,

1    privileged information, work-client privilege.  But he did

2    bring all of the various images that he made of each of the

3    software devices and I'm sure I'm using some of the wrong

4    terms and he'd be able to describe it more appropriately.

5    But he did bring each of the --

6                THE COURT:  Are you willing to enter into a

7    confidentiality agreement?

8                ATTORNEY JARBOLA:  Oh, absolutely, yes.

9                THE COURT:  Does that take care of it?

10               ATTORNEY HAVERSTICK:  Well, may I suggest this,

11   Your Honor?  Can we get through the cross of --

12               THE COURT:  Yes, we're going to do that.  I'm

13   just seeing what preliminary agreements we can reach here.

14               ATTORNEY HAVERSTICK:  Once we have an

15   understanding and assuming we're comfortable that the state

16   of facts are as counsel represented them -- and I don't have

17   any reason to disbelieve them -- then I think the appropriate

18   next step is doing just that, entering into some sort of

19   protective order to make sure that this information -- this

20   is -- this is the secret of Coca-Cola.  This is the formula

21   for Coca-Cola for this company or any other software company.

22   And I don't know how far along the experts have gone in

23   trying to decrypt it or crack it.  We can take -- the owner

24   of the company and the president of the company flew up here

25   from Georgia today to be in the courtroom because it's that

1    serious.

2              So if the Commonwealth's willing to take it

3    that seriously and they really are confining its use today

4    and they agree and represent to the Court that we're going to

5    negotiate appropriate protective order before it can go

6    anywhere else and we have an accounting, then I think we can

7    work something out.

8              THE COURT:  Okay.  Well, let's do the

9    testimony, then we can see at the end of that what you can

10   work out.

11             ATTORNEY HAVERSTICK:  All right.

12             THE COURT:  Okay.  Mr. Jarbola, you can call

13   your witness.

14             (Sotto voce discussion between
               counsel.)

15

16             ATTORNEY JARBOLA:  May I have a moment?

17             THE COURT:  Yes.

18             ATTORNEY HAVERSTICK:  Your Honor, one quick

19   housekeeping matter.  We do have a pending motion *in limine*

20   for the exclusion of this testimony.  I wanted to raise it --

21             THE COURT:  Based on?

22             ATTORNEY HAVERSTICK:  The search and seizure

23   issue.

24             THE COURT:  Okay.

25             ATTORNEY HAVERSTICK:  I just want to know --

1 and look, we're not in front of a jury so I suppose if we

2 took this up at the back end, I know the Court's competent to

3 figure out what's in or out.

4          I also made clear with counsel and on the

5 record that what is being proposed in terms of

6 confidentiality or confidentiality orders and protective

7 orders means that all of the information seized to date is

8 going to be returned and the Commonwealth can't use this

9 information in some other case unless and until there's a

10 protective order in place. Because it's -- it's not much

11 good to us to agree to a confidentiality order if other -- if

12 the Commonwealth in other actions its planning on using this

13 information without a confidentiality order. And I believe

14 that Miss Romano may perceive -- based on conversation she

15 had -- she and I had over e-mail, that she's not bound by any

16 order this Court issues with respect to confidentiality or

17 protective order or injunction.

18          ATTORNEY ROMANO: Your Honor, Karen Romano.

19 Can I speak to that?

20          THE COURT: Sure.

21          ATTORNEY ROMANO: We did receive a cease and

22 desist letter in response to the order you issued which we

23 are following. I do respect your order in that regard. What

24 I stated to counsel was I don't think an order you entered

25 here is necessarily binding on the Commonwealth Court. But

1  we are certainly willing to enter a protective order,

2  confidentiality agreement.  I think the agreement we reached

3  was let's talk after today and we will see where we go.  But

4  we will agree we're not going to use anything in the

5  Commonwealth Court case until we've reached an appropriate

6  agreement with counsel.

7          THE COURT:  Well, but a confidentiality or

8  protective order with respect to these machines would be

9  binding on all courts, correct?

10          ATTORNEY ROMANO:  And certainly we can sign one

11  maybe generally on behalf of the state police and the Office

12  of Attorney General.

13          THE COURT:  No, but I want to understand your

14  comment.  I mean, any decision here on the merits wouldn't be

15  binding on the Commonwealth Court.  But a confidentiality and

16  protective order with respect to these machines would be

17  binding all courts.  Do you agree with that?

18          ATTORNEY ROMANO:  For these particular

19  machines, yes, Your Honor, the machines that our expert

20  inspected.  I don't think we're speaking about anything

21  differently.  That we can agree to that, that what you enter

22  in that regard would be binding on both cases or all three

23  cases.

24          ATTORNEY HAVERSTICK:  Well, in that case, if

25  they're willing to agree in good faith or negotiate in good

1    faith and they return the material that they took or destroy

2    it or we have some confidence that it's not going to be

3    further analyzed, then I think we can work something out

4    after today.

5                    THE COURT:  Okay.  Very good.

6                    ATTORNEY JARBOLA:  Commonwealth would call

7    Peter Nikiper.

8                              PETER NIKIPER,
                       called as a witness,
9              having been duly sworn or affirmed,
               was examined and testified as follows:
10

11                   ATTORNEY JARBOLA:  Judge, if I may, before I

12   begin with Mr. Nikiper, I just wanted to let the Court know

13   Mr. Nikiper and BMM do have counsel here present.  If I could

14   ask them to introduce himself, please.

15                   ATTORNEY RUBLEY:  Good morning, Your Honor.

16   William Rubley on behalf of BMM.

17                   THE COURT:  Okay.

18                   ATTORNEY JARBOLA:  And can you spell your last

19   name for the court reporter?

20                   ATTORNEY RUBLEY:  Sure, it's R-u-b-l-e-y.

21                   ATTORNEY JARBOLA:  Judge, this was in relation

22   to a writ of summons and various cease and desists or threats

23   of lawsuit that were sent to Mr. Nikiper and BMM.  They have

24   retained counsel.  Counsel is here for Mr. Nikiper.  I wanted

25   to make the Court aware.

1          THE COURT:  Okay.

2                DIRECT EXAMINATION
                (As to Qualifications)
3

4    BY ATTORNEY JARBOLA:

5          Q.     Can you state your name for the record, spelling

6    your last name, please?

7          A.     My name is Peter Nikiper.  The last name is

8    spelled N-i-k-i-p, as in Peter, e-r.

9          Q.     And, Mr. Nikiper, provide to the Court your

10   educational background.

11         A.     I graduated as a computer engineer with Bachelor's

12   of Science from the New Jersey Institute of Technology.

13         Q.     And after you received your Bachelor of Science,

14   what was your area of employment?

15         A.     Immediately following that I joined the IT

16   department for a local bank in South Jersey.  And from there

17   I moved on to working in the gambling industry in Las Vegas

18   with a company known as Gaming Laboratories International.

19   After separating with them, I did some IT work before I was

20   hired by BMM.

21         Q.     And you're currently employed with BMM right now?

22         A.     Correct.

23         Q.     How long have you been employed with BMM?

24         A.     Just over ten years now.

25         Q.     And that's BMM Testlabs?

1    A.    Correct.

2    Q.    Can you give us a brief overall review of some of

3    your relevant experience from your education and employment

4    concerning the types of various analyses, designs,

5    programming, et cetera, you're familiar with regarding

6    gaming?

7    A.    It's my role and responsibility at BMM to read the

8    various rules, regulations, and statutes for gambling devices

9    and then tell our engineering department, work with them to

10   develop the test cases and methods that we use to test and

11   confirm compliance with those rules and regulations.

12        In addition to that, it's my job to answer the

13   oddball questions that come up.  It's my job to work with

14   clients from time to time to review white papers and design

15   documents and give opinion as to how that meets or doesn't

16   meet the various rules and regulations, and occasionally to

17   perform forensic examinations which led to this and be able

18   to produce reports that state to what I've seen, what I've

19   done, and how something looks like it works.

20        THE COURT:  You say oddball questions, like

21   from lawyers?

22        THE WITNESS:  Sometimes from lawyers, sometimes

23   from various design --

24        THE COURT:  Not from the court.

25        THE WITNESS:  Not from the courts, no.

1       THE COURT:  Just wanted to clarify that.

2       THE WITNESS:  No worries.

3  BY ATTORNEY JARBOLA:

4       Q.    And what is your current position with BMM?

5       A.    I am the director of technical compliance.

6       Q.    Did you hold any previous positions?

7       A.    Not at BMM, no.

8       Q.    And what you just described, would that cover some

9  of your responsibilities as the director of technical

10 compliance?

11      A.    Yes.

12      Q.    Now, what is involved in conducting gaming

13 equipment testing and analysis?

14      A.    Depending on the rules and regulations and the

15 regulatory framework that a game is operating under, we look

16 at how it operates, what it looks like to players, what is

17 disclosed to players, how the math works out.

18          Basically anything that a regulatory agency would

19 be interested in in how a game would work or operate, we're

20 going to look at all of those different pieces.  So typically

21 from a submissions standpoint we will get source code, we

22 will get math documents, we'll get design documents.  We'll

23 also get the actual binaries or be able to build those

24 binaries generated from the source code for the actual

25 computer instruction set that's then going to be used to run

1    the game.

2          We'll review it; we'll build it; we'll work with

3    the manufacturer to build it.  We'll put it on the device and

4    physically test that device and put it through its paces.

5          Q.     And when you're talking about the binaries and

6    testing how the machine works, what does that mean?

7          A.     So computer code is human readable language, and

8    in order for a computer to understand that, that typically

9    has to be compiled or interpreted in some way for the

10   computer.  And so those binaries -- and most games are

11   developed using a program language such as C or C++, so the

12   source code is taken.  It is then compiled in the machine

13   language and turn it into a binary file that the machine can

14   read.

15         Q.     And are you familiar in your position, your

16   duties, with the laws of numerous jurisdictions as it applies

17   to gaming, including what types of games are legal and what

18   types of games would be illegal, including illegal gambling

19   devices?

20         A.     Yes.

21         Q.     And as part of your employment with BMM, do you

22   provide gaming device review and consultation work?

23         A.     Yes.

24         Q.     What kinds of reviews do you offer?

25         A.     That runs a very large gamut.  One of the least

1  invasive ones that we do is an evaluation report in which we

2  look how the machine operates.  We look at the rules and

3  basically just say it operates the way the manufacturer says

4  it operates.  And we would typically call that an evaluation

5  report.

6       There are times manufacturers want a letter that

7  just says this works together with something else.  We might

8  do some kind of attestation letter saying that we hooked it

9  up, we've seen that it works appropriately and that's as far

10 as we went, all the way to what I would deem is our full

11 certification services, at which point we're doing testing

12 for a particular regulatory body and that is to go through

13 that game and make sure that compliance is met with that

14 jurisdiction's rules or regulations.

15      Q.   And do any of these reviews consist of skill

16 versus chance gaming devices?

17      A.   In recent years more so.  The casino gaming

18 industry has brought out rules for skill-based games in

19 casinos, so we have looked at the idea between skill and

20 chance, what makes up skill, what makes up chance, and how

21 does that apply to various regulatory frameworks that we deal

22 with.

23      Q.   For what entities have you provided such gaming

24 device review and consultation?

25      A.   Besides the matters here, we have done that for

1  other cases in the State of Pennsylvania.  We've done that

2  for a case into Idaho, a case in Arizona, and a case in

3  California.

4           But in addition to that, we've done reviews of

5  those games going into actual casinos for the Nevada Gaming

6  Control Board, Missouri Gaming Commission, State of

7  California, the various tribal entities there.  So we've done

8  that pretty broad spectrum across the United States.

9       Q.     Are you aware of any other companies that provide

10  this sort of gaming device and review consultation?

11      A.     One of my previous employers, Gaming Laboratories

12  International, is one.  There's another test lab called

13  Eclipse Testing out of, I believe, Ohio.  They offer this

14  type of certification services as well, in addition to BMM.

15  And there is various agencies and groups outside the U.S.

16  which have in more recent years tried to gain traction in the

17  U.S., such as SIQ which is out of Slovenia.

18      Q.     So mainly within the United States there's pretty

19  much three basic organizations that do this type of work?

20      A.     Three primary, two of them are larger than the

21  third one, yes.

22      Q.     And have you previously provided testimony in

23  court concerning such gaming devices involving skill versus

24  chance?

25      A.     Yes.

1    Q.    In what states again?

2    A.    For that particular one that would be here in

3  Pennsylvania where I've actually provided in-court testimony.

4    Q.    And were you qualified and recognized as an expert

5  in the field of gaming equipment testing and analysis?

6    A.    For that case, yes.

7          THE COURT:  What was the case?

8          THE WITNESS:  That was -- I'm trying to think

9  back to the actual title.  I think it was like 405 U.S.

10 Dollars against the Commonwealth.

11         THE COURT:  What county?

12         THE WITNESS:  That was here in Dauphin County.

13         THE COURT:  What judge?

14         THE WITNESS:  I do not recall off the top of my

15 head.

16         THE COURT:  Judge McNally?

17         THE WITNESS:  Yeah.  I rely on AJ for what

18 judge we appear before.

19         THE COURT:  Okay.  Was that the case?

20         ATTORNEY JARBOLA:  Yes, Judge.  It was

21 different machines.

22         THE COURT:  I read the opinion.

23         ATTORNEY JARBOLA:  Excuse me?

24         THE COURT:  I read the opinion.

25         ATTORNEY JARBOLA:  Okay.

1    BY ATTORNEY JARBOLA:

2        Q.      At some point in time were you contacted by the

3    Office of Attorney General or the state police and the Bureau

4    of Liquor Control Enforcement to provide expert analysis and

5    testimony regarding Pace-O-Matic Pennsylvania skill machines?

6        A.      Yes.

7        Q.      How does this occur?

8        A.      We had a reach-out from Mr. Michael Nickles with

9    the -- I want to say the A.G.'s office, to enter into a

10   contract to look at these machines.  And over conversations

11   and scheduling I ended up flying out a few months ago to look

12   at these machines at the state police office and Bureau of

13   Liquor Control not too far from here.

14       Q.      And at some point were you retained to provide an

15   expert analysis and testimony in the instant case?

16       A.      Yes.

17       Q.      And this would involve three machines that were

18   seized from Champions Bar and Grill?

19       A.      Yes.

20       Q.      And what area do you intend to provide expert

21   testimony in for this case?

22       A.      I intend to go over how the machines worked to

23   what I saw at the -- at the headquarters for the state

24   police, review what I saw while there, and then afterwards a

25   dissection of the images that I made to try and determine how

1    the machines work at a more computer programming level.

2         Q.    So basically over your testing and analysis?

3         A.    Correct.

4         Q.    And we've gone over your education and training

5    and just different duties with BMM.  What specific areas of

6    your training and education would be applicable to your

7    expertise in the gaming analysis?

8         A.    From my education as computer engineer, I've

9    learned how to -- how a computer works and how to build one

10   from the grains of sand that make up the silicon boards all

11   the way to programming the machine, getting it to do

12   something that a user would want.  From my work experience

13   working at Game Laboratories International and on BMM, how do

14   these machines work, how are they programmed for use in

15   gaming markets throughout the United States and the world.

16        Q.    And is BMM an accredited testing facility?

17        A.    Yes.

18        Q.    And are you an accredited testing engineer?

19        A.    Yes.  I do hold a certificate -- certificate

20   tester foundational level with the ASTQB.

21        Q.    What is that, please?

22        A.    I could not tell you what that acronym means for

23   the life of me, but basically they are a software testing

24   accreditation firm for the United States.  There's an

25   international version of it and I have met their requirements

1    for a foundational level tester of software.

2                    ATTORNEY JARBOLA:  Judge, at this point, before

3    I proceed any further, Commonwealth would tender Mr. Nikiper

4    as an expert witness in the field of gaming equipment testing

5    and analysis.

6                    THE COURT:  Cross on qualifications.

7                    ATTORNEY BUTKOVITZ:  Yes.  I have some

8    questions.

9                        CROSS EXAMINATION
                       (As to Qualifications)

10

11   BY ATTORNEY BUTKOVITZ:

12       Q.    Mr. Nikiper, you mentioned earlier that in your

13   role as an expert you read the rules and regulations for the

14   jurisdiction before you conduct your testing; is that right?

15       A.    Correct.

16       Q.    And did you do that here?

17       A.    I did look over what is required for the

18   Pennsylvania Gaming Control Board, but in this particular

19   case, since it's not with that, I looked over what was

20   statutorily required.

21       Q.    What statutes did you look at?

22       A.    I could not name them off the top of my head.

23       Q.    Could you tell me what they generally said?

24       A.    Generally we looked at the ones that relate to

25   what is a skill versus chance.

1      Q.      Is that stated in the statute?

2      A.      I want to say yes, I read that somewhere in the

3   statute.

4      Q.      You said that you -- that your office reviews in

5   conducting these evaluations source code, design documents,

6   manuals, things of that nature, correct?

7      A.      Correct.

8      Q.      Did you do that here?

9      A.      Here, no, because we were not given access to the

10  source code or user manuals.  So our investigation here, our

11  analysis was based on how the device appears to a player

12  sitting in front of it.  And then from there we looked at

13  what was on the actual program storage media inside the

14  device to try and understand how the device actually works:

15  Is there an RNG?  Is there something that is -- that would

16  tell us how the device works.  And we stopped shortly due to

17  time constraints before we dig too deeply into that.

18     Q.      In this case you didn't actually examine the

19  software, anything under the hood of the device; is that

20  correct?

21     A.      That would be a fairly accurate statement, yes.

22     Q.      Okay.  So even though you were offered as an

23  expert based on your knowledge and expertise in how the

24  programming and underlying components operate, you didn't

25  actually utilize that expertise in conducting this

1 evaluation; is that fair?

2     A.    We reached a point where I could not go any

3 further, yes.

4     Q.    Okay.  So the answer's yes.

5     A.    Yes.

6     Q.    You mentioned that you testified in another -- in

7 a separate Dauphin County case, correct?

8     A.    Correct.

9     Q.    In that case did you review the source code,

10 design documents, other materials that you said you generally

11 review in conducting your evaluations?

12     A.    No.  In that case we were able to get down to

13 where the software was but we were not able to decompile and

14 the opposing counsel was not willing to provide a copy of the

15 source code or anything else.  So we were able to dig down to

16 a point but only to that point.  The most detailed we got was

17 a pay schedule from that particular manufacturer, and from

18 there we were able to confirm their expert witness's

19 numerical findings on the math.  We did show a slight

20 difference between our results and their results but we were

21 able to line up for the most part and agree on how the

22 machine worked to a degree.

23     Q.    So in that separate case you had access to what

24 you referred to as the math of the machine?

25     A.    To something that looked like the math of that

1    machine, yes.

2         Q.    Did you have access to that in this case?

3         A.    I did not.

4         Q.    Is it fair to say that the opinions offered in

5    your report are inconclusive?

6         A.    I wouldn't say they're inconclusive.  I can give a

7    detailed of where skill versus chance aligns with the game

8    play of this machine.  But that is as far as I could go.

9         Q.    In your report did you not identify software and

10   other materials that if granted access to would impact your

11   overall conclusions?

12        A.    Yes.

13        Q.    So I'm going to ask again.  Is your opinion

14   offered in your report that you intend to offer today in your

15   view conclusive?

16        A.    They're conclusive to what I have seen.  There's

17   definitely more info -- more evidence, more information I

18   could see that would alter that opinion, but I can only give

19   an opinion as so far as what I have seen.

20        Q.    So I understand that you feel that you're offering

21   a conclusion based on what was available to you.  My question

22   is, in your industry, have you ever given an opinion like

23   you're going to give today based on limited materials that

24   were made available to you?

25        A.    Yes.  And for those case -- those times, if we

1    needed to give an opinion based on the limited knowledge that

2    we have, that would usually yield into an attestation type of

3    letter that says how it works, an evaluation letter that says

4    it works the way the manufacturer says it works, or in this

5    case a forensic level report that says this is what we're

6    able to see and this is what we can divine from that.

7          Q.    But again, your opinion is limited to what you

8    were able to observe, correct?

9          A.    Correct.

10         Q.    But in your industry were those observations

11   enough to support how the game -- how the game actually

12   operates?

13         A.    In some cases, yes.

14         Q.    In this case?

15         A.    In this case, I think -- I would say I'm fairly

16   close to very educated guess as to how this machine works.

17         Q.    So close to an educated guess, meaning that you

18   need additional materials in order to offer even educated

19   guess?

20         A.    I would need additional material to be able to say

21   with definitive certainty how the machine works.

22         Q.    The report -- your report is dated -- you issued

23   two versions of the report; is that right?

24         A.    We issued one final version report on

25   November 4th.  And then later that evening, within a few

1   hours of issuing that at the end of the day, Mr. Jarbola came

2   back with a -- I would say a nonsubstantive change to one of

3   the sentences.  I agreed that that was a simple enough

4   change, so we issued a revised updated final on November 7th,

5   the following Monday.

6                    THE COURT:  Did you have both versions?

7                    ATTORNEY BUTKOVITZ:  We have both versions,

8   yes.

9                    THE COURT:  Okay.

10  BY ATTORNEY BUTKOVITZ:

11      Q.    And you've reviewed everything in your report?

12      A.    Yes.

13      Q.    And you're prepared today to testify that it's

14  accurate and correct?

15      A.    Yes.

16      Q.    You didn't actually sign the second version of the

17  report; is that correct?

18      A.    There should be an electronic signature on there.

19      Q.    I believe it indicates Travis Foley signed the

20  November 7th version of the report.  I can show that to you.

21      A.    That should be my signature.

22                   THE COURT:  Which report did you attach to your

23  motion *in limine*?

24                   ATTORNEY BUTKOVITZ:  I don't know.

25                   THE WITNESS:  And if it has Travis's signature

1   on there that would be an administrative error that we should

2   correct.

3            THE COURT:  I only have one report.  I'm not

4   sure which.

5            ATTORNEY BUTKOVITZ:  What's the date on it, on

6   the front?

7            THE COURT:  November 4th.

8            ATTORNEY BUTKOVITZ:  Okay.  So it's the one

9   that he signed.

10           THE COURT:  It has a signature, whether it's

11  actual or electronic I don't know, on the last page.

12           THE WITNESS:  The way our project office staff

13  puts those together, that would be an electronic signature,

14  an image of my actual physical signature that they have

15  attached to it.

16  BY ATTORNEY BUTKOVITZ:

17     Q.    On page -- just last question before we leave voir

18  dire, page 7, terms and conditions.  Maybe it would be better

19  if I pulled this up.

20           Does this look like the report that you issued?

21  Is that what this appears to be?

22     A.    Yes.

23           THE COURT:  Mine has November 4th on it.  This

24  says November 7th.

25           ATTORNEY BUTKOVITZ:  That's fine for this

1   purpose.  It's the same in both reports.

2             THE COURT:  Okay.

3   BY ATTORNEY BUTKOVITZ:

4      Q.    So I'd like to go to the third paragraph from the

5   bottom.  Can you read that to yourself for a minute.

6      A.    Okay.

7             THE COURT:  You mean the paragraph that starts

8   with the undersigned?

9             ATTORNEY BUTKOVITZ:  Correct.

10            THE COURT:  Okay.

11   BY ATTORNEY BUTKOVITZ:

12      Q.    That paragraph appears to certify that the device

13   you reviewed, quote, that the gaming product meets the

14   requirements of its laws and the regulations adopted

15   thereunder, and all published technical standards, control

16   standards, control procedures, policies, industry notices,

17   and similar requirements implemented or issued by the

18   jurisdiction to the best of BMM's knowledge and belief.

19            Do you see that?

20      A.    I see it, yes.

21      Q.    Is that an accurate statement?

22      A.    Yes.  This page is basically the boilerplate legal

23   text that we put on pretty much all of our reports.  So if

24   you look at any report issued by BMM, you will find this

25   boilerplate legal text on there.

1    Q.    My question was whether that statement was

2    accurate.

3    A.    To the best of our knowledge, we reviewed this

4    machine and how it operates and any requirements that it was

5    supposed to be operating under.

6    Q.    I don't know that that answers my question.  This

7    certifies that it in fact meets the requirements of the laws

8    in the jurisdiction, correct?

9    A.    That's what that statement is saying.  And as I

10   said, this is the boilerplate legal text we put on all of our

11   reports.  Whether or not that should be or should not be on a

12   report of this particular nature is a business decision that

13   I am not privy to.

14   Q.    My -- but you certified under penalty of perjury

15   that this is accurate, correct?

16   A.    Everything on this report is accurate, as I have

17   seen it, as I have witnessed it and documented it.

18              THE COURT:  What do you mean by business

19   decision to what you're not privy?

20              THE WITNESS:  The business makes decisions as

21   to what's going to be on various reports, what the templates

22   look like that we utilize.  I do have, in certain cases, say

23   into that.

24              This boilerplate legal text I am not -- I have

25   no say in whether or not this should or should not be -- I

1    can definitely take that back to the business, say for

2    forensic report of this nature, you should probably change

3    this.  But I have not been the one to actually design or

4    write that text.

5                    THE COURT:  If it was completely up to you,

6    would you have included that paragraph?

7                    THE WITNESS:  I would review it differently

8    possibly, now that I've been questioned on it, yes.

9                    THE COURT:  Would you have included that

10   paragraph if this report was a hundred percent yours?

11                   THE WITNESS:  I would probably change it a

12   little bit, to be honest.

13                   ATTORNEY BUTKOVITZ:  Your Honor, at this point

14   we'd move to exclude Mr. Nikiper's testimony.  He's testified

15   today that he needs additional information, that he had

16   additional information he could make an educated guess about

17   the operation of this machine.  He's just now affirmed that,

18   again, that the certification here that the device complies

19   with Pennsylvania law.  At this stage we would submit that he

20   does not meet the standard for offering an opinion to a

21   reasonable degree of professional certainty and therefore

22   should be excluded.

23                   ATTORNEY JARBOLA:  Judge, I don't believe he

24   said one time that these machines meet the standards.  He

25   said that this was standard language that's included,

1    standard legalese language that's included in contracts.  He

2    would change some of that language, without putting words in

3    his mouth, I would imagine based on the information he

4    actually wrote in this report that would be the area that he

5    would change.

6              Regarding areas where he would make an educated

7    guess, again, this is why the Commonwealth sought to conduct

8    discovery pursuant to its new matter, so we could get

9    additional information for the expert to review, analyze, and

10   testify to.  But Mr. Nikiper, based upon his expertise I

11   would submit, is certainly more than qualified to testify

12   regarding the gaming review and analysis that he conducted

13   and his inspection of these machines and what he observed and

14   whether it meets the definition of skill versus chance in a

15   predominant factor test.

16             THE COURT:  I think the limitations the witness

17   articulated would go to the weight and not the admissibility.

18             ATTORNEY BUTKOVITZ:  Your Honor, if I could be

19   heard a little bit further on it.  I believe that this goes

20   to a gatekeeping function in so far as Mr. Nikiper has

21   explicitly said that at best we're talking about an educated

22   guess.  That does not meet the standard for admission of

23   expert opinion testimony.  In that case we would seek its

24   exclusion.

25             THE COURT:  I understand your position.  We're

1    going to allow it.

2                    ATTORNEY CARUSONE:  Your Honor, Chris Carusone

3    representing Champions Sports Bar.  I do have an additional

4    motion to exclude his testimony on a different ground.

5                    The ground is, I don't believe that the

6    foundation has been laid by the Commonwealth is sufficient to

7    establish that this witness has an adequate understanding of

8    Pennsylvania law to be able to offer an expert opinion about

9    whether these machines are gambling devices or not.

10                   He's testified in one prior case involving a

11   different machine.  He has identified no statutes or cases

12   that he relied on in making this determination.  He indicated

13   that he believed that the standard governing whether these

14   machines are games of skill or games of chance was statutory,

15   which it's not.  It's case-law based.  So I don't believe

16   there's been a sufficient foundation laid to establish that

17   this witness can offer this kind of an opinion with regard

18   for the law in Pennsylvania.

19                   ATTORNEY JARBOLA:  Judge, again, he will -- the

20   expert will go through his understanding of Pennsylvania law

21   when he testifies further, what information he was given by

22   us and what information he based his opinion on, which is the

23   predominant fact test.

24                   THE COURT:  Yeah, I think the expert will

25   testify to the facts and I would apply the facts to the law.

1   ATTORNEY CARUSONE:  I think he's going to be

2   offering ultimately a legal opinion, Your Honor.

3   THE COURT:  Well, you could --

4   ATTORNEY CARUSONE:  There has to be some

5   foundation for that.

6   THE COURT:  I assume you'll object and we'll

7   deal with that at the time.

8   ATTORNEY CARUSONE:  Very good.

9   ATTORNEY BUTKOVITZ:  Your Honor, can I just add

10  one more point, just to close the record on this before we --

11  put a fine point on it.  And that is I believe Mr. Nikiper

12  testified although he's being offered based on his expertise

13  in software and the underlying technology, I believe during

14  voir dire he testified that he didn't actually apply that

15  expertise here.  He didn't have an opportunity to.  So,

16  again, just further submit that he does not meet the standard

17  for offering an expert opinion at this point.

18  THE COURT:  Okay.  You can proceed.

19  ATTORNEY JARBOLA:  Thank you, Judge.

20  DIRECT EXAMINATION

21  BY ATTORNEY JARBOLA:

22  Q.    Before we go into the substance of your report and

23  your analysis of this case, I wanted to discuss the

24  inspection that you conducted.

25  A.    Okay.

1    Q.    Again, at some point were you contacted by the

2  Bureau of Liquor Control Enforcement to provide expert

3  services as it related to the Pace-O-Matic machines?

4    A.    Yes.

5    Q.    And what, if anything, did you need from us in

6  order to conduct a performance analysis and review?

7    A.    At first we discussed where we would look at the

8  machines, whether that would be at the state police office or

9  whether a machine could be shipped to us.  Given the

10  evidentiary nature of it, it was decided it would be more

11  practical for BMM to send an engineer such as myself out to

12  Pennsylvania here and look at the machines at the state

13  police offices.

14    Q.    And at this point did you conduct an actual

15  physical game playing inspection of devices in Harrisburg?

16    A.    Yes, a couple months ago I did fly out to

17  Pennsylvania here, drove out to Harrisburg, went to the state

18  police offices and looked at a number of differing machines,

19  all Pace-O-Matic made, different versions with a primary

20  focus on the three at issue here.

21    Q.    And this occurred October 27th, 2022?

22    A.    I believe that would be correct.

23    Q.    And broadly speaking, could you give us an

24  overview of what occurred during this on-site review?

25    A.    What occurred is that I was presented with the

1    machines, spoke with the attorneys, looked at -- set up video
2    camera, looked at the machines, put money on the machines,
3    played them, went through every feature and option that I
4    could divine as a player on the machines, so what every
5    button does on the screen, how it works, how it operates,
6    what's the behavior and nature of it.
7             At that point I was shown by the officers a menu
8    that they could get into by toggling a switch and I did go
9    through the options in that menu.
10            And then afterwards -- after playing on the
11   machine for a period of time all the different game themes,
12   looking at the rules for each game, playing this "follow me"
13   feature that was present on the game, I then turned the
14   machine off, removed the program storage media and made a
15   forensic copy of that media for later analysis back at the
16   office.
17       Q.    And could you describe first what you did when you
18   played the devices?
19       A.    So I went through each and every single game
20   theme.  I looked at every button that was available and then
21   played and worked on every single function that was available
22   to a player on the machine.  And I did this with a video
23   camera over my shoulder watching, recording what was
24   transpiring so I had something to later go back to refer to
25   when I was generating the report.

1    Q.    And is this typically how you would examine any

2  device that you were retained to inspect?

3    A.    Yes.

4    Q.    Did you play only one software version of the

5  Pennsylvania skill devices?

6    A.    No.  While there, the attorneys asked me to play

7  on numerous different versions of the Pace-O-Matic device

8  that they had.  They had multitude of different devices.  The

9  overall cabinet on them was very similar between them.  There

10 were minor design differences.  But the software versions, I

11 looked at them, particularly was asked to look -- compare and

12 contrast what was available on the different versions of the

13 software and for the most part they were fairly consistent.

14            THE COURT:  Are you saying you worked on or

15 played other Pace-O-Matic machines that are not these

16 machines, is that what you're saying?

17            THE WITNESS:  Not these three, yes.

18            THE COURT:  Okay.

19            ATTORNEY JARBOLA:  I'm going to mark as

20 Commonwealth's Exhibit Number 1 -- may I approach, Your

21 Honor?

22            THE COURT:  Yes.  You don't need to ask.

23            ATTORNEY JARBOLA:  Thank you.

24 BY ATTORNEY JARBOLA:

25   Q.    I'm showing you, Mr. Nikiper, what I've marked as

1    Commonwealth's Exhibit Number 1.  Can you identify that,

2    please?

3         A.    This is --

4              THE COURT:  You have a copy for me?

5              ATTORNEY JARBOLA:  I do, Judge, that's what I

6    was looking for.

7              THE COURT:  Okay.

8              THE WITNESS:  This is a copy of the report that

9    was issued by my office on November 7th.

10             THE COURT:  And do you have a copy for my law

11   clerk?

12             ATTORNEY JARBOLA:  I do not at this moment but

13   I can certainly get one this afternoon.  I can make a copy --

14             THE COURT:  Okay.

15             ATTORNEY JARBOLA:  -- during an intermission

16   unless -- I have a copy.

17             THE COURT:  Are you going to point out the

18   difference between November 4th and November 7th report?

19             ATTORNEY JARBOLA:  Yes, Judge.

20             THE COURT:  Okay.

21   BY ATTORNEY JARBOLA:

22        Q.    And this is -- you indicated this is a report you

23   prepared?

24        A.    Yes.

25        Q.    And other than the electronic signature on page 8,

1   did you prepare the document and write this report?

2        A.     Yes.

3              THE COURT:  So the signature on the last -- on

4   Exhibit 1, the name on the signature is not yours?

5              THE WITNESS:  That is correct.

6              THE COURT:  Okay.

7              THE WITNESS:  That was put as Travis.  His

8   electronic signature was attached but with my name and

9   everything.

10             THE COURT:  Okay.

11             THE WITNESS:  So that was an administrative

12  error.

13             THE COURT:  And who is Travis Foley?

14             THE WITNESS:  Travis Foley is my boss's boss.

15  He is the CTO for BMM.

16             THE COURT:  Okay.

17             THE WITNESS:  By default, reports issued by our

18  office are signed by him, not by me, for gaming reports that

19  would be issued to most jurisdictions.  Forensic reports,

20  typically the engineer who wrote the report would then have

21  their signature on it instead.

22             ATTORNEY JARBOLA:  Judge, I -- Commonwealth

23  would move for the admission of Commonwealth's Exhibit

24  Number 1 with the request if we may substitute signature page

25  once we receive a proper signature page from Mr. Nikiper.

1          THE COURT:  Any objection?

2          ATTORNEY BUTKOVITZ:  Well, we don't have an

3   objection to it being admitted as is, but I think the

4   clarification of the signature is what it is and it's been to

5   some extent clarified through testimony.

6          THE COURT:  Yeah, I agree.  I don't think there

7   should be any substitution.

8          ATTORNEY JARBOLA:  Thank you, Judge.

9          THE COURT:  But it's admitted.

10         ATTORNEY JARBOLA:  Thank you.

11   BY ATTORNEY JARBOLA:

12      Q.    Before going further, there was discussion about a

13   report that was submitted November 4th and then a report that

14   was submitted November 7th.  Could you just discuss the

15   change?

16      A.    The change was the last sentence in my conclusion

17   or second-to-last sentence of my conclusion.  We moved a

18   comma from one position to another, removed one word.  I

19   believe it was a then.  And that was it.  So it was a very

20   minor change in the last paragraph of my conclusion just

21   clarifying the text and making it a little more readable.

22      Q.    Did it alter the substance or your opinion in the

23   report?

24      A.    It did not.

25      Q.    And the only change was in the last paragraph in

1    that second-to-last sentence?

2        A.    Correct.

3        Q.    Can you tell the Court what the various software

4    versions of the Pennsylvania skill devices were played?

5        A.    So I started off looking at a couple different

6    versions, 402.50 and 402.51.  And then that expanded out to

7    look at a couple of other versions or I should say a few

8    other versions, 402.44, 402.57, 58, 59, a bunch of different

9    versions in that 402 family.

10            Most software version would typically have a major

11   version and a minor version.  And the minor version is

12   typically reserved for minor code changes, whereas the major

13   version is your massive overarching functional changes.  So a

14   402 major version, if I was to consider that a major version,

15   and the minor version's that .50, 51, 57, et cetera.

16       Q.    And again, you were initially retained as an

17   expert regarding two Commonwealth Court cases, correct?

18       A.    Correct.

19       Q.    When you began your inspection on, I think it was,

20   September 27th, did you begin to review machines for that

21   case?

22       A.    Yes.

23       Q.    Do you recall what software version those were?

24       A.    The first machine I was looking at was a 402.50

25   and then I went back and we looked at a bunch of different

1    versions.   402.51 was the second set of machines that I
2    looked at.   So I started off looking at one version and as
3    I -- as each of the machines, we went -- kind of started one
4    side of the room and went down to the other side of the room.
5        Q.      And did you have the opportunity to play the
6    Champions Bar devices with the software 402.51?
7        A.      Yes.
8        Q.      The devices you were shown, can you describe just
9    the outward appearance of how they looked?
10       A.      So there were two main form factors that I saw
11   between the differing versions.   The one specifically marked
12   for Champions, there was a -- I would call, like, a tabletop
13   or desktop unit that was a metal enclosure.   The screen was a
14   bit smaller than this LCD in front of me, maybe about a 11-
15   or 14-inch screen.   It was an LCD, metal enclosure.   On the
16   front at the top was a bill acceptor, at the bottom on the
17   side was a receipt printer.   There was a button deck below
18   the monitor.   The device went back a substantial amount and
19   looked to be on some kind of pivot dolly so that it could be
20   shifted around a little bit.
21            If you unlocked the front door, the whole front
22   would open up to the left.   And on the back there was another
23   door that could be unlocked and that provided access to the
24   logic board.   The majority of the interior space in the
25   machine was just open air.

1      Q.      And the actual physical machines you were shown

2  from Champions, were they standup machines or smaller

3  machines?  Can you describe it that way?

4      A.      So there were two main form factors.  There was

5  that tabletop that I just described and then there was an

6  upright cabinet, what we would call an upright in the gaming

7  industry in which you would have the chair in front of it.

8  It stands about from the ground to about maybe four and a

9  half, five feet.  Didn't bring a tape measure, so I couldn't

10  give you the exact dimensions of it.  And that had a monitor

11  mounted to a wood frame.  It enclosed a computer board behind

12  the monitor and there was a button deck and a lower partition

13  where you had a ticket printer -- I shouldn't say ticket

14  printer but a receipt printer and you had a bill accepter.

15      Q.      And were you able to play the two upright

16  machines?

17      A.      Yes.

18              ATTORNEY JARBOLA:  A moment of the Court's

19  indulgence.

20  BY ATTORNEY JARBOLA:

21      Q.      Did you also have an opportunity to play the

22  tabletop with the Champions software?

23      A.      Yes.

24      Q.      Comparatively, how did each of the versions of the

25  software play?

1    A.    They played fairly consistently.  It was -- there

2  was a difference between the 402.50 machines and how the

3  "follow me" feature would be triggered or would be allowed.

4  Some of the 402.50 versions that I saw the "follow me" was

5  available at all times.  In the other versions, it was only

6  available under a limited criteria of outcomes you would have

7  the option of "follow me."

8    Q.    Other than that difference, did they play --

9    A.    Other than that, they played pretty identical.

10 The base game was the exact same grid.  It was nine different

11 symbols arranged in a grid of three-by-three.  The game play

12 was fairly consistent between the game themes.  The themes

13 just changed the artwork and the positioning of items.  It

14 didn't change the functionality.

15         And when a player would hit play, the -- each of

16 the symbols would spin.  They could hit the play button a

17 second time to stop the position of those.  And then the

18 player's requirement, as disclosed in the rules, was to place

19 a wild symbol in one of the nine symbols that was there, so

20 changing one of the nine presented symbols with a wild card

21 symbol and then you had -- as a player, it was defined in the

22 rules to be able to pick the most optimal place.  So in that

23 grid of three-by-three, those nine symbols, which is the most

24 optimal place to place that symbol to effect a winning

25 outcome if one was available.

1      Q.    And while you were playing and before you were

2    playing, were you given any information regarding the law

3    about gambling in Pennsylvania?

4      A.    No, not before I started.  Our company does do

5    testing for the Pennsylvania Gaming Control Board, so I had

6    that knowledge already.  In previous conversations we had

7    talked about a predominant factor type of test, where does

8    skill versus chance line up, which as the -- which is greater

9    for the game play and for the outcome generation.  And then

10    we dived in a little bit deeper into what that analysis

11    should look like after I had started my work.

12      Q.    After playing each of the various software

13    versions, what, if anything, did you do next?

14      A.    So after playing the different versions, it was

15    you shut down the machine, make a forensic copy of the

16    program storage media.  Typically when we do these type of

17    forensic evaluations we work on -- we look at the device and

18    then we make that forensic copy, depending on what we're

19    trying to do and accomplish.

20          For a jackpot lockup type of forensic where

21    someone wins a large jackpot, we do, depending on the state

22    of the machine -- usually in those cases they're turned

23    off -- we would start with the forensic copy and then bring

24    the machine up.  This way if turning the machine on it

25    wouldn't corrupt the media, trying to get the media as close

1  to the source as possible.

2          In this case the machines were already powered on,

3  so we started off with a play and then made a forensic copy,

4  keeping note of which copy, which machine to try and then go

5  back and if we could define and determine how the machine

6  worked from that.  Later analysis I could try and see if I

7  could map to what I had played.

8      Q.    And did you look at the various hardwares in the

9  cabinetry?

10     A.    Did look at the hardware.  Other than minor

11 differences, they were all pretty much the same.  You had

12 different main boards, similar configuration but minor

13 computer differences.  Kind of like getting one -- one Dell

14 from one unit and getting another Dell from another unit.

15 The inside's going to be relatively the same but there are

16 minor differences.  Some of the drive -- some of the devices

17 had a SSD-type of drive to it, others had an M.2 --

18 mSATA-style device.  So there was slight differences as to

19 the program storage media and where it was located in the

20 cabinet.  But for the most part they were fairly common.

21     Q.    And this image you took, how did that occur?

22     A.    So we used a device called a Tableau TD3.  It is a

23 forensic disk duplication device.  What we do is we pull the

24 source media out of the suspect machine in question.  We

25 connect it to this device and this device will do a

DAUPHIN COUNTY COURT REPORTERS

1    byte-by-byte copy from that media to an image file.  And from

2    there we can mount that image file as if we were looking at

3    that source media virtually later.

4         Q.    And for the record, the Tableau, is that

5    t-a-b-l-e-a-u?

6         A.    Correct, yes.

7         Q.    And are you aware if this type of device is

8    generally used in your field?

9         A.    Yes.  We -- when we were first looking for such a

10   device, we did reach out it a few different regulatory

11   agencies to see if they had any experience in forensics and

12   what they use.  And this came recommended to us and went

13   looking into the company and the history of the device.  This

14   was something that had been admissible in courts previously.

15   The company had a certificate that they could provide on

16   demand and so we decided to go with their particular unit.

17        Q.    And why do you make a forensic copy of the program

18   storage media?  What would that accomplish?

19        A.    The main -- one of the main reasons is to analyze

20   how the device works later without having to take the device

21   from an evidentiary process or holding.  So in a case like

22   this, where the machines are being held, rather than trying

23   and take that evidence with us, we can make a duplicate copy

24   of the machine's program storage media, the hard drive, and

25   be able to take that back to our office and later analyze it

1    over a longer course of time.  Playing on the device is easy,

2    can be done within a couple of hours.  Pulling apart a

3    device's internal program storage, that takes a lot longer of

4    a time frame and it's easier to do from our office than it is

5    to do it in the field.

6        Q.    And taking an image of the program storage media,

7    does that affect the original hardware in the machines?

8        A.    No.  It's designed specifically not to write the

9    device but to only read from it.  So the device never gets

10   written to.  The contents of it doesn't change.  And if we

11   were to go to that device today and fingerprint that drive

12   and fingerprint it when I made a copy of it, the two should

13   be identical.

14       Q.    Overall this process of playing, videotaping the

15   game play on the machine, to inspection like you did -- the

16   inside the machine and the hardware -- to the imaging of the

17   device's program media, is that something you do every time

18   you're retained as an expert or retained to review and

19   analyze machines?

20       A.    Yes.

21       Q.    Based upon your expertise, this process you went

22   through from playing to imaging, is this the same or similar

23   process anyone else in the field of gaming equipment testing

24   analysis would conduct?

25       A.    I would expect so, yes.

1      Q.      Were you also provided with three security

2   dongles?

3      A.      Yes.  So later into the analysis of the program

4   storage media it became evident that the -- where the

5   software on the Pace-O-Matic devices is contained is an

6   encrypted partition and in order to decrypt that we would

7   need a decryption key.  In looking at the media and talking

8   internally between myself and my boss, the security dongle

9   seemed like that would be probably where the decryption key

10  would be.  So I made a request, since time was short on this,

11  back to the state police to see if I could get one of the

12  dongles sent out to me back in my office after the fact.

13          While waiting for that dongle, I was able to take

14  apart the boot instructions of the Pace-O-Matic device and

15  was able to identify a couple of processes where it looked

16  like it was reading from that security key and would possibly

17  be grabbing a decryption key from that USB dongle.

18     Q.      And can you describe how these dongles were

19  packaged when they were received by you?

20     A.      So they were in a padded envelope.  Two of the

21  dongles were marked as evidence in this particular case, so

22  they were completely sealed.  I did bring them with me.  They

23  are sealed.  I didn't open them.  The third -- there was a

24  third dongle from the device that was told at that point in

25  time was forfeited to the state and so that was one in a

1    white envelope.  And I was told that I could do what I needed

2    to with that device.

3                 Upon receiving them, we opened up the packaging,

4    made sure that they were in good physical order, making sure

5    that there was no shipping damage done to it.  We inventoried

6    them just so that we kept custody on it, and then from there

7    I was able to look more deeply at that one device that was

8    not in the evidentiary envelopes.

9                 From there we took some high resolution pictures

10   of the board layout.  There was a plastic enclosure on the

11   device.  I was able to open up the device and look at that

12   board in a detailed fashion to understand what was on the

13   board.  It was a custom designed USB device with two main

14   chips on there.  There was a USB to serial chip that converts

15   a USB signal into serial communications and then a small

16   microcontroller, programmable microcontroller connected to

17   that serial line that would then be able to talk through the

18   serial point to something that was plugged into.

19        Q.      And all of the things you're discussing right now

20   was your review of one of the dongles?

21        A.      Correct.

22        Q.      And the dongle you analyzed, you mentioned that

23   was in this separate envelope?

24        A.      Yes.

25        Q.      The two dongles that you did not analyze, were

1    those touched or removed from the evidence envelopes?

2        A.    No, they were left in the evidence envelopes.

3    There was a clear plastic window so I could see the device

4    inside but I did not remove it from that evidentiary

5    envelope.  It was sealed completely and I didn't want to

6    break that seal without proper authorization and without the

7    specific way the state police would want me to break the seal

8    if I needed to.

9                ATTORNEY BUTKOVITZ:  Your Honor, at this point

10   I'd like to interject and ask for an offer of proof regarding

11   the purportedly forfeit dongle that he based this analysis

12   on.  I mean, to our knowledge this is the first time we're

13   hearing about this.  I don't know what is being referenced as

14   far as anything being forfeited to the state.  I mean, the

15   subject of this litigation, a lot of this litigation is about

16   whether or not they're allowed to seize our materials and

17   what they're allowed to do with them.

18               ATTORNEY JARBOLA:  If I may allow -- I was

19   going to call an additional witness, Corporal Matthew

20   Barrett, who would be able to provide information regarding

21   that.  It's my understanding that there was a criminal

22   investigation in Fayette County.  This investigation is

23   sealed.  During that investigation, there were a number of

24   various devices that were seized, including 12 Pace-O-Matic

25   machines that were owned by the vendor.

1        As part of this individual's guilty plea and

2  sentencing, he agreed to forfeit certain money and his

3  interest -- his ownership interest in those machines.  And we

4  have retained or obtained unsealed copies of the forfeiture

5  orders we were going to have introduced through Corporal

6  Barrett regarding the forfeiture of those devices and where

7  those devices come from.

8        ATTORNEY BUTKOVITZ:  A couple of things to

9  address there, Your Honor.  I believe the Forfeiture Act is

10  very specific about what's supposed to happen with property

11  once it's forfeited.  It's ultimately supposed to be

12  destroyed.

13        I don't know the details of the investigation

14  or criminal action that opposing counsel has just referenced.

15  But what I do understand is that it does not involve the

16  devices that are at issue here, the Dauphin County devices.

17  It's separate devices that were seized in Fayette.  And even

18  if the -- there was someone that owned the device itself that

19  had somehow forfeited the physical device, that does not go

20  to the question of the underlying software, which I think

21  you're hearing about extensive protections that were put in

22  place due to the sensitivity of it that would allow them to

23  do this -- this unsanctioned additional search and analysis.

24        But we have at this point no connection

25  between -- and no information.  This is the first time we're

1  hearing anything about this, that the dongle came from a

2  device that were not at issue before the Court today.

3              THE COURT:  Mr. Jarbola, why are we talking

4  about machines that are not at issue in this case?

5              ATTORNEY JARBOLA:  Sure, Judge.  This is in

6  relation to the motion *in limine* and the preliminary

7  injunction that were filed.  I had intended to prepare

8  answers but with the numerous motions that were filed by

9  three different attorneys -- there was only one of me -- I

10 couldn't get answers to responses filed to each of them.

11 That was the point of having Mr. Nikiper testify today

12 regarding what he examined, how machines are all

13 substantially similar regarding what he analyzed on this

14 dongle to show the Court that he didn't do anything improper.

15             That's the reason we're talking about other

16 machines and other dongles.  And he would be able to testify

17 that they appear to be substantially similar but, however, he

18 will also testify that while he attempted to look at this

19 dongle which was on a -- I misspoke.  I'll correct that in a

20 moment -- on this dongle which is owned by the state police

21 now, that dongle is not a basis of his report.

22             He attempted to get into the dongle but was

23 unable to and the basis of his report is more on the game

24 play.

25             And I misspoke earlier.  I said it was a

1     forfeited 12 devices.  They were 12 devices that were ordered

2     destroyed or for training purposes to the Pennsylvania State

3     Police.

4             ATTORNEY HAVERSTICK:  Your Honor, are they

5     going to pull software and hardware out of -- out of a PC

6     down the street?  I mean, that doesn't have anything to do

7     with this case.  And furthermore, this is just the kind of --

8     this is exactly why we're so concerned about the IP

9     protections and what they have been running around doing with

10    this guy and analyzing software.

11            They have their hands on proprietary, patented

12    information and nobody, not the owner of the software, has

13    any idea that they're busy passing it around, where it's

14    gone, what he's doing with it.  He works for competitors to

15    this business.  Set aside the myriad of issues regarding

16    whether that expert has any business looking at that dongle

17    from a purportedly forfeited device in some unrelated

18    criminal prosecution in Fayette County, what in heaven's name

19    does it have to do with this case?  It's not -- it's not even

20    from these machines.

21            THE COURT:  Yes, that's the threshold question.

22    What's it have to do with this case and why are we talking

23    about it?

24            ATTORNEY JARBOLA:  Because it was a way for him

25    to determine how these devices work.  Again, for -- as an

1    expert, he testified how he conducts his inspections and

2    analysis.  He'll play the machines and then he'll try to get

3    to how these machines operate.  And all of these dongles,

4    from what I have been told by Mr. Nikiper, they all appear to

5    be the same thing.  It's a way to decrypt the underlying

6    encryption key that's on each device.

7                 So we don't know whether any dongle would work

8    for my machine or whether only a certain dongle works for a

9    certain machine.  But this was all what was trying to be

10   determined.  And again, this goes to the motion *in limine* and

11   the motion for preliminary injunction and that's what I --

12   that's what occurred here.

13               ATTORNEY HAVERSTICK:  Your Honor, Mr. Jarbola

14   just said that in this forfeiture order that nobody in this

15   courtroom has seen that the dongle -- the security dongle,

16   again, potentially patented, highly sensitive intellectual

17   property of Pace-O-Matic, was supposed to be either destroyed

18   or used for training purposes.  That -- this is not a

19   training purpose.  He's up here using that information trying

20   to justify years after the fact that these games were seized

21   as *per se* contraband.  I mean, let's not forget the posture

22   of this.

23               In 2014 Beaver County held that a game which we

24   now hear is substantially similar to the ones that were

25   seized in Dauphin was a legal game.  And at some point out of

1  the ether the LCE decided, well, we're just going to -- we're

2  just going to as an *ipse dixit* say that these games are now

3  contraband *per se*.  But they don't have any evidence of it.

4  They don't have any evidence.  His report is full of

5  concessions that he doesn't really know because they don't

6  have the facts and the basis to actually say what this game

7  does.  They didn't have any evidence of it when they shipped

8  him a security dongle from some other game and asked him,

9  hey, try to crack into this and see what it does and tell us

10  if you were right all these years when you said this was

11  contraband *per se*.

12              They're doing it backwards, Your Honor.

13  They're doing this backwards.  And not only are they doing it

14  backwards, now they're -- now they're tampering with valued

15  intellectual property rights of Pace-O-Matic because there's

16  a right way to do all of this analysis and there's a wrong

17  way.  And they are demonstrably doing it the wrong way.  And

18  the least of the sanctions for that should be this testimony

19  should be disregarded.  I mean, how are we ever going to

20  separate out what his testimony is and whether it's based on

21  his review of some other dongle from some other game in

22  Fayette, whether it's based on --

23              THE COURT:  Well, did he review it?

24              ATTORNEY JARBOLA:  No, Judge.  He attempted to

25  look at it and went no further.

1          THE COURT:  And cannot.  Okay.  So we started

2     this conversation with an offer of proof.  Are you satisfied

3     with the offer?

4          ATTORNEY HAVERSTICK:  No, not -- because I

5     still don't -- I still don't know what -- what business he

6     has --

7          THE COURT:  He didn't review it.

8          ATTORNEY HAVERSTICK:  -- touching --

9          THE COURT:  He didn't analyze it, so I'm still

10    not clear why we're talking about it if he didn't analyze it.

11         ATTORNEY HAVERSTICK:  Is it in the courtroom

12    now?

13         ATTORNEY JARBOLA:  That I don't know.

14         THE WITNESS:  Yes.

15         ATTORNEY HAVERSTICK:  Then I -- Your Honor, I

16    think we have a standing objection to the testimony of this

17    witness.  I mean, I suppose we can hear what he has to say,

18    but I have -- I think everybody should have grave concerns

19    that this witness is relying on inspection of games other

20    than the ones at issue.  He said it already.  He looked at

21    various software versions; he's looked at games seized in

22    other counties.  He looked at the Beaver County version, he

23    just said.  He just he identified it as version 44.

24         THE COURT:  Are these the same machines as in

25    Beaver County?

1         ATTORNEY HAVERSTICK: He said he looked at it

2 and he said they're functionally the same as legal game in

3 Beaver County.

4         THE COURT: Was Beaver County appealed?

5         ATTORNEY HAVERSTICK: No, they did not appeal.

6         THE COURT: Are these the same machines as in

7 Beaver County?

8         ATTORNEY JARBOLA: No, Judge. There are major

9 differences and we can get into that later.

10         ATTORNEY BUTKOVITZ: Right. But the report

11 says that he did review version 44. Version 44 is the one

12 that was -- that was the subject of the Beaver County

13 decision.

14         THE COURT: Okay.

15         ATTORNEY HAVERSTICK: We can --

16         ATTORNEY BUTKOVITZ: And he further says in his

17 report that version 44 is substantially similar or appears to

18 play the same as the device that is at issue today.

19         THE COURT: Okay. You can bring that out on

20 cross.

21         ATTORNEY BUTKOVITZ: Yeah.

22         THE COURT: So you've got your offer of proof,

23 right?

24         ATTORNEY HAVERSTICK: I'm going to -- yes, and

25 I apologize for being animated. But this is really

1    concerning.  It is really concerning to hear that the

2    Commonwealth is that cavalier with information sent -- it

3    knows is sensitive proprietary information.  That's why they

4    want to enter into a confidentiality order and a

5    non-disclosure and other protections to protect their

6    analysis of because they know it's valuable IP.  And to hear

7    that they're just shipping it all over from various versions

8    across the state and they don't have any idea with it,

9    there's no chain of custody, is really, really concerning.

10              THE COURT:  Okay.

11              ATTORNEY JARBOLA:  And, Judge, just if I may,

12   very briefly, there is chain of custody that has been and

13   will be testified to.  There is no security issue as nothing

14   was actually examined.  Again, regarding what devices were

15   examined, what software version, by my review of the

16   petitioner's expert report, he reviewed other series as well,

17   such as 59, devices from the Monroe County case.  So each

18   expert has reviewed other devices other than what --

19              THE COURT:  Monroe County?

20              ATTORNEY JARBOLA:  Monroe County, I apologize,

21   yes.

22              THE COURT:  What?  Monroe County?

23              ATTORNEY JARBOLA:  Yes, Your Honor.

24              THE COURT:  Was there a published opinion?

25              ATTORNEY JARBOLA:  No, I don't -- I'm not sure

1   on that.

2          ATTORNEY HAVERSTICK:  No.  We're waiting for an

3   order from the court on our return of property motion.

4          THE COURT:  Okay.

5          ATTORNEY JARBOLA:  And the basis of their

6   expert report I believe is on the software version ending in

7   59.  But we're willing to enter that NDA or offer or

8   protective order regarding what was -- or what may be

9   learned, what is on this security dongle.

10          And again, the reason that I am having

11  Mr. Nikiper testify to this and Corporal Barrett testify to

12  this later is again because of what occurs in these cases.

13  Counsel has previously sued various members of the state

14  police, he has now threatened to sue BMM and Mr. Nikiper, so

15  I believe it's important the Court knows and so Mr. Nikiper

16  can testify to specifically what he did and what he did not.

17          ATTORNEY HAVERSTICK:  All I can say to that,

18  Your Honor, is when people are handling this information and

19  IP the wrong way, that concerns us.  And there's been a

20  history of the Commonwealth mishandling our IP, seizing our

21  games without having any basis at all to do so.  So yeah, we

22  take that seriously and we're going to react seriously do it.

23          And I think we'll -- after -- you know, after

24  we get done with the evidentiary portion, I think we need to

25  have a longer conversation on the record about what the

1   Commonwealth has done with seized versions of this software
2   and hardware in this case or other cases, where it's going,
3   what they have, what they've looked at, who they've talked
4   to.  I mean, we just -- I think we have to get that on the
5   record.
6            THE COURT:  Well, we're going to get on the
7   record this case and not other cases.  Okay.
8            ATTORNEY HAVERSTICK:  Yes, but --
9            THE COURT:  Then we'll deal with that at the
10  end.  So let's take -- we're going to take a ten-minute
11  recess.
12           ATTORNEY JARBOLA:  Thank you, Judge.
13           (A recess was taken at 10:58 a.m. to
             11:10 a.m.)
14
15           THE COURT:  So do you think we'll finish today?
16           ATTORNEY JARBOLA:  Judge, in what I just
17  mentioned, looking at my watch, I don't believe we're going
18  to get through everybody.  We'll do our best.
19           THE COURT:  Okay.  But we're at least going to
20  go till 5:00, 6:00, 7:00, tonight --
21           ATTORNEY JARBOLA:  Sure.
22           THE COURT:  -- to see if we can get done.
23  Because for some reason I had this scheduled for a half a
24  day.  I got to -- I don't know why.  But I've got to
25  reschedule some things this afternoon.

1          Go ahead.

2    BY ATTORNEY JARBOLA:

3        Q.    Mr. Nikiper, I believe you were last discussing

4    the image copy of the software and the security dongle.

5        A.    Correct.

6        Q.    What, if anything, did you do with the dongle?

7              THE COURT:  The security dongle?

8              ATTORNEY JARBOLA:  Yes.

9              THE WITNESS:  So the first thing that I did

10   when -- while at the state police headquarters was I did make

11   note that there was a security dongle -- and I've seen

12   licensing dongles for softwares before -- and thought it was

13   some kind of licensing key or something that was not super

14   important to what I was doing.

15             During the later analysis, seeing that there

16   was an encrypted partition, and the pointers that the

17   security dongle might also have that -- besides that

18   licensing information that I've seen on other such dongles,

19   might have the decryption key, it might play a bigger role in

20   the security model for Pace-O-Matic's device.

21             I requested a copy of it so I can get more

22   detailed, clean pictures of the device and be able to try and

23   understand how the device works to see if my suspicion from

24   looking at what was in the media was correct.

25   ///

BY ATTORNEY JARBOLA:

    Q.    And ultimately did you conduct any analysis of the device or include it in your report?

    A.    So it led to my analysis was I did try to make a media copy of this device using the Tableau device like I did for the program storage media.

            THE COURT:  You mean -- by "device" you mean security dongle?

            THE WITNESS:  Yes, the security dongle, yes. However, it does not mount as any readable partition or data drive, so that was not possible.  From that point it was dig more deeply into those processes that hinted that it was looking at the security dongle for the decryption key and see that it was mapping to a specific USB device that would get mounted.

            So computers, when you plug in a device, the computer has to understand what that device is.  And for the type of architectural design that Pace-O-Matic has, when you plug this device into a UNIX computer, it should mount as that specific USB device.

            I was not able to try that nor was I able to go any further than that in my investigation of the actual software and media.

BY ATTORNEY JARBOLA:

    Q.    In any of the review of the dongle, did any of

1    that come into your conclusion in your report?

2        A.     It did not have an overall bearing on whether or

3    not my opinion is is this primarily skill or chance, so no.

4        Q.     And back to the actual software media.  Ultimately

5    what's the goal of trying to image and then analyze this

6    program storage media?

7        A.     The ultimate goal is to try and understand how

8    exactly the device works despite how it might be presented to

9    a patron.  A good example of understanding how a device works

10    versus how it's presented is I've seen in gambling devices

11    a -- what I would call a pick 'em bonus, what the industry

12    would call a pick 'em bonus in which a number of symbols is

13    shown to a player in a bonus round where they then have to

14    pick X number of those symbols.

15        There are two ways of primarily doing this.  One

16    is each spot is given a value and wherever the player taps,

17    whatever picks or symbols the player makes, those are the

18    exact values that they get.

19        The other way is to script that.  It doesn't

20    matter where the player picks, their first choice will always

21    be a certain value.  And so the game, before the player even

22    engages in that bonus, already knows what the outcome of that

23    bonus will be.  There's no randomness to it.  It's already

24    predetermined.

25        And so the only way a player would know whether

1    they were playing where their picks actually have any random

2    value to it or if it's predetermined is to look at the source

3    code, how is the game designed to work.

4            And that's what we try to do.  We see if, one, can

5    we get to the files that actually govern the game play, and

6    two, can we disassemble or understand how they're built and

7    what the instructions are for how that game plays.

8        Q.    Then do you go back and compare that to your

9    physical game play?

10       A.    Correct.  So we can look at what the instructions

11   tell the computer to do versus what the player sees and tie

12   and marry those two items together to be able to understand

13   how that particular feature works.

14       Q.    There was a claim or worry that you may share or

15   distribute your results, your inspection with competitors of

16   Pace-O-Matic, such as casinos.  Did that occur here?

17       A.    No.  We treat each client, in this case -- this

18   particular case for the Office of the Attorney General, as

19   only for that case.  That will not get shared with anyone

20   else unless there's a court order requiring us to do so.

21       Q.    And is there any provision in your contract or

22   work agreement with the OAG, the state police that would

23   prevent you from turning it over to anyone?

24       A.    Off the top of my head I don't recall every

25   verbiage or term in that contract.  But as a general

1   principle for BMM we treat each client's data separately and

2   in confidentiality.  So we would never share one client's

3   information with anyone else unless we're required to do so,

4   either by express written consent of that customer to share

5   that data or if we're provided some kind of court order, at

6   which point our attorneys would be involved in that

7   decision-making process.

8       Q.    Understood.  And have you communicated about your

9   review and analysis of these devices to anyone else other

10  than your direct boss or myself, Chris Herrington, or Karen

11  Romano?

12      A.    No.

13      Q.    Prior to reviewing these devices, did you ever

14  have an opportunity to review Pace-O-Matic machines?

15      A.    Not in any detail.  There was a period a few years

16  ago where Pace-O-Matic wanted to become a client of BMM or

17  have BMM perform services.  Ultimately that didn't happen.

18      Q.    Do you know why that was?  Were you involved in

19  that?

20      A.    I was not involved in the actual decision-making

21  process.  I had reservations from what I heard in talking

22  with the agency, Pace-O-Matic, at that meeting about whether

23  or not that is work that we would or would not accept.

24          Typically BMM has made an issue not to take on

25  what we would call non-gaming devices, devices that are not

1    going to a casino environment.  So we typically don't take on

2    clients that are manufacturers and looking to sell their

3    devices that would not be regulated in some way in the United

4    States.

5         Q.    And do you or BMM, do you work with any other

6    gaming manufacturers or entities in Pennsylvania that you're

7    aware of?

8         A.    So we do work for most of the major manufacturers

9    in the gambling space for the Pennsylvania Gaming Control

10   Board.

11        Q.    So that's more directly with the Gaming Control

12   Board?

13        A.    Yes.  So --

14        Q.    How does that relationship -- who would the client

15   be?

16        A.    So each manufacturer would be their own client and

17   we would prepare reports specifically designed for the

18   Pennsylvania Gaming Control Board.  So those reports would be

19   shared with manufacturer that requested those services and

20   with the ultimate regulator of that device which would be the

21   Pennsylvania Gaming Control Board.

22        Q.    In review of those machines, that would be under a

23   Gaming Act?

24        A.    Yes.

25        Q.    So do you work for any casinos in Pennsylvania?

1      A.      Not specifically for any of the casinos, no.

2      Q.      In fact, aren't basically as some of the reviews

3  that you conduct for the Gaming Controlling Board at odds

4  with casinos?

5      A.      Conceivably there could be.

6      Q.      What do you mean by that?

7      A.      The regulator may say we only want games that fit

8  within a certain regulatory scheme, whereas a casino might

9  want some option outside of that.  Since we don't work

10  directly with the casinos, I couldn't say what that

11  relationship is specifically.  But conceivably with what a

12  client of a manufacturer might want implemented versus what

13  should be allowed could be at odds.  I can provide an example

14  not related to Pennsylvania if that would be helpful just to

15  clear that type of relationship issue out.

16      Q.      I think you covered that.  Thank you.

17      A.      Okay.

18      Q.      Do you or BMM have any vested interest in what is

19  certified in Pennsylvania?

20      A.      No.  Ultimately we provide an opinion as to

21  whether or not something meets or does not meet the rules and

22  regulations of the State of Pennsylvania and we provide that

23  information for the Gaming Control Board to then make an

24  approval decision or disapproval decision at their

25  discretion.

1    Q.    And finally regarding the forensic evaluation

2 report that you prepared and was introduced as Commonwealth's

3 Exhibit Number 1, what is that report predicated on?

4    A.    This report is predicated on the information that

5 I've seen from the game play of the devices and limited

6 nature as to how much I was able to drill into the program

7 storage media.

8    Q.    And did you include descriptions from the

9 inspection or what you observed from the hardware and

10 software?

11    A.    Yes.

12    Q.    Did you then opine or assume certain things from

13 what you observed?

14    A.    I did opine on what I seen.  There are some

15 educated guesses as to how the device may or may not work

16 based on a player perspective and my knowledge and expertise

17 of being in the gambling industry now for close to 20 years.

18    Q.    These descriptions of the hardware, software, did

19 that lead you to your ultimate opinion in your report?

20    A.    It was more the game play of how the device worked

21 that led me to my conclusions.

22    Q.    Thank you.  I'd like to go through the forensic

23 evaluation report that you prepared for today.

24    A.    Sure.

25    Q.    So looking at one of the Pace-O-Matic devices, the

1    device is turned on ready for play, what is a player shown?

2         A.    The first screen that I saw was a menu options

3    screen.  And what this does is it shows the name of the

4    device, what games the player can pick from, and it shows

5    what the relevant performance stats are, basically how much

6    money is on the device at that point in time.

7              From there the player can then scroll through a

8    list of game themes that they could pick from.  It would show

9    six per screen and you could move the screen left or right to

10   look at the full complement of games that were available to

11   the player.

12        Q.    And did you have an opportunity to play each of

13   these various game themes?

14        A.    I made a point to play each and every single one,

15   yes.

16        Q.    How many game themes were there?

17        A.    It would vary would be the best way to put it, is

18   that one of the games I looked at had only six game themes

19   available so there was no move to either side.  Other games

20   had two screens.  I did not see it go to three, so at most 12

21   would be available.  But I want to say it was typically eight

22   to ten were the number that I saw most common between all of

23   the different devices I looked at.

24        Q.    Overall how were -- how were the various game

25   themes played?  Did they have similar options?

1       A.      The game themes all worked very similar to each

2   other.  Other than artwork and positional differences, the

3   objective of each game was pretty much the same.  There was

4   nine symbols, so when the player would play the game there's

5   nine symbols on the screen.  Those would rotate.  When they

6   stopped, the player would then have to pick one of those nine

7   symbols to be replaced with a wild card.  And that wild card

8   would change that symbol to mean any type of symbol and that

9   would be used to try and make a line of three symbols.  So if

10  you could get three pirates in a row, that would pay

11  something.

12      Q.      In the various pages or in the single page with 16

13  themes, were you presented with the option of selecting to

14  play the "follow me" game?

15      A.      Not in that chooser screen, no.

16      Q.      Next I want to go over some of the buttons that

17  were present on the various game themes in the machine.

18      A.      Mm-hmm.

19      Q.      Could you first explain the various buttons that

20  you observed on the machine itself?

21      A.      Going in no particular order on the report, there

22  was a help button on each game theme.  This gave the rules

23  and the objective for the player was supposed to do for that

24  specific base game play.

25              There was a button labelled next puzzle and that

1  would show and reveal to the player the next outcome at that

2  bet level.  So if I was by default went into the game and I

3  was at the lowest bet level and I picked next puzzle

4  immediately, it would show me the next outcome immediately if

5  I was to immediately hit play.

6           And there was two buttons to raise or decrease my

7  bet level.  And with each bet level, as I either raised it or

8  lowered it, would have a different puzzle outcome that would

9  be available.  So the multiple different themes -- it was a

10  pirate theme, it was a jewel theme, there was luxury or

11  living large-type of game theme.  Looking at these different

12  game themes and then looking at each bet level, each game

13  theme, each bet level had a different next possible puzzle

14  that would be revealed by that button.

15           Outside of that, the last button would be to --

16  two last buttons would be one go back out to the menu screen

17  to select a different game theme to play or actually press

18  play and play that next puzzle.

19      Q.      And when you select the help button, on each of

20  the game themes were you able to select it for each game

21  theme?

22      A.      Yes.

23      Q.      And when selecting the help button, is there any

24  mention of any bonus games in any of the instructions?

25      A.      No.

1    Q.    Is there any mention of the "follow me" feature in

2  any of the instructions for any of the game themes?

3    A.    No, there's no mention of the "follow me."  And

4  let me just clarify.  The pay table that could sometimes be

5  available on the help screen that showed you what each symbol

6  and what it paid out, there was mention of bonus but no

7  actual rules or description of what that bonus would be.

8         So there was a hint that there was or inclination

9  that there was some kind of bonus available if you were to

10  get a certain symbol combination, but it did not describe

11  that bonus until you actually got it -- until you actually

12  got it.  And before you actually played that bonus it would

13  give you a brief blurb of what was expected for the player to

14  do in that bonus.

15    Q.    Understood.  The next button I'd like to discuss

16  is the next puzzle button that you mentioned.  Can you

17  describe what this button or option does?

18    A.    It shows what the next outcome would be at that

19  current bet options the player has selected.  So if I'm in a

20  particular game theme playing at the lowest bet level and I

21  hit the next puzzle button, I will see the next puzzle for

22  that option.  If I was to increase my bet level by one and

23  then look at that next puzzle button, it would show me the

24  next puzzle for that specific bet level.  So they were not

25  all the same.

1    Each time you would press that next puzzle button,

2  it would not be consistent between the options as to what the

3  next outcome would be.  However, if you did play a game at a

4  specific bet level and then go to a different bet level and

5  do that next puzzle, it would not advance any of the other

6  game plays.  It would just be the one that you played.

7    Q.    So each wager level had its own accompanying

8  greater next puzzle?

9    A.    Yes.

10    Q.    So if you were to view the next puzzle at a

11  particular, as you called, wager level and then played that

12  particular wager level, would the next puzzle or grid change

13  for any other wager level?

14    A.    No, just the one that you played.

15    Q.    Was there a limit on how many times you could

16  press the next puzzle button or how many times you can review

17  that next grid?

18    A.    There did not appear to be a limit.  I did -- I

19  was able to press it several times and review the same puzzle

20  multiple times, so it wasn't like a limit to the times that

21  you could press it, unless that was such a large number that

22  I just didn't achieve it.

23    Q.    So if a player were to press the next puzzle

24  button several times and review that next grid, they would be

25  able to determine if there was a predetermined win or where

1     to place that wild?

2         A.     Yes.

3         Q.     In your report you note that a player may exercise

4     some level of skill pressing the next puzzle button.  Can you

5     explain this, please?

6         A.     So I've heard this argument by other clients in

7     other court cases that there's potential strategy or skill in

8     a player's actions by being able to go through each game

9     theme and each next possible puzzle and only choose winning

10    ones, and then if there were no winning ones, either cash out

11    or go -- and go to another device or just not engage the game

12    at all.

13         And while there's certain level of skill that is

14    needed to define that as a strategy, it's simply looking at

15    what is the next available options and determining whether or

16    not you want to play it or not.

17         You could see the next outcome is going to be a

18    winner, but not enough to make all your money for your wager

19    back or it could be a big winner or you could have all losers

20    and maybe you play a loser because you're bored and want to

21    do something.  I -- it's one of those things, you could see

22    what the next ones were.  Is that truly a skill?  I would

23    argue it -- the first person who devises it and figures out

24    how to do it, that could possibly be a skill.  But it's not

25    necessarily a skill to follow the prewritten strategy that

1   you read off the Internet or from someone else who told you,

2   hey, here's what you're supposed to do.

3        Q.    What happens if there's no potential winning

4   outcome at every wager level?

5        A.    If there's no available winning outcomes the

6   player has two choices to make, either play one of the losing

7   outcomes to see if the next one after that might be a winner

8   or cash out and walk away from the device.

9        Q.    In such a situation where every wager level is a

10  predetermined losing outcome, is there any amount of skill a

11  player can input to change those losing outcomes or change

12  the grid on that next puzzle?

13       A.    I did not see any way for the player to change a

14  loser -- a losing puzzle outcome into a winning puzzle

15  outcome if there was no place to put a wild and make a win.

16       Q.    Were you able to determine the origin of the next

17  puzzle or the next grid for each wager level at each game

18  theme?

19       A.    I was not.  That's another one of those instances

20  where if we had access to the source code to see how that was

21  generated that would be something that would be interesting,

22  would definitely weigh my opinion whether it is more skill or

23  more chance.  But without that information it looks as random

24  chance.  It could be done by an RNG.  It could be

25  predetermined from a pool of potential outcomes like a

1   lottery draw.  I don't know.

2       Q.     And what is an RNG?

3       A.     An RNG is a random number generator.  So in casino

4   gambling your outcomes are decided by an RNG.  So when the

5   player hits play, the next random numbers are pulled from

6   that RNG algorithm and that would define your reel stops.  So

7   if you had a virtual video reel game and you hit play, the

8   program is going to pull from that RNG.  Let's say it's a

9   three-reel game, three reel stops.  And so that would dictate

10  where those spinning reels would actually stop, what symbol

11  they would stop on.

12      Q.     And you mentioned pulling from a pool of grids.

13  What would that mean?

14      A.     So we've seen, especially for lottery games or

15  pull tab games where there's a specific prize pool structure

16  made up -- kind of like if you were to play the lottery here

17  in Pennsylvania, where there's a certain number of winning

18  and losing outcomes that's decided ahead of time -- it's then

19  shuffled up and then those are hidden and divvied out to

20  individual games.

21          So you could potentially have a situation where

22  I've seen electronic pull tab games in casino market where

23  you do this particular type of method where everything is

24  predetermined; however, what's next is random or appears

25  random to the player.

Q.     And in playing these games, how does it appear to
the player?

A.     It appears as random.  So it would be the same as
getting a scratch-off lottery ticket and scratching off the
protective film over it to reveal a winning or losing outcome
of the lottery ticket.

ATTORNEY BUTKOVITZ:  I'm going to object.  I
didn't get a chance to there but it calls for speculation to
the extent he's offering opinion as to what a player and how
a player would observe this, to the extent he opines that the
player would think that it's chance.

THE COURT:  Sustained.

BY ATTORNEY JARBOLA:

Q.     In your expertise in sitting and playing this
device, what does it appear to you?

A.     It appears as chance to me.  Sitting there playing
the device without any knowledge as to where it comes from,
it looks as if it is random chance.

Q.     And could you compare or relate that to anything
else?

A.     I can compare it to, as I said, a lottery
scratch-off where it's predetermined or a slot machine where
it's determined at the time I press play.  That I can see
next puzzle looks to say that at least some of it is
predetermined as in to the next puzzle I'm going to get was

1    predetermined to some level, but I don't know if that's done

2    randomly in some fashion.

3              ATTORNEY BUTKOVITZ:  Your Honor, I'm going to

4    object again.  He's completely speculating.  He's comparing

5    the device here to scratch-offs and other forms of gambling

6    based on parts of the game that he's admitting that he can't

7    see.  So he's talking about what his guess as to what's

8    happening under -- beneath the hood.

9              THE COURT:  Sustained.  Sustained.

10   BY ATTORNEY JARBOLA:

11        Q.    What happens when you press the play button?

12        A.    What happens is all nine symbols start to rotate

13   and the play button changes slightly in that you can tap it

14   again and stop the symbols from spinning.  The ultimate

15   result is whatever you saw in the next puzzle, if you had

16   looked, would be what you now see on those selection of nine

17   symbols and you'll now have an opportunity to place that wild

18   symbol.

19        Q.    Do you have to stop each of the reels?

20        A.    You don't.  They will stop themselves after a

21   period of time.  But in a common feature in some casino slot

22   games is the ability to press play and then press play again

23   to stop the symbols thereby minimizing the game time.  I've

24   seen auto play do this in various jurisdictions.  It's not

25   very common here in the U.S., but outside of the U.S. an auto

1    play feature is something that is fairly common.  Where

2    people will put a sum of money on to the game, turn on the

3    auto play feature, and then move to the next game, put money

4    on that game, turn on auto play.  And what they're doing is

5    basically just playing to see if they can hit a jackpot and

6    make their money back.

7         Q.    In your professional opinion, what is the main

8    part or the base part of each game theme?

9         A.    In this particular case?

10        Q.    Yes, in these devices.

11             ATTORNEY BUTKOVITZ:  Objection.  Objection.  I

12   need the question read back there.  Is it his opinion as to

13   defining the base game?  I'm sorry.

14             THE COURT:  What is the main part or the base

15   part of each game theme.  Is that your question?

16             ATTORNEY JARBOLA:  Yes, Judge.

17             ATTORNEY BUTKOVITZ:  I don't know that he has a

18   basis for an opinion to place a value judgment on what

19   constitutes the main part of the game.  We're here on a

20   motion for return of property concerning the classification

21   of the device, the game in its entirety.  So the extent that

22   there's some opinion of value placed on one part of the game

23   over the other, I've not heard anything from this expert that

24   would authorize him to offer that opinion.

25             THE COURT:  You can explore that on cross.

1          Go ahead.

2   BY ATTORNEY JARBOLA:

3       Q.     In your professional opinion, what is the main

4   portion or base portion of each game theme?

5       A.     So the objective of the base game or the main part

6   of the game is to place a wild symbol on this grid of nine

7   symbols to try and effect the most optimal win of completing

8   as many lines as possible.  So there are, like I said, it's a

9   three-by-three grid.  You have three horizontal lines, you

10  have three vertical potential lines, and two diagonal lines.

11  And the objective is to place that wild in the most optimal

12  spot to get the highest possible winning outcome if there is

13  a winning outcome on that.

14      Q.     What do you have to do once the reel stops

15  spinning?

16      A.     You would have to place that wild potentially if

17  there is a winning outcome.  If there's no winning outcome --

18  as it didn't matter where you placed that wild symbol, you

19  could not get a winning outcome -- you are not required to

20  place that winning symbol.  You could press play again or you

21  would have an option for a "follow me."

22      Q.     And is there a period of time to make this

23  selection?

24      A.     7yes.

25      Q.     And is that a time period known and visible to the

1  player?

2      A.      Yes.  There's a countdown timer that is shown to

3  the player.

4      Q.      What happens if a selection is not made in a given

5  time period?

6      A.      It would be similar to if you were to sleep a win

7  in bingo, you forfeit any prize if there was one.

8      Q.      In such a situation were you able to determine if

9  you could play the "follow me" game?

10      A.      If it was a losing outcome, you could -- there

11  would also be options to play a "follow me" without making

12  that selection.  If it was a winning outcome, it was that you

13  had to make the most optimal selection and have a prize pay

14  out that was less than 105 percent of your wager.  Once you

15  met those criteria, you were also then given the option to

16  play this "follow me" feature.

17      Q.      If you made no selection in the 30-second time

18  limit?

19      A.      Only if there was a loser.

20      Q.      Okay.

21      A.      If it was a winner, you would have to make that

22  optimal selection.

23      Q.      Okay.  So if you didn't make that selection, then

24  there wasn't an option to play the "follow me" game?

25      A.      Correct.  You would forfeit the option to play the

1    "follow me."

2        Q.      After pressing play, who chooses the next nine

3    symbols?

4        A.      The game.  It's presented by the game to the

5    player.  How that choice is made, I do not know.

6        Q.      Does the player have any control over what the

7    nine symbols are presented on each grid?

8        A.      No.

9        Q.      In your report you note a player may exercise some

10   level of skill in placing the wild symbol.  Can you explain

11   that, please?

12       A.      So that is a level of pattern recognition on the

13   player's part to be able to see where you have two symbols in

14   a row and where you need to place the wild symbol to turn

15   that into three symbols in a row.  So you may have a pirate,

16   a cannon, and a pirate on one line.  So you would want to

17   replace that cannon with a wild symbol to make it three

18   pirates in a row and get paid out for three pirates in a row.

19   You might have on the top horizontal a cannon, pirate,

20   pirate, but then going down you might have the cannon and

21   then a treasure chest and a treasure chest.  So the optimal

22   place is to place it in that first place to get that top

23   horizontal line and that first vertical line.

24       Q.      So would you make what would turn up to be, from

25   your description for the record, an L?

1    A.     I would make an, yeah, inverted L.  You're

2  basically making two lines be winnable lines instead of one

3  line be a winnable line.

4    Q.     In that scenario, though, the players still only

5  interacts with the game once?

6    A.     Correct.  There was a very rare instance where you

7  basically if you put the wild in the middle you could hit

8  every single possible line so you'd get the -- you'd get the

9  diagonals, you'd get the cross shape so you could hit

10  multiple lines depending on where you place that wild symbol.

11  Depending on what patterns, what symbols were shown to the

12  player.

13    Q.     Based upon your expertise, are you able to

14  quantify the level of skill in selecting a wild symbol?

15    A.     It does require skill.  It requires pattern

16  recognition to be able to do that.  But it is not the end all

17  be all of everything.  There is -- what is presented to the

18  player to begin with and that the player has no ability to

19  change that or affect that other than placing this wild

20  symbol, I would say it's less than 50 percent of the player's

21  involvement in the game and the overall outcome determination

22  of the game.  The game provides an outcome.  That outcome,

23  whether it's done randomly or through some permutation, I

24  don't know.  It looks random to me.  And the player's skill

25  is simply to make a win on what could be a potential winning

1  outcome.

2      Q.     Are you able to compare playing the base grid game

3  to playing video poker game?

4      A.     Yes.  So in video poker or an actual live poker

5  game skill is used by a player to, one, understand what cards

6  they've been given, what cards have not been drawn or may

7  have been given to other players, and what are their chances

8  of getting a specific outcome based on what cards they hold.

9          So if I'm given five cards and I'm allowed to

10  throw away any number of those five cards to get new cards,

11  based on what I have in front of me there is a skill and a

12  mathematical knowledge to possess to decide I'm going to hold

13  these three cards or these two cards, discard the others in

14  order to get a potential pattern or outcome.

15          However, the shuffling of the cards and what cards

16  are dealt is done purely on chance.  Another place with poker

17  where you have skill with that is if you're in a live poker

18  game, we're all playing in that poker game.  I can look at my

19  cards that I have, I can look at whatever cards are visible

20  to me, but then I can use my ability to read other people to

21  try and determine, do they have something worth staying in

22  the game for where I could potentially beat their hand, or

23  can I bluff them to make them think that I have something

24  better than I -- than what I really do -- than what I already

25  have and make them either fold or continue on and prove that

1   I have something better than that.

2               ATTORNEY BUTKOVITZ:  I'm going to object and

3   move to strike that response.  It exceeds anything in the

4   report.

5               ATTORNEY JARBOLA:  He's in his expert opinion

6   reviewing gambling devices, video gambling devices.  He's

7   making -- he's offering testimony comparing these devices to

8   video poker games.

9               THE COURT:  Objection's overruled.

10              ATTORNEY BUTKOVITZ:  But he doesn't -- Your

11  Honor, if I can be heard.  He's making that comparison but he

12  does not make that comparison in the report.  We have no

13  notice about him comparing this to video poker or other --

14              THE COURT:  I think it was just an analogy.

15  We'll permit it.  Overruled.

16  BY ATTORNEY JARBOLA:

17      Q.     In your professional opinion is there more skill

18  utilized in playing video poker or in the base grid game?

19              ATTORNEY BUTKOVITZ:  I'm going to object.

20              THE COURT:  Sustained.  Sustained.

21  BY ATTORNEY JARBOLA:

22      Q.     In playing the various game themes, did you have

23  the opportunity to play any bonus games?

24      A.     I did achieve some of the patterns that would be

25  required to play a bonus game.  One of the bonus games was in

1    a military theme game where your -- looks like there's
2    symbols swarming the beach and you had to aim a cannon to
3    destroy those symbols coming at the beach.  So you would see
4    a ship come out from the side and you'd have to tap on that
5    ship several times in order to defeat it and get a prize for
6    it.
7            Sometimes there'd be a helicopter or a plane.  You
8    would have to tap those to destroy it and get a different
9    value.  At times there would be a tank or people, et cetera,
10   on that beach that you would then have to tap.
11           One of the other game themes was an underwater
12   fish-type of theme.  You had what was described as a camera
13   and you had to photograph fish as they came into your view.
14   So you would see a fish start to swim by, you had to tap on
15   the fish in order to take a picture of it and get a prize.
16   Q.    Were there any bonuses regarding free spins?
17   A.    I did not see anything specifically for that.  But
18   I did not hit every single bonus, so I don't know if a free
19   spin bonus was one of the potential bonuses.
20   Q.    Do you have any idea how the system presents the
21   outcomes from the bonus games?
22   A.    I do not know how the system defines -- how the
23   system generates what's going to be shown and what the player
24   has to do.  The rules are given.  You know that it's going to
25   do something.  But as for what symbols show up, I was able to

1    hit, like I said, on that military theme, that beach bonus

2    several times and the items that would come out for me to tap

3    and defeat was not consistent.

4        Q.    Do you see such bonus games in any other area that

5    you review games for?

6        A.    In casino games I see pick 'em bonuses, I've

7    seen -- I've seen free spin bonuses.  I've seen knowledge and

8    trivia bonuses.  I've seen racing bonuses.  So the bonuses

9    can run the gamut of what people can come up with.

10            ATTORNEY BUTKOVITZ:  I'm going to object again.

11   In the report there's no discussion of the bonus games.

12   There's certainly no comparison of the fact that there's a

13   bonus game in this somehow being indicative or consistent

14   with what he's observed in casino places.

15            THE COURT:  Overruled.

16   BY ATTORNEY JARBOLA:

17       Q.    I'd like to briefly just discuss the play button

18   with you a little bit more.

19       A.    Okay.

20       Q.    If there's no predetermined winning outcome on

21   that grid that you play after pressing play, must a player

22   interact with the device and choose a symbol to place a wild?

23       A.    No.  So if there is no potential winning

24   combination to be made, the player can immediately press play

25   and play the next game or they can tap in an area where

1    there's, I would call it, a status bar, basically gives like

2    places -- place the wild.  It would rotate and say something

3    else.  One of the rotating items it would say is follow --

4    "follow me."  And if you were to tap that, that would take

5    you into this "follow me" feature.

6         Q.    But in such a situation you said player can just

7    press the play button again?

8         A.    Yes.  So I was able to -- like I can on different

9    slot machines that I've played in the office and whatnot,

10   just continually press the play button and play until I would

11   get a winning out -- potential winning outcome.

12         If there was a winning outcome that could be made

13   on a grid, I could no longer press the play button to go

14   forward.  I would have to place that wild symbol.  I still

15   had the option to place it in the wrong place and not get any

16   win for it or I could place it in a optimal or semi -- I

17   wouldn't even say optimal -- in a place that would still get

18   me some kind of a win.

19         Q.    And when there is no winning outcome available,

20   were you able to observe what the play button looks like?

21         A.    It would go back to being a play button.  It

22   wouldn't -- it would look the same as if it was to play the

23   next game when its idle.

24         Q.    And each time you press play, your credit level is

25   decreased?

1      A.      Yes.  So every time you press the play button,

2   your credit balance decreases by the amount of your wager

3   option.  So if you're selected to play 40 credits, every time

4   you hit play your balance would deduct by 40.  If you're

5   playing at 80 credits, or 80 cents, it would deduct by that

6   80 credits, or 80 cents, every time you press the play

7   button.

8      Q.      And you just mentioned that when there is either

9   predetermined winning outcome on the screen, what does the

10   play button look like in that situation?

11      A.      It is grayed out.  And if you were to tap it,

12   there's an audible chime and the game would continue to

13   prompt you to place the wild symbol somewhere on that grid.

14      Q.      Now I'd like to discuss the "follow me" game theme

15   on these devices.

16      A.      Okay.

17      Q.      First, is there always an opportunity to play the

18   "follow me" game theme after every play?

19              ATTORNEY BUTKOVITZ:  I'm going to object to the

20   characterization as a game, as a separate game theme.

21   Throughout his report he clearly identifies "follow me" as a

22   feature that is part of the game that's at issue today.

23              ATTORNEY JARBOLA:  Judge, he indicated earlier

24   that it was his opinion that the base game is the main

25   portion of the game.  I believe he's free to characterize the

```
 1   game as he sees fit and as an expert.

 2               ATTORNEY BUTKOVITZ:  I'm talking about his

 3   report.  I believe he refers to a base game and a "follow me"

 4   feature.  It does not refer to two separate games.

 5               THE COURT:  Well, his report does say the,

 6   quote, "follow me," unquote, feature.

 7               ATTORNEY JARBOLA:  Sure.

 8               THE COURT:  I mean, is that what you consider

 9   it, a feature?

10               THE WITNESS:  I consider it a feature.

11               THE COURT:  Okay.

12               THE WITNESS:  It's not part of the base game.

13               THE COURT:  Okay.  Go ahead.

14   BY ATTORNEY JARBOLA:

15        Q.    Is there always an opportunity to play that

16   "follow me" feature?

17        A.    No.  And I'll characterize that on the three games

18   that are part of this case here, it was not always an option.

19   However, on some of the versions that I was asked to take a

20   look at while there and included in this report, it was an

21   option that you could play the "follow me" feature after

22   every game play.

23        Q.    When was it regarding these devices for this case,

24   when was it not able to be played?

25        A.    So if you had a losing outcome and let the timer
```

1    expire, your "follow me" option would not be available.  If

2    you had a winning outcome and it was greater than 105 percent

3    of the amount that you wagered, you would not have an option

4    for a "follow me," or if you had a winning outcome and you

5    did not make the most optimal selection in the grid, you

6    would not get an option for a "follow me."

7         Q.    Then you mentioned that whether or not you could

8    always play the feature differed on the software version.

9    What, if anything, does that tell you?

10        A.    It tells me that the "follow me" feature might be

11   configureable as to how it is available to a patron to play

12   with, so whether it's always available or what conditions it

13   is available for a player to be able to engage with.

14        Q.    What does that mean?

15             ATTORNEY BUTKOVITZ:  I'm going to object.  I

16   don't -- I can use this as a standing objection, whatever

17   Your Honor would prefer, but we're going to oppose this line

18   of testimony to the extent that he's -- he's completely

19   speculating.  He says what it might indicate and then he

20   doesn't -- and he's already testified earlier that he does

21   not have the additional materials he would need to make a

22   determination.

23             THE COURT:  I'm going to sustain the objection.

24   You can re-ask it.

25             I don't like standing objections.  You're going

1    to have to object each time.

2                    ATTORNEY BUTKOVITZ:  What's that?

3                    THE COURT:  I don't like standing objections.

4                    ATTORNEY BUTKOVITZ:  Okay.  Fair enough.

5    BY ATTORNEY JARBOLA:

6        Q.    You mentioned it appeared that in a different

7    software versions there was either an option -- there was

8    always an option to play "follow me" feature, correct?

9        A.    In one of the versions I looked at there was

10   always an option to play the "follow me" feature.

11                    THE COURT:  A version that's not these three

12   machines?

13                    THE WITNESS:  That's not these three machines,

14   yes.

15   BY ATTORNEY JARBOLA:

16       Q.    In these three machines there were scenarios where

17   you could not play the feature?

18       A.    Correct.

19       Q.    Now, would there be any differences between the

20   software versions of whether you could play the feature, what

21   does that tell you?

22                    ATTORNEY BUTKOVITZ:  It's going to be -- I'm

23   sorry.  It's going to be the same objection, to the extent

24   he's asking him to opine on what's happening under the hood.

25   The fact that there are -- there are observable differences

1  in a version that's not the subject of this case, between

2  that device and --

3              THE COURT:  I understand.  How would he know?

4              ATTORNEY JARBOLA:  He's not making any

5  assumption.  He would -- as an offer of proof, he would

6  testify that and that it's a configureable option that a

7  vendor or a manufacturer could change how it occurs in the

8  machine.

9              ATTORNEY BUTKOVITZ:  By configurable he's

10 talking about something that happens under the hood.  He's

11 opining that there might be something that someone could do

12 under the hood that changes how the game plays and that's the

13 basis for objecting.  There's no basis for opining on that

14 area.

15             THE COURT:  Yes.  Sustained.

16 BY ATTORNEY JARBOLA:

17     Q.    When the "follow me" feature is made available to

18 a player, can you describe where that touch point is on the

19 machine screen?

20     A.     It varied on the game theme in artwork.  For the

21 most part it was mostly in that status area.  But that status

22 area instead of being on most of the games it was right

23 underneath that grid of nine symbols but above the player's

24 balance and how much the wager options and some of the

25 buttons were in most of the game themes.  But in some of the

1  game themes it would be off to the side.  So the position

2  would change as to where those status messages and the shape

3  of that touch point was on the screen.

4     Q.    And did you observe how the "follow me" feature

5  touch point appeared?  Was it always there?

6     A.    The status message positioning was always there

7  but the "follow me" saying "touch here to follow me" was not

8  always visible to the patron.  So it would alternate text in

9  that status area from different messages to -- that it was

10 indicating to the player.

11    Q.    So if it was available to play it wasn't always

12 present on the screen?

13    A.    Correct.

14    Q.    Were you -- in your game play were you able to

15 determine whether there was a time delay from when the grid

16 stopped spinning to when the "follow me" feature touch point

17 would appear?

18    A.    I wouldn't say that there was a specific countdown

19 for pressing the "follow me."  But there was definitely a

20 time-out period.  So if you had a losing grid and you -- you

21 would have the option to press the "follow me."  It would be

22 one of the rotating messages that were there or alternating

23 messages that would be there.  If you completed the game and

24 it was a condition that would allow you the "follow me," that

25 would be one of the alternating messages that would be

1   flashing there that you could touch there to "follow me."

2              If you won the game and you were not going to get

3   the "follow me," it would not show up in that space.  You

4   could tap there knowing that in previous games you had an

5   option for a "follow me," so if you continue to tap there,

6   but you just wouldn't get into the "follow me" because it

7   wasn't an active touch point for it.

8              THE COURT:  If you're -- if you have a winning

9   outcome, why would you press "follow me"?

10             THE WITNESS:  So if you didn't -- so again, one

11  of the conditions on the winning outcome was that your total

12  winning amount had to be made in the most optimal way and be

13  less than 105 percent of your wager amount.  And so that

14  would give you the option to "follow me."

15             One of the things with the "follow me" feature

16  when you press the button is you would get the rules for the

17  "follow me."  It would tell you how many credits you could

18  win.  It said that it would pay 105 percent.  So if you were

19  to, let's say, wager 40 credits, win only 40 credits, you

20  have not passed that 105 percent threshold.  You would have

21  the option of the "follow me."  If you pressed that option to

22  play the "follow me," you would get the additional 5 percent

23  of credits offered to you.  So if I stick with 40 as the

24  example --

25             THE COURT:  If you bet 40 and win 40, you

1    didn't have a winning outcome, right?

2                THE WITNESS:  You did have a winning outcome.

3    You just didn't make as much as what you wagered in that --

4                THE COURT:  You made the same amount.

5                THE WITNESS:  You made the same amount, but you

6    did not make 105 percent.

7                THE COURT:  You call that a winning outcome?

8                THE WITNESS:  Yes.

9                THE COURT:  Okay.

10               THE WITNESS:  In typical casino parlance, if I

11   may, just using the Nevada Gaming Control Board.

12               THE COURT:  I guess you define winning by not

13   losing.

14               THE WITNESS:  Correct.

15               THE COURT:  If you have a losing outcome, you

16   can select "follow me."

17               THE WITNESS:  If you have a losing outcome

18   presented, you could pick the "follow me" option immediately.

19               THE COURT:  Okay.  Go ahead.

20   BY ATTORNEY JARBOLA:

21       Q.    Based upon your expertise in gaming testing and

22   analysis, would you say the location of the touch point is in

23   a readily discernible place?

24       A.    Unless you --

25               ATTORNEY BUTKOVITZ:  Objection.  Calls for

1    speculation.

2                    THE COURT:  Yes.  I don't know what that means.

3    Sustained.

4    BY ATTORNEY JARBOLA:

5        Q.     In reviewing other types of games, where would you

6    find such a -- can you describe all the buttons on the screen

7    and where this button is located?

8        A.     Where this button's located is where I would

9    typically see on other games status messages that are

10   typically alternating text, alerting the player:  Press play

11   to play a game; you can win X number of credits; how much you

12   actually won in that particular game.

13                   There's usually some kind of status area that

14   gives that messaging to the players and it's an alternating

15   text.  That is where I did see the "follow me" be presented.

16   It is not always available there.  So it's not always shown,

17   hey, press here to "follow me."

18       Q.     Prior to initiating the "follow me" feature, is

19   the feature discussed at all during any of the game themes

20   instructions?

21       A.     No.

22       Q.     Is the "follow me" feature an available game theme

23   to pick on the attract screen?

24       A.     It is not.

25       Q.     So if you are aware that it exists and you see it

1 on that area where it would pop up with the "press here to

2 follow play" touch point and decide to press the button, what

3 happens when you press it?

4     A.    If it's available, you would -- and you touch that

5 touch point, the screen would bring up the rules for the

6 "follow me" feature.  And what it is -- basically I would

7 equate it to the game Simon.  That electronic game that would

8 have four touch point color buttons and it would light up in

9 a different pattern.  You had to replicate that pattern.  The

10 rules basically say that's going to give you a pattern over

11 rounds and it is the player's objective to repeat that

12 pattern back to the game, to the device, in order to be

13 successful.

14       It did not specify the exact number of rounds.

15 From playing it, I was able to determine that it's 20 rounds

16 and it would tell you how much you would get if you can

17 successfully completed this over all of the required rounds.

18 And that value would change.

19       So again, giving the example, if I wagered 40

20 credits, I won 20 credits, it would give me 22 additional

21 credits by completing the "follow me" feature.  Thereby if I

22 look at gambling as it's defined, typically requires

23 consideration, risk, and reward -- or chance, I would say.

24 Consideration, chance, and reward.  This looks to be we're

25 trying to remove or negate the consideration needed for that

```
1    gambling definition in that you --
2              ATTORNEY BUTKOVITZ:  This is -- we're going to
3    object at this stage because it both calls for speculation
4    about what was intended by the author or creator and it
5    appears to offer a legal conclusion.
6              THE COURT:  Sustained.
7    BY ATTORNEY JARBOLA:
8         Q.   When you're -- just to be clear, when you're given
9    the rules, that's the first time it's explained, how to play
10   the "follow me" feature?
11        A.   Correct.  I did not see any rules or indication
12   for how to play the "follow me."
13             THE COURT:  So let me just interject here.  So
14   if you have a losing outcome and you select "follow me" and
15   then you say its like a Simon game, you match the sequence --
16             THE WITNESS:  Mm-hmm.
17             THE COURT:  -- successfully, then you'll win.
18             THE WITNESS:  You would get whatever amount it
19   was programmed to give you, which in this case would be a
20   hundred --
21             THE COURT:  In your example, you bet 20, get
22   22, so you win as I understand it.
23             THE WITNESS:  You would get the 105 percent of
24   your wager amount.  It would always pay out to that.
25             THE COURT:  Does that happen every time?
```

1          THE WITNESS:  The value it would give you would
2     be enough to make you to 105 percent of your wager.
3          THE COURT:  Every time you play?
4          THE WITNESS:  Every time you pay.  So if you
5     won something --
6          THE COURT:  Is that skill?
7          THE WITNESS:  The actual "follow me" feature I
8     would say is skill.  The amount that it gives you is not a
9     skill component.
10          THE COURT:  But regardless of the amount, it
11     always would be a winning hand.
12          THE WITNESS:  It would always be enough to make
13     it so that your wager amount plus 5 percent is always given
14     to you.
15          THE COURT:  Okay.
16     BY ATTORNEY JARBOLA:
17     Q.     Are you ever disclosed how long you have to
18     replicate each pattern?
19     A.     There was no timer to replicate the pattern
20     visible to me when playing the game.  I've seen other games
21     that have a similar feature to it and it had a countdown
22     timer that you had to complete that pattern within.  In this
23     game it did not appear to show that in this feature.
24     Q.     How about any disclosure as to how long it would
25     take to fully complete the 20 rounds of "follow me"?

1    A.    There was no disclosure of how long it would take

2  to complete that 20 rounds.

3                THE COURT:  A time limit to complete it?

4                THE WITNESS:  There is a time limit.  So if you

5  are presented a pattern and you did not enter in any pattern,

6  it would time-out and say, Sorry, you lost.

7                THE COURT:  Over what time?  What's that time

8  limit?

9                THE WITNESS:  It was not consistent of the

10  couple of times that I tried to measure.

11                THE COURT:  What's the least amount and the

12  most amount?

13                THE WITNESS:  I would say it was roughly

14  somewhere between 20 and 30 seconds.

15                THE COURT:  Okay.

16  BY ATTORNEY JARBOLA:

17    Q.    Going back to the "follow me" feature, just to be

18  clear on what you would receive if it was successfully

19  completed, if there is a total loss in the grid game where

20  there was a zero outcome, what is the percentage of the wager

21  level you would receive if you complete the "follow me"?

22    A.    You would get 105 percent of whatever was wagered

23  back for that -- for that particular base game.  So if I

24  wagered 40, I would get 42 back in the "follow me."  If I

25  wagered 80, it would be an additional 5 percent of 80 credits

1    which would probably be 4 credits.  And it would seem that it

2    would round it because if you take 5 percent of 40 it's like

3    41 point something.  It rounded it up to 42.

4        Q.    What happens if the outcome in the grid game were

5    a hit or if there were less credits than what were wagered?

6    In that scenario do you still get 105 percent of the original

7    wager level?

8        A.    So if you had a combination in that base game,

9    that grid puzzle, whatever you may want to call it, you made

10   the optimal choice and you won something that was less than

11   105 percent of your wager amount, you would get the "follow

12   me."  And the "follow me" would make up the difference to get

13   you to that 105 percent.

14       Q.    So you don't get, like, a total 105 percent; it's

15   just the difference?

16       A.    It's just the difference to make it to

17   105 percent.  So again, the example I give consistently --

18   because 40 was the most common minimum pay level on the game

19   when I was playing it -- if I made 20, I would get 22 in the

20   "follow me."  If I got 40 in the base game, I would get only

21   2 credits in the "follow me."  If I got 10 in the base game,

22   I would get 32 credits in "follow me."

23                 THE COURT:  Where's the chance in this versus

24   skill?

25                 THE WITNESS:  As in how much credits you get?

```
 1                    THE COURT:  In the having the winning outcome.
 2                    THE WITNESS:  The chance is where does that
 3     original grid come from.
 4                    THE COURT:  Okay.  What do you mean by that?
 5                    THE WITNESS:  So the way I refer it is if you
 6     have --
 7                    THE COURT:  Does it matter where the original
 8     grid comes from?  You eventually get -- you either have a
 9     winning outcome or a losing outcome, right, regardless of how
10     it comes about.
11                    THE WITNESS:  Correct.  You have --
12                    THE COURT:  And then if you have a losing
13     outcome you get the "follow me" option.
14                    THE WITNESS:  If you press it before the timer
15     expires, yes.
16                    THE COURT:  And how much time is that?
17                    THE WITNESS:  That was approximately 25, 30
18     seconds.
19                    THE COURT:  So if you do that, then you have a
20     winning outcome.
21                    THE WITNESS:  Then you could have the "follow
22     me" and if you successfully complete the "follow me" you
23     would have a win.
24                    THE COURT:  So is the chance element whether or
25     not you push "follow me"?
```

```
1              THE WITNESS:  That would be one of the -- one
2  of the abilities to say there might be a chance that you
3  noticed that you should press it or not, or whether or not
4  you make a decision to press it or not.
5              THE COURT:  Okay.
6  BY ATTORNEY JARBOLA:
7      Q.    The 105 percent that you get when you successfully
8  complete the 20 rounds, is that for all of your lost wagers
9  or just that particular wager level?
10     A.    It would be just for that previous game, that base
11 game that you lost in.  So again, if you wagered 40, you
12 would have an option to get 42 as the most.
13     Q.    And again, there is a limit in what you could win
14 on the "follow me" feature, which is the 105 percent,
15 correct?
16     A.    Correct.
17     Q.    Comparatively, did you observe any limit such as
18 105 percent limit on that base grid game?
19     A.    No.
20             THE COURT:  How much more do you have on
21 direct?
22             ATTORNEY JARBOLA:  Say maybe an hour, Judge.
23             THE COURT:  Okay.  Let's take a lunch recess
24 for 45 minutes.  We'll reconvene at 1:00 p.m.
25             (A recess was taken at 12:13 p.m.)
```

1              THE COURT:  So as far as if we need another day

2    or a half day, do you folks have your schedules?

3              ATTORNEY JARBOLA:  Yes, sir.

4              THE COURT:  I'm going to go through three

5    dates.  This coming Monday, November 28th, just tell me if it

6    doesn't work.  Or if you have to check with witnesses.

7              ATTORNEY HAVERSTICK:  Our expert's out of the

8    country.

9              THE COURT:  Okay.  Friday, December 2nd.

10             ATTORNEY CARUSONE:  No.

11             THE COURT:  January 12th.

12             ATTORNEY HAVERSTICK:  Your Honor, depending on

13   how long the Commonwealth wants to go, I think we've run

14   Dr. Vancura who came up from Las Vegas whose testimony I can

15   accomplish that in half an hour.

16             THE COURT:  Say that again.

17             ATTORNEY HAVERSTICK:  I can have Dr. Vancura's

18   direct done in under half an hour, probably in 20 minutes,

19   and I prefer to do it today because --

20             THE COURT:  He came in from Las Vegas.

21             ATTORNEY HAVERSTICK:  He came in from Las

22   Vegas.

23             THE COURT:  And who's your witness after this?

24             ATTORNEY JARBOLA:  It would be David Schoppe

25   and then depending if Your Honor wanted to hear additional

1  testimony regarding the motions *in limine*, but we would be
2  fine just to accommodate everybody if --
3              THE COURT:  After him take --
4              ATTORNEY JARBOLA:  Please.
5              THE COURT:  Okay.  We'll do that.  We'll get
6  him done after this witness.  Let's talk about, see what
7  witness we get done, then remind me to talk about dates if we
8  need another day.
9              Go ahead.  Continue with your direct.
10 BY ATTORNEY JARBOLA:
11     Q.     Mr. Nikiper, before we had finished, there was a
12 moment in your testimony where you discussed pressing play
13 rapidly.  When you examined the machines and played the
14 machines, did you play in that fashion?
15     A.     I did for part of the game play.
16     Q.     And you were able to accomplish that playing
17 rapidly and just continuously pressing play?
18     A.     You can continually press play until you have a
19 outcome which has a winner on it where it will stop you until
20 you place that wild symbol.  If there's no winning outcome,
21 you're not required to place the wild symbol, you can
22 continually just press play and play the next puzzle, next
23 puzzle, next puzzle.
24     Q.     And when you were continuously pressing play in
25 that fashion, did you have an opportunity to play the "follow

1    me" feature?

2        A.     The opportunity was there but by pressing play you

3    forfeit that opportunity and play the next game.

4                THE COURT:  So you say you continue to press

5    play until you win?

6                THE WITNESS:  Until you have a puzzle that has

7    a winning outcome on it, at which point you then are required

8    to place that wild symbol somewhere on one of those nine

9    existing symbols.

10               THE COURT:  And if you do that, you will then

11   win.

12               THE WITNESS:  You would then have an -- a

13   winning outcome, yes.

14   BY ATTORNEY JARBOLA:

15       Q.     Back to the "follow me" feature.  When playing and

16   inspecting the devices, were you able to play and

17   successfully complete the "follow me" feature?

18       A.     I was.

19       Q.     How did you accomplish that?

20       A.     While my memory is fairly good, it's not that

21   good.  So what I did is I pulled out my cell phone, used a

22   calculator app and mapped one of the numbers on the nine

23   digits on the calculator app with the nine circles that are

24   presented to the player and so each one that would light up I

25   would add that number onto the list of numbers that I had in

1    the calculator.

2           And every time there was intermission I would push

3    the plus sign.  So I would have five numbers, plus, five

4    numbers, plus, five numbers, and after that it was a -- so

5    that corresponded first five rounds.

6           After the first five rounds there was an

7    intermission.  There was a required 14-second break or so in

8    the game play of "follow me."  So you would have to wait

9    through that intermission.  When you came back it would then

10   give you the next round for that feature game, whatever you

11   might want to call it.

12          So you'll have one round, gives you one light-up

13   on that grid of nine colored circles and you'd have to repeat

14   that back.  Round 2, give you that first one plus an

15   additional one and you'd have to do those two correctly.

16   Round three it would be the first two plus a new one.  And it

17   would build and build and build.

18          After the first five rounds, it would stop.  It

19   would give you this intermission for a few seconds, take the

20   grid away, says it's intermission.  After a few seconds it

21   would come back and continue on with rounds 6, go on for five

22   rounds.  At round 10 it would go into another intermission,

23   come back for round 11.  Do that to round 15.

24          After round 15 and the intermission that followed

25   round 15, round 16 would occur but then instead of going

1   straight to round 17, it would be another intermission.  Then

2   17 would occur, followed by another intermission.  Then round

3   18 would occur with another intermission.

4              So there were breaks in that.  And the way you

5   just kept track of it to try and complete the "follow me" was

6   map those to a number on my calculator and sit there and just

7   add the next number and then just repeat that sequence back

8   as if I was tapping in numbers on my calculator app.

9        Q.    Did you successfully complete the "follow me"

10  feature without using the calculator app?

11       A.    I did not.

12       Q.    And --

13             THE COURT:  Did you try?

14             THE WITNESS:  I tried but I was not able to.

15             THE COURT:  Okay.

16  BY ATTORNEY JARBOLA:

17       Q.    I think you said you can't play through each

18  round, there are intermissions?

19       A.    What's that?

20       Q.    You can't play through continuously, there are

21  intermissions?

22       A.    There are forced intermissions or forced breaks,

23  yes.

24       Q.    And based upon your play, how long -- how long

25  were each of these intermissions?

1    A.    They were about 14, 15 seconds.

2    Q.    And there were, you said, seven of them?

3    A.    I believe that number would be right.

4    Q.    And based upon your training and experience and

5    expertise in the field of gaming analysis, do you have an

6    opinion as to why the "follow me" feature includes so many

7    intermissions?

8             ATTORNEY BUTKOVITZ:  Objection.  Calls for

9    speculation.  He's talking about subjectively from the

10   manufacturer/designer standpoint, why these things might be

11   included, why might be designed in that manner.

12            ATTORNEY JARBOLA:  And this goes to the

13   question of whether these games are determined based on

14   chance or skill and whether patrons play these games, play

15   this "follow me" feature.  And as an expert he would know why

16   machines have certain features and he can opine as to where

17   having this feature fits in in his analysis.

18            ATTORNEY BUTKOVITZ:  Again, I restate the

19   objection.  He has no basis for opining on whether players

20   play or would play or the reason why it was designed in a

21   certain manner.  As they said extensively, his opinion and

22   analysis was limited strictly to his play of the game.

23            THE COURT:  It seems speculative.  Objection

24   sustained.

25   ///

BY ATTORNEY JARBOLA:

    Q.    When you play the "follow me" feature and you reach an intermission, what, if anything, did this do to the way you played it?

    A.    So when getting the intermission it gave me an opportunity to kind of sit back and relax from what I was doing, breaking my concentration of watching for the next symbol and making sure that I was keeping track of it on my phone.

    Q.    And actually during the intermissions did you notice anything about the various colored nine dots?

    A.    The nine dots would disappear and it would be replaced with a message that said "intermission."

    Q.    What happens if you get the pattern wrong?

    A.    You immediately lose and the game -- and the feature ends and goes back to the base game where you left off.

    Q.    Based upon your play, were you able to determine -- say you played the first 18 rounds successfully and you get that last on round 19 or 20 incorrect.  Do you still collect zero credits or do you get a fraction of credits?

    A.    You collect nothing.

    Q.    Do you get anymore chances to attempt to win the 105 percent?

```
1         A.      No.

2                 THE COURT:  When you go back to the base game

3    in that scenario, are you then starting from zero?  Meaning

4    you lost your initial 40 credits if that's what you bet.

5                 THE WITNESS:  In gambling requirement there's a

6    requirement that if there's any type of interruption or we

7    replace the screen with another screen, when you complete

8    that bonus whatnot, the game goes back to the exact state it

9    was in where it left that.  And that's what it appeared to do

10   here.  So whatever that screen showed at the end of that base

11   game is what it would go back to.

12                THE COURT:  And that base game was a losing

13   proposition, right?

14                THE WITNESS:  So if it was a losing proposition

15   or a winning proposition, it would go back to looking like it

16   was with any credit balance adjustment if you won the "follow

17   me" feature.  If you lost the "follow me" feature, you

18   wouldn't get that credit adjustment but --

19                THE COURT:  Right.  You just described a

20   scenario where after 18 rounds you made a mistake on 19, you

21   go back to the base game and in the base game you lost

22   because that's why you're doing "follow me," right?

23                THE WITNESS:  You could have won in the base

24   game but won less than what you wagered so you would get the

25   "follow me" option as well.  So --
```

1          THE COURT:  Right.  Okay.

2          THE WITNESS:  But yes.

3          THE COURT:  So when you go back to the base

4    game, let's say you bet 40 initially and won 20, so you're

5    down 20, and you go to "follow me," and then you come back to

6    the base game.  You're still at down 20.

7          THE WITNESS:  Correct.

8          THE COURT:  Do you permanently lose that 20 or

9    can you then continue to play and try to win it?

10         THE WITNESS:  You have lost that 20 credits.

11         THE COURT:  Permanently?

12         THE WITNESS:  Permanently.

13   BY ATTORNEY JARBOLA:

14      Q.    Based upon your review and your expertise in the

15   field of gambling analysis, in comparing the level of

16   interaction with the written portion of the game and the

17   "follow me" feature, could you rate the level of skill

18   required to complete the "follow me" feature?

19      A.    The follow --

20         ATTORNEY BUTKOVITZ:  Object again.  I think it

21   calls for speculation.  I'm not sure what the basis for that

22   opinion is.

23         THE COURT:  Are you asking for a percent, like

24   what percent skill versus chance --

25         ATTORNEY JARBOLA:  Just --

1    THE COURT:  -- in your question?

2    ATTORNEY JARBOLA:  Just -- no, Judge.  Just

3  comparing the level of skill in the grid portion versus the

4  "follow me" feature.

5    THE COURT:  I'm not sure what you mean by "can

6  you rate the level of skill."  I'm not sure what that part of

7  the question means.

8    ATTORNEY JARBOLA:  I can rephrase.

9    THE COURT:  Okay.  I mean, what would be an

10  option of answers to rate the level of skill, like low,

11  medium, high?  Is that what you're looking for?

12    ATTORNEY JARBOLA:  Just asking him to compare

13  the interaction in the level of skill between the two.  Yes.

14    THE COURT:  Between the two what?

15    ATTORNEY JARBOLA:  Between the grid game and

16  the "follow me" feature.

17    THE COURT:  So you're asking which involves

18  more skill than the other?  Is that --

19    ATTORNEY JARBOLA:  Yes, when has -- the level

20  of interaction, compare the two.

21    ATTORNEY BUTKOVITZ:  May I comment?

22    THE COURT:  Yeah.

23    ATTORNEY BUTKOVITZ:  So I think that's -- we

24  have an objection to where it looks like that's going insofar

25  as we've already objected to the characterization of this

1   being two different games.

2           It sounds like from the proposed question

3   that's exactly what they're trying to get at again, which is

4   that he can somehow evaluate what they are calling the base

5   game, is how much skill versus chance is there, and

6   separately analyze "follow me" which is a feature

7   continuation of the same game play.  Again, we're here on

8   return of property as to a single game or multiple separate

9   games themes on a single device.  We're dealing with one

10  game.

11          THE COURT:  Do you want to respond?

12          ATTORNEY JARBOLA:  Judge, just during

13  eventually argument I would provide case law where I will

14  submit to the Court that what controls is how the game is

15  actually played and the -- Mr. Nikiper has testified that the

16  main portion of the game is the grid portion.  But as far

17  as -- that's as far as the comparing.  But all I'm asking him

18  is to say whether or not rate or compare the skill from one

19  section to the next.

20          THE COURT:  So are you asking whether the base

21  is easier to win at than the "follow me"?  Or is that what

22  you're asking?

23          ATTORNEY JARBOLA:  Yes.

24          THE COURT:  Or vice versa.

25          ATTORNEY JARBOLA:  Yes.

1      ATTORNEY BUTKOVITZ:  We would object even on

2  relevance.  I mean, the question, if we're talking about case

3  law, I think is whether the outcome predominantly skill or

4  chance, can it be won every time since --

5      THE COURT:  When you say predominantly, is that

6  a 50 percent threshold?  Because his report talks about in

7  terms of 50 percent.  You said --

8      ATTORNEY BUTKOVITZ:  Yes, I think it's

9  50 percent or 51 percent skill versus chance.  But it comes

10  to the outcome, not does this part of the game --

11      THE COURT:  No.  But is that what the case law

12  says, if it's 51, if somehow someone designated 51 percent

13  skill, 49 chance, it's then a game of skill?

14      ATTORNEY BUTKOVITZ:  I don't think the case law

15  goes into that level of assigning a percentage.

16      THE COURT:  Well, you just phrased it in those

17  terms and his report seems to phrase it in terms of this

18  50 percent figure.

19      ATTORNEY BUTKOVITZ:  I don't think --

20      THE COURT:  And wondering where all that comes

21  from.

22      ATTORNEY BUTKOVITZ:  Well, I think it probably

23  comes from just the term predominant.  And there's case law

24  that talks about when relative skill versus chance because

25  the same -- the same portion of the game or the same game can

1     have elements of chance and skill involved and the presence

2     of one doesn't -- is not determinative of the ultimate

3     classification. But the case law is clear that what you're

4     focused on is the outcome and whether the outcome is capable

5     of winning every single time which is -- well, I wouldn't

6     argue.

7              THE COURT: Will the parties be asking me to

8     make a determination at some point whether this is more skill

9     than chance --

10             ATTORNEY BUTKOVITZ: No.

11             THE COURT: -- or more chance than skill?

12             ATTORNEY BUTKOVITZ: I believe from our side

13    the issue is very simple, which is is this game capable -- is

14    the game capable, not is this hypothetical player, is this

15    specific individual -- is the game itself capable of being

16    won every single independent play. The play consisting of

17    both the base game and the "follow me" feature when it's

18    available.

19             ATTORNEY JARBOLA: Judge, it's our position

20    that that's not the standard at all. The standard is how it

21    is practically played in the field, not the theoretical

22    possibilities of how a game is played in establishments like

23    Champions.

24             ATTORNEY BUTKOVITZ: Your Honor, obviously we

25    completely disagree with that. In fact, the case law is very

1  clear that it's not the fact that it could theoretically be

2  played as a gambling device that would allow the Court to

3  find that it's a gambling device, that you are looking at the

4  game and its features.  It doesn't change from suddenly

5  become a gambling device or a legal skill device depending on

6  who comes up to play.  You know, the game itself is either

7  legal or not.  It's either predominantly skill or predominant

8  chance and the differences for player to player are merely a

9  factor of the skill involved.

10          THE COURT:  Okay.  What's the question?  Ask

11 your question again.

12 BY ATTORNEY JARBOLA:

13    Q.    Can you, based upon your review of the game,

14 compare the level of skill required to complete the "follow

15 me" feature?

16          ATTORNEY BUTKOVITZ:  That's our -- renewing our

17 objection.  Just trying to compare --

18          THE COURT:  Again, back to what you mean by

19 level of skill in the "follow me."  What are -- what are the

20 possible answers?

21          ATTORNEY JARBOLA:  It's the only portion of the

22 game that it has any meaningful skill, greater skill there.

23          THE COURT:  Sustained.

24 BY ATTORNEY JARBOLA:

25    Q.    In your report you referenced the "follow me"

1    feature.  Does that take skill to complete?

2        A.      I would say yes, it does.

3        Q.      What about any other portion of the game?

4        A.      Various aspects of the game require some level of

5    skill and player interaction, whereas other parts of the game

6    are provided to the player from some random source potential.

7    Without knowing exactly how those elements are divined and

8    brought about to the player, I can't answer specifically it

9    is or isn't.

10       Q.      Based upon your review, were you able to determine

11   how each -- in the "follow me" feature, how each colored

12   circle or touch point is chosen?

13       A.      No, I was not able to.

14       Q.      Were you able to determine based upon your review

15   whether it's a predetermined pattern or whether it's chosen

16   randomly during play?

17       A.      From a player perspective, it looks as if it's a

18   randomly chosen pattern.  I could not tell if there was some

19   predeterministic bid to it, if it was some permutation of

20   something.  I couldn't determine that.

21       Q.      Is that something that a review of the source code

22   would provide that answer?

23       A.      Fundamentally that would be something I would

24   expect to be able to see in the source code is how the game

25   chooses what the next iteration is going to be in those

1   rounds and determine is it done through a random number

2   generator, a weighted table, a list of here's -- here's the

3   20 combinations you're gonna have and which, you know, which

4   one are you picking from.  It could be any number of

5   different implementation styles.

6                   ATTORNEY BUTKOVITZ:  I'm going to object and

7   move to strike.  From what I'm just hearing it sounds like a

8   hundred percent speculation and if you get past the

9   speculation you've got the question of relevance.

10                  THE COURT:  Well, you didn't review the source

11  code, correct?

12                  THE WITNESS:  That is correct.

13                  THE COURT:  You're guessing what would be

14  the -- your answer if you did review it.

15                  THE WITNESS:  I'm giving possible permutations

16  of what the information could be if I did have an opportunity

17  to review the source code, from my experience in testing slot

18  machines for yearly 20 years.

19                  THE COURT:  What's your response?

20                  ATTORNEY BUTKOVITZ:  Again, that's the

21  definition of speculation.  He's saying that a gambling

22  device, and totally different industry than he works in,

23  based on that he's able to -- he believes he's able to and be

24  educated, I think educated guess, at what he might find

25  behind -- again, under the --

1          THE COURT:  What's the relevance?  Because he

2     didn't review the source code.

3          ATTORNEY JARBOLA:  My question was just solely

4     whether the source code could provide that answer.

5          THE COURT:  Yes, but what's the relevance of

6     that?  Because we don't -- he didn't review it.

7          ATTORNEY JARBOLA:  Correct, that it's relevant

8     and we should be permitted access to it through discovery.

9          ATTORNEY BUTKOVITZ:  Again, Your Honor, this

10    comes back to whether or not they should be able to give any

11    opinions today.  Because we're hearing him speak out of both

12    sides of the mouth.

13          On the one hand, we can't offer an opinion

14    because they don't have the source code; at the same time

15    they're offering and saying that he is qualified to offer

16    opinion based on what he was able to evaluate.  So they can't

17    have it both ways.

18          THE COURT:  Objection sustained.

19    BY ATTORNEY JARBOLA:

20    Q.    The last question I have regarding the "follow me"

21    feature, in your expert opinion is it designed in a way to

22    realize that extra 5 percent that you would win on a

23    successful completion?

24          ATTORNEY BUTKOVITZ:  Objection.  It's talking

25    about the design of it.  Again, as we've established ad

1  nauseam, he did not conduct an analysis that allows him to

2  offer any opinions on the design of the game.

3          ATTORNEY JARBOLA:  He played the game and he

4  would be able --

5          THE COURT:  Well, I'm just not going to respond

6  to that objection, but what do you mean by "design in a way

7  to realize the extra 5 percent"?  What's --

8          ATTORNEY JARBOLA:  Is that when if a player

9  were to cash out, he doesn't realize the 5 percent.  It stays

10  on the machine.

11          ATTORNEY BUTKOVITZ:  Oh, that's also -- that's

12  outside the scope of his report.  And it's speculative.

13          THE COURT:  I'm not sure I understand.  So if

14  you win "follow me," you win an extra 5 percent, right?

15          ATTORNEY JARBOLA:  Correct.

16          THE COURT:  And you're saying the player

17  doesn't realize that?

18          ATTORNEY JARBOLA:  Correct.  Because -- and he

19  could testify to when he goes to redeem or cash out that the

20  machine rounds down to the lowest nearest whole dollar and

21  any remaining credits stay on the machine.

22          ATTORNEY BUTKOVITZ:  That's nowhere in the

23  report.  I don't think the word redemption is anywhere in the

24  report.  It's all about game play and nowhere does his report

25  cover cashout in any way.

1    THE COURT:  So, Mr. Jarbola, so if someone had

2 bet $10 and they win "follow me," they would win $10.05,

3 correct -- 50 cents, $10.50.

4    ATTORNEY JARBOLA:  Yes.

5    THE COURT:  So it would round it to what?

6    ATTORNEY JARBOLA:  $10 plus whatever other

7 credits were on the machine.

8    ATTORNEY BUTKOVITZ:  Your Honor, just know that

9 looking at this Schoppe report, this is an issue that can be

10 addressed separately but as far as the expert report for this

11 witness, this issue is not covered by it.  It's not

12 appropriate for questioning through this witness.

13    THE COURT:  So you're saying that my

14 hypothetical you win "follow me" and you bet $10 so you now

15 have $10.50, when you cash out you only get $10?

16    ATTORNEY JARBOLA:  If you were to cash out at

17 that moment, plus whatever other credits were on the machine.

18    THE COURT:  Forgetting about other credits.

19    ATTORNEY JARBOLA:  If that was all you had

20 left, yes, you would only get $10.

21    THE COURT:  And the 50 cent would stay on the

22 machine.

23    ATTORNEY JARBOLA:  Yes, 50 credits would.

24    ATTORNEY HAVERSTICK:  Which you could continue

25 playing, Your Honor.  It doesn't go away.  It's there and

1  continue to play.  If you choose to cash out at $10.50 mark,

2  you haven't lost anything because you're getting $10 back

3  that you put in the machine and you still own those 50

4  credits.  You can walk away from the machine if you want or

5  you can stay and play those 50 credits.  You haven't lost

6  anything.

7        THE COURT:  Do you --

8        ATTORNEY BUTKOVITZ:  This goes outside --

9        THE COURT:  Can you take the credits with you

10  and come back another day or not?

11        ATTORNEY HAVERSTICK:  At that point no.  If you

12  bet $10, put $10 in the machine, play, won "follow me," won

13  $10.50 -- and by the way, not every machine I think is

14  configured this way, but let's assume we're talking about a

15  machine that is configured this way -- and you decided you

16  only wanted to play that day, that's the only -- I want to

17  play once today, and I want to cash out right now.  I cash

18  out, I get my $10 back.  That 50 credits, that 50 cents stays

19  on the machine.

20        Now, if I have to go and I don't want to play

21  anymore, I walk away from the upside of the $10, but I

22  haven't lost anything.  I still have my original $10 back.

23  At that point like playing a video game or an amusement

24  device.

25        THE COURT:  Would the credits go to the next

1   player?

2                ATTORNEY BUTKOVITZ:  Yes.  It would not go --

3   yes, it would not go to the location; it would not go to the

4   operator.  It would remain on the device and available for

5   continued play.

6                THE COURT:  So how do you -- if they don't walk

7   away, how would you eventually capture that extra money?

8                ATTORNEY BUTKOVITZ:  There's a couple different

9   ways.  You can continue to play until you get to an even

10  dollar, or you can play it directly in the hopes that, you

11  know, you may win a bonus, you may win a prize that gets you

12  up over the whole dollar amount.

13               THE COURT:  And your next witness -- next

14  expert talks about this?

15               ATTORNEY JARBOLA:  Yes, Judge.

16               THE COURT:  Okay.  We'll let that expert talk.

17  It's not in his report.

18               ATTORNEY JARBOLA:  Sure.

19               THE COURT:  Unless you can point to it in his

20  report.

21               ATTORNEY JARBOLA:  We'll review it with the

22  next witness.

23               THE COURT:  Okay.

24  BY ATTORNEY JARBOLA:

25       Q.    In your report, and you discuss one of these

1    exceptions earlier, you noted the game play was relatively

2    the same.  Or I think you said substantially similar.  One of

3    the exceptions was how the "follow me" feature could be

4    played.  Was there any other exception that you noticed?

5        A.    No.  They were -- like I said, other than the

6    artwork differences, the games were pretty much the same, the

7    bonuses that I've seen were somewhat similar in nature but

8    whole -- but they had their own unique individual flare to

9    it.

10       Q.    Were there any operational considerations in the

11   device that you observed?

12       A.    There was one consideration, one thing that we did

13   look at the menues that were available and it was pointed out

14   to me by the agents at the state -- at the state police that

15   we looked at and tried to determine how it worked.  There was

16   a -- I forget what it was called but it was some kind of

17   limit.  And that limit looked at a -- it was a dollar figure.

18   And so on some of the games it was like 2500, another device

19   it was 5,000, on another device it was 10,000.  And what that

20   looked like from that -- looking at it to try and understand

21   what that was and what it did, it looked like it was keeping

22   track of how much money was going in and out of the device as

23   kind of a performance metric.  And as players would lose,

24   this number would get bigger and when it hit that value,

25   whatever was preset, the 2500, 5,000 or 10,000, once it hit

1    that limit the game would freeze, lock up, and require

2    another fill or some kind of code put in to then re-enable

3    the game for play.

4            So it looked like there was a limitation to how

5    much play could exist on the device. And once that threshold

6    was met, the device was then disabled until something was

7    done to it. Whether that's done as a business decision or

8    whatnot, I couldn't tell. All I could tell that as you

9    played that device, as you won, that number would get lower.

10   As you lost, that number would go higher. And if it rose to

11   that threshold level, the game would go out of service.

12       Q.    And you were able to track that as you were

13   playing?

14       A.    We were able to see it move as I was playing. So

15   I would be able to play a game, see how much I won or lost,

16   go into that menu and then see on a back-end menu that would

17   not be available to players that number then went up or down

18   correspondingly.

19       Q.    And this limit of what amount would be played in

20   the industry, does this have a term?

21       A.    We use a set of terms to define the mathematical

22   how the game -- how game works. To me it varies, player

23   fairness requirements. The two terms we use for that is --

24   they're inverses of each other. There's the return to player

25   and the hold. And what the return to player is, if you were

1   to play every combination available mathematically on the

2   game, at a certain bet level, how much percentage of that

3   player's money would go back to the player?

4           And the inverse of that is the hold.  How much

5   money is then kept by the owner of the game, the operator of

6   the game, whatever that person would be.  So in a casino

7   environment, that would be how much is kept by the casino

8   operation.  We use that term to define, one of the things is,

9   player fairness with return to player.  Lot of your

10  jurisdictions, not all of them, say 80 percent return to

11  player is the absolute minimum for a game design.  You don't

12  want a game below that minimum threshold.  And that helps

13  define what is -- what is fair to the player but is also

14  their upper limits on that threshold.

15          So if you look at the State of Minnesota and the

16  Tribal State Compact that they have there for the casino

17  industry, there's a minimum, there's a maximum.  And the

18  maximum is set so that the operation has a guaranteed amount

19  of return to the operation for funding the tribe.

20          ATTORNEY BUTKOVITZ:  I'm going to object.  It's

21  the same theme as before.  And this one's even clearly

22  spelled out in his report.  But also providing his testimony

23  just now that -- he sees that there's a limit with a dollar

24  amount, that it then jumps to, well, in gambling devices have

25  hold percentages and he's then opining that this is that

1  thing that he -- that he observes in casinos.  But in his

2  report, in his testimony he doesn't have the source code or

3  adequate information to actually offer that opinion or that

4  analysis.

5  ATTORNEY JARBOLA:  In his report he says he

6  doesn't have the source code to definitively say how the hold

7  percentages are programmed, but he can testify to that it

8  appears there is a hold percentage and what that would mean

9  in his analysis of a game of skill versus chance.

10  ATTORNEY BUTKOVITZ:  He's got no basis for

11  opining that the numbers he's seeing is a hold percentage.

12  In fact, it's not a percentage at all.  It's not a ratio of

13  anything.  He's saying he sees a number and therefore he's

14  entitled to opine that that's the hold percentage and

15  therefore, hey, hold percentage is -- casinos have those so

16  this seems like a casino device.

17  I think when you take it through each of the

18  stages, it's pretty clear that it's pure speculation.

19  THE COURT:  I think you can explore that on

20  cross.  Objection's overruled.

21  BY ATTORNEY JARBOLA:

22  Q.   As you were discussing in the casino industry, is

23  there a set regulatory return to player?

24  A.   There is typically a minimum at the very least and

25  some jurisdictions there's also a maximum return to player.

1   Q.     To your knowledge, is there any such regulation

2   regarding Pace-O-Matic machines?

3   A.     We haven't tested these for any specific

4   jurisdiction, so without knowing what jurisdiction that they

5   were looking at going into, I wouldn't be able to say what

6   would be a requirement on there.  They are operating in a

7   fashion that's outside the control of the game -- of the

8   Pennsylvania Gaming Control Board as far as my knowledge, so

9   the rules and regulations should or should they not apply is

10  something that is up for others to decide.

11  Q.     In your professional opinion is there any

12  significance you could draw from these devices appearing to

13  have a hold percentage?

14          ATTORNEY BUTKOVITZ:  Objection.  Again, he's

15  not opining that there even is a hold percentage.

16          THE COURT:  Sustained.

17  BY ATTORNEY JARBOLA:

18  Q.     If a machine had a hold percentage, who would set

19  that?

20  A.     Typically that is done at the manufacturer level.

21  And when they determine the math of the game they'll design a

22  game for a specific return to player or hold.  Since they're

23  inverses of each other, it depends on what they're trying to

24  do and accomplish with the game.  There's also different

25  ways -- I'll just put this out there because it might help

1   clarify the mud a little bit in that besides the hold

2   percentage there's also something we call volatility in the

3   gaming industry.  And that is the play style of the game.

4   And that is talking about --

5                   ATTORNEY BUTKOVITZ:  I'm going to object.  This

6   is nowhere in the report.  He's offering something for

7   verification that's not in response to a question; it's not

8   covered by the report.

9                   ATTORNEY JARBOLA:  It is covered in the report.

10  It discusses play level percentages which he observed in his

11  play.

12                  THE COURT:  What part of the report?

13                  ATTORNEY JARBOLA:  That would be page 5, last

14  paragraph.

15                  ATTORNEY BUTKOVITZ:  I believe in the report he

16  says there's play level percentages and he doesn't know what

17  that means.  It says, Without the source code, it's not

18  possible to adequately evaluate these issues.

19                  I don't think that he's able to opine on

20  volatility issues in the casino industry.

21                  THE COURT:  Sustained.

22  BY ATTORNEY JARBOLA:

23      Q.    Without opining whether there is a hold

24  percentage, would the presence of a hold percentage have any

25  impact on your opinion of skill versus chance?

1      A.      It would not.

2      Q.      So if there was a hold percentage on the machine,

3  that wouldn't impact whether you thought it was based

4  predominantly on skill or predominantly on chance?

5      A.      No, it would not.

6      Q.      You did note in your report observing play level

7  percentages.  Could you describe what that was?

8      A.      So that number that we were just talking about,

9  that was that limit.  That was either 2500, 5,000, or 10,000

10  and there could be more limits that I'm not aware of, but the

11  ones that I saw, those were some of the dollar values.  That

12  play level percentage, he's talking about how much of that is

13  from the hold of the device, what it looks like, the hold

14  percentage of the device.  And that as I played, as I would

15  play on a slot machine, you have certain performance

16  characteristics that you keep track of in a slot machine.

17  And so as you play, that hold percentage or return to player

18  percentage will vary.

19          If I bring a game up for the first time, I hit

20  play on it, and I win the jackpot, the return to player is

21  going to be a couple thousand percent.  My hold is going to

22  be a negative number.

23          As I play that device over time, that should

24  balance out to that designed average theoretical hold.  In

25  this case if there is a limit to how much money the game can

1  potentially hold and earn before something has to happen to

2  the device as an operational consideration, this is what it

3  looks to be in that it is looking at every time the player

4  losses and therefore contributes more towards a higher hold

5  percentage, when that hold percentage reaches that threshold,

6  the game is disabled.

7      Q.    Did it -- your review of the device, did it appear

8  to track your performance?

9      A.    It did.

10     Q.    How were you able to determine this?

11     A.    So going in to the back-end menu by toggling a

12  switch inside the game -- which most players would not have

13  the ability to do, but the operator of the game would -- I

14  could go in and I could look at how many games were played,

15  how much money was wagered, how much money was won, how much

16  money was lost.

17             ATTORNEY JARBOLA:  Moment of the Court's

18  indulgence.

19             Thank you, Judge.

20  BY ATTORNEY JARBOLA:

21     Q.    In your game play and inspection, were you able to

22  determine how the game was tracked?

23             ATTORNEY BUTKOVITZ:  I'm sorry.  How the game

24  was what?

25  ///

1    BY ATTORNEY JARBOLA:

2        Q.    How the game was tracked.  Is there a game recall?

3        A.    There was a limited game recall that would show

4    the outcome of the -- of a number of previous base games, so

5    the original puzzle grid that you are asked to solve.  There

6    was no game recall to show the players in the "follow me,"

7    whether they chose to "follow me," what they got right, what

8    they got wrong, what the pattern was.  All you could see in

9    the game recall is what was the pattern presented to the

10   player and what was their pick and what was the winning

11   outcome, if any.

12   BY ATTORNEY JARBOLA:

13       Q.    Was there any way to track the "follow me"

14   feature?

15       A.    I did not see a way.

16       Q.    Was there a way to track how often players

17   successfully completes the "follow me" feature?

18       A.    No.

19       Q.    And just in conclusion, summing up, are you

20   familiar with and aware of the three elements of gambling in

21   Pennsylvania?

22       A.    The three elements are commonly referred to as

23   consideration, chance, and reward.

24       Q.    Then regarding the chance element, are you aware

25   of the test utilized in Pennsylvania?

1    A.    It is the predominance test which it tries to

2  equate a level of percentage of play of how much skill versus

3  chance is involved.  If a game is more than 50 percent chance

4  outcome, it is -- to -- 50 percent of the outcome is -- comes

5  from chance elements of the game, it would be a game of

6  chance.  Whereas, if more than 50 percent of the outcome is

7  derived from the player's skill, it would be a skill outcome.

8    Q.    Ultimately, based upon your game play and

9  inspection, do you have an opinion to a reasonable degree of

10 professional certainty as to whether the seized Pace-O-Matic

11 games you analyzed were based predominantly on skill,

12 predominantly on chance?

13           ATTORNEY BUTKOVITZ:  I'm going to object before

14 he answers.  Both that's legal conclusion, as well as the

15 basis or foundation for the opinion.  We covered extensively

16 to now shoehorn in the phrase professional certainty after

17 we've already heard how much guesswork is involved here, I

18 don't believe he's authorized to offer that opinion.

19           ATTORNEY JARBOLA:  He's an expert in analyzing

20 these games and game play analysis and evaluation.  He --

21 yes, there is additional information that would assist in

22 making these determinations, but his determination is based

23 upon his play of the game and based upon his play of the game

24 he can render opinion based upon his experience and expertise

25 as to whether there was more skill or chance involved in the

1   device, in the game.

2             ATTORNEY BUTKOVITZ:  No doubt that he did his

3   best with what he had.  But we've not heard is that the

4   industry -- that there's a methodology adopted by the

5   industry that he complied with.  And that what we do see from

6   the report, from his testimony is, well, he did his best with

7   what he had.  Really, he's guessing at the conclusion.

8             THE COURT:  I'm just trying to, Mr. Jarbola,

9   understand based on the testimony he gave how he can give a

10  percent of whether it's predominantly skill or chance.

11            ATTORNEY JARBOLA:  We're not asking for a

12  percentage.  We're just asking --

13            THE COURT:  Or predominantly -- I guess

14  predominantly means more than 50.  How he's able to come to

15  that conclusion based on the testimony he gave so far, that's

16  what I'm wrestling with.

17            ATTORNEY JARBOLA:  Sure.  Based upon his game

18  play, it's his position that the base game is the main game

19  of this device, and the outcomes are ultimately determined --

20  predetermined by chance in that base game.  He would testify

21  that ultimately the question is where is winning determined.

22  And he can testify that winning is ultimately determined from

23  that predetermined finite pool of predetermined outcomes, the

24  turning of the card which is each of those next puzzles or

25  next grid game which is the base main portion of the game as

1   he testified.

2           ATTORNEY BUTKOVITZ:  That's not what he

3   testified to.  I mean, what we're hearing now is that he can

4   disregard the "follow me" feature and that he's offered an

5   opinion that the main part is the part to be considered and

6   that's where really the whether a win or loss is generated

7   comes from.  And that's not supported by the case law, not

8   supported by the testimony, not supported by the report.  As

9   we heard earlier, he testified that this game is capable of

10  winning 105 percent every time you play.

11          ATTORNEY JARBOLA:  He did not say that, Judge.

12  We can over --

13          ATTORNEY BUTKOVITZ:  I believe he did, Your

14  Honor, in response to Your Honor's questioning.

15          THE COURT:  Well, what I recall is that if you

16  lose in the base game and you push "follow me" and you have

17  enough skill you'll win.

18          ATTORNEY BUTKOVITZ:  Correct.

19          THE COURT:  I thought he said that the chance

20  part of it was whether or not you pushed "follow me."  I

21  think that's what I recall from my questions.

22          ATTORNEY BUTKOVITZ:  Well, certainly the

23  question now was basically are you -- either asking him to

24  assume or about his opinion and disregarding "follow me,"

25  that it's his opinion that the base game is the main part of

1   the game and that's where chance happens.

2           As we already covered, you can't characterize

3   this as two different games.  The law doesn't allow him to

4   offer an opinion that disregards a feature of the game, an

5   admitted feature of the game.

6           ATTORNEY JARBOLA:  He's not arguing about the

7   law.  That's what we'll argue to Your Honor.  And the law

8   does state you can ignore that portion of the game which is

9   not played by players in the field.  What is ultimately

10  determinative is how the device is played and where winning

11  is ultimately determined.

12          ATTORNEY BUTKOVITZ:  I didn't hear any

13  testimony about how it's played in the field.  Absolutely not

14  authorized or not qualified to offer.

15          THE COURT:  He testified how he played it.

16          ATTORNEY BUTKOVITZ:  How he played it.

17          THE COURT:  Yes.

18          ATTORNEY BUTKOVITZ:  And he played that.  He

19  played "follow me."

20          ATTORNEY JARBOLA:  He also played in the rapid

21  fashion and he can testify to as where the winning determined

22  and where do you input skill and where is the outcome

23  effected, where is the outcome ultimately determined for each

24  game.  And that's certainly within his purview as an expert.

25          THE COURT:  We're going to take a five-minute

1  recess.

2              (A recess was taken at 1:53 p.m. to
              2:08 p.m.)
3

4              THE COURT:  Objection's overruled.  You can

5  answer the question.

6              THE WITNESS:  Can you repeat the question?

7  BY ATTORNEY JARBOLA:

8      Q.      Yes, of course.  Based upon your game play and

9  inspection, do you have an opinion to a reasonable degree of

10  professional certainty as to whether the seized Pace-O-Matic

11  games you analyzed are based predominantly on skill or on

12  chance?

13     A.      Looking at the various different elements of the

14  game play available, I cannot say with a hundred percent

15  certainty that it is predominantly more skill because I don't

16  know where everything comes from and that it looks fairly

17  random to a player just sitting there.  There would be -- you

18  know, if you were to place one of these next to a casino

19  game, would a player be able to see that there was anything

20  significantly different with this game considering some of

21  the games that are in casinos today.  I wouldn't think so.

22              And so I would say that it strongly favors a

23  classification for chance.  But again, since I don't have

24  access to all the information, how exactly the underlying

25  features work, as was pointed out, if I had access to that,

1    I'd give a more clear answer as to where I would feel that

2    this should line up.

3                    ATTORNEY BUTKOVITZ:  Again, going to state the

4    objection again.  And now we're hearing that this game is

5    indistinguishable to somebody from a casino device if it were

6    to be placed there.  And that's his basis for opining that he

7    thinks it should be regulated as a -- or under the regulatory

8    umbrella of casino games.

9                    THE COURT:  You can explore that on cross.

10                   Is that your last question?

11                   ATTORNEY JARBOLA:  No, Judge, just two more.

12   BY ATTORNEY JARBOLA:

13       Q.     To a player that's playing rapidly --

14                   ATTORNEY BUTKOVITZ:  Objection.

15                   THE COURT:  Finish the question.

16   BY ATTORNEY JARBOLA:

17       Q.     To -- when you were playing rapidly, how was

18   the -- how was winning ultimately determined in the game?

19       A.     Like any win playing randomly, if there was a

20   potential winning prize on that grid, you had to place a wild

21   symbol.  That was required.  And so with that, you know,

22   ultimately the win comes from either, A, the chance of

23   getting a winning grid or winning pattern there and being

24   able to correctly decipher that it was present and

25   appropriately place, that wild symbol.  So it was -- you'd be

1  presented with a possible winning outcome.  You would then

2  have to either, A, effectuate it by placing the wild symbol

3  in the most optimal place, or you could place it in a bad

4  spot and get nothing.  So ultimately I would say it comes

5  more from that origination point for that pattern, whatever

6  it is.

7       Q.     I think I misspoke.  I said playing rapidly, not

8  randomly.

9       A.     And that's the thing, when playing randomly --

10  playing rapidly you could only play rapidly if there are

11  losing outcomes, that there is no winning outcome.  So that

12  is totally based on, whatever the game, however it creates

13  those patterns.

14       Q.     And is skill a primary driver in the outcome of

15  the game?

16            ATTORNEY BUTKOVITZ:  Objection.  Same

17  objection.

18            THE COURT:  Sustained.  Primary driver?

19            ATTORNEY JARBOLA:  Excuse me, Judge.

20            THE COURT:  You said primary driver?  Sustained

21  on the form of the question.

22  BY ATTORNEY JARBOLA:

23       Q.     How was skill utilized in this game?

24       A.     Skill was utilized in a handful of different

25  areas, one is being able to use pattern recognition to

1   understand where to place the wild symbol on that base puzzle

2   or grid to effectuate a win.  And then if you choose to

3   engage with the "follow me" feature, you then needed to use

4   pattern recognition and memory to be able to repeat the

5   pattern that the game presents to you in a short period of

6   time and be able to repeat that accurately back to the game.

7       Q.    In those grid games, there was a losing outcome

8   presented, is there any way to change that presented outcome?

9       A.    No.  If you're provided a pattern or grid where

10  there's no possibility of making a pattern, there is nothing

11  the player can do to change that losing outcome into a

12  winning outcome.

13      Q.    And can you say professional degree of certainty

14  where winning is determined?

15      A.    Winning is determined for the base game is

16  determined on whether or not the player is provided a grid

17  that had a winning potential and the player was able to place

18  a wild in a correct or optimal spot to realize that winning

19  outcome.

20              ATTORNEY JARBOLA:  Thank you, Judge.  I have no

21  further questions.  I believe I moved for its admission, but

22  I move for the admission of Mr. Nikiper's report.

23              THE COURT:  Any objection?

24              ATTORNEY BUTKOVITZ:  No.  I believe it's

25  already been admitted.

1                THE COURT:  Okay.  Cross-examine.

2                ATTORNEY BUTKOVITZ:  Yes.  Thank you.

3                CROSS EXAMINATION

4  BY ATTORNEY BUTKOVITZ:

5     Q.     Good afternoon, Mr. Nikiper.

6     A.     Good afternoon.

7     Q.     I'll cut to the chase.  Would you agree that the

8  device that you inspected, the one that's at issue in this

9  case today, can be won every play?

10    A.     I would not agree with that.  You could have a

11  losing outcome, you might get -- you get the option to play

12  the "follow me," but you may not be able to complete that

13  "follow me" successfully.

14    Q.     Okay.  Well, is there anything about the way

15  follow -- that "follow me" that prevents you from winning

16  "follow me" or is it capable of being won every time?

17    A.     Depends on the person playing it.

18    Q.     Okay.

19    A.     For me, it was not winnable if I did not use a

20  technologic aid and even with a technologic aid I was not

21  able to always successfully complete the "follow me."

22    Q.     Right.  So you personally were unsuccessful in

23  completing it every single time?

24    A.     Correct.

25    Q.     Is that what I'm hearing?  But my question was

1   whether the game is capable of being won every single play.

2   Is that an accurate statement?

3       A.     Capable in being won, the entirety of the game?

4       Q.     Is -- yes.  Yes.

5       A.     You could get money out of the game.  I don't

6   think you can win every game.

7       Q.     What's the difference?

8       A.     In that, yes, you can successfully complete the

9   "follow me" but you did so on a losing outcome.  So the game

10  provided a losing outcome, you then had to click the "follow

11  me" and play it.  You are not always required -- you're not

12  required to play the "follow me."  So if presented with

13  losing outcome, you could hit play, you could walk away and

14  let the timer expire and not win.

15       Q.     Let's be clear, though.  I'm talking about the

16  game, though, I'm not talking about what some hypothetical

17  person might play in one instance versus another.  So my

18  question is stated a little bit differently.  Is there

19  anything in the game that prevents you from successfully

20  completing all the features that are available to you on

21  every single play?

22       A.     No, I don't think that there's anything

23  prohibiting it.

24       Q.     So there's nothing -- I'll limit how much we get

25  into this, but let's take a slot machine.  You pull the

1   lever, right?

2        A.      Mm-hmm.

3        Q.      You could -- your money's already committed, you

4   get a losing result, end of story, right?

5        A.      Correct.

6        Q.      Okay.  So in -- to contrast that with the device

7   you were asked to analyze here, you press play, you're

8   presented with nine symbols, correct?

9        A.      Yes.

10       Q.      You've committed some consideration so your bank

11   goes down, correct?

12       A.      Correct.

13       Q.      At that point in time is there anything that

14   prevents you from recovering your initial consideration?

15   Anything that prevents you from walking away with at least as

16   much money as you had when you walked up to the machine?

17       A.      If I did not press the "follow me," there would be

18   nothing to stop me or make me do one thing or the other.

19       Q.      I understand that, but if you -- if you elected

20   not to play "follow me."  But let's -- let's assume that it's

21   part of a single game because that's what we've talked about.

22   It's a feature of the same game.  So if a player is

23   determined to win every single time, could they do that?

24       A.      They could attempt to do that, yes.

25       Q.      Well, I'm not -- I'm not -- again, I'm not looking

1    at the individual delicacies of an individual and whether or

2    not they would be successful because they have a good enough

3    memory or whatnot.  But I'm talking about the game itself, is

4    it possible for someone to sit down and win that game every

5    single time?  Is there anything in it that prevents them from

6    winning it every single time?

7         A.    I don't think there's anything that prevents a

8    player who is sufficiently capable to be able to do that,

9    yes.

10        Q.    Okay.  You looked at several different versions of

11   the Pace-O-Matic software in your analysis, correct?

12        A.    Correct.

13        Q.    Were you ever made aware of the Beaver County

14   decision that found version -- software version 44 to be a

15   legal game of skill?

16        A.    There was a brief conversation that there was

17   previous court cases on some of the versions and that at

18   least one case, which probably is the Beaver one that you are

19   talking about, where a court did rule that this looked like

20   it could be a legal game of skill.

21        Q.    Well, did you read it?

22        A.    I did not read the opinion myself.  All I had was

23   a conversation.

24        Q.    Okay.  So you have no reason to dispute that the

25   court in fact did find that it was a legal game of skill, not

1   that it could be?

2       A.      I have no knowledge of what the court actually

3   wrote.

4               ATTORNEY JARBOLA:  Objection.  He stated he

5   hasn't read the report.  He can't testify to what it states.

6               ATTORNEY BUTKOVITZ:  Right.  So I'll withdraw

7   the question.

8   BY ATTORNEY BUTKOVITZ:

9       Q.      You said that you looked at the rules,

10  regulations, and law before you conduct your analysis,

11  correct?

12      A.      Rules, regulations, and laws written for gambling,

13  yes.  That doesn't include all judicial opinions that might

14  have been issued.

15      Q.      Okay.  I'm not talking about all judicial opinions

16  but an opinion that dealt with this specific game including,

17  the specific software version that you looked at and cite in

18  your report.  You didn't look at that?

19      A.      I did not see that, no.

20      Q.      Did you think it was important that you look at

21  that?  Would that -- would that impact anything in your

22  opinion or analysis contained in your written report?

23      A.      It could if I read the opinion, but I'd have to

24  see what the opinion stated.  It might not change my -- my

25  understanding of how the game works and how I would break it

1   down.

2   Q.      So we look at your report on page 2.  Let me ask

3   this a simpler way.  Could you describe for me, was there a

4   methodology for how you were going to examine this device set

5   forth and determined before you actually went and analyzed

6   the devices?

7   A.      Yes.  We do have internally to BMM a core set of

8   principles and guidelines that for different types of test

9   cases that we would be confronted with and how we would

10   engage those particular testing requirements.

11   Q.      Did you comply with those requirements in

12   conducting this analysis?

13   A.      I believe I followed those, yes.

14   Q.      So you relied on those in conducting your analysis

15   here?

16   A.      Yes.

17   Q.      Did you provide -- did you bring with you today

18   those written guidelines?

19   A.      I did not bring those guidelines with me.

20   Q.      You understand there was a trial subpoena accepted

21   on your behalf, correct?

22   A.      There was a what?

23   Q.      A trial subpoena addressed to you that was

24   accepted on your behalf by Mr. Jarbola, are you aware of

25   that?

1      A.      I was aware of his subpoena for any and all

2  documents provided in this -- to create this report, yes.

3      Q.      Didn't you just testify that you relied upon these

4  internal principles in performing your analysis?

5      A.      I did say that we do follow a written document

6  process of how we do these things, but that was not -- I

7  don't print out and make that part of the case file that

8  provides for this report.

9      Q.      I understand it wasn't part of the report.  But

10  the subpoena asked you to bring additional documents that you

11  relied upon or reviewed in connection with the performance of

12  the report that is covered by this report.  Do you understand

13  that?

14      A.      I get what you're asking.

15      Q.      That's a good start.

16      A.      That always is.  But I would not consider that

17  myself.  And I can definitely ask and figure out, is that

18  something I need to provide.  If it is, I can provide that.

19  But I followed a guideline of if I'm going out for a

20  forensic, what do I need to do.  I need to make sure that

21  every action I do is recorded in some way, is documented, and

22  can be shown that if questioned about it I can show how I

23  came to my conclusions.

24      Q.      Okay.  All right.  So on page 2 number 2, scope of

25  work, I direct your attention there.  There's one, two,

1    three, four, five, six bullet points.  Do you see where I am?

2       A.    Yes.

3       Q.    This defines the scope of work that you were to

4    perform in preparing this report; is that right?

5       A.    Correct.

6       Q.    So let's just go through them with you one at a

7    time.  On-site inspection of the seized devices.  That's

8    number 1.  Did you do that?

9       A.    Yes.

10      Q.    Number 2, technical analysis and review of

11   evidence from the seized devices.  Did you do that?

12      A.    Yes.

13      Q.    Number 3, source code analysis if possible.  Did

14   you do that?

15      A.    I did not do that because it was not possible.  No

16   source code was provided nor was I able to get to the actual

17   files that run the game and be able to decompile them to a

18   level of understanding that would be considered source code.

19      Q.    Number 4, review of potential random number

20   generators if possible.  Did you do that?

21      A.    I did not.

22      Q.    Review of game play by patrons, did you do that?

23      A.    I did not view any patrons playing it because

24   these were already seized and was not taken out to where we

25   were.

1      Q.      Okay.

2      A.      So I looked at it from a player perspective, if I

3  had no knowledge of anything in gaming, what would -- what

4  would I be looking at.

5      Q.      You looked at it from your perspective; is that

6  right?

7      A.      Looked at it from my perspective and I tried to

8  look at it from a player who just sat down with no knowledge

9  of the game to the best of my ability.

10     Q.      Fair enough.  Number 6, review of potential

11  retention ratios on the devices.  Did you go do that?

12     A.      Again, I did not have access to the math.  I was

13  not able to get to a point where I could complete that.

14     Q.      Okay.  So -- sorry.  Just to circle back real

15  quick, the technical analysis and review of evidence from

16  seized devices, how does that differ from the on-site

17  inspection of the seized devices that you performed?

18     A.      So the on-site inspection is to look at the

19  devices, play through every option, go through every option

20  that I could find in the device, open it up, look at what

21  boards are in there, what components make up the device, its

22  construction, and whatnot.

23          The technical analysis piece is then to, as I'm

24  going through, trying to come up with the opinions in this

25  report, look back at the evidence that I collected from the

1   on-site part and structure that into what my opinion is:  How

2   does the device play, how does it work, what is the possible

3   ways it could be designed to work that way, what would the

4   origin instructions set potentially be.

5        Q.    So number one, on-site inspection of the seized

6   devices, would it be fair to stay that's the collection of

7   the information that you're going to analyze?

8        A.    Yes.

9        Q.    Two, technical analysis and review of the analysis

10  of the seized devices is your then analysis of what was

11  collected on the on-site inspection?

12       A.    That would be a correct statement.

13       Q.    Okay.  So it sounds like you're saying you told us

14  you did those two things and then of these six, the other

15  four were not performed?

16       A.    Were not completed, that is correct.

17       Q.    If you turn to page 3, next-to-the-last paragraph,

18  very last sentence, talk about the selection is not made

19  within the period, the game is an automatic loss.

20       A.    I see that.

21       Q.    Is that -- is that an accurate statement?  Is it

22  an automatic loss?

23       A.    For that part of the game, yes.

24       Q.    Isn't it just -- isn't that the rules of the game?

25  So -- let me rephrase.  The point of the game is to select

```
1    the proper -- to substitute the wild in the proper square,
2    right?
3         A.    Correct.
4         Q.    All right.  So if you failed to do that, then you
5    lose?
6         A.    Correct.
7         Q.    So it's not an automatic loss, it's you failed to
8    complete the task.
9         A.    If -- yes.  You would fail to complete the task;
10   therefore, it is a loss.
11        Q.    Okay.
12        A.    There may be no correct place to put that symbol;
13   so, therefore, it's just always a loss.
14        Q.    Well, when you say it's always a loss, let's be
15   clear.  You're saying you're presented with a losing outcome
16   on the base game, trying to put this in terms of --
17        A.    Yes.
18        Q.    The terms that you use.
19        A.    Yes, that would be losing outcome on the base
20   game.
21        Q.    Okay.  But when we talk about outcome, as in
22   outcome of the -- of all the things you could play with the
23   single consideration that you've paid into it, it's not
24   necessarily true that it's a loss in that outcome sense?
25        A.    In what you're defining as the outcome, that would
```

1    be correct.

2         Q.     Right.  And that's because "follow me" would then

3    be an option that the player could select, correct?

4         A.     If configured that way, yes, it does appear that

5    you would be able to engage the "follow me" feature and if

6    you could successfully complete that you would be able to get

7    105 percent of your wager back.

8         Q.     You came up with strategy to successfully complete

9    "follow me," right?

10        A.     Yes.

11        Q.     Is there anything -- they won't kick you out --

12   well, strike that.

13             You weren't -- are you aware of anything that

14   prevents the use of strategies like that to complete "follow

15   me"?

16        A.     Again, I'm -- I played the device in an

17   environment that's not its normal operating environment.

18   Would a actual operator prevent someone from using their cell

19   phone while at the game?  That's definitely a possibility.

20        Q.     That's not my question, though.  I'm asking what

21   you're aware of; I'm not asking you to speculate.  I'm asking

22   is there anything in the game that prevents the use of other

23   devices to assist as part of your strategy to successfully

24   complete the "follow me" feature?

25        A.     There is nothing on the game that says you should

1   not use a technological aid or strategy to complete a

2   particular part.

3        Q.    Would it be fair to characterize the decisions to

4   whether or not -- well, strike that.

5             You seemed to suggest earlier that not all players

6   may in every instance be aware of the "follow me" feature.

7   Correct?

8        A.    It did look that way.  Unless you knew where to

9   look or you were told that there would be some feature like

10  that, you may not notice that there is an opportunity or

11  ability to play or engage in the "follow me" feature.

12       Q.    Did you consider the possibility that the ability

13  to play through the game to perceive the "follow me" is an

14  option in a way to turn what otherwise would be a losing

15  outcome into an ultimate winning outcome is itself a skill?

16       A.    That you're able to be observant I don't know is

17  necessarily wholeheartedly a skill.

18       Q.    What does that mean?

19       A.    Are there people who are extremely observant?

20  Yes.  Are there people who are absolutely clueless as to the

21  environment around them?  Yes.  Is that necessarily a skill

22  or just an ability?

23       Q.    You would agree that memory is a skill, right?

24       A.    Memorization is a skill.

25       Q.    And recognizing patterns is a skill?

1      A.      I would say that is definitely a skill.

2      Q.      And being able to recognize where to place the

3  wild so that it's optimal because some paylines may be more

4  valuable than others, right?

5      A.      That would be a skill, being able to pattern

6  recognize that, yes.

7      Q.      You would at least concede that whether or not to

8  play the "follow me" feature is a choice, correct?

9      A.      Correct.

10      Q.      So again, there's nothing in the game that

11  prevents "follow me" from being activated, utilized, and

12  ultimately successfully completed, right?

13      A.      There's nothing to prevent you.  However, it is

14  not clearly denoted anywhere on the game that there is an

15  option for a "follow me," that there is a "follow me" feature

16  or ultimately what that feature does.  You're provided a

17  cryptic message that says "touch here to follow me."  That is

18  it.  That is the only information a player with no knowledge

19  of the game would have.

20      Q.      But you're saying you were presented with an

21  instruction to press "follow me"?

22      A.      It says "press here to "follow me."  If you're

23  observant, you might touch there; if you're not observant,

24  you might not.  And even if you see it you might go, I don't

25  know what that is so I'm not gonna do it.

1    Q.    Let's go to page 5.  On the devices.  Towards the

2  end of your testimony you used the phrase "fill."  There

3  would be -- there was a need to input addition -- a code or

4  fill after the device was blocked after this number was met.

5    A.    Correct.

6    Q.    Where did you -- what do you understand that term

7  "fill" to mean?

8    A.    Couple different places it comes from.  The

9  terminology used there, one was given to me by the state

10  police.  They called it a fill in that the device had this

11  limit.  Once the limit was reached, an operator would need to

12  call in to get a new fill or another set of ability to

13  continue to play the device.

14         The other terminology would be with the old idea

15  of a hopper, in that inside a slot machine, once it paid out

16  a certain amount, it had no more coins and so it would

17  require a fill of more coins into that hopper to continue to

18  pay out.

19         So the terminology is refreshing the device to

20  some level to continue its proper operation.

21    Q.    So in your report you opine that there is a limit,

22  sometimes it was 5,000, in some devices it was 10,000, and

23  therefore you jumped to the conclusion that that is the hold

24  percentage.  Do you see that?

25    A.    I do.

1    Q.    How do you find that there's a hold percentage

2    based on the fact that you see a dollar value limit?

3    A.    The way I saw it from that dollar value limit and

4    see the actual figure where it indicates to me that based on

5    the play -- and I could see that as I won playing the game,

6    that number would go down; as I lost on the game, that number

7    would go up -- would correspond to the calculation of a hold

8    percentage in slot machines and slot performance.

9         So if I'm looking at a gaming floor, I want to

10   know how well the machines are doing on that floor, I'm going

11   to look at the performance:  How much was wagered, how much

12   was won, how much was lost.  I'm going to look at those

13   different performance characteristics to understand how much

14   money the operation has made and how much that I might need

15   to revenue share or be taxed on for taxation purposes.

16        So seeing a number that corresponded to that type

17   of activity led me to that conclusion that it might be used

18   in a similar fashion.

19   Q.    All right.  Well, you don't sound too certain.

20   Are there other potential explanations for what this number

21   is?

22        Strike that.  Let me withdraw the question.

23        So you talked about fills and hearing about that

24   from the state police.  Are you aware of the licensing scheme

25   structure that Pace-O-Matic utilizes with its software?

1    A.    There was some conversation that I was made aware

2  of where that there is some licensing scheme that a operation

3  could license the value -- to a certain value.  Once they

4  achieve that figure, that's what they would be licensed for

5  and they would have to refresh it or refill it.

6    Q.    Okay.  So you're being offered as an expert, so

7  let's -- maybe the easiest way to do this is a hypothetical.

8          Let's say that a fill is 5,000 or $10,000

9  represents the maximum amount of net income that can be

10  earned on the machine.  And once that amount is reached the

11  game locks and there must be a new fill in order to continue

12  operation of the game.  Is that -- would that make sense to

13  you?

14    A.    It makes sense to me.

15    Q.    Okay.  If that were the case, let's say $10,000 to

16  start, every time the player wins -- I'm sorry.  Every time

17  the player were to lose the amount left on that fill would

18  understandably go down because there's less amount of that

19  net income to be made on that machine; is that right?

20    A.    Correct, because the operation would have realized

21  a loss and that would count towards, as you said, their --

22  what they're earning off of the game, yes.

23    Q.    So do you have any basis for disputing that that

24  is in fact what these play percentage you were observing were

25  conveying?

1    A.    That's kind of what I thought it was conveying,

2  which would go to a hold percentage if I was to compare that

3  to casino terminology.

4    Q.    Well, this is talking about the maximum amount

5  that an operator or location, amount that can be -- of income

6  that can be generated from this machine, correct?

7    A.    Correct.

8    Q.    In your report you talked about the preprogrammed

9  minimum amount of profit or a guaranteed profit, right?

10   A.    I talked about how that, in casino parlance, we

11  have return to player and hold percentage or hold.  They're

12  inverses of each other.  And that defines --

13   Q.    No, no.  I'm sorry.  You're not answering my

14  question.  Because I'm -- I'll point specifically to the part

15  of your report on page 5 saying:  Having such a limit

16  implemented on the device would point to the conclusion

17  there's some guaranteed amount of income to an operator.

18   A.    Correct.

19   Q.    What did you -- what part of your analysis allowed

20  you to opine or are you opining that there is a guaranteed

21  amount of income to an operator connected to this device?

22   A.    Looking at how the game play works and, again,

23  looking at that number, that increase and decreased as I

24  played, I could definitely see that as players lost money in

25  the game the amount of net, as you called it, would decrease

1    for that operator.  And so that was that guaranteed, so to

2    speak, amount of money that they could make off the device.

3          Q.    Well, I mean, let's -- so to speak, you're the one

4    who used the word guaranteed.  Let's -- let's talk about -- I

5    think we covered this earlier, that players -- that the game

6    itself is capable of being won every single play, right?  I

7    mean, you can quibble about how often that does happen in the

8    field, what an individual's preferences might be, but as far

9    as the game itself, it's capable of being won a hundred

10    percent -- every single time -- I try to say away from

11    percentages -- right?

12          A.    Conceivably, yes.  Given those criterias that you

13    set, yes.

14          Q.    Right.  Conceivably because it's capable of being

15    won.  I'm not saying it is won a hundred percent of the time,

16    but the game itself is capable of being won every single play

17    if you take into account the availability of the "follow me"

18    feature; is that correct?

19          A.    If you take into account that can be successfully

20    done every time, then yes.

21          Q.    So where you say on page 5 basically that this

22    would be indicative of a game of chance because otherwise a

23    skilled advanced player could win every play and eliminate

24    any mathematical average possible, you see that?

25          A.    Mm-hmm.

1    Q.      That is a possibility with this game, isn't it?

2    A.      That is a possibility where you could have someone

3    potentially do that, yes.

4    Q.      Okay.  How long did your analysis of these devices

5    take per device?

6    A.      I did not review the total hours, but it took me

7    quite a few hours of going through it and coming back to it

8    across multiple days and weeks.

9    Q.      Did you feel that you had enough time to

10   successfully complete your inspection and analysis?

11   A.      I was able to complete as much as I could given

12   the time frame -- time frame and constraints.  Is there more

13   work that I would have liked to do on this?  Yes.  However,

14   given the time constraints needed for this, I was not able to

15   complete everything or pursue all avenues of investigation

16   into it.

17   Q.      Who authorized you to conduct the under-the-hood

18   inspection that you performed?

19   A.      That was discussed that we would do that level of

20   work with the Attorney General's Office and the state police

21   and they agreed to that.

22   Q.      In performing your inspection, you understood that

23   the information on these devices are sensitive, correct?

24   A.      Any client data is sensitive.

25   Q.      Well, you understood that there were a number of

1   levels of encryption and other security on them, correct?

2        A.      I did eventually learn that there was encryption

3   on the device and that it was encrypted to be protected in

4   some way, shape, or fashion.  And I did not move forward past

5   that, as much as I would like to.

6        Q.      Why didn't you move forward?

7        A.      Time constraints.

8        Q.      Okay.  So you were unable to move forward on that?

9        A.      Correct.

10       Q.      Just as a practical -- not because anyone told you

11  that you were not permitted to or that you didn't have

12  permission from the software owner -- the owner of the IP

13  that you were seeking to access?

14       A.      Correct.

15       Q.      Where is the -- where's the information that you

16  collected now?

17       A.      Currently it is in my backpack on a portable hard

18  drive.

19       Q.      Is that everything that you copied or imaged or

20  otherwise took from the devices that were examined?

21       A.      That is complete -- everything I have copied over

22  to that hard drive to provide here as needed.  I still have a

23  copy back at the office and that's just for record retention

24  that we have it.

25       Q.      How many copies are there?

1      A.    It's just those two copies.  Otherwise it would

2  just be the one copy back at the office.

3      Q.    So where -- where is the copy specifically at your

4  office?  What I'm getting at, is it in a locked room?  Is it

5  in a safe?

6      A.    It is in a locked room in a safe.

7      Q.    And the items that are in your bag now, can you go

8  through whether it changed any hands, where it's gone from

9  the time that you received it to today?

10      A.    I can document exactly where it has been.  It has

11  been in my possession the entire time.

12      Q.    Your possession, like on your person?

13      A.    Within my direct control, yes.

14      Q.    In a locked location?

15      A.    In a zippered pouch right now, but I've -- it's

16  been on my person or in my direct control.

17      Q.    Well, when you say "direct control," what does

18  that include?

19      A.    So it's been locked inside my house over the

20  weekend from the time I copied it and brought it home before

21  flying here after a weekend.  Was I home the entire time?

22  No.  I had to run out and take my dog to the vet.

23      Q.    Has anyone else from BMM had access or reviewed

24  the materials that you created or reviewed in preparing your

25  report?

1    A.     No one did, no.

2           ATTORNEY BUTKOVITZ:  Court's indulgence.  Let

3    me see if I can wrap this up.

4    BY ATTORNEY BUTKOVITZ:

5    Q.     So the on-site inspection that you performed, can

6    you identify who was present?

7    A.     Yes.  Present when I first arrived was the

8    attorneys here on -- Chris Herrington, Karen Romano, Michael

9    Nickles were present, along with the agents from the state

10   police from the CAGE unit.

11   Q.     You said there were multiple days of inspection,

12   right?

13   A.     There was two days of inspection.

14   Q.     Okay.  And the people that you just identified by

15   category, are those the same people present both days?

16   A.     I think Mr. Nickles was not present for the second

17   day but a majority -- I don't think Karen showed up for the

18   second day.  I don't recall.  But I know Chris was there --

19   we chatted several times on both days -- and the agents from

20   the state police.

21   Q.     Was there anyone else on day two that wasn't there

22   on day one?

23   A.     Other than Mr. Nickles, no -- or and Karen, I

24   don't recall if she was there the second day or not.

25   Q.     Did you -- you may have addressed this on your

1    direct.  Did you record the tests that you performed -- did

2    you actually record the inspections?

3         A.    Yes.

4         Q.    Where is that now?

5         A.    That is on that hard drive that I just stated.  So

6    all the video footage from that, any pictures I took, and the

7    forensic images that I gained from the machines.

8                    ATTORNEY BUTKOVITZ:  Thank you.

9                    (Sotto voce discussion between
                     counsel was held off the record.)
10

11   BY ATTORNEY BUTKOVITZ:

12        Q.    Have you ever conducted this kind of analysis

13   without an NDA or other -- or similar writing in place --

14   stop there.  Have you ever done this kind of analysis without

15   an NDA or other similar protection specifically in place?

16        A.    We have -- we have always had some contract signed

17   prior to us doing any of this work.

18        Q.    Okay.

19        A.    So an actual NDA document titled that way, no.

20        Q.    You talk about not sharing information, I guess

21   protecting the interests of the client in all instances,

22   correct?

23        A.    We try to strive for that, yes.

24        Q.    The client in this case is the Office of the

25   Attorney General, correct?

1    A.    Correct.

2    Q.    The client is not Pace-O-Matic.

3    A.    Correct.

4    Q.    Correct?  So there's -- there's no NDA or similar

5    document that you were consciously operating under that would

6    provide protection to Pace-O-Matic; is that fair?

7    A.    That would be fair.

8    Q.    Have you ever performed an analysis under a

9    situation like that?

10   A.    Yes.

11   Q.    In what, can you describe generally how many times

12   the other circumstances?

13   A.    Usually every time that I've done a forensic of

14   this type, usually the side that Pace-O-Matic is currently

15   sitting on, I would not have some agreement with them prior

16   to for this analysis.  So if I look back at the previous case

17   that I testified here in Pennsylvania for, I had no agreement

18   with the manufacturer of the device in question at that point

19   in time.

20   Q.    Well, right.  In that case you also didn't

21   actually access the source code and we didn't hear any

22   testimony about efforts you may have pursued to access that.

23   Right?

24   A.    We did not talk about that, no, we did not.

25   Q.    Just final thing, apologies if you've already

1   heard this before, but you were asked to examine the game

2   itself, correct?

3        A.      Correct.

4        Q.      You would agree with me that whether this is

5   predominantly chance, predominantly skill, legal, illegal

6   will not vary depending on who happens to step up to play it,

7   correct?

8        A.      The decision as to what it is should not -- should

9   not rely solely on one particular thing, no.

10                ATTORNEY BUTKOVITZ:  All right.  No further

11   questions.

12                THE COURT:  Any redirect?

13                ATTORNEY JARBOLA:  No, Your Honor.

14                THE COURT:  Thank you, sir.  Step down.

15                THE WITNESS:  Thank you.

16                THE COURT:  We'll take a ten-minute recess.

17                (A recess was taken at 2:49 p.m. to
                 3:03 p.m.)

18

19                ATTORNEY HAVERSTICK:  Your Honor, I understand

20   we're doing it out of order because of the exigence of

21   travel.  We call Dr. Olaf Vancura.

22                      OLAF VANCURA,
                     called as a witness,
23          having been duly sworn or affirmed,
            was examined and testified as follows:

24

25   ///

DIRECT EXAMINATION
(As to Qualifications)

BY ATTORNEY HAVERSTICK:

1

2

3

4      Q.     Dr. Vancura, good afternoon.  Will you please

5  state your name for the record?

6      A.     First name Olaf, O-l-a-f, like frank; last name

7  Vancura, V, like victory, a-n, like Nancy, s-c like Charlie,

8  u-r-a.

9      Q.     Would you please detail your educational

10  background?

11      A.     So my undergrad degree is from Santa Clara

12  University in electrical engineering.  I then went to Johns

13  Hopkins and got a master's in physics, as well as a Ph.D. in

14  physics.  I then did my post-doctoral fellowship at Harvard

15  University.

16      Q.     Subsequent to your post-doc, did you continue work

17  as an astrophysicist at Harvard-Smithsonian?

18      A.     Yes.  After the post-doc I became an

19  astrophysicist at the Harvard-Smithsonian Center For

20  Astrophysics for several years.

21      Q.     At some point in that time frame did you

22  transition to the gaming world, correct?

23      A.     That's correct.

24      Q.     Describe that for the Court, please.

25      A.     It was probably in the -- I would have to say the

1   mid 1990s.  I became more and more interested in gaming.  I

2   began inventing casino games.  I wrote my first book on

3   casino gambling.  I created and applied to teach a course at

4   Tufts University which is near Harvard on -- specifically on

5   casino gambling.  It was like an applied math course on

6   casino gambling and I taught that for several years.  It was

7   a very popular class, nominated as the best course at Tufts.

8           And eventually I began consulting, doing quite a

9   bit of consulting for the gaming industry.  And a company

10  that I had a long-term project consulting with was called

11  Mikohn Gaming and they eventually brought me in to head up

12  their -- ultimately head up their games division, but at the

13  time it was to get them started in gaming content.

14       Q.    By getting them started in gaming content, does

15  that mean you were designing games?

16       A.    Yes.

17       Q.    Can you describe that process for us, please?

18  What goes into that?

19       A.    Yes.  So basically -- and this is more applicable

20  to the slot machine side of things than table games, but it's

21  somewhat equally applicable to both.  And I've designed many

22  slots and table games as well, as well as video poker.

23           So the idea and generally in slot machine is you

24  kind of start with a -- with the set of regulations that must

25  be adhered to.  But other than that, it's kind of a blank

1  canvas, if you will, to use a painting analogy.  So you have

2  to decide everything from the theme you're gonna use, the

3  style of artwork, the nature of the mathematics, what format

4  you'll use -- like a five-by-three reels or three-by-three or

5  whether you're even going to use paylines or not.  I mean,

6  it's a pretty open palette or to start with.

7          And in my view to successfully design games you've

8  got to understand the market.  You're not designing for

9  yourself; you're designing for the customer.  That is a

10  lesson I learned early on and it's a very valuable lesson.

11          And so there's a lot of decisions that have to be

12  made and, you know, essentially those decisions are boiled

13  down into what we call a spec or a specification for the game

14  that will be, if you will, a recipe for how the game's going

15  to play, everything from format to pay table to rules of play

16  to how the bonuses will play, frequencies of those things.

17  It's all folded in there.  And that then serves as the

18  blueprint for a title that a team of developers will

19  typically work on.

20      Q.    Does your designing of a gaming platform or device

21  include coding?

22      A.    Yes.  The way -- not for all designers, but for

23  me, yes.  I do a lot of coding, a lot of programming.  I

24  have, for example, written software that solves the home game

25  of Yahtzee, how you should optimally play that game to

1   maximize your score.

2          I have written software to -- in the form of a

3   neural network that learns how to play blackjack and it plays

4   at an expert level.

5          So yeah, I'm quite familiar with software.  And in

6   particular for games what I tend to do is I tend to code the

7   anticipated rules or algorithms that will be in the game,

8   including the pay tables, and then I simulate those.  And

9   there are certain, what I call, metrics or measurements that

10  I'm looking for as I design a game, anything from hit

11  frequency to how often I win a big award to how often I get

12  to a bonus game to how quickly I might double or lose all my

13  money.  Those kinds of things are things you would think

14  about as you design a game so that it would be popular for

15  players.

16      Q.     Inherent in game design is an understanding of

17  gaming mathematics?

18      A.     Absolutely.

19      Q.     Can you describe what that means to the Court?

20      A.     Yes.  So typically a game -- the games are random.

21  They're some form of randomness, if I'm referring to, let's

22  say, a gambling game, a slot machine or a blackjack or table

23  game.  So the random element might be the shuffling of the

24  deck of cards, whether that's video cards as in video poker

25  or whether it's physical cards on the blackjack table.  The

1    random element might be an RNG and if it's in the form of a

2    slot machine, for example.  So typically what we would do in

3    a Class III product, Las Vegas-style slot machine, is we

4    would -- as the player initiates -- there's a -- what we call

5    an asynchronous RNG that's constantly running.  It might

6    generate a hundred random numbers per second continually.

7    And when the player goes ahead and hits play, it will pull

8    from that constant stream of RNGs and then begin to assign

9    RNGs to required random events.  It might -- so each reel

10   stopping its position that it stops on, if there's five

11   reels, each of those five would be random.

12          If you trigger a bonus game, then you need to

13   generate an award for that or a set of awards.  Those would

14   be additional random numbers you would draw typically.

15   Q.     You mentioned Mikohn as a gaming employer.  Did

16   you have others?

17   A.     Yeah, more recently than Mikohn.  So at Mikohn

18   Gaming, I was -- as, again, I was brought in to start their

19   gaming content to move them into that space, if you will.

20   When I left them several years later, I had been promoted a

21   few times and left as chief creative officer.  A few years

22   after that I joined American Gaming Systems as VP of game

23   development.  So I was in charge of all of R&D and basically

24   the same kind of process that had been put in place at

25   Mikohn, if you will, and that we're talking about was put in

1   place at AGS.

2       Q.    So in all of these various jobs, I assume that you

3   would perform similar tasks and analysis using the scientific

4   method, mathematics, computer programming?

5       A.    Yeah, there are -- yeah, the mathematics and the

6   underpinnings of this and the approach is similar, yes.

7       Q.    Are you an author?

8       A.    Yes.

9       Q.    How many titles?

10      A.    Well, in terms of books, I've written three or

11  four.  I'm going to have to think.  So a book generally on

12  casino gambling, a book that described that optimal strategy,

13  the Yahtzee I talked about earlier, and then a book called

14  *Knock-Out Blackjack* which described a new card counting

15  system that my coauthor and I invented.  There's also another

16  book, a compendium of academic math papers that I was the

17  lead editor for called "Finding the Edge" and that would be

18  it probably.

19      Q.    Are you an inventor?

20      A.    Yes.

21      Q.    How many patents do you have?

22      A.    I have over 80 in the United States and others

23  worldwide.

24      Q.    Anything else you think the Court should know

25  about your background before I tender you as an expert?

1      A.      No.

2              ATTORNEY HAVERSTICK:  In that case, Your Honor,

3      I tender Dr. Vancura as an expert in gaming design and

4      mathematics.

5              THE COURT:  Cross on qualifications?

6              ATTORNEY JARBOLA:  No cross, Judge.

7              THE COURT:  Okay.  He's accepted as an expert.

8              ATTORNEY HAVERSTICK:  Very good.

9                      DIRECT EXAMINATION

10     BY ATTORNEY HAVERSTICK:

11     Q.      Dr. Vancura, you prepared a report for

12     consideration of this Court in anticipation of your testimony

13     today, correct?

14     A.      Yes.

15     Q.      I'd like to mark that as Petitioner 1.

16             THE COURT:  Do you have a copy for me and my

17     law clerk?

18             ATTORNEY HAVERSTICK:  Yes.  If I may approach.

19             THE COURT:  Yes.  You don't need to ask.

20     BY ATTORNEY HAVERSTICK:

21     Q.      Does that look like your report, Dr. Vancura?

22     A.      Just checking my signature.  Yes, sir.

23     Q.      Now let's talk about that for a little bit.  The

24     purpose of this report is to opine on whether the

25     Pennsylvania skill game, the one at issue, is a predominant

1  skill device, correct?

2       A.    Yes.

3       Q.    Describe for the Court, if you would, your

4  methodology in your analysis of the Pennsylvania skill game

5  in reaching an opinion.

6       A.    Sure.  So basically I have played multiple

7  versions of the Pennsylvania skill game and including at the

8  headquarters of Pace-O-Matic and so I'm able to play those,

9  if you will, to my heart's content.  I'm able to, based on

10  the specific software there, I'm able to, what we call, gaff

11  or force certain things to happen in the game.  So I can

12  force a bonus game so I don't have to play for two hours to

13  see everything.  I'm able to time things.  I'm able to make

14  sure I understand everything.  And for this particular

15  version here I directed the play of this to verify that it

16  was the same game play that I verified on the other versions.

17       I've also asked for and had conversations with

18  various engineers and developers at Pace-O-Matic to make sure

19  I understand the algorithms, to make sure I understand what's

20  happening, what's kind of driving the game mathematically.

21       I've asked for and received what I would

22  characterize as spreadsheets.  They're not really what we

23  call in gaming PAR sheets, but they describe the underlying

24  math that takes place and what I would call the base

25  component of the game, of the bonus component of the game.

1          And then ultimately what I did is I decided to
2    code up the game.  So I wrote a simulator that simulates the
3    game.  It does not produce output like you would see on the
4    actual device, so I'm not -- my code doesn't output actual
5    symbols where a player has to pick a spot and do things like
6    that.  My code works in what's called the output space, so it
7    just generates the outcomes using the math associated with
8    the game.
9          It assumes that the player plays optimally so he
10   will always pick the best spot in the three-by-three grid and
11   it assumes also that the player will play "follow me" when
12   it's available and will play that with skill.  In other
13   words, he'll complete the "follow me."
14          So from those simulations I'm able to generate
15   many metrics that are of interest to me, not just as a
16   designer but help me understand the game and whether -- how
17   much, you know, skill versus chance is a part of the game.
18        Q.    How many games did you simulate after you received
19   the game app?
20        A.    Well, I chose two representative titles that are
21   mentioned in my report.  So one is called Living Large.  The
22   other one is called Bombs & Bombshells.  And for each of
23   those games I simulated 10 million games.
24        Q.    Backing up, you mentioned that you personally
25   played the games.

1      A.      Yes.

2      Q.      Correct?  You played those games through to

3  completion?

4      A.      Yes.

5      Q.      Including "follow me"?

6      A.      Yes.

7      Q.      Did you win "follow me"?

8      A.      Yes, but I took notes.

9      Q.      The game didn't prevent you from taking notes, I

10  gather?

11     A.      No, no.

12     Q.      You mentioned something interesting.  Rather than

13  review the source code, you chose to code the game yourself.

14  Can you explain why you didn't review the source code?

15     A.      Yeah, I -- just with respect to source code -- and

16  I have not seen the source code for the Pace-O-Matic

17  product -- but for example at AGS, as being in charge of all

18  of R&D, one of the first things that we did when I joined AGS

19  was we basically redid the entire platform.  And that's a lot

20  of coding.  I think our code -- code base when we were done

21  was about a hundred thousand lines.  That is a lot to review.

22          And in my view a judicious player that wants to

23  understand the Pace-O-Matic product and wants to learn and

24  let's say wants to beat the game, that patient, skillful

25  player that judicially watches the game and plays the game in

1    a judicious fashion, that player will be able to determine

2    that the game is beatable.  I don't think you need to see the

3    source code.

4         Q.    I see.  Now, you ran simulations of roughly 10

5    million games?

6         A.    Yeah, it was 10 million games for each of those

7    two titles, yes.

8         Q.    After reviewing those simulations -- or rather

9    those -- that simulated games, did you reach a conclusion

10    mathematically as to whether the Pennsylvania skill game is

11    one of predominant skill?

12         A.    Yes, I believe it's predominantly skill.

13         Q.    All right.  Let's take that apart.  There are --

14    there are acknowledged different phases of the games.  We

15    have different words for them.  By the way, in your

16    professional opinion, is it appropriate to valuate a game

17    from beginning to end of play or in sort of broken up

18    constituent partway?

19         A.    I think the most logical way to think about the

20    game is frankly the way the game keeps score in terms of

21    money or credits or points.  So the moment I say play and

22    I've -- and I've committed that amount of consideration to

23    the game would be -- would be the start of the game.  The

24    credit meter is deducted to reflect that and then the game

25    play begins.

1            The end of the game, then, similarly, if we're

2   keeping score by dollars, is the final resolution of the

3   game:  What happens at the end, how much have I won at the

4   end of that -- at the end of that game cycle.

5       Q.    Discuss your findings with respect to the

6   mathematics for playing the game both at the base level and

7   then with the "follow me" addition.

8       A.    Yes.  So in terms of how we approach games and in

9   terms of let's say PAR sheets or mathematical descriptions of

10  games that I have created for regulators -- whether it's slot

11  side, table game side, either way -- typically what has to be

12  considered, to consider a game from start to finish, you have

13  to consider all possible ways of all possible pays.

14  That's -- that's the standard.

15            So to the extent -- let's say that when I make a

16  wager I always initiate a bonus game.  So that would occur a

17  hundred percent of the time.  But let's say once in a hundred

18  times that base -- I'm sorry.  Did I say base or bonus right

19  there?  I meant to say base.  I'm not sure what I said.

20            Anyway, one hundred percent of the time I initiate

21  a base game with the wager.  But to the extent 1 percent of

22  those plays I get to initiate a bonus game, that needs to be

23  considered.  That conditional probability of getting that

24  bonus game and how much that bonus game is worth all needs to

25  be folded in.  And then you need to fold in bonus game B,

1    bonus game C and their frequencies.

2              There might be other things happening in the game

3    as well.  There might be what we call base game features.  So

4    maybe randomly once every 20 spins all my cherries turn into

5    wild.  And then I evaluate what happened on my spin.  Or

6    maybe once every hundred spins all my cherries and my palms

7    turn into wilds or something like that.  That all needs to be

8    folded in.  Everything needs to be folded in, all the paths

9    the games can take, their conditional probabilities and how

10   much they're worth all needs to be folded in to the overall

11   model.

12        Q.    Feel free to consult your report when you answer

13   this question if you need to.  Let us know where you're

14   looking in the report.  But can you describe the

15   probabilities of success for a skillful player playing the

16   Pace-O-Matic game?

17        A.    Yes.  So Pace-O-Matic -- a skillful player that

18   plays the Pace-O-Matic game can win, being defined as make a

19   net profit, on that game on each and every play of the game.

20        Q.    To what degree of mathematic certainty?

21        A.    100 percent.

22        Q.    Let's discuss for a moment your calculations with

23   respect to the preview feature.  You have an understanding of

24   what that feature is?

25        A.    Yes, sir.

1      Q.     And can you explain it for the Court?

2      A.     Yes.  If I could just briefly, Your Honor -- I

3 know that earlier there was conversation about win versus hit

4 versus all that stuff.  And gaming has its unique

5 nomenclature and I think part of the issue as I understand it

6 is those terms are used differently by different people.

7          So to me the way I used it in this report, a loss

8 I kind of just define as it's a total loss.  I put in $4, I

9 get out zero.  That's a total loss.  In the gaming space what

10 we typically call a hit, which is used I think a little bit

11 differently than the police use it here in Pennsylvania, but

12 a hit as the way I would use it as designers is any pay at

13 all.  So if I wager $4 and get out 4 cents, that's a hit

14 technically.  So it's not a very good hit.

15          And then a win would be you're paid an amount

16 greater than your wager.  Now, sometimes it will just say win

17 generally.  Like, we'll say, like, the machine might say you

18 won 40 cents because the player did win 40 cents, but in the

19 design world if his wager was a dollar and you got back 40

20 cents we would say that was a hit.  And I don't want to

21 obfuscate the issue more, but to the extent that I say

22 something that doesn't seem to make sense, just -- I'll be

23 happy to correct that.

24      Q.     Back to the next puzzle feature.

25      A.     Yes, sorry.

1    Q.    Before I commit any money to playing the game, I
2    have the ability to activate that feature, right?
3    A.    Yes.  So -- exactly.  So the game -- the version
4    51 in question has 12 titles that are available and each of
5    those have -- let me think for a moment, 40, 80, 120 -- I
6    think six bet levels, so there are a total of 72 previews
7    available.  And -- if I did that right.  And each of those is
8    unique, so there's a pool of outcomes associated with each
9    combination of game title and wager level or play level
10   within that game title.
11         And each of those are unique and each of those are
12   separate.  So if I -- if I -- if I say I'd like to play
13   Living Large at $2, I can go into the preview for that and I
14   can see exactly what that next puzzle will be without
15   committing any money to that.  It's just a preview.  It's
16   just a advance -- it's an advanced preview of what's going to
17   happen.
18   Q.    So if I understand that correctly, with -- with
19   100 percent certainty before I decide to spend a nickle on
20   the game, I can know whether I'm going to win and therefore I
21   want to play or I'm gonna lose, I don't win, right?
22   A.    Yeah.  Are you referring to the game as a whole or
23   just the base game, the puzzle component?
24   Q.    Start with the puzzle.  I'm going to move through.
25   A.    So with the puzzle there's the way I view it.

1   There are two -- well, there's a number of different things

2   that can happen in terms of dollars.  But in terms of what

3   happens with the symbols that you see, there's really two

4   outcomes possible.  You're either going to be presented with

5   a puzzle where what I view -- what I call paying symbols are

6   the only things that can pay.  So, for example, let's say I

7   wager $4 and three cherries pays 80 cents.  If I see that

8   there's two cherries there and everything else is just a

9   jumble so I know that I can win that one line of cherries, I

10  know that that will be worth 80 cents based on the preview

11  and my ability to see that pattern and my ability to know or

12  look up what that pay table is.

13          Those are what I call symbol pays.  Those are pays

14  where I absolutely know exactly what's gonna be offered to

15  me, and as a skillful player I know exactly -- before I even

16  put the consideration into play I know exactly what the

17  result will be for that component.

18          Now, there is one exception to that.  And there's

19  only one exception.  And that is if I'm going to trigger a

20  bonus game.  So let's say three flags triggers a bonus game.

21  And I go into the preview screen and I look at my

22  three-by-three matrix and I see that there's a flag in the

23  top left corner and a flag in the bottom right corner.  So I

24  see the pattern.  I know that three flags is going to trigger

25  a bonus, so I know that if I go into that puzzle -- and let's

1    say the rest is a jumble again.  Picking the center position

2    is optimal.  And what happens is a skillful player will know

3    if he picks that center position and goes into the bonus or

4    any bonus -- every bonus on this game works the same way --

5    that a skillful player that goes into the bonus will

6    necessarily win more than the consideration.  It's always a

7    multiple of the consideration, let's say five times, ten

8    times what the wager was.

9            But that skillful player will know he's going to

10   go into the bonus but on those rare occasions where the bonus

11   is triggered he won't know exactly how much he'll win.  On

12   all the rest of plays that are symbol pays only, he will know

13   exactly how much he's going to get back as a result of that

14   puzzle.  Whether it's a total loss, whether it's a partial

15   loss, whether it's a net win, he will know exactly.

16       Q.    So to sum up --

17       A.    So sorry.  Yes, so the preview feature is

18   extremely important in my view in -- as one of the factors

19   that eliminates a lot of chance going into the base game

20   puzzle.

21       Q.    Because you can see what's going to happen next?

22       A.    Because you can see what's going to be presented

23   to you.

24       Q.    Before you commit?

25       A.    Exactly.

1    Q.    You calculated as part of your mathematic analysis

2   the return of player options for a player to play skillfully

3   through all phases of the game, right?

4    A.    Yes.

5    Q.    Can you describe that to the Court, please?

6    A.    Yes.  So when I simulated the game, I simulate a

7   skillful player, so this player will place the wild optimally

8   in the three-by-three grid.  I also assume that if that

9   player has not won 105 percent of the wager that that player

10  will go ahead and play the "follow me" feature and the

11  "follow me" feature will be -- will be successfully

12  completed.  So essentially what happens is for a skillful

13  player, once I put the consideration into play, now I'm

14  ignoring the preview.  The preview is still important, Your

15  Honor, in my opinion.  But I'm ignoring it now for this

16  purpose.

17       So I put consideration into play and I play

18  optimally the puzzle.  I either won 105 percent or more

19  already and I'm good to go and I'm not offered "follow me,"

20  the game's over at that point, or I have yet to win

21  105 percent.  I might have won zero percent, a total loss.  I

22  might have won 50 percent, whatever.  Then I'm offered

23  "follow me."  I go ahead and play "follow me" and I -- and I

24  change my outcome from zero percent to 105 percent.

25       So in either case I've already exceeded

1   105 percent or I can always make it so I get back

2   105 percent.  So I have a net profit, I have a net win on

3   each and every play of the game.  That's what happens.

4       Q.    Here comes my favorite questions.  If a monkey and

5   a skillful player play a slot machine, do their results vary

6   over time?  Are they different from each other?

7       A.    A monkey and a skillful player?

8       Q.    Yes.

9       A.    Yeah.  They'll be quite different.

10      Q.    In a slot machine?

11      A.    Oh, a slot machine, I'm sorry.  No.  For a slot

12  machine they'll be the same.  This is one of the things I

13  wanted to comment on for Your Honor.  It's, you know, this

14  issue of chance versus skill, they're somewhat or are

15  complementary in the sense that chance implies true

16  randomness.

17          So I roll two dice.  That's a chance event.  Skill

18  implies something -- it's something where I can affect the

19  outcome.  It might be strategy; it might be memory; it might

20  be pattern recognition; it might be patience; it might be --

21  there's a number of things that would -- I think would fall

22  under skill.  And probably the pretty typical skill game

23  would be considered chess, where all the information is known

24  to both players.

25          So a monkey playing a pure chance game or anyone

1    playing a pure chance game means it's a hundred percent

2    determined by randomness.  So if I were to play against a

3    monkey on a traditional slot machine, we would fair exactly

4    the same.  There's nothing either of us could do to get

5    better.  There's nothing either of us could do to play worse.

6    I could play for a year and at the end of the year I would be

7    just as good, no better or worse than I was at the beginning

8    of the year.  That's one of the attributes of a game of pure

9    chance is you can't affect the outcome.  You can't do

10   anything to get better or get worse.

11              So a traditional slot machine you cannot make the

12   outcome be a win if you wanted to.  You couldn't do it.  And

13   you can't make the outcome be a loss even if you wanted to.

14   Video poker is another good example and that's a game that

15   starts to marry chance and skill together.  I cannot make the

16   outcome of video poker a win if I want to.  I can't do that

17   because of the chance part.  I can't make the outcome of

18   video poker necessarily a loss if I want to.  I can't do that

19   either because of the chance part.  I can't force it one way

20   or the other.

21              The Pace-O-Matic game is different from either of

22   those two.  If I want to win on every play I can.  I can --

23   every time I play Pace-O-Matic I can win more than the

24   consideration and show a net profit on each and every play.

25   And the converse is true.  If I want to lose all of my

1   consideration on each and every play, I can do that on

2   Pace-O-Matic.  So that to me is a demonstration, if you will,

3   of how much skill is part of this, is part of this game.

4       Q.     A player in the Pace-O-Matic game over time can

5   learn and improve?

6       A.     Absolutely.  Yeah.  When I first began playing the

7   game, I would -- I would miss some of the patterns in the

8   three-by-three.  You know, I played too fast, I wasn't

9   patient enough, I wasn't discerning enough between the

10  symbols if they had similar color schemes.  So, yeah, I would

11  say definitely get better with time and you can -- I think

12  you can also get better with time, or as we heard earlier

13  today or as I said, you know, you can take notes as you do

14  the "follow me."  It's not -- it's not unachievable to use

15  a -- problem solving is another form of skill, you know -- to

16  use problem solving to come up with other ways to beat

17  "follow me."

18      Q.     If a monkey and a skillful player play the

19  Pace-O-Matic game, will their results diverge?

20      A.     They would be markedly different.  I discussed

21  that in the report.  I think that on average I think the

22  monkey ends up with what we call an RTP or return to

23  player -- or perhaps RTM, return to monkey -- would be around

24  6 to 10 percent.

25             A skillful player on Pace-O-Matic, their RTP is

1    about 170 to 174 percent, in other words, way over a hundred

2    percent.  That person's making money.

3              And you can actually calculate the skillful play

4    how much you would expect to make hourly.  And that's

5    included in my report as well.  Basically it's around 18 to

6    $19 an hour.

7         Q.    Is it your opinion that a patient and skillful

8    player can win the Pace-O-Matic game -- and by win I mean win

9    at least 105 percent of the consideration -- on every play?

10        A.    At least 105 percent on each and every play.  Yes.

11        Q.    Is there any feature or functionality of the game,

12   any element of chance that can prevent a skillful and patient

13   player from achieving that result in every single play?

14        A.    Are you asking me if there's anything that would

15   prevent that?

16        Q.    Correct?

17        A.    There's nothing that would prevent that.

18        Q.    Is there any gambling device that you know of in

19   the slot machine world that performs in a comparable way?

20        A.    No.  I mean, in my career I've been fortunate to

21   have created some very successful titles, and some of the

22   titles that I created moved -- move the slot machine space

23   into slots that utilize bonus games that had strategy, bonus

24   games that had trivia or knowledge, where we have, you know,

25   quite a few patterns around that space.  And players really

1  enjoyed that.  But at the end of the day you were offering

2  the player strategy or knowledge-based games that were in the

3  form of bonus games.  And overall those slots were still

4  predominantly chance.

5      Q.    Is it your opinion that the Pace-O-Matic game,

6  because of the ability to win it on every play, is a game of

7  predominant skill?

8      A.    I would say that that's one of the factors that

9  weighs absolutely, the fact that you can win it on each and

10  every play, yes.

11     Q.    Are there any others that you'd like to mention?

12     A.    Well, in my view the skill is interwoven

13  throughout the game.  I mean, you have the preview feature

14  that in my view eliminates chance because you know what that

15  puzzle will be.  You've got to complete the puzzle.  There

16  are bonus games in version 51, some of which have skill, and

17  then you've got "follow me."  So it's kind of interwoven

18  throughout.

19     Q.    Are all of your opinions expressed today stated to

20  a reasonable degree of scientific certainty in the field of

21  gaming mathematics and gaming design?

22     A.    Yes.

23           ATTORNEY HAVERSTICK:  Thank you.

24           Your Honor, we move to admit Petitioner 1, the

25  report of Dr. Vancura.

```
1              THE COURT:  Any objection?

2              ATTORNEY JARBOLA:  No objection.

3              THE COURT:  It's admitted.

4              ATTORNEY HAVERSTICK:  I have no more questions.

5              THE COURT:  Cross-examine.

6              ATTORNEY JARBOLA:  Thank you, Judge.

7                    CROSS EXAMINATION

8    BY ATTORNEY JARBOLA:

9         Q.    Good afternoon, Doctor.

10        A.    Hello.

11        Q.    You mentioned you believe the most appropriate and

12   logical way to measure this game is the score or the keeping

13   of the points, correct?

14        A.    Yeah, I -- exactly, it takes consideration or

15   credits or -- it takes consideration, credits, coins,

16   whatever units you want to use to initiate the game and,

17   therefore, at the conclusion of the game that's what's

18   updated and that's how players keep score, yes.

19        Q.    And where does the game track the points?

20        A.    There's a track meter on the screen.

21        Q.    And does the accounting on the game, does that

22   track the "follow me" feature?

23        A.    Are you talking about the credit meter for the

24   player?

25        Q.    No, the actual -- the counting -- or the
```

1  accounting of the game in determining what games are played,

2  is there a way for the game to track how often the "follow

3  me" feature is played by a player?

4      A.    I don't know the answer to that.

5      Q.    Do you know if the accounting features track that

6  grid or puzzle portion of the game?

7              ATTORNEY HAVERSTICK:  Your Honor, I object.  I

8  let the first one go but that's beyond the scope of the

9  direct.  They weren't talking about the accounting feature.

10              THE COURT:  Your response to the objection?

11              ATTORNEY JARBOLA:  He had discussions with the

12  individuals who developed this game.  He stated that the most

13  important portion of any game, the most logical way to follow

14  any game is the tracking of points.  And I am saying that if

15  that truly is the most logical way, "follow me" isn't

16  tracked, and I'm asking if he knows if the --

17              ATTORNEY HAVERSTICK:  Well --

18              ATTORNEY JARBOLA:  -- base game is tracked.

19              ATTORNEY HAVERSTICK:  I don't think that was

20  his testimony.  I mean, I thought he said he didn't know.

21  And I'm sure we're getting into it.

22              THE COURT:  What's the relevance of how often

23  "follow me" is selected?

24              ATTORNEY JARBOLA:  Well, it's whether players

25  are playing it.

1          ATTORNEY HAVERSTICK:  Your Honor, this gets

2  back to this fight we had throughout the day.  The game is

3  immutable.  Your job --

4          THE COURT:  The game is what?

5          ATTORNEY HAVERSTICK:  Immutable.  It doesn't

6  change from person to person to person.  It is what it is.

7  It's either a skill game or it's a chance game.  The fact

8  that players choose to play it one way or the other doesn't

9  have anything to do with sort of what it is.

10          ATTORNEY CARUSONE:  Your Honor, if I could join

11  that objection here.  And the main case here -- because this

12  has come up several time, it's going to come up more -- which

13  is this question of how do you measure whether this game is

14  predominantly a game of chance or not.  What's your scope?

15  What are you looking at?  Okay.

16          The main case here is *Commonwealth versus Two*

17  *Electronic Poker Game Machines*.  In this opinion, which I --

18          THE COURT:  Was that in your papers?

19          ATTORNEY CARUSONE:  Yes, it is.  And I have a

20  copy of the opinion for you as well.

21          THE COURT:  Okay.

22          ATTORNEY CARUSONE:  If you turn to page 4 under

23  heading B.

24          ATTORNEY JARBOLA:  Judge, I'll withdraw the

25  question.  We can brief this later.

1          THE COURT:  Okay.

2          ATTORNEY HAVERSTICK:  Well, I'd like to hear

3     the end of Mr. Carusone's --

4          THE COURT:  Is it that good?

5          ATTORNEY HAVERSTICK:  It better be.

6          ATTORNEY BUTKOVITZ:  It goes to the next

7     questions that are going to be asked.

8          ATTORNEY CARUSONE:  Your Honor, just for the

9     Court's edification, the question's withdrawn, if you look at

10    the bottom of page 4 under B, it says right in the center of

11    that paragraph:  The inquiry must be whether the machine is

12    so intrinsically connected with gambling as to constitute a

13    gambling device *per se*.

14          That's right in the center of that paragraph

15    under B at the bottom of page 4.

16          The next line, very bottom of page 4:  Such a

17    determination will turn on the characteristics of the machine

18    when read against the three elements necessary for

19    gambling -- consideration, a result determined by chance

20    rather than skill, and a reward.  If the machine displays all

21    three qualities, then it will be so intrinsically connected

22    with gambling as to be a gambling device *per se*.

23          It does not matter how often a particular

24    feature of this game is played or not played.  It doesn't

25    matter how long it takes to play one feature versus the other

1    feature.  What matters is the characteristics of the game.

2    And so questions, and I think they're going to be offering

3    witnesses about the manner in which people who are observed

4    play the game or the way most people play the game or

5    internal accounting of how they play the game is really not

6    relevant under this legal standard.

7                    ATTORNEY JARBOLA:  Judge, since we took the

8    time to go through that argument, if I may, I would offer the

9    Court *Commonwealth v. Lund*.  This is 15 A2.d 839.  I

10   apologize.  I do not have a copy for your clerk but I could

11   make a copy.

12                   THE COURT:  Thank you.

13                   This is a 1940 case.

14                   ATTORNEY JARBOLA:  It is Judge, yes.

15                   THE COURT:  Okay.

16                   ATTORNEY JARBOLA:  And in this case the

17   Superior Court on page 5 of the printout, would be 844 of the

18   citation, it says that the --

19                   THE COURT:  Where are you reading from?

20                   ATTORNEY JARBOLA:  This is page 5.

21                   THE COURT:  Yes, I'm on page 5.

22                   ATTORNEY JARBOLA:  One, two -- the third full

23   paragraph down.

24                   THE COURT:  Where it starts "it seems to us"?

25                   ATTORNEY JARBOLA:  It may have printed

1    differently.  It would be "the problem presented by bank
2    night" is where the paragraph starts.  It would be three --
3    four paragraphs.
4                    THE COURT:  Oh, that's on page 4 of mine.
5    Okay.
6                    ATTORNEY JARBOLA:  I apologize.
7                    THE COURT:  It says:  The problem presented by
8    bank night.
9                    ATTORNEY JARBOLA:  Yes.
10                   THE COURT:  Okay.
11                   ATTORNEY JARBOLA:  And here and in additional
12   portions of the opinion the Court states that it's not --
13                   THE COURT:  Where are you reading from?
14                   ATTORNEY JARBOLA:  The --
15                   THE COURT:  That whole paragraph?
16                   ATTORNEY JARBOLA:  No, just five lines down.
17                   THE COURT:  Okay.  The test by which?
18                   ATTORNEY JARBOLA:  Yes.  The test by which to
19   determine the answer to this question is not to inquire into
20   the theoretical possibilities of the scheme but to examine
21   the actual practical operation.
22                       So the goal of the reviewing court is to review
23   and determine how a game is truly played, not how it
24   theoretically may be played.
25                   THE COURT:  Is there any facts in this case

1    that further explain theoretical possibilities of the scheme

2    and actual practical operation?  Are they talking about

3    people playing the machine or --

4             ATTORNEY JARBOLA:  This game was about a

5    lottery where --

6             THE COURT:  Like Power Ball?

7             ATTORNEY JARBOLA:  Somewhat.

8             THE COURT:  Do you have any -- did you write

9    any books on how to beat Power Ball?

10            THE WITNESS:  Well, not Power Ball, but, I

11   mean, there was a Montreal Keno game that was beaten because

12   the RNG was bad.

13           ATTORNEY BUTKOVITZ:  Your Honor --

14           THE COURT:  Go -- let him finish.

15           ATTORNEY BUTKOVITZ:  Yeah, sure.

16           ATTORNEY JARBOLA:  The underlying facts of the

17  case were regarding a scheme that was developed by an

18  individual which the Court found gambling.  They would have

19  this theater night or bank night where individuals would have

20  to purchase a ticket to come to the theater that night but

21  there were possibilities where a person could obtain a ticket

22  earlier in the day or if they knew to ask for a free ticket

23  they were given this free ticket.

24           So the question was whether or not there was

25  consideration in this case.  And the Court went beyond

1  whether somebody may know of whether they could ask for a

2  free ticket, get this free ticket or whether it's how it's

3  actually operated on game night or bank night, theater night.

4  And in reading through the opinion, the Court discusses it's

5  not theoretical possibilities of the scheme but again the

6  actual practical operation.

7           ATTORNEY BUTKOVITZ:  May I respond?

8           THE COURT:  Yes.

9           ATTORNEY BUTKOVITZ:  I mean, it's -- as he

10 conceded, it's not dealing with a gambling device.  It's

11 dealing with -- with an operation.  And in the case I believe

12 it's talking about, well, do we need to get into the

13 motivation of the individual in buying this?  It's dealing

14 with the element of consideration.  It has nothing to do with

15 chance versus skill and the issues that we're dealing with

16 today.

17           THE COURT:  We're not dealing with

18 consideration, right?

19           ATTORNEY BUTKOVITZ:  Correct.  So I'd submit

20 that it has absolutely nothing to do --

21           THE COURT:  Mr. Jarbola, do you have any cases

22 that contradict more directly the *Commonwealth versus Two*

23 *Electronic Poker Game Machines*?

24           ATTORNEY JARBOLA:  It's our position that,

25 first, *Two Electronic Poker Machines* doesn't stand for that

1    proposition.  There's still a weighing of the probabilities.

2    There is no other case on point of how a court is to consider

3    how a game is played.

4                We're asking the Court and we think it's the

5    most appropriate that just as the Superior Court found you

6    should evaluate how a game is truly played versus how it may

7    theoretically be developed or theoretically be --

8                THE COURT:  How do we determine how it's,

9    quote, truly played, unquote, unless we have, I don't know, a

10   hundred, 200, 500 witnesses on how they played it?

11               ATTORNEY JARBOLA:  By our expert who has

12   actually conducted thousands of visits to -- excuse me,

13   hundreds of visits to various establishments and observed how

14   players play the game and conduct sites --

15               THE COURT:  On this Pace-O-Matic?

16               ATTORNEY JARBOLA:  Yes, Judge.

17               ATTORNEY HAVERSTICK:  Your Honor, by that

18   logic, if you go to Dave and Busters and two people decide to

19   bet on the outcome of the basketball free throw, it's a

20   gambling device.  Well, that's silly.  Of course it's not a

21   gambling device.  That's just how the people are choosing to

22   play it.  If you look at what the device is by itself at Dave

23   and Busters, a, you know, a hoop and a ball and you get free

24   throws, that's a skill game.

25               ATTORNEY BUTKOVITZ:  Wait a minute.  To bring

1     this -- in the case that Mr. Jarbola cited, and the question

2     was, well, why are these people buying these tickets.  Is it

3     because they want to enjoy the show?  Is it because they want

4     to be entered into the lottery?  And they want to take a

5     closer microscope to, you know, a large scale, why were

6     people doing this thing.  That's totally different from the

7     inquiry that we have today about the element of skill versus

8     chance and is the -- is the game capable of being played

9     skillfully such that it can be won every single time.  I

10     think the more recent and controlling case law is dispositive

11     on that.

12             ATTORNEY CARUSONE:  And this is a Supreme Court

13     case from 19 --

14             THE COURT:  '83.

15             ATTORNEY CARUSONE:  -- 83 which is the seminal

16     case that every expert cites to on the issue, not,

17     respectfully, Superior Court case from 1940 that didn't even

18     involve a gambling device *per se* which is what was at issue

19     in this opinion.  So, I mean, absent some authority, some

20     legal authority that says that you're to consider the way

21     some people play the game, a hundred people play the game,

22     that's irrelevant.

23             ATTORNEY JARBOLA:  If I may, just so the Court

24     is aware that that question is actually before the

25     Commonwealth Court right now in the different manufacturer's

1  appeal from Luzerne County.

2        ATTORNEY BUTKOVITZ:  So we're going to make

3  that clear, though, in that case they found a game that was

4  similar to ours was constituted a game of legal skill.

5  That's why it's on appeal.

6        THE COURT:  Is that from Luzerne County?

7        ATTORNEY BUTKOVITZ:  Correct.

8        ATTORNEY JARBOLA:  Yes, Your Honor.

9        THE COURT:  Was there a Luzerne County lower

10  court opinion?

11        ATTORNEY BUTKOVITZ:  There was.

12        ATTORNEY JARBOLA:  Yes, Your Honor.

13        THE COURT:  And it was your -- it was

14  Pace-O-Matic?

15        ATTORNEY BUTKOVITZ:  It was not our device.

16        THE COURT:  I thought you said the Commonwealth

17  found that --

18        ATTORNEY BUTKOVITZ:  No.  What I'm saying, to

19  the extent Mr. Jarbola's explaining about a decision that's

20  going to be coming down from the Commonwealth Court -- or at

21  least wanted to make clear what the trial decision was.  The

22  trial court found that a device that we believe is similar

23  for practical purposes concerning what was discussed in the

24  opinion, that court found that it was a legal game of skill

25  because it could be won every single time.

```
1                    THE COURT:  And the issue on appeal is whether
2       it's the machine itself or how it's played?
3                    ATTORNEY BUTKOVITZ:  I can't speak to that.
4                    ATTORNEY JARBOLA:  That is one of the
5       questions -- issues raised, yes.
6                    THE COURT:  Does anybody have that lower court
7       opinion?
8                    ATTORNEY JARBOLA:  Let me see if I have it.
9                    THE COURT:  I think that's the first I'm
10      hearing.
11                   ATTORNEY HAVERSTICK:  We do.  We can get it to
12      you quickly.
13                   ATTORNEY JARBOLA:  I don't have it with you.
14                   THE COURT:  If you have the cite I can get it.
15                   ATTORNEY JARBOLA:  I don't think it was
16      published.
17                   THE LAW CLERK:  If it's unpublished we might
18      not be able to get it.
19                   THE COURT:  If it's unpublished we probably
20      can't get it, I'm told.
21                   ATTORNEY JARBOLA:  If it's something we have, I
22      can e-mail to you.
23                   THE COURT:  Okay.  And that's the issue in the
24      Commonwealth Court or one of the issues?
25                   ATTORNEY JARBOLA:  It's one of the issues
```

1   before the Commonwealth Court.

2           THE COURT:  Did the Luzerne County exclude

3   evidence on how the machine is practically played or how did

4   that -- how did that issue become an appeal issue?

5           ATTORNEY JARBOLA:  It was discussed -- I wasn't

6   the attorney that handled that case.

7           THE COURT:  I mean, did they -- did the lower

8   court hear that testimony about how it was practically played

9   and testimony about the machine itself and weighed both and

10  determined it was -- how the machine itself was played?  And

11  is that how it went up on appeal or did they exclude

12  evidence?

13          ATTORNEY JARBOLA:  I'm not positive, Judge.  I

14  believe briefly --

15          ATTORNEY BUTKOVITZ:  We've located more copies.

16  I don't know if we can circulate it to everybody

17  electronically or whatever's easiest or if you want we can

18  send somebody down to print it.

19          THE COURT:  Just send it to my law clerk.

20          ATTORNEY BUTKOVITZ:  What's that?

21          THE COURT:  Send it to my law clerk via e-mail.

22          ATTORNEY BUTKOVITZ:  Sure.

23          THE COURT:  Let me see counsel at sidebar on a

24  scheduling matter.

25                  (A discussion was held off the
                    record at sidebar.)

1

2          THE COURT:  We're going to sustain the

3   objection temporarily and address the matter in briefs and

4   with the next witness for the Commonwealth -- Attorney

5   General.

6          ATTORNEY JARBOLA:  Thank you, Judge.

7   BY ATTORNEY JARBOLA:

8       Q.    Do you still have your report, Doctor?

9       A.    Yes.

10      Q.    I'm just going to go through, it's probably the

11  easiest way, a couple questions on a couple of the pages.

12      A.    Okay.

13      Q.    I first direct your attention to page 2, Section

14  B, the summary of your opinion.  You discuss various

15  components of the game consists of including mental

16  visualization.  Is that in the "follow me" feature or is that

17  in the puzzle --

18          THE COURT:  Where are you reading from?

19          ATTORNEY JARBOLA:  This is the first bullet

20  point, Judge.

21          THE COURT:  Okay.  Got it.

22          THE WITNESS:  I believe -- well, I mean, one of

23  the areas it could be used in that I know I had in mind was

24  mentally visualizing the three-by-three grid and imagining,

25  you know, where that wild needed to go.

```
1   BY ATTORNEY JARBOLA:
2        Q.    And the same paragraph you mentioned responding
3   within a time limit.  If you're truly using the pre-reveal,
4   you can continually go into the pre-reveal and know exactly
5   where the wild symbol has to go, correct?
6        A.    Correct.
7        Q.    So there really wouldn't be any sort of time limit
8   that had any impact because you would know exactly where it
9   had to go if you're using the pre-reveal, correct?
10       A.    You mean once you got into the three-by-three, if
11  you had judicially used the pre-reveal, then that -- then
12  that 30-second time limit, you're going to be well within it?
13       Q.    Yes.
14       A.    I would agree.
15       Q.    You have mentioned the game, this is the second
16  bullet point, the game affords all players the ability to
17  win.  What happens if a player chooses the wrong icon?  Does
18  it afford an ability to win in that situation?
19       A.    You mean if there's a winning payline in the
20  puzzle and the player makes a mistake?
21       Q.    Yes.
22       A.    Then he's lost the ability to win more than the
23  cost to play.  He will -- he will lose.
24       Q.    Okay.
25       A.    That's part of the skill.
```

1    Q.    You indicate that skillful play -- I believe you

2  have testified skillful play entirely eliminates chance.

3  Isn't it true that no amount of skill can determine what

4  icons appear and what order in the puzzle game?

5    A.    I'll answer that at the end.  I mean, you can make

6  the same argument that "follow me" has that element of chance

7  that the order of the Simon circles is completely random.

8  And it is.  But it's still a game that's I think we would all

9  agree is almost a hundred percent skill.  So just because

10 randomness is a component of something doesn't mean that it

11 dictates or is the predominant factor.  And an example of

12 that would be the "follow me" feature.

13       But going back to the base game question, there is

14 a random element which is where -- you know, the arrangement

15 of those three-by-three symbols.  But in my view the preview

16 feature almost entirely eliminates that chance for the reason

17 I probably spent more time than I should have earlier on it

18 which is, you know, 97 to 99 percent of the time it's only

19 going to be symbol pays.  So the preview future in those

20 cases eliminates chance.  A skillful player will know exactly

21 what his intermediate outcome will be after the puzzle --

22 after the three-by-three base game component.

23       And then the other 1 to 3 percent, the skillful

24 player knows that a bonus game will be triggered and that

25 bonus game will necessarily win a multiple of the

1    consideration.  The skillful player won't know exactly how

2    much he will win in that 1 to 3 percent of the time, but he

3    knows that he will be far ahead.  So that's what I meant by

4    that.

5        Q.    I understand.  Is it possible for a player to

6    utilize skill to change what icons appear in that grid

7    portion?

8        A.    Only insofar as they may choose from that menu of

9    game titles and play levels.  But you can't change any of

10   those.  You can just select from what's been already

11   preselected.

12       Q.    And the skillful player, if they're playing and

13   every next puzzle is a losing outcome, or they don't achieve

14   credits more than what they would wager, the only option is

15   to either play losing outcome or walk away, correct?

16       A.    You mean if there was only one game title and one

17   play level available?

18       Q.    No, throughout each game theme.

19       A.    Okay.  So I go through them all and they're all --

20   they're all lose -- lose your entire consideration?

21       Q.    Correct.  Yes.

22       A.    You can still win any one of those because of the

23   "follow me" feature.

24       Q.    Is there any way to change that in the grid

25   portion of the game?  There's no way to change what symbols

1  appear?

2      A.     No.  If I understand the question correctly.  You

3  can't change that.

4      Q.     Page 7, if I may, this would be number 5 in

5  discussing traditional video poker.

6      A.     Yes.

7      Q.     Similarly, before I get to that question, if I

8  may, are you aware of what the origin of the next puzzle is

9  in the Pace-O-Matic machines?

10      A.     What do you mean by "origin"?

11      Q.     Is it -- is there a random number generator or is

12  it a finite pool?

13      A.     There is a finite pool and there is a random

14  number generator.

15      Q.     How would that be different than the RNG that it

16  used in a video poker machine compared to these Pace-O-Matic

17  games with a little bit of skill sprinkled in?

18      A.     Well, I mean, they're quite different.  You're

19  talking about just how is the RNG used?  Or what is the

20  question?

21      Q.     An RNG is used in your --

22      A.     Yeah, but as I said earlier, just because an RNG

23  is used in a feature or a game or a component, that doesn't

24  mean that it's chance based or predominantly chance.  I

25  believe an excellent example of that is "follow me."  There's

1    an RNG that determines the order that those circles will

2    pulse and yet the game is a game of skill.

3       Q.    And the origin of the next puzzle being the finite

4    pool but also using the random number generator, how did you

5    determine that?

6       A.    Through conversations I had with the developers.

7       Q.    And did you create any notes from any of these

8    conversations that you relied upon in making your expert

9    report?

10       A.    I am assembling those for whoever asks for them.

11       ATTORNEY JARBOLA:  What I am getting to, Judge,

12    we had also, very late notice, was a subpoena that included a

13    document request for such a matter.

14       ATTORNEY HAVERSTICK:  I mean, Your Honor, we

15    got that subpoena on Saturday when he was getting ready to

16    travel.  And I think some of the materials they asked for are

17    the same -- of the same ilk of the things that they tried to

18    get we think illicitly through BMM, material that is

19    otherwise covered by trade protected -- trade secrets

20    protections and that type of material.  So, I mean, I think

21    he's capable of answering all of the questions that they have

22    for him in terms of the substance of his report.

23       THE COURT:  Well, we're not dealing with

24    whether you're objecting to the subpoena at this point,

25    you're just -- you're saying whether he has the material and

1   he doesn't have it.

2               ATTORNEY HAVERSTICK:  No.  And he didn't -- by

3   way of explanation --

4               THE COURT:  It came late.

5               ATTORNEY HAVERSTICK:  Nobody brought their

6   documents.

7               THE COURT:  So purposes of right now today, he

8   doesn't have it, so next question.

9   BY ATTORNEY JARBOLA:

10      Q.     Also on page 7, the paragraph with base game

11  outcomes, you discuss that each subsequent outcome is

12  randomly drawn from that separate pool, correct?

13      A.     Yes.

14      Q.     And would that be similar to the turning of the

15  card in the well-shuffled deck?

16      A.     I guess it would be -- if you want to use that

17  analogy, it would be analogous to I shuffle a deck of 52

18  cards and -- well, no.  That's not a good analogy.  Basically

19  these are -- these are outcomes.  And my code also works in

20  the outcomes based.

21              These are outcomes.  A pool of, let's say, I think

22  I mentioned in here the typical pool size is about 400,000

23  and they're drawn eight at a time because there's eight

24  paylines, right?  Three across, three vertical, and the two

25  diagonals.  And based on the type of game it is, there's a

1    subset of games that necessarily require a potential win on

2    each puzzle.  There's another subset of games that don't have

3    that requirement.  So that logic needs to be folded in.

4            And then on the flip side, what is the maximum

5    number of paylines in a three-by-three grid that you can

6    complete with only one wild given that -- given that it was a

7    starting position is the loser, and the answer is four.

8            So on any given play of the game, depending on

9    what type of game it is, there's either a minimum of zero or

10   one paylines that potentially pay and a maximum of four that

11   would potentially pay.  To your question of the analogy with

12   a deck of cards, I mean, I've tried to explain to you how it

13   works, so, you know, I don't see the analogy just off the top

14   of my head.

15           I mean, it would -- because it's drawing outcomes

16   from a pool, these outcomes are like -- for example, if I

17   wager $4 one of the outcomes might be I win $2.  And it might

18   be represented on screen as three tanks.  So if that is

19   the -- if that outcome is drawn and seven other losing

20   outcomes are drawn, let's say, then the Pace-O-Matic engine

21   will say, okay, I need to have one winning payline that when

22   it's complete will be three tanks and the other -- the other

23   eight paylines have to be losers.  And so there's an

24   algorithm where it generates that.  And it may generate a

25   tank lower left and a tank upper right so that you got to

1   pick the middle one.  But it has to ensure that there's no

2   other paylines that are won or even possible when doing that.

3   That's how it generally functions.

4        Q.     Understood.  To a player, does it appear random to

5   the player?

6        A.     You mean the actual symbols that appear in the

7   three-by-three grid?

8        Q.     Yes.  What would appear next, once a player

9   presses play, that next puzzle, what appears on that grid,

10  that would appear random to the player?

11       A.     Yeah, and I -- I mean, to be clear, they are --

12  those symbols would appear to be randomly generated, but they

13  are accessible to the player before any consideration is --

14  needs to be put into play.  So they're predetermined.  In the

15  gaming space we're comfortable with being random and

16  predetermine at the same time.

17       Q.     If every player only played when a winning screen

18  was available, what would happen?

19       A.     Again, I believe that for a skillful player, I

20  think, you know, what I demonstrated hopefully is for a

21  skillful player any -- and I mentioned this in the report --

22  let my say it this way:  If let's say, you know, Olaf is a

23  skillful player, for argument's sake, and let's say you

24  wanted to -- and you told me, you said, I want you to play

25  this game title -- you know, just pick any one of them -- and

1    I want you to play this bet level on that title.  It's

2    completely up to you.  It's not up to me at all.  You just --

3    you just picked it whatever you wanted to.

4             I would walk up to that machine before putting any

5    consideration into play, before I do anything, before I

6    commit any wager or commit any amount of money, I could walk

7    up to that machine and about 98 percent of the time I would

8    be able to tell you to the penny how much I will win on that

9    very next play.  Win, not lose.  My net profit on that next

10   play I'll be able to tell it to you on the penny.

11            So that is -- that is not representative of a game

12   of chance that I'm able to do that for you.  That is highly

13   representative of a game of skill, that I can to the penny

14   tell you what my profit will be on the very next game that

15   you have selected for me that I didn't even select.

16   Q.     And if that very next game was a losing outcome,

17   there's no skill that could be inputted to change what is

18   presented in that grid as a losing outcome?

19   A.     But remember the game has a puzzle component,

20   right, primary game component, if I will.

21   Q.     Yes.  And that primary --

22   A.     Based on certain -- based on what happens there is

23   logically interconnected to the "follow me" component.  So as

24   a skillful player, I look at the entire game.  And as I look

25   at that entire game, I can predict for you to the penny how

1  that game will end up and how much profit I'll make.

2      Q.     But in just that grid portion, there's no way to

3  change those losing outcome grid to a winning outcome grid?

4      A.     That's correct.

5      Q.     How long does it take to complete the "follow me"

6  feature?

7      A.     I've done it in -- I think the report I put 10

8  minutes 30 seconds.  I've done it, I believe, as -- as short

9  as 10 minutes.

10      Q.     And there's a limit on what you could receive in

11  successfully completing the "follow me" feature which is

12  105 percent, correct?

13      A.     Yes.  It's logically interconnected to what's

14  happened prior to the game.  So, for example, if I bet $4 and

15  I win nothing, it's one of those losing puzzles where I have

16  to lose the entire amount, then I'm -- I'm paying for -- I'm

17  playing for 105 percent of my consideration in the "follow

18  me," right?  Because I've won zero so far.  So I'm going to

19  play this game for $4.20.

20          And for some players, they might not want to spend

21  10 minutes to make $4.20.  But for other players they will

22  want to spend 10 minutes to make $4.20.  That's the choice

23  the player makes.

24      Q.     But there is that 105 percent limit on what could

25  be received?

1      A.      If you get into the "follow me," yes.

2      Q.      Yes.

3      A.      Yeah.  You might win more than 105 percent in the

4   puzzle part and then of course you're not eligible for

5   "follow me."

6      Q.      And there is no such limit on a percentage of what

7   may be won in the puzzle portion.  There is no 105 percent

8   limit on a potential winning.

9      A.      That's correct.

10     Q.      Would you agree with me that playing the "follow

11   me" feature is time consuming?

12     A.      I would say compared to the base game puzzle, it

13   is time consuming, yes.

14     Q.      And isn't it also true, 100 percent true that the

15   only chance a player has to win more than 105 percent of what

16   is wagered is during that grid puzzle game and not the

17   "follow me"?

18     A.      No, I would say that's not true.  I mean, you

19   can -- you might win it during the puzzle game or you might

20   trigger a bonus game, in which case you'll almost

21   certainly -- skillful player would certainly win more than

22   105 percent.  You'll win a multiple of the original

23   consideration, so three times, five times, ten times, those

24   kinds of numbers.

25     Q.      And again, that's only available in that grid

1    portion or in the bonus game?

2        A.     Yes.

3        Q.     In your analysis and inspection, did you have an

4    opportunity to view how any patrons in Champions played the

5    game?

6        A.     No.

7        Q.     Go to page 15 next, please.  Super skill versus

8    the rapid skill comparison.

9        A.     Yes.

10        Q.     Are you aware that the only games on the Champions

11    devices which is a 402.51 software are the rapid skills,

12    correct?

13        A.     My understanding is the version 51 software has 12

14    titles generally available.  There's some kind of -- there's

15    a default configuration and some are enabled and some are

16    not.  But I reviewed all 12 titles because my understanding

17    is all 12 are available.

18        Q.     So do you know if the only games on the Champions

19    devices were rapid skill?

20        A.     I don't know.

21        Q.     If the only games were the rapid skill, would the

22    math properties and the diagramming you created on page 18,

23    that wouldn't apply to Champions games, correct?  Because

24    that's super skills series game?

25        A.     Yeah, in terms of the simulation I chose one game

1    from super skill and one game from rapid skill.  So the
2    Living Large game, which is the rapid skill representative if
3    you will, would still be applicable and would generally --
4    would generally be a representative of that family.
5         Q.    On page -- I'm sorry.  I'm going backwards -- page
6    17.
7         A.    It's okay.
8         Q.    The first paragraph, that last sentence:  Once
9    presented to a player, the eight outcomes are not replaced
10   into the pool; as such the pool is slowly exhausted.
11        I believe that was what you mentioned a moment
12   ago?
13        A.    Yes.  Well, I don't know that I explicitly
14   mentioned that a few moments ago but we were discussing
15   pools, yeah.
16        Q.    So in these games, there are only so many winning
17   outcomes and that is that they are used, would you agree that
18   the chances of winning in that grid portion of the game go
19   down regardless of skill?
20        A.    No.  I would not agree.
21        Q.    So as each of the eight outcomes are replaced, you
22   wouldn't agree that the chances of winning go down as the
23   games -- the number of games reduce?
24        A.    No.  I mean, I'll go back to your card analogy
25   with the deck of cards.  So I mean, I shuffle up a deck of 52

1   cards and I'm trying to get an ace and let's say I pull the

2   first three out.  I mean, if none of those are an ace, my

3   chance of an ace has gone up with what's left in the deck.  I

4   mean, that's the basis of card counting.

5       Q.    If you can win on every play, why isn't the

6   "follow me" theme offered as a game theme in choosing a game

7   themes at the beginning?  Do you know?

8             ATTORNEY HAVERSTICK:  Objection, Your Honor.  I

9   don't know that has anything to do with the topic in his

10  report.  It is a business decision.

11            THE COURT:  I don't know.  Overrule.

12            THE WITNESS:  I think "follow me" was

13  specifically designed to be a layer on top of each of the

14  other games.  So, I mean, in the gaming space we often will

15  do bonus games that might be layers on top of a family of

16  games.  It's not uncommon for such a bonus game layer, if you

17  will, to have the same game play across several titles.

18  BY ATTORNEY JARBOLA:

19      Q.    You would agree with me, though, that the "follow

20  me" feature is not advertised in the game selection or in any

21  of the hint sections for each of the game themes?

22      A.    I believe that's correct.

23      Q.    Just for sake -- this was the chart that was here

24  on page 18 regarding the Bombs & Bombshells, you include the

25  probability of a win as 85.2 percent but that includes what

1  you characterize as a win less than the play amount, correct?

2  A.    Yeah.   That's what I was alluding to earlier, that

3  discussion of hit versus win and kind of the nomenclature we

4  have in gaming.  So this -- the way I'm using win here would

5  be a pay of any amount that's not zero.

6  Q.    So let's say in such a situation where you were

7  presented with -- or you were wagering a $4 and you're

8  presented with a $2 potential winning outcome.

9  A.    Correct.

10  Q.    You're not winning $2, you're actually losing $2

11  in that scenario, correct?

12  A.    You're doing both.

13  Q.    Okay.   I did enjoy the monkey questions as well.

14  On page 19, you mentioned under Subsection B the estimate to

15  random play; i.e., a monkey.

16  A.    Yes.

17  Q.    This assumes that someone is just randomly

18  selecting one of the nine grids to place the wild, correct?

19  A.    That is correct.

20  Q.    Would you agree that potentially a child who may

21  be considered an unskilled player would have a better than

22  one in nine chance of select the correct icon?

23  A.    I would agree.  But this isn't intended to be a

24  random player.  So this is intended to represent what --

25  how -- what the outcome of the game would be if it was -- if

1  the player -- if the player only utilized chance.

2      Q.    And the rapid skill series, I'm going to just

3  rediscuss on page 20 to 21, I'm not really going to refer to

4  any certain line.  Just are you familiar with the Living

5  Large game and the rapid skill series?

6      A.    Yes.

7      Q.    And the bonus games in the rapid skills series

8  such as in Living Large, there's no skill that is involved in

9  completing -- successfully completing the bonus game?

10      A.    For Living Large that's true.  But I believe Bombs

11  & Bombshells has a version of itself both in super skill and

12  rapid skill and the rapid skill version of Bombs & Bombshells

13  skill is involved in the bonus game.

14                ATTORNEY JARBOLA:  A moment, Your Honor,

15  please.

16                THE COURT:  Sure.

17  BY ATTORNEY JARBOLA:

18      Q.    On page -- on page 16 you mentioned the report is

19  on the PEN59?

20      A.    Yeah, that's a mistake on my part.  It's PEN51, 51

21  is the version that's referred to here.

22      Q.    So that would have been the version that you did

23  play and inspect for your report, the 51?

24      A.    Well, I mean, I've played multiple versions of the

25  Pennsylvania Pace-O-Matic skill product.  The -- with respect

1  to 51, it was basically I was playing by proxy.  I was

2  directing play through a videoconference of what I wanted to

3  see, making sure that it was version 51 in particular because

4  that's -- that's the issue in this case.

5      Q.      Did you actually then sit down and actually play

6  without the -- I don't understand what video proxy is, but

7  without the video proxy?

8      A.      Just like -- just like a Zoom call or whatever --

9      Q.      Oh, okay.

10     A.      -- where I'm just -- there's a person there live

11 on the device and I'm just directing how I want the game to

12 play and, you know, either taking screen captures or those

13 kinds of things.

14             ATTORNEY JARBOLA:  Judge, I have nothing

15 additional.

16             Thank you, Doctor.

17             THE COURT:  Any redirect?

18             ATTORNEY HAVERSTICK:  No, Your Honor.

19             THE COURT:  Thank you, sir.

20             THE WITNESS:  Thank you.

21             THE COURT:  Is there anything you need to put

22 on the record?  I'm going to let my court reporter go.  She

23 has an appointment.

24             ATTORNEY HAVERSTICK:  Only that I think there's

25 an agreement with the Commonwealth that there's going to be

1     no analysis by the Commonwealth, in this case or any other

2     one, pending an agreement on how a further review might be

3     conducted. I ask that the copies of the images and any other

4     media that BMM still possesses, I think he said it was in his

5     safe in the office, be returned to the Commonwealth so that

6     we know that, you know, they are all here where we have

7     easier access to them.

8              THE COURT: Those two points you make, do you

9     agree with both?

10             ATTORNEY JARBOLA: Yes, sir. That's correct.

11     First regarding the -- no additional analysis will occur on

12     these machines or either the two Commonwealth Court case

13     machines.

14             THE COURT: Okay.

15             ATTORNEY JARBOLA: And the copy that

16     Mr. Nikiper has will be provided to the state police and also

17     the copy that was brought today in response to the subpoena,

18     we didn't have an opportunity to previously review that and

19     Mr. Nikiper informed us that the audio was accidentally on.

20     So we just wanted to review that audio to make sure it was

21     not anything confidential regarding any ongoing

22     investigations. But once that's reviewed, we can also turn

23     that over to counsel.

24             ATTORNEY BUTKOVITZ: We would also ask that

25     there be -- I believe there's one more expert to testify from

1   the Commonwealth and that, you know, basically he be required

2   to testify as if he were testifying today, meaning that there

3   would be no further analysis, materials collected.

4           THE COURT:  They've already agreed to that.

5           ATTORNEY BUTKOVITZ:  Well, they've agreed that

6   they wouldn't do any further analysis of the dongle and the

7   hard drive.  But as far as going out in the field in any way

8   trying to supplement or go -- or expand the report that's

9   been issued, I think the -- everybody here's prepared to go

10  today.  I believe that his testimony should effectively be

11  frozen in time and he should be required to testify as he

12  would today.

13          ATTORNEY JARBOLA:  Judge, there's no intention

14  of going out into the field or conducting any additional.

15          THE COURT:  Okay.

16          ATTORNEY BUTKOVITZ:  Is that an agreement then?

17          THE COURT:  Sounds like it.

18          ATTORNEY JARBOLA:  Just want to clarify that he

19  still has a job to do as far as other investigations and

20  maybe establishments, but it will be nothing that would

21  further his report.

22          ATTORNEY HAVERSTICK:  Yeah, we're -- the point

23  is we wanted him to be treated as if he's testifying today.

24          ATTORNEY BUTKOVITZ:  To be clear, what I'm

25  saying is his testimony as of today should be the same as

1   whatever he testifies to in the future.  We understand he may

2   be -- he may -- he has a day job.  Whatever he does there he

3   can and should continue to do, but as far as expanding his

4   opinions, going out and trying to beef it up in any way is

5   what we're asking to not happen.

6                   THE COURT:  Okay.

7                   ATTORNEY JARBOLA:  If I may, Judge, I would

8   similarly ask, I don't know if there are any other witnesses

9   that may be offered by the petitioners.  We would ask that

10  they be precluded from conducting any further examinations

11  and/or visits into the field as well.

12                  THE COURT:  Agreed.

13                  ATTORNEY BUTKOVITZ:  I think that's fair.  I

14  think it should go both ways.

15                  THE COURT:  Okay.

16                  ATTORNEY HAVERSTICK:  Your Honor, in terms of

17  scheduling now --

18                  THE COURT:  We don't need her for scheduling.

19  We'll work on that.  I'll do a separate order.

20                  ATTORNEY HAVERSTICK:  Okay.

21                  THE COURT:  We'll discuss that in a moment.  Is

22  there anything else you want to have on the record?

23                       (Sotto voce discussion between
                          counsel.)

24

25                  ATTORNEY BUTKOVITZ:  No.

1          ATTORNEY JARBOLA:  No.

2          (The proceedings adjourned at
           4:33 p.m. to be reconvened
3          December 2, 2022, at 9:30 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T I O N**

2

3          I hereby certify that the proceedings and

4    evidence are contained fully and accurately in the notes

5    taken by me on the hearing of the above cause, and that this

6    transcript of proceedings meets the format specifications

7    established by the Supreme Court of Pennsylvania in Rule

8    4010.

9

10

           _____
12          Heather L. Artz, RMR, CRR, CRC
            Official Court Reporter
13

14           November 30, 2022
            Date

15

16

17

18

19

20

21

22

23

24

25

## $

**$10** [11] - 122:2, 122:6, 122:14, 122:15, 122:20, 123:2, 123:12, 123:18, 123:21, 123:22
**$10,000** [2] - 158:8, 158:15
**$10.05** [1] - 122:2
**$10.50** [4] - 122:3, 122:15, 123:1, 123:13
**$19** [1] - 189:6
**$2** [1] - 211:17
**$4.20** [3] - 214:19, 214:21, 214:22

## '

**'83** [1] - 200:14
**'em** [3] - 62:11, 62:12, 86:6

## 1

**1** [11] - 35:20, 36:1, 37:4, 37:24, 67:3, 149:8, 174:15, 179:21, 190:24, 206:23, 207:2
**10** [10] - 101:21, 107:22, 176:23, 178:4, 178:6, 188:24, 214:7, 214:9, 214:21, 214:22
**10,000** [4] - 125:19, 125:25, 131:9, 156:22
**100** [3] - 180:21, 182:19, 215:14
**105** [35] - 80:14, 90:2, 94:13, 94:18, 94:20, 95:6, 98:23, 99:2, 100:22, 101:6, 101:11, 101:13, 101:14, 101:17, 103:7, 103:14, 103:18, 110:25, 136:10, 153:7, 185:9, 185:18, 185:21, 185:24, 186:1, 186:2, 189:9, 189:10, 214:12, 214:17, 214:24, 215:3, 215:7, 215:15, 215:22

**10:58** [1] - 59:13
**11** [2] - 40:14, 107:23
**11:10** [1] - 59:13
**12** [8] - 49:24, 52:1, 68:20, 182:4, 216:13, 216:16, 216:17
**120** [1] - 182:5
**12:13** [1] - 103:25
**12th** [1] - 104:11
**14** [1] - 109:1
**14-inch** [1] - 40:15
**14-second** [1] - 107:7
**15** [6] - 107:23, 107:24, 107:25, 109:1, 195:9, 216:7
**16** [3] - 69:12, 107:25, 220:18
**17** [3] - 108:1, 108:2, 217:6
**170** [1] - 189:1
**174** [1] - 189:1
**18** [6] - 108:3, 110:19, 111:20, 189:5, 216:22, 218:24
**19** [4] - 110:20, 111:20, 200:13, 219:14
**1940** [2] - 195:13, 200:17
**1990s** [1] - 169:1
**1:00** [1] - 103:24
**1:53** [1] - 138:2

## 2

**2** [11] - 101:21, 107:14, 147:2, 148:24, 149:10, 182:13, 204:13, 219:8, 219:10
**20** [20] - 67:17, 97:15, 97:20, 98:21, 99:25, 100:2, 100:14, 101:19, 103:8, 104:18, 110:20, 112:4, 112:5, 112:6, 112:8, 112:10, 119:3, 119:18, 180:4, 220:3
**200** [1] - 199:10
**2014** [1] - 53:23
**2022** [1] - 33:21
**21** [1] - 220:3
**22** [3] - 97:20, 98:22, 101:19
**25** [1] - 102:17
**2500** [3] - 125:18, 125:25, 131:9

**27th** [2] - 33:21, 39:20
**28th** [1] - 104:5
**2:08** [1] - 138:2
**2:49** [1] - 167:17
**2nd** [1] - 104:9

## 3

**3** [4] - 149:13, 151:17, 206:23, 207:2
**30** [3] - 100:14, 102:17, 214:8
**30-second** [2] - 80:17, 205:12
**32** [1] - 101:22
**3:03** [1] - 167:17

## 4

**4** [14] - 101:1, 149:19, 181:8, 181:13, 183:7, 193:22, 194:10, 194:15, 194:16, 196:4, 211:17, 214:14, 219:7
**40** [19] - 88:3, 88:4, 94:19, 94:23, 94:25, 97:19, 100:24, 101:2, 101:18, 101:20, 103:11, 111:4, 112:4, 181:18, 181:19, 182:5
**400,000** [1] - 210:22
**402** [2] - 39:9, 39:14
**402.44** [1] - 39:8
**402.50** [4] - 39:6, 39:24, 42:2, 42:4
**402.51** [4] - 39:6, 40:1, 40:6, 216:11
**402.57** [1] - 39:8
**405** [1] - 17:9
**41** [1] - 101:3
**42** [3] - 100:24, 101:3, 103:12
**44** [5] - 55:23, 56:11, 56:17, 145:14
**45** [1] - 103:24
**49** [1] - 115:13
**4:33** [1] - 225:2
**4th** [5] - 24:25, 26:7, 26:23, 36:18, 38:13

## 5

**5** [16] - 94:22, 99:13, 100:25, 101:2,

**120:22, 121:7, 121:9, 121:14, 130:13, 156:1, 159:15, 160:21, 195:17, 195:20, 195:21, 208:4
**5,000** [5] - 125:19, 125:25, 131:9, 156:22, 158:8
**50** [18] - 39:15, 82:20, 115:6, 115:7, 115:9, 115:18, 122:3, 122:21, 122:23, 123:3, 123:5, 123:18, 134:3, 134:4, 134:6, 135:14, 185:22
**500** [1] - 199:10
**51** [11] - 39:15, 115:9, 115:12, 182:4, 190:16, 216:13, 220:20, 220:23, 221:1, 221:3
**52** [2] - 210:17, 217:25
**57** [1] - 39:15
**58** [1] - 39:8
**59** [3] - 39:8, 57:17, 58:7
**5:00** [1] - 59:20

## 6

**6** [3] - 107:21, 150:10, 188:24
**6:00** [1] - 59:20

## 7

**7** [3] - 26:18, 208:4, 210:10
**72** [1] - 182:6
**7:00** [1] - 59:20
**7th** [6] - 25:4, 25:20, 26:24, 36:9, 36:18, 38:14
**7yes** [1] - 79:24

## 8

**8** [1] - 36:25
**80** [11] - 88:5, 88:6, 100:25, 127:10, 173:22, 182:5, 183:7, 183:10
**83** [1] - 200:15
**839** [1] - 195:9
**844** [1] - 195:17
**85.2** [1] - 218:25

## 9

**97** [1] - 206:18
**98** [1] - 213:7
**99** [1] - 208:18
**9:34** [1] - 3:1

## A

**A.G.'s** [1] - 18:9
**a.m** [3] - 3:1, 59:13, 59:13
**A2.d** [1] - 195:9
**abilities** [1] - 103:2
**ability** [16] - 77:22, 82:18, 83:20, 132:13, 150:9, 154:11, 154:12, 154:22, 156:12, 182:2, 183:11, 190:6, 205:16, 205:18, 205:22
**able** [96] - 5:8, 6:4, 12:17, 13:23, 22:12, 22:13, 22:15, 22:18, 22:21, 24:6, 24:8, 24:20, 31:8, 41:15, 42:22, 45:25, 47:13, 47:15, 48:7, 48:11, 48:17, 49:20, 51:16, 60:22, 61:21, 63:12, 67:6, 70:20, 72:19, 72:25, 73:8, 74:16, 80:8, 81:13, 82:13, 82:16, 83:2, 85:25, 87:8, 87:20, 89:24, 90:13, 93:14, 97:15, 105:16, 106:16, 108:14, 110:18, 118:10, 118:13, 118:14, 118:24, 119:23, 120:10, 120:16, 121:4, 126:12, 126:14, 126:15, 129:5, 130:19, 132:10, 132:21, 135:14, 138:19, 139:24, 140:25, 141:4, 141:6, 141:17, 142:12, 142:21, 145:8, 149:16, 149:17, 150:13, 153:5, 153:6, 154:16, 155:2, 155:5, 161:11, 161:14, 175:8, 175:9, 175:10, 175:13, 176:14,

178:1, 202:18,
213:8, 213:10,
213:12
**absent** [1] - 200:19
**absolute** [1] - 127:11
**absolutely** [8] - 6:8,
137:13, 154:20,
171:18, 183:14,
188:6, 190:9, 198:20
**academic** [1] - 173:16
**accept** [1] - 64:23
**accepted** [3] - 147:20,
147:24, 174:7
**accepter** [1] - 41:14
**acceptor** [1] - 40:16
**access** [17] - 3:24,
4:21, 21:9, 22:23,
23:2, 23:10, 40:23,
74:20, 120:8,
138:24, 138:25,
150:12, 162:13,
163:23, 166:21,
166:22, 222:7
**accessible** [1] -
212:13
**accidentally** [1] -
222:19
**accommodate** [1] -
105:2
**accompanying** [1] -
72:7
**accomplish** [6] -
43:19, 45:18,
104:15, 105:16,
106:19, 129:24
**account** [2] - 160:17,
160:19
**accounting** [6] - 7:6,
191:21, 192:1,
192:5, 192:9, 195:5
**accreditation** [1] -
19:24
**accredited** [2] - 19:16,
19:18
**accurate** [8] - 21:21,
25:14, 27:21, 28:2,
28:15, 28:16, 143:2,
151:21
**accurately** [1] - 141:6
**ace** [3] - 218:1, 218:2,
218:3
**achieve** [4] - 72:22,
84:24, 158:4, 207:13
**achieving** [1] - 189:13
**acknowledged** [1] -
178:14
**acronym** [1] - 19:22
**Act** [2] - 50:9, 65:23
**action** [2] - 50:14,
148:21

**actions** [2] - 8:12,
73:8
**activate** [1] - 182:2
**activated** [1] - 155:11
**active** [1] - 94:7
**activity** [1] - 157:17
**actual** [26] - 13:23,
13:24, 16:5, 17:9,
21:13, 26:11, 26:14,
33:14, 41:1, 61:22,
62:4, 64:20, 71:7,
83:4, 99:7, 149:16,
153:18, 157:4,
165:19, 176:4,
191:25, 196:21,
197:2, 198:6, 212:6
**ad** [1] - 120:25
**add** [3] - 32:9, 106:25,
108:7
**addition** [5] - 12:12,
16:4, 16:14, 156:3,
179:7
**additional** [21] -
24:18, 24:20, 29:15,
29:16, 30:9, 31:3,
49:19, 50:23, 90:21,
94:22, 97:20,
100:25, 104:25,
107:15, 134:21,
148:10, 172:14,
196:11, 221:15,
222:11, 223:14
**address** [2] - 50:9,
204:3
**addressed** [3] -
122:10, 147:23,
164:25
**adequate** [2] - 31:7,
128:3
**adequately** [1] -
130:18
**adhered** [1] - 169:25
**adjourned** [1] - 225:2
**adjustment** [2] -
111:16, 111:18
**administrative** [2] -
26:1, 37:11
**admissibility** [1] -
30:17
**admissible** [1] - 45:14
**admission** [4] - 30:22,
37:23, 141:21,
141:22
**admit** [1] - 190:24
**admitted** [5] - 38:3,
38:9, 137:5, 141:25,
191:3
**admitting** [1] - 77:6
**adopted** [2] - 27:14,
135:4

**advance** [2] - 72:5,
182:16
**advanced** [2] - 160:23,
182:16
**advertised** [1] -
218:20
**affect** [4] - 46:7,
82:19, 186:18, 187:9
**affirmed** [3] - 10:9,
29:17, 167:23
**afford** [1] - 205:18
**affords** [1] - 205:16
**afternoon** [7] - 5:3,
36:13, 59:25, 142:5,
142:6, 168:4, 191:9
**afterwards** [2] - 18:24,
34:10
**agencies** [2] - 16:15,
45:11
**agency** [2] - 13:18,
64:22
**agents** [3] - 125:14,
164:9, 164:19
**ago** [5] - 18:11, 33:16,
64:16, 217:12,
217:14
**agree** [23] - 3:7, 7:4,
8:11, 9:4, 9:17, 9:21,
9:25, 22:21, 38:6,
142:7, 142:10,
154:23, 167:4,
205:14, 206:9,
215:10, 217:17,
217:20, 217:22,
218:19, 219:20,
219:23, 222:9
**agreed** [6] - 25:3,
50:2, 161:21, 223:4,
223:5, 224:12
**agreement** [10] - 6:7,
9:2, 9:6, 63:22,
166:15, 166:17,
221:25, 222:2,
223:16
**agreements** [2] - 4:6,
6:13
**AGS** [3] - 173:1,
177:17, 177:18
**ahead** [10] - 60:1,
75:18, 79:1, 89:13,
95:19, 105:9, 172:7,
185:10, 185:23,
207:3
**aid** [3] - 142:20, 154:1
**aim** [1] - 85:2
**air** [1] - 40:25
**AJ** [1] - 17:17
**alerting** [1] - 96:10
**algorithm** [2] - 75:6,
211:24

**algorithms** [2] - 171:7,
175:19
**aligns** [1] - 23:7
**allow** [6] - 31:1, 49:18,
50:22, 93:24, 117:2,
137:3
**allowed** [6] - 42:3,
49:16, 49:17, 66:13,
83:9, 159:19
**allows** [1] - 121:1
**alluding** [1] - 59:17
**almost** [3] - 206:9,
206:16, 215:20
**alter** [2] - 23:18, 38:22
**alternate** [1] - 93:8
**alternating** [4] - 93:22,
93:25, 96:10, 96:14
**American** [1] - 172:22
**amount** [39] - 40:18,
74:10, 82:2, 90:3,
94:12, 94:13, 95:4,
95:5, 98:18, 98:24,
99:8, 99:10, 99:13,
100:11, 100:12,
101:11, 124:12,
126:19, 127:18,
127:24, 156:16,
158:9, 158:10,
158:17, 158:18,
159:4, 159:5, 159:9,
159:17, 159:21,
159:25, 160:2,
178:22, 181:15,
206:3, 213:6,
214:16, 219:1, 219:5
**amusement** [1] -
123:23
**AN** [1] - 168:7
**analogous** [1] -
210:17
**analogy** [7] - 84:14,
170:1, 210:17,
210:18, 211:11,
211:13, 217:24
**analyses** [2] - 4:22,
12:4
**analysis** [65] - 4:12,
4:18, 4:20, 13:13,
17:5, 18:4, 18:15,
19:2, 19:7, 20:5,
21:11, 30:12, 32:23,
33:6, 34:15, 43:10,
44:6, 46:24, 47:3,
49:11, 50:23, 53:2,
54:16, 57:6, 60:15,
61:2, 61:4, 64:9,
95:22, 109:5,
109:17, 109:22,
112:15, 121:1,
128:4, 128:9,

134:20, 145:11,
146:10, 146:22,
147:12, 147:14,
148:4, 149:10,
149:13, 150:15,
150:23, 151:9,
151:10, 159:19,
161:4, 161:10,
165:12, 165:14,
166:8, 166:16,
173:3, 175:4, 185:1,
216:3, 222:1,
222:11, 223:3, 223:6
**analyze** [12] - 4:6,
30:9, 45:19, 45:25,
46:19, 48:25, 55:9,
55:10, 62:5, 114:6,
144:7, 151:7
**analyzed** [7] - 3:17,
10:3, 48:22, 51:13,
134:11, 138:11,
147:5
**analyzing** [2] - 52:10,
134:19
**animated** [1] - 56:25
**answer** [12] - 12:12,
118:8, 118:22,
119:14, 120:4,
138:5, 139:1,
180:12, 192:4,
196:19, 206:5, 211:7
**answer's** [1] - 22:4
**answering** [2] -
159:13, 209:21
**answers** [6] - 28:6,
51:8, 51:10, 113:10,
117:20, 134:14
**anticipated** [1] - 171:7
**anticipation** [1] -
174:12
**anyway** [1] - 179:20
**apart** [3] - 46:2, 47:14,
178:13
**apologies** [1] - 166:25
**apologize** [4] - 56:25,
57:20, 195:10, 196:6
**app** [5] - 106:22,
106:23, 108:8,
108:10, 176:19
**appeal** [6] - 56:5,
201:1, 201:5, 202:1,
203:4, 203:11
**appealed** [1] - 56:4
**appear** [18] - 17:18,
51:17, 53:4, 72:18,
76:1, 76:15, 93:17,
99:23, 132:7, 153:4,
206:4, 207:6, 208:1,
212:4, 212:6, 212:8,
212:10, 212:12

**appearance** [1] - 40:9
**appeared** [3] - 91:6, 93:5, 111:9
**appearing** [1] - 129:12
**applicable** [4] - 19:6, 169:19, 169:21, 217:3
**applied** [2] - 169:3, 169:5
**applies** [1] - 14:16
**apply** [5] - 15:21, 31:25, 32:14, 129:9, 216:23
**appointment** [1] - 221:23
**approach** [4] - 35:20, 173:6, 174:18, 179:8
**appropriate** [8] - 4:25, 6:17, 7:5, 9:5, 122:12, 178:16, 191:11, 199:5
**appropriately** [3] - 6:4, 15:9, 139:25
**approval** [1] - 66:24
**architectural** [1] - 61:18
**area** [11] - 11:14, 18:20, 30:4, 86:4, 86:25, 92:14, 92:21, 92:22, 93:9, 96:13, 97:1
**areas** [4] - 19:5, 30:6, 140:25, 204:23
**argue** [3] - 73:23, 116:6, 137:7
**arguing** [1] - 137:6
**argument** [4] - 73:6, 114:13, 195:8, 206:6
**argument's** [1] - 212:23
**Arizona** [1] - 16:2
**arranged** [1] - 42:11
**arrangement** [1] - 206:14
**arrived** [1] - 164:7
**articulated** [1] - 30:17
**artwork** [5] - 42:13, 69:2, 92:20, 125:6, 170:3
**aside** [1] - 52:15
**aspects** [1] - 118:4
**assembling** [1] - 209:10
**assign** [1] - 172:8
**assigning** [1] - 115:15
**assist** [2] - 134:21, 153:23
**associated** [2] - 176:7, 182:8
**assume** [7] - 32:6,

67:12, 123:14, 136:24, 144:20, 173:2, 185:8
**assumes** [3] - 176:9, 176:11, 219:17
**assuming** [1] - 6:15
**assumption** [1] - 92:5
**ASTQB** [1] - 19:20
**astrophysicist** [2] - 168:17, 168:19
**Astrophysics** [1] - 168:20
**asynchronous** [1] - 172:5
**attach** [1] - 25:22
**attached** [2] - 26:15, 37:8
**attempt** [2] - 110:24, 144:24
**attempted** [3] - 51:18, 51:22, 54:24
**attention** [2] - 148:25, 204:13
**attestation** [2] - 15:8, 24:2
**attorney** [1] - 203:6
**ATTORNEY** [373] - 3:5, 3:8, 3:20, 5:6, 6:8, 6:10, 6:14, 7:11, 7:16, 7:18, 7:22, 7:25, 8:18, 8:21, 9:10, 9:18, 9:24, 10:6, 10:11, 10:15, 10:18, 10:20, 10:21, 11:4, 13:3, 17:20, 17:23, 17:25, 18:1, 20:2, 20:7, 20:11, 25:7, 25:10, 25:24, 26:5, 26:8, 26:16, 26:25, 27:3, 27:9, 27:11, 29:13, 29:23, 30:18, 31:2, 31:19, 32:1, 32:4, 32:8, 32:9, 32:19, 32:21, 35:19, 35:23, 35:24, 36:5, 36:12, 36:15, 36:19, 36:21, 37:22, 38:2, 38:8, 38:10, 38:11, 41:18, 41:20, 49:9, 49:18, 50:8, 51:5, 52:4, 52:24, 53:13, 54:24, 55:4, 55:8, 55:11, 55:13, 55:15, 56:1, 56:5, 56:8, 56:10, 56:15, 56:16, 56:21, 56:24, 57:11, 57:20, 57:23, 57:25, 58:2, 58:5, 58:17, 59:8, 59:12, 59:16, 59:21, 60:2,

60:8, 61:1, 61:24, 76:7, 76:13, 77:3, 77:10, 78:11, 78:16, 78:17, 79:2, 84:2, 84:5, 84:10, 84:16, 84:19, 84:21, 86:10, 86:16, 88:19, 88:23, 89:2, 89:7, 89:14, 90:15, 91:2, 91:4, 91:5, 91:15, 91:22, 92:4, 92:9, 92:16, 95:20, 95:25, 96:4, 98:2, 98:7, 99:16, 100:16, 103:6, 103:22, 104:3, 104:7, 104:10, 104:12, 104:17, 104:21, 104:24, 105:4, 105:10, 106:14, 108:16, 109:8, 109:12, 109:18, 110:1, 112:13, 112:20, 112:25, 113:2, 113:8, 113:12, 113:15, 113:19, 113:21, 113:23, 114:12, 114:23, 114:25, 115:1, 115:8, 115:14, 115:19, 115:22, 116:10, 116:12, 116:19, 116:24, 117:12, 117:16, 117:21, 117:24, 119:6, 119:20, 120:3, 120:7, 120:9, 120:19, 120:24, 121:3, 121:8, 121:11, 121:15, 121:18, 121:22, 122:4, 122:6, 122:8, 122:16, 122:19, 122:23, 122:24, 123:8, 123:11, 124:2, 124:8, 124:15, 124:18, 124:21, 124:24, 127:20, 128:5, 128:10, 128:21, 129:14, 129:17, 130:5, 130:9, 130:13, 130:15, 130:22, 132:17, 132:20, 132:23, 133:1, 133:12, 134:13, 134:19, 135:2, 135:11, 135:17, 136:2, 136:11, 136:13, 136:18, 136:22,

137:6, 137:12, 137:16, 137:18, 137:20, 138:7, 139:3, 139:11, 139:12, 139:14, 139:16, 140:16, 140:19, 140:22, 141:20, 141:24, 142:2, 142:4, 146:4, 146:6, 146:8, 164:2, 164:4, 165:8, 165:11, 167:10, 167:13, 167:19, 168:3, 174:2, 174:6, 174:8, 174:10, 174:18, 174:20, 190:23, 191:2, 191:4, 191:6, 191:8, 192:7, 192:11, 192:17, 192:18, 192:19, 192:24, 193:1, 193:5, 193:10, 193:19, 193:22, 193:24, 194:2, 194:5, 194:6, 194:8, 195:7, 195:14, 195:16, 195:20, 195:22, 195:25, 196:6, 196:9, 196:11, 196:14, 196:16, 196:18, 197:4, 197:7, 197:13, 197:15, 197:16, 198:7, 198:9, 198:19, 198:24, 199:11, 199:16, 199:17, 199:25, 200:12, 200:15, 200:23, 201:2, 201:7, 201:8, 201:11, 201:12, 201:15, 201:18, 202:3, 202:4, 202:8, 202:11, 202:13, 202:15, 202:21, 202:25, 203:5, 203:13, 203:15, 203:20, 203:22, 204:6, 204:7, 204:19, 205:1, 209:11, 209:14, 210:2, 210:5, 210:9, 218:8, 218:18, 220:14, 220:17, 221:14, 221:18, 221:24, 222:10, 222:15, 222:24, 223:5, 223:13, 223:16, 223:18, 223:22, 223:24,

224:7, 224:13, 224:16, 224:20, 224:25, 225:1
**Attorney** [8] - 4:4, 5:12, 9:12, 18:3, 63:18, 161:20, 165:25, 204:4
**attorneys** [5] - 34:1, 35:6, 51:9, 64:6, 164:8
**attract** [1] - 96:23
**attributes** [1] - 187:8
**audible** [1] - 88:12
**audio** [2] - 222:19, 222:20
**author** [2] - 98:4, 173:7
**authority** [2] - 200:19, 200:20
**authorization** [1] - 49:6
**authorize** [1] - 78:24
**authorized** [3] - 134:18, 137:14, 161:17
**auto** [4] - 77:24, 77:25, 78:3, 78:4
**automatic** [3] - 151:19, 151:22, 152:7
**availability** [1] - 160:17
**available** [41] - 23:21, 23:24, 34:20, 34:21, 35:12, 42:5, 42:6, 42:25, 68:10, 68:19, 68:21, 70:9, 71:5, 71:9, 73:15, 74:5, 87:19, 90:1, 90:11, 90:12, 90:13, 92:17, 93:11, 96:16, 96:22, 97:4, 116:18, 124:4, 125:13, 126:17, 127:1, 138:14, 143:20, 176:12, 182:4, 182:7, 207:17, 212:18, 215:25, 216:14, 216:17
**avenues** [1] - 161:15
**average** [3] - 131:24, 160:24, 188:21
**award** [2] - 171:11, 172:13
**awards** [1] - 172:13
**aware** [19] - 10:25, 16:9, 45:7, 65:7, 96:25, 131:10, 133:20, 133:24, 145:13, 147:24,

148:1, 153:13,
153:21, 154:6,
157:24, 158:1,
200:24, 208:8,
216:10

# B

**Bachelor** [1] - 11:13
**Bachelor's** [1] - 11:11
**back-end** [2] - 126:16,
132:11
**background** [3] -
11:10, 168:10,
173:25
**backing** [1] - 176:24
**backpack** [1] - 162:17
**backwards** [4] -
54:12, 54:13, 54:14,
217:5
**bad** [2] - 140:3, 197:12
**bag** [1] - 163:7
**balance** [5] - 88:2,
88:4, 92:24, 111:16,
131:24
**Ball** [3] - 197:6, 197:9,
197:10
**ball** [1] - 199:23
**bank** [6] - 11:16,
144:10, 196:1,
196:8, 197:19, 198:3
**bar** [1] - 87:1
**Bar** [3] - 18:18, 31:3,
40:6
**Barrett** [3] - 49:20,
50:6, 58:11
**base** [55] - 42:10,
69:24, 78:8, 78:13,
78:14, 79:4, 79:5,
83:2, 84:18, 88:24,
89:3, 89:12, 100:23,
101:8, 101:20,
101:21, 103:10,
103:18, 110:16,
111:2, 111:10,
111:12, 111:21,
111:23, 112:3,
112:6, 114:4,
114:20, 116:17,
133:4, 135:18,
135:20, 135:25,
136:16, 136:25,
141:1, 141:15,
152:16, 152:19,
175:24, 177:20,
179:6, 179:18,
179:19, 179:21,
180:3, 182:23,
184:19, 192:18,

206:13, 206:22,
210:10, 215:12
**based** [55] - 7:21,
8:14, 15:18, 21:11,
21:23, 23:21, 23:23,
24:1, 30:3, 30:10,
31:15, 31:22, 32:12,
46:21, 49:11, 54:20,
54:22, 67:16, 77:6,
82:13, 83:8, 83:11,
95:21, 108:24,
109:4, 109:13,
110:18, 112:14,
117:13, 118:10,
118:14, 119:23,
120:16, 131:3,
134:8, 134:11,
134:22, 134:23,
134:24, 135:9,
135:15, 135:17,
138:8, 138:11,
140:12, 157:2,
157:4, 175:9,
183:10, 190:2,
208:24, 210:20,
210:25, 213:22
**basic** [1] - 16:19
**basis** [11] - 51:21,
51:23, 54:6, 58:5,
58:21, 78:18, 92:13,
109:19, 112:21,
128:10, 134:15,
139:6, 158:23, 218:4
**basketball** [1] -
199:19
**beach** [4] - 85:2, 85:3,
85:10, 86:1
**bearing** [1] - 62:2
**beat** [4] - 83:22,
177:24, 188:16,
197:9
**beatable** [1] - 178:2
**beaten** [1] - 197:11
**Beaver** [9] - 53:23,
55:22, 55:25, 56:3,
56:4, 56:7, 56:12,
145:13, 145:18
**became** [2] - 47:4,
168:18, 169:1
**become** [3] - 64:16,
117:5, 203:4
**beef** [1] - 224:4
**began** [4] - 39:19,
169:2, 169:8, 188:6
**begin** [4] - 10:12,
39:20, 82:18, 172:8
**beginning** [3] -
178:17, 187:7, 218:7
**begins** [1] - 178:25
**behalf** [4] - 9:11,

10:16, 147:21,
147:24
**behavior** [1] - 34:6
**behind** [2] - 41:11,
119:25
**belief** [1] - 27:18
**believes** [1] - 119:23
**below** [2] - 40:17,
127:12
**beneath** [1] - 77:8
**best** [10] - 27:18, 28:3,
30:21, 59:18, 68:17,
135:3, 135:6, 150:9,
169:7, 176:10
**bet** [24] - 70:2, 70:3,
70:7, 70:12, 70:13,
71:19, 71:20, 71:22,
71:24, 72:4, 94:25,
98:21, 111:4, 112:4,
122:2, 122:14,
123:12, 127:2,
182:6, 199:19,
213:1, 214:14
**better** [10] - 26:18,
83:24, 84:1, 187:5,
187:7, 187:10,
188:11, 188:12,
194:5, 219:21
**between** [21] - 7:14,
15:19, 22:20, 35:9,
36:18, 40:11, 42:2,
42:12, 47:8, 50:25,
68:22, 72:2, 91:19,
92:1, 100:14,
113:13, 113:14,
113:15, 165:9,
188:9, 224:23
**beyond** [2] - 192:8,
197:25
**bid** [1] - 118:19
**big** [2] - 73:19, 171:11
**bigger** [2] - 60:19,
125:24
**bill** [2] - 40:16, 41:14
**binaries** [4] - 13:23,
13:24, 14:5, 14:10
**binary** [1] - 14:13
**binding** [5] - 8:25, 9:9,
9:15, 9:17, 9:22
**bingo** [1] - 80:7
**bit** [12] - 29:12, 30:19,
40:14, 40:20, 43:10,
86:18, 130:1,
143:18, 169:9,
174:23, 181:10,
208:17
**blackjack** [3] - 171:3,
171:22, 171:25
**Blackjack** [1] - 173:14
**blank** [1] - 169:25

**blocked** [1] - 156:4
**blueprint** [1] - 170:18
**bluff** [1] - 83:23
**blurb** [1] - 71:13
**BMM** [31] - 5:11, 5:22,
10:13, 10:16, 10:23,
11:20, 11:21, 11:23,
11:25, 12:7, 13:4,
13:7, 14:21, 16:14,
19:5, 19:13, 19:16,
27:24, 33:11, 37:15,
58:14, 64:1, 64:16,
64:17, 64:24, 65:5,
66:18, 147:7,
163:23, 209:18,
222:4
**BMM's** [1] - 27:18
**board** [5] - 40:24,
41:11, 48:10, 48:12,
48:13
**Board** [11] - 16:6,
20:18, 43:5, 65:10,
65:12, 65:18, 65:21,
66:3, 66:23, 95:11,
129:8
**boards** [3] - 19:10,
44:12, 150:21
**body** [1] - 15:12
**boiled** [1] - 170:12
**boilerplate** [4] - 27:22,
27:25, 28:10, 28:24
**Bombs** [4] - 176:22,
218:24, 220:10,
220:12
**Bombshells** [4] -
176:22, 218:24,
220:11, 220:12
**bonus** [57] - 62:11,
62:12, 62:13, 62:22,
62:23, 70:24, 71:6,
71:7, 71:9, 71:11,
71:12, 71:14, 84:23,
84:25, 85:18, 85:19,
85:21, 86:1, 86:4,
86:11, 86:13, 111:8,
124:11, 171:12,
172:12, 175:12,
175:25, 179:16,
179:18, 179:22,
179:24, 179:25,
180:1, 183:20,
183:25, 184:3,
184:4, 184:5,
184:10, 189:23,
190:3, 190:16,
206:24, 206:25,
215:20, 216:1,
218:15, 218:16,
220:7, 220:9, 220:13
**bonuses** [9] - 85:16,

85:19, 86:6, 86:7,
86:8, 125:7, 170:16
**book** [6] - 169:2,
173:11, 173:12,
173:13, 173:16
**books** [2] - 173:10,
197:9
**boot** [1] - 47:14
**bored** [1] - 73:20
**boss** [3] - 37:14, 47:8,
64:10
**boss's** [1] - 37:14
**bottom** [7] - 4:11,
27:5, 40:16, 183:23,
194:10, 194:15,
194:16
**bound** [1] - 8:15
**break** [4] - 49:6, 49:7,
107:7, 146:25
**breaking** [1] - 110:7
**breaks** [2] - 108:4,
108:22
**brief** [4] - 12:2, 71:13,
145:16, 193:25
**briefly** [4] - 57:12,
86:17, 181:2, 203:14
**briefs** [1] - 204:3
**bring** [13] - 5:22, 6:2,
6:5, 41:9, 43:23,
47:22, 56:19, 97:5,
131:19, 147:17,
147:19, 148:10,
199:25
**broad** [1] - 16:8
**broadly** [1] - 33:23
**broken** [1] - 178:17
**brought** [7] - 15:18,
118:8, 163:20,
169:11, 172:18,
210:5, 222:17
**build** [7] - 13:23, 14:2,
14:3, 19:9, 107:17
**built** [1] - 63:6
**bullet** [3] - 149:1,
204:19, 205:16
**bunch** [2] - 39:8,
39:25
**Bureau** [4] - 5:13,
18:3, 18:12, 33:2
**business** [9] - 28:12,
28:18, 28:20, 29:1,
52:15, 52:16, 55:5,
126:7, 218:10
**Busters** [2] - 199:18,
199:23
**busy** [1] - 52:13
**BUTKOVITZ** [112] -
20:7, 20:11, 25:7,
25:10, 25:24, 26:5,
26:8, 26:16, 26:25,

27:3, 27:9, 27:11, 29:13, 30:18, 32:9, 38:2, 49:9, 50:8, 56:10, 56:16, 56:21, 76:7, 77:3, 78:11, 78:17, 84:2, 84:10, 84:19, 86:10, 88:19, 89:2, 90:15, 91:2, 91:4, 91:22, 92:9, 95:25, 98:2, 109:8, 109:18, 112:20, 113:21, 113:23, 115:1, 115:8, 115:14, 115:19, 115:22, 116:10, 116:12, 116:24, 117:16, 119:6, 119:20, 120:9, 120:24, 121:11, 121:22, 122:8, 123:8, 124:2, 124:8, 127:20, 128:10, 129:14, 130:5, 130:15, 132:23, 134:13, 135:2, 136:2, 136:13, 136:18, 136:22, 137:12, 137:16, 137:18, 139:3, 139:14, 140:16, 141:24, 142:2, 142:4, 146:6, 146:8, 164:2, 164:4, 165:8, 165:11, 167:10, 194:6, 197:13, 197:15, 198:7, 198:9, 198:19, 199:25, 201:2, 201:7, 201:11, 201:15, 201:18, 202:3, 203:15, 203:20, 203:22, 222:24, 223:5, 223:16, 223:24, 224:13, 224:25
**button** [34] - 34:5, 34:20, 40:17, 41:12, 42:16, 69:22, 69:25, 70:14, 70:15, 70:19, 70:23, 71:15, 71:16, 71:17, 71:21, 71:23, 72:1, 72:16, 72:24, 73:4, 77:11, 77:13, 86:17, 87:7, 87:10, 87:13, 87:20, 87:21, 88:1, 88:7, 88:10, 94:16, 96:7, 97:2
**button's** [1] - 96:8
**buttons** [7] - 69:16, 69:19, 70:6, 70:16, 92:25, 96:6, 97:8

**buying** [2] - 198:13, 200:2
**BY** [64] - 11:4, 13:3, 18:1, 20:11, 25:10, 26:16, 27:3, 27:11, 32:21, 35:24, 36:21, 38:11, 41:20, 60:2, 61:1, 61:24, 76:13, 77:10, 79:2, 84:16, 84:21, 86:16, 89:14, 91:5, 91:15, 92:16, 95:20, 96:4, 98:7, 99:16, 100:16, 103:6, 105:10, 106:14, 108:16, 110:1, 112:13, 117:12, 117:24, 120:19, 124:24, 128:21, 129:17, 130:22, 132:20, 133:1, 133:12, 138:7, 139:12, 139:16, 140:22, 142:4, 146:8, 164:4, 165:11, 168:3, 174:10, 174:20, 191:8, 204:7, 205:1, 210:9, 218:18, 220:17
**byte** [2] - 45:1
**byte-by-byte** [1] - 45:1

# C

**cabinet** [3] - 35:9, 41:6, 44:20
**cabinetry** [1] - 44:9
**CAGE** [1] - 164:10
**calculate** [1] - 189:3
**calculated** [1] - 185:1
**calculation** [1] - 157:7
**calculations** [1] - 180:22
**calculator** [6] - 106:22, 106:23, 107:1, 108:6, 108:8, 108:10
**California** [2] - 16:3, 16:7
**camera** [3] - 34:2, 34:23, 85:12
**cannon** [5] - 81:16, 81:17, 81:19, 81:20, 85:2
**cannot** [4] - 55:1, 138:14, 187:11, 187:15
**canvas** [1] - 170:1
**capable** [15] - 116:4,

116:13, 116:14, 116:15, 136:9, 142:16, 143:1, 143:3, 145:8, 160:6, 160:9, 160:14, 160:16, 200:8, 209:21
**Capital** [1] - 3:22
**capture** [1] - 124:7
**captures** [1] - 221:12
**card** [8] - 42:20, 69:7, 135:24, 173:14, 210:15, 217:24, 218:4
**cards** [19] - 83:5, 83:6, 83:8, 83:9, 83:10, 83:13, 83:15, 83:19, 171:24, 171:25, 210:18, 211:12, 217:25, 218:1
**care** [1] - 6:9
**career** [1] - 189:20
**CARUSONE** [11] - 31:2, 32:1, 32:4, 32:8, 104:10, 193:10, 193:19, 193:22, 194:8, 200:12, 200:15
**Carusone** [1] - 31:2
**Carusone's** [1] - 194:3
**case** [87] - 4:20, 5:15, 5:17, 5:18, 8:9, 9:5, 9:24, 16:2, 17:6, 17:7, 17:19, 18:15, 18:21, 20:19, 21:18, 22:7, 22:9, 22:12, 22:23, 23:2, 23:25, 24:5, 24:14, 24:15, 30:23, 31:10, 31:15, 32:23, 39:21, 44:2, 45:21, 47:21, 51:4, 52:7, 52:19, 52:22, 57:17, 59:2, 59:7, 63:17, 63:18, 63:19, 78:9, 89:18, 89:23, 92:1, 98:19, 114:13, 115:2, 115:11, 115:14, 115:23, 116:3, 116:25, 131:25, 136:7, 142:9, 145:18, 148:7, 158:15, 165:24, 166:16, 166:20, 174:2, 185:25, 193:11, 193:16, 195:13, 195:16, 196:25, 197:17, 197:25, 198:11, 199:2, 200:1, 200:10,

200:13, 200:16, 200:17, 201:3, 203:6, 215:20, 221:4, 222:1, 222:12
**case-law** [1] - 31:15
**cases** [17] - 9:22, 9:23, 12:10, 16:1, 24:13, 28:22, 31:11, 39:17, 43:22, 58:12, 59:2, 59:7, 73:7, 145:17, 147:9, 198:21, 206:20
**cash** [9] - 73:10, 74:8, 121:9, 121:19, 122:15, 122:16, 123:1, 123:17
**cashout** [1] - 121:25
**casino** [25] - 15:17, 65:1, 66:8, 75:3, 75:22, 77:21, 86:6, 86:14, 95:10, 127:6, 127:7, 127:16, 128:16, 128:22, 130:20, 138:18, 139:5, 139:8, 159:3, 159:10, 169:2, 169:3, 169:5, 169:6, 173:12
**casinos** [10] - 15:19, 16:5, 63:16, 65:25, 66:1, 66:4, 66:10, 128:1, 128:15, 138:21
**category** [1] - 164:15
**cavalier** [1] - 57:2
**cease** [2] - 8:21, 10:22
**cell** [2] - 106:21, 153:18
**cent** [1] - 122:21
**center** [4] - 184:1, 184:3, 194:10, 194:14
**Center** [1] - 168:19
**cents** [10] - 88:5, 88:6, 122:3, 123:18, 181:13, 181:18, 181:20, 183:7, 183:10
**certain** [21] - 28:22, 50:2, 53:8, 53:9, 62:21, 66:8, 67:12, 71:10, 73:13, 75:17, 109:16, 109:21, 127:2, 131:15, 156:16, 157:19, 158:3, 171:9, 175:11, 213:22, 220:4
**certainly** [9] - 9:1, 9:10, 30:11, 36:13,

86:12, 136:22, 137:24, 215:21
**certainty** [10] - 24:21, 29:21, 134:10, 134:16, 138:10, 138:15, 141:13, 180:20, 182:19, 190:20
**certificate** [3] - 19:19, 45:15
**certification** [3] - 15:11, 16:14, 29:18
**certified** [2] - 28:14, 66:19
**certifies** [1] - 28:7
**certify** [1] - 27:12
**cetera** [3] - 12:5, 39:15, 85:9
**chain** [2] - 57:9, 57:12
**chair** [1] - 41:7
**Champions** [11] - 18:18, 31:3, 40:6, 40:12, 41:2, 41:22, 116:23, 216:4, 216:10, 216:18, 216:23
**chance** [84] - 15:16, 15:20, 16:24, 20:25, 23:7, 30:14, 31:14, 43:8, 62:3, 74:23, 74:24, 76:8, 76:11, 76:16, 76:18, 83:16, 97:23, 97:24, 101:23, 102:2, 102:24, 103:2, 109:14, 112:24, 114:5, 115:4, 115:9, 115:13, 115:24, 116:1, 116:9, 116:11, 117:8, 128:9, 130:25, 131:4, 133:23, 133:24, 134:3, 134:5, 134:6, 134:12, 134:25, 135:10, 135:20, 136:19, 137:1, 138:12, 138:23, 139:22, 160:22, 167:5, 176:17, 184:19, 186:14, 186:15, 186:17, 186:25, 187:1, 187:9, 187:15, 187:17, 187:19, 189:12, 190:4, 190:14, 193:7, 193:14, 194:19, 198:15, 200:8, 206:2, 206:6,

206:16, 206:20, 208:24, 213:12, 215:15, 218:3, 219:22, 220:1
**chances** [4] - 83:7, 110:24, 217:18, 217:22
**change** [34] - 25:2, 25:4, 29:2, 29:11, 30:2, 30:5, 38:15, 38:16, 38:20, 38:25, 42:14, 46:10, 69:8, 72:12, 74:11, 74:13, 82:19, 92:7, 93:2, 97:18, 117:4, 141:8, 141:11, 146:24, 185:24, 193:6, 207:6, 207:9, 207:24, 207:25, 208:3, 213:17, 214:3
**changed** [2] - 42:13, 163:8
**changes** [4] - 39:12, 39:13, 77:13, 92:12
**changing** [1] - 42:20
**characteristics** [4] - 131:16, 157:13, 194:17, 195:1
**characterization** [2] - 88:20, 113:25
**characterize** [6] - 88:25, 89:17, 137:2, 154:3, 175:22, 219:1
**charge** [2] - 172:23, 177:17
**Charlie** [1] - 168:7
**chart** [1] - 218:23
**chase** [1] - 142:7
**chatted** [1] - 164:19
**check** [1] - 104:6
**checking** [1] - 174:22
**cherries** [5] - 180:4, 180:6, 183:7, 183:8, 183:9
**chess** [1] - 186:23
**chest** [2] - 81:21
**chief** [1] - 172:21
**child** [1] - 219:20
**chime** [1] - 88:12
**chip** [1] - 48:14
**chips** [1] - 48:14
**choice** [5] - 62:20, 81:5, 101:10, 155:8, 214:22
**choices** [1] - 74:6
**choose** [6] - 73:9, 86:22, 123:1, 141:2, 193:8, 207:8
**chooser** [1] - 69:15
**chooses** [3] - 81:2,

118:25, 205:17
**choosing** [2] - 199:21, 218:6
**chose** [4] - 133:7, 176:20, 177:13, 216:25
**chosen** [3] - 118:12, 118:15, 118:18
**Chris** [4] - 31:2, 64:10, 164:8, 164:18
**circle** [2] - 118:12, 150:14
**circles** [4] - 106:23, 107:13, 206:7, 209:1
**circulate** [1] - 203:16
**circumstances** [1] - 166:12
**citation** [1] - 195:18
**cite** [2] - 146:17, 202:14
**cited** [1] - 200:1
**cites** [1] - 200:16
**claim** [1] - 63:14
**Clara** [1] - 168:11
**clarification** [1] - 38:4
**clarified** [1] - 38:5
**clarify** [4] - 13:1, 71:4, 130:1, 223:18
**clarifying** [1] - 38:21
**class** [1] - 169:7
**Class** [1] - 172:3
**classification** [3] - 78:20, 116:3, 138:23
**clean** [1] - 60:22
**clear** [16] - 8:4, 49:3, 55:10, 66:15, 98:8, 100:18, 116:3, 117:1, 128:18, 139:1, 143:15, 152:15, 201:3, 201:21, 212:11, 223:24
**clearly** [3] - 88:21, 127:21, 155:14
**clerk** [5] - 36:11, 174:17, 195:10, 203:19, 203:21
**CLERK** [1] - 202:17
**click** [1] - 143:10
**client** [10] - 6:1, 63:17, 64:16, 65:14, 65:16, 66:12, 161:24, 165:21, 165:24, 166:2
**client's** [2] - 64:1, 64:2
**clients** [3] - 12:14, 65:2, 73:6
**close** [5] - 24:16, 24:17, 32:10, 43:25, 67:17

**closer** [1] - 200:5
**clueless** [1] - 154:20
**coauthor** [1] - 173:15
**Coca** [2] - 6:20, 6:21
**Coca-Cola** [2] - 6:20, 6:21
**code** [40] - 13:21, 13:24, 14:7, 14:12, 21:5, 21:10, 22:9, 22:15, 39:12, 63:3, 74:20, 118:21, 118:24, 119:11, 119:17, 120:2, 120:4, 120:14, 126:2, 128:2, 128:6, 130:17, 149:13, 149:16, 149:18, 156:3, 166:21, 171:6, 176:2, 176:4, 176:6, 177:13, 177:14, 177:15, 177:16, 177:20, 178:3, 210:19
**coding** [3] - 170:21, 170:23, 177:20
**coins** [3] - 156:16, 156:17, 191:15
**Cola** [2] - 6:20, 6:21
**collect** [2] - 110:21, 110:23
**collected** [4] - 150:25, 151:11, 162:16, 223:3
**collection** [1] - 151:6
**color** [2] - 97:8, 188:10
**colored** [3] - 107:13, 110:11, 118:11
**combination** [5] - 71:10, 86:24, 101:8, 127:1, 182:9
**combinations** [1] - 119:3
**comfortable** [2] - 6:15, 212:15
**coming** [4] - 85:3, 104:5, 161:7, 201:20
**comma** [1] - 38:18
**comment** [3] - 9:14, 113:21, 186:13
**Commission** [1] - 16:6
**commit** [4] - 182:1, 184:24, 213:6
**committed** [3] - 144:3, 144:10, 178:22
**committing** [1] - 182:15
**common** [6] - 44:20, 68:22, 77:21, 77:25,

78:1, 101:18
**commonly** [1] - 133:22
**Commonwealth** [32] - 4:3, 5:17, 8:8, 8:12, 8:25, 9:5, 9:15, 10:6, 17:10, 20:3, 30:7, 31:6, 37:22, 39:17, 57:2, 58:20, 59:1, 104:13, 193:16, 195:9, 198:22, 200:25, 201:16, 201:20, 202:24, 203:1, 204:4, 221:25, 222:1, 222:5, 222:12, 223:1
**Commonwealth's** [8] - 3:4, 3:17, 4:2, 7:2, 35:20, 36:1, 37:23, 67:2
**communicated** [1] - 64:8
**communications** [1] - 48:15
**Compact** [1] - 127:16
**companies** [1] - 16:9
**company** [9] - 6:21, 6:24, 11:18, 43:4, 45:13, 45:15, 169:9
**comparable** [1] - 189:19
**comparatively** [2] - 41:24, 103:17
**compare** [11] - 35:11, 63:8, 76:19, 76:21, 83:2, 113:12, 113:20, 114:18, 117:14, 117:17, 159:2
**compared** [2] - 208:16, 215:12
**comparing** [6] - 77:4, 84:7, 84:13, 112:15, 113:3, 114:17
**comparison** [4] - 84:11, 84:12, 86:12, 216:8
**compendium** [1] - 173:16
**competent** [1] - 8:2
**competitors** [2] - 52:14, 63:15
**compiled** [2] - 14:9, 14:12
**complement** [1] - 68:10
**complementary** [1] - 186:15
**complete** [34] - 99:22, 99:25, 100:2, 100:3,

100:21, 102:22, 103:8, 106:17, 108:5, 108:9, 111:7, 112:18, 117:14, 118:1, 142:12, 142:21, 143:8, 150:13, 152:8, 152:9, 153:6, 153:8, 153:14, 153:24, 154:1, 161:10, 161:11, 161:15, 162:21, 176:13, 190:15, 211:6, 211:22, 214:5
**completed** [6] - 93:23, 97:17, 100:19, 151:16, 155:12, 185:12
**completely** [8] - 29:5, 47:22, 49:5, 77:4, 90:18, 116:25, 206:7, 213:2
**completes** [1] - 133:17
**completing** [7] - 79:7, 97:21, 142:23, 143:20, 214:11, 220:9
**completion** [2] - 120:23, 177:3
**compliance** [4] - 12:11, 13:5, 13:10, 15:13
**complied** [1] - 135:5
**complies** [1] - 29:18
**comply** [1] - 147:11
**component** [11] - 99:9, 175:25, 182:23, 183:17, 206:10, 206:22, 208:23, 213:19, 213:20, 213:23
**components** [3] - 21:24, 150:21, 204:15
**computer** [14] - 11:11, 13:25, 14:7, 14:8, 14:10, 19:1, 19:8, 19:9, 41:11, 44:13, 61:17, 61:19, 63:11, 173:4
**computers** [1] - 61:16
**concede** [1] - 155:7
**conceded** [1] - 198:10
**conceivably** [4] - 66:5, 66:11, 160:12, 160:14
**concentration** [1] - 110:7
**concern** [4] - 3:21,

3:22, 5:9
**concerned** [1] - 52:8
**concerning** [7] - 12:4,
16:23, 57:1, 57:9,
78:20, 201:23
**concerns** [2] - 55:18,
58:19
**concessions** [1] -
54:5
**conclusion** [15] -
23:21, 38:16, 38:17,
38:20, 62:1, 98:5,
133:19, 134:14,
135:7, 135:15,
156:23, 157:17,
159:16, 178:9,
191:17
**conclusions** [3] -
23:11, 67:21, 148:23
**conclusive** [2] -
23:15, 23:16
**condition** [1] - 93:24
**conditional** [2] -
179:23, 180:9
**conditions** [3] - 26:18,
90:12, 94:11
**conduct** [11] - 20:14,
30:7, 33:6, 33:14,
46:24, 61:2, 66:3,
121:1, 146:10,
161:17, 199:14
**conducted** [5] - 30:12,
32:24, 165:12,
199:12, 222:3
**conducting** [8] -
13:12, 21:5, 21:25,
22:11, 147:12,
147:14, 223:14,
224:10
**conducts** [1] - 53:1
**confidence** [1] - 10:2
**confidential** [1] -
222:21
**confidentiality** [12] -
4:6, 6:7, 8:6, 8:11,
8:13, 8:16, 9:2, 9:7,
9:15, 57:4, 64:2
**configurable** [1] -
92:9
**configuration** [2] -
44:12, 216:15
**configureable** [2] -
90:11, 92:6
**configured** [3] -
123:14, 123:15,
153:4
**confining** [1] - 7:3
**confirm** [2] - 12:11,
22:18
**confronted** [1] - 147:9

**connect** [1] - 44:25
**connected** [4] - 48:16,
159:21, 194:12,
194:21
**connection** [2] -
50:24, 148:11
**consciously** [1] -
166:5
**consent** [1] - 64:4
**consider** [9] - 39:14,
89:8, 89:10, 148:16,
154:12, 179:12,
179:13, 199:2,
200:20
**consideration** [31] -
97:23, 97:24, 97:25,
125:12, 132:2,
133:23, 144:10,
144:14, 152:23,
174:12, 178:22,
183:16, 184:6,
184:7, 185:13,
185:17, 187:24,
188:1, 189:9,
191:14, 191:15,
194:19, 197:25,
198:14, 198:18,
207:1, 207:20,
212:13, 213:5,
214:17, 215:23
**considerations** [1] -
125:10
**considered** [6] -
136:5, 149:18,
179:12, 179:23,
186:23, 219:21
**considering** [1] -
138:20
**consist** [1] - 15:15
**consistent** [5] - 35:13,
42:12, 72:2, 86:3,
86:13, 100:9
**consistently** [2] -
42:1, 101:17
**consisting** [1] -
116:16
**consists** [1] - 204:15
**constant** [1] - 172:8
**constantly** [1] - 172:5
**constituent** [1] -
178:18
**constitute** [1] - 194:12
**constituted** [1] - 201:4
**constitutes** [1] - 78:19
**constraints** [4] -
21:17, 161:12,
161:14, 162:7
**construction** [1] -
150:22
**consult** [1] - 180:12

**consultation** [3] -
14:22, 15:24, 16:10
**consulting** [3] - 169:8,
169:9, 169:10
**consuming** [2] -
215:11, 215:13
**contacted** [2] - 18:2,
33:1
**contained** [2] - 47:5,
146:22
**content** [4] - 169:13,
169:14, 172:19,
175:9
**contents** [1] - 46:10
**context** [2] - 4:9, 4:25
**continually** [5] -
87:10, 105:18,
105:22, 172:6, 205:4
**continuation** [1] -
114:7
**continue** [17] - 3:11,
83:25, 88:12, 94:5,
105:9, 106:4,
107:21, 112:9,
122:24, 123:1,
124:9, 156:13,
156:17, 156:20,
158:11, 168:16,
224:3
**continued** [1] - 124:5
**continuously** [3] -
105:17, 105:24,
108:20
**contraband** [3] -
53:21, 54:3, 54:11
**contract** [4] - 18:10,
63:21, 63:25, 165:16
**contracts** [1] - 30:1
**contradict** [1] - 198:22
**contrast** [2] - 35:12,
144:6
**contributes** [1] -
132:4
**Control** [14] - 5:13,
16:6, 18:4, 18:13,
20:18, 33:2, 43:5,
65:9, 65:11, 65:18,
65:21, 66:23, 95:11,
129:8
**control** [7] - 27:15,
27:16, 81:6, 129:7,
163:13, 163:16,
163:17
**Controlling** [1] - 66:3
**controlling** [1] -
200:10
**controls** [1] - 114:14
**conversation** [7] -
8:14, 55:2, 58:25,
145:16, 145:23,

158:1, 181:3
**conversations** [6] -
5:24, 18:10, 43:6,
175:17, 209:6, 209:8
**converse** [1] - 187:25
**converts** [1] - 48:14
**conveying** [2] -
158:25, 159:1
**copied** [3] - 162:19,
162:21, 163:20
**copies** [5] - 50:4,
162:25, 163:1,
203:15, 222:3
**copy** [28] - 22:14,
34:15, 36:4, 36:8,
36:10, 36:13, 36:16,
43:15, 43:18, 43:23,
44:3, 44:4, 45:1,
45:17, 45:23, 46:12,
60:4, 60:21, 61:5,
162:23, 163:2,
163:3, 174:16,
193:20, 195:10,
195:11, 222:15,
222:17
**core** [1] - 147:7
**corner** [2] - 183:23
**Corporal** [2] - 49:19,
50:5, 58:11
**correct** [116] - 3:18,
9:9, 11:22, 12:1,
19:3, 20:15, 21:6,
21:7, 21:20, 22:7,
22:8, 24:8, 24:9,
25:14, 25:17, 26:2,
27:9, 28:8, 28:15,
33:22, 37:5, 39:2,
39:17, 39:18, 45:6,
48:21, 51:19, 60:5,
60:24, 63:10, 80:25,
82:6, 91:8, 91:18,
93:13, 95:14, 98:11,
102:11, 103:15,
103:16, 112:7,
119:11, 119:12,
120:7, 121:15,
121:18, 122:3,
136:18, 141:18,
142:24, 144:5,
144:8, 144:11,
144:12, 145:11,
145:12, 146:11,
147:21, 149:5,
151:12, 151:16,
152:3, 152:6,
152:12, 153:1,
153:3, 154:7, 155:8,
155:9, 156:5,
158:20, 159:6,
159:7, 159:18,

160:18, 161:23,
162:1, 162:9,
162:14, 165:22,
165:25, 166:1,
166:3, 166:4, 167:2,
167:3, 167:7,
168:22, 168:23,
174:13, 175:1,
177:2, 181:23,
189:16, 191:13,
198:19, 201:7,
205:5, 205:6, 205:9,
207:15, 207:21,
210:12, 214:4,
214:12, 215:9,
216:12, 216:23,
218:22, 219:1,
219:9, 219:11,
219:18, 219:19,
219:22, 222:10
**correctly** [4] - 107:15,
139:24, 182:18,
208:2
**correspond** [1] -
157:7
**corresponded** [2] -
107:5, 157:16
**correspondingly** [1] -
126:18
**corrupt** [1] - 43:25
**cost** [1] - 205:23
**counsel** [15] - 6:16,
7:14, 8:4, 8:24, 9:6,
10:13, 10:24, 22:14,
50:14, 58:13, 165:9,
203:23, 222:23,
224:23
**count** [1] - 158:21
**countdown** [3] - 80:2,
93:18, 99:21
**counties** [1] - 55:22
**counting** [4] - 3:23,
173:14, 191:25,
218:4
**country** [1] - 104:8
**county** [1] - 17:11
**County** [21] - 17:12,
22:7, 49:22, 50:16,
52:18, 53:23, 55:22,
55:25, 56:3, 56:4,
56:7, 56:12, 57:17,
57:19, 57:20, 57:22,
145:13, 201:1,
201:6, 201:9, 203:2
**couple** [12] - 33:16,
39:5, 39:7, 46:2,
47:15, 50:8, 100:10,
124:8, 131:21,
156:8, 204:11
**course** [7] - 46:1,

138:8, 169:3, 169:5, 169:7, 199:20, 215:4
**court** [20] - 10:19, 12:24, 16:23, 17:3, 58:3, 63:20, 64:5, 73:7, 145:17, 145:19, 145:25, 146:2, 196:22, 199:2, 201:10, 201:22, 201:24, 202:6, 203:8, 221:22
**COURT** [294] - 3:3, 3:7, 3:13, 3:16, 5:5, 6:6, 6:9, 6:12, 7:8, 7:12, 7:17, 7:21, 7:24, 8:20, 9:7, 9:13, 10:5, 10:17, 11:1, 12:20, 12:24, 13:1, 17:7, 17:11, 17:13, 17:16, 17:19, 17:22, 17:24, 20:6, 25:6, 25:9, 25:22, 26:3, 26:7, 26:10, 26:23, 27:2, 27:7, 27:10, 28:18, 29:5, 29:9, 30:16, 30:25, 31:24, 32:3, 32:6, 32:18, 35:14, 35:18, 35:22, 36:4, 36:7, 36:10, 36:14, 36:17, 36:20, 37:3, 37:6, 37:10, 37:13, 37:16, 38:1, 38:6, 38:9, 51:3, 52:21, 54:23, 55:1, 55:7, 55:9, 55:24, 56:4, 56:6, 56:14, 56:19, 56:22, 57:10, 57:19, 57:22, 57:24, 58:4, 59:6, 59:9, 59:15, 59:19, 59:22, 60:7, 61:7, 76:12, 77:9, 78:14, 78:25, 84:9, 84:14, 84:20, 86:15, 89:5, 89:8, 89:11, 89:13, 90:23, 91:3, 91:11, 92:3, 92:15, 94:8, 94:25, 95:4, 95:7, 95:9, 95:12, 95:15, 95:19, 96:2, 98:6, 98:13, 98:17, 98:21, 98:25, 99:3, 99:6, 99:10, 99:15, 100:3, 100:7, 100:11, 100:15, 101:23, 102:1, 102:4, 102:7, 102:12, 102:16, 102:19, 102:24, 103:5, 103:20, 103:23, 104:1, 104:4, 104:9,

104:11, 104:16, 104:20, 104:23, 105:3, 105:5, 106:4, 106:10, 108:13, 108:15, 109:23, 111:2, 111:12, 111:19, 112:1, 112:3, 112:8, 112:11, 112:23, 113:1, 113:5, 113:9, 113:14, 113:17, 113:22, 114:11, 114:20, 114:24, 115:5, 115:11, 115:16, 115:20, 116:7, 116:11, 117:10, 117:18, 117:23, 119:10, 119:13, 119:19, 120:1, 120:5, 120:18, 121:5, 121:13, 121:16, 122:1, 122:5, 122:13, 122:18, 122:21, 123:7, 123:9, 123:25, 124:6, 124:13, 124:16, 124:19, 124:23, 128:19, 129:16, 130:12, 130:21, 135:8, 135:13, 136:15, 136:19, 137:15, 137:17, 137:25, 138:4, 139:9, 139:15, 140:18, 140:20, 141:23, 142:1, 167:12, 167:14, 167:16, 174:5, 174:7, 174:16, 174:19, 191:1, 191:3, 191:5, 192:10, 192:22, 193:4, 193:18, 193:21, 194:1, 194:4, 195:12, 195:15, 195:19, 195:21, 195:24, 196:4, 196:7, 196:10, 196:13, 196:15, 196:17, 196:25, 197:6, 197:8, 197:14, 198:8, 198:17, 198:21, 199:8, 199:15, 200:14, 201:6, 201:9, 201:13, 201:16, 202:1, 202:6, 202:9, 202:14, 202:19, 202:23, 203:2,

203:7, 203:19, 203:21, 203:23, 204:2, 204:18, 204:21, 209:23, 210:4, 210:7, 218:11, 220:16, 221:17, 221:19, 221:21, 222:8, 222:14, 223:4, 223:15, 223:17, 224:6, 224:12, 224:15, 224:18, 224:21
**Court** [40] - 3:10, 5:17, 7:4, 8:16, 8:25, 9:5, 9:15, 10:12, 10:25, 11:9, 39:3, 39:17, 51:2, 51:14, 58:15, 114:14, 117:2, 168:24, 171:19, 173:24, 174:12, 175:3, 181:1, 185:5, 195:9, 195:17, 196:12, 197:18, 197:25, 198:4, 199:4, 199:5, 200:12, 200:17, 200:23, 200:25, 201:20, 202:24, 203:1, 222:12
**Court's** [5] - 8:2, 41:18, 132:17, 164:2, 194:9
**courtroom** [3] - 6:25, 53:15, 55:11
**courts** [4] - 9:9, 9:17, 12:25, 45:14
**cover** [2] - 14:2, 121:25
**covered** [9] - 66:16, 122:11, 130:8, 130:9, 134:15, 137:2, 148:12, 160:5, 209:19
**crack** [2] - 6:23, 54:9
**create** [2] - 148:2, 209:7
**created** [6] - 163:24, 169:3, 179:10, 189:21, 189:22, 216:22
**creates** [1] - 140:12
**creative** [1] - 172:21
**creator** [1] - 98:4
**credit** [6] - 87:24, 88:2, 111:16, 111:18, 178:24, 191:23
**credits** [35] - 88:3, 88:5, 88:6, 94:17,

94:19, 94:23, 96:11, 97:20, 97:21, 100:25, 101:1, 101:5, 101:21, 101:22, 101:25, 110:21, 110:22, 111:4, 112:10, 121:21, 122:7, 122:17, 122:18, 122:23, 123:4, 123:5, 123:9, 123:18, 123:25, 178:21, 191:15, 207:14
**criminal** [3] - 49:21, 50:14, 52:18
**criteria** [2] - 42:6, 80:15
**criterias** [1] - 160:12
**cross** [12] - 4:2, 6:11, 20:6, 56:20, 78:25, 82:9, 128:20, 139:9, 142:1, 174:5, 174:6, 191:5
**CROSS** [3] - 20:9, 142:3, 191:7
**cross-examine** [2] - 142:1, 191:5
**cryptic** [1] - 155:17
**CTO** [1] - 37:15
**current** [2] - 13:4, 71:19
**custody** [3] - 48:6, 57:9, 57:12
**custom** [1] - 48:13
**customer** [2] - 64:4, 170:9
**cut** [1] - 142:7
**cycle** [1] - 179:4

---

## D

**D.A.'s** [1] - 4:21
**damage** [1] - 48:5
**data** [4] - 61:10, 64:1, 64:5, 161:24
**date** [2] - 8:7, 26:5
**dated** [1] - 24:22
**dates** [2] - 104:5, 105:7
**Dauphin** [4] - 17:12, 22:7, 50:16, 53:25
**Dave** [2] - 199:18, 199:22
**David** [1] - 104:24
**days** [5] - 161:8, 164:11, 164:13, 164:15, 164:19
**deal** [3] - 15:21, 32:7,

59:9
**dealing** [7] - 114:9, 198:10, 198:11, 198:13, 198:15, 198:17, 209:23
**dealt** [2] - 83:16, 146:16
**December** [1] - 104:9
**decide** [6] - 83:12, 97:2, 129:10, 170:2, 182:19, 199:18
**decided** [7] - 33:10, 45:16, 54:1, 75:4, 75:18, 123:15, 176:1
**decipher** [1] - 139:24
**decision** [15] - 9:14, 28:12, 28:19, 56:13, 64:7, 64:20, 66:24, 103:4, 126:7, 145:14, 167:8, 201:19, 201:21, 218:10
**decision-making** [2] - 64:7, 64:20
**decisions** [4] - 28:20, 154:3, 170:11, 170:12
**deck** [9] - 40:17, 41:12, 171:24, 210:15, 210:17, 211:12, 217:25, 218:3
**decompile** [2] - 22:13, 149:17
**decrease** [2] - 70:6, 159:25
**decreased** [2] - 87:25, 159:23
**decreases** [1] - 88:2
**decrypt** [3] - 6:23, 47:6, 53:5
**decryption** [5] - 47:7, 47:9, 47:17, 60:19, 61:13
**deduct** [2] - 88:4, 88:5
**deducted** [1] - 178:24
**deem** [1] - 15:10
**deeper** [1] - 43:10
**deeply** [3] - 21:17, 48:7, 61:12
**default** [3] - 37:17, 70:2, 216:15
**defeat** [2] - 85:5, 86:3
**define** [8] - 44:5, 73:14, 75:6, 95:12, 126:21, 127:8, 127:13, 181:8
**defined** [3] - 42:21, 97:22, 180:18
**defines** [3] - 85:22,

149:3, 159:12
**defining** [2] - 78:13, 152:25
**definitely** [9] - 23:17, 29:1, 74:22, 93:19, 148:17, 153:19, 155:1, 159:24, 188:11
**definition** [3] - 30:14, 98:1, 119:21
**definitive** [1] - 24:21
**definitively** [1] - 128:6
**degree** [8] - 22:22, 29:21, 134:9, 138:9, 141:13, 168:11, 180:20, 190:20
**delay** [1] - 93:15
**delicacies** [1] - 145:1
**Dell** [2] - 44:13, 44:14
**demand** [1] - 45:16
**demonstrably** [1] - 54:17
**demonstrated** [1] - 212:20
**demonstration** [1] - 188:2
**denoted** [1] - 155:14
**department** [2] - 11:16, 12:9
**derived** [1] - 134:7
**describe** [19] - 6:4, 34:17, 40:8, 41:3, 47:18, 71:10, 71:17, 92:18, 96:6, 131:7, 147:3, 166:11, 168:24, 169:17, 171:19, 175:3, 175:23, 180:14, 185:5
**described** [6] - 13:8, 41:5, 85:12, 111:19, 173:12, 173:14
**description** [2] - 71:7, 81:25
**descriptions** [3] - 67:8, 67:18, 179:9
**design** [20] - 12:14, 12:23, 13:22, 21:5, 22:10, 29:3, 35:10, 61:18, 120:25, 121:2, 121:6, 127:11, 129:21, 170:7, 171:10, 171:14, 171:16, 174:3, 181:19, 190:21
**designated** [1] - 115:12
**designed** [11] - 46:8, 48:13, 63:3, 65:17,

109:11, 109:20, 120:21, 131:24, 151:3, 169:21, 218:13
**designer** [1] - 176:16
**designers** [2] - 170:22, 181:12
**designing** [4] - 169:15, 170:8, 170:9, 170:20
**designs** [1] - 12:4
**desire** [2] - 5:14, 5:16
**desist** [1] - 8:22
**desists** [1] - 10:22
**desktop** [1] - 40:13
**despite** [1] - 62:8
**destroy** [3] - 10:1, 85:3, 85:8
**destroyed** [3] - 50:12, 52:2, 53:17
**detail** [2] - 64:15, 168:9
**detailed** [4] - 22:16, 23:7, 48:12, 60:22
**details** [1] - 50:13
**determination** [6] - 31:12, 82:21, 90:22, 116:8, 134:22, 194:17
**determinations** [1] - 134:22
**determinative** [2] - 116:2, 137:10
**determine** [24] - 18:25, 44:5, 52:25, 72:25, 74:16, 80:8, 83:21, 93:15, 97:15, 110:19, 118:10, 118:14, 118:20, 119:1, 125:15, 129:21, 132:10, 132:22, 178:1, 196:19, 196:23, 199:8, 206:3, 209:5
**determined** [19] - 5:20, 53:10, 76:23, 109:13, 135:19, 135:21, 135:22, 137:11, 137:21, 137:23, 139:18, 141:14, 141:15, 141:16, 144:23, 147:5, 187:2, 194:19, 203:10
**determines** [1] - 209:1
**determining** [2] - 73:15, 192:1
**develop** [1] - 12:10
**developed** [4] - 14:11, 192:12, 197:17,

199:7
**developers** [3] - 170:18, 175:18, 209:6
**development** [1] - 172:23
**device** [130] - 5:20, 14:3, 14:4, 14:22, 15:24, 16:10, 21:11, 21:14, 21:16, 21:19, 27:12, 29:18, 35:2, 35:7, 40:18, 43:17, 44:18, 44:22, 44:23, 44:25, 45:7, 45:10, 45:13, 45:20, 46:1, 46:9, 46:11, 47:14, 47:24, 48:2, 48:7, 48:11, 48:13, 49:3, 50:18, 50:19, 51:2, 52:17, 53:6, 56:18, 60:20, 60:22, 60:23, 61:3, 61:5, 61:7, 61:14, 61:16, 61:17, 61:19, 61:20, 62:8, 62:9, 65:20, 67:15, 67:20, 68:1, 68:4, 68:6, 73:11, 74:8, 76:15, 76:17, 77:5, 78:21, 86:22, 92:2, 97:12, 114:9, 117:2, 117:3, 117:5, 119:22, 123:24, 124:4, 125:11, 125:18, 125:19, 125:22, 126:5, 126:6, 126:9, 128:16, 131:13, 131:14, 131:23, 132:2, 132:7, 135:1, 135:19, 137:10, 139:5, 142:8, 144:6, 147:4, 150:20, 150:21, 151:2, 153:16, 156:4, 156:10, 156:13, 156:19, 159:16, 159:21, 160:2, 161:5, 162:3, 166:18, 170:20, 175:1, 176:4, 189:18, 194:13, 194:22, 198:10, 199:20, 199:21, 199:22, 200:18, 201:15, 201:22, 221:11
**device's** [2] - 46:3, 46:17
**devices** [62] - 6:3, 12:8, 14:19, 15:16,

16:23, 31:9, 33:15, 34:18, 35:5, 35:8, 39:4, 40:6, 40:8, 44:16, 47:5, 49:24, 50:6, 50:7, 50:16, 50:17, 52:1, 52:25, 57:14, 57:17, 57:18, 62:10, 64:9, 64:13, 64:25, 65:3, 67:5, 67:25, 68:23, 78:10, 84:6, 84:7, 88:15, 89:23, 106:16, 127:24, 129:12, 147:6, 149:7, 149:11, 150:11, 150:16, 150:17, 150:19, 151:6, 151:10, 153:23, 156:1, 156:22, 161:4, 161:23, 162:20, 216:11, 216:19
**devises** [1] - 73:23
**diagonal** [1] - 79:10
**diagonals** [2] - 82:9, 210:25
**diagramming** [1] - 216:22
**dice** [1] - 186:17
**dictate** [1] - 75:9
**dictates** [1] - 206:11
**differ** [1] - 150:16
**differed** [1] - 90:8
**difference** [8] - 22:20, 36:18, 42:2, 42:8, 101:12, 101:15, 101:16, 143:7
**differences** [11] - 35:10, 44:11, 44:13, 44:16, 44:18, 56:9, 69:2, 91:19, 91:25, 117:8, 125:6
**different** [55] - 13:20, 17:21, 19:5, 31:4, 31:11, 33:19, 34:11, 35:7, 35:8, 35:12, 39:5, 39:8, 39:25, 42:10, 43:14, 44:12, 45:10, 51:9, 68:23, 70:8, 70:9, 70:11, 70:13, 70:17, 72:4, 85:8, 87:8, 91:6, 93:9, 97:9, 114:1, 119:5, 119:22, 124:8, 129:24, 137:3, 138:13, 138:20, 140:24, 145:10, 147:8, 156:8, 157:13, 178:14, 178:15,

181:6, 183:1, 186:6, 186:9, 187:21, 188:20, 200:6, 200:25, 208:15, 208:18
**differently** [6] - 9:21, 29:7, 143:18, 181:6, 181:11, 196:1
**differing** [2] - 33:18, 40:11
**dig** [3] - 21:17, 22:15, 61:11
**digits** [1] - 106:23
**dimensions** [1] - 41:10
**dire** [2] - 26:18, 32:14
**DIRECT** [4] - 11:2, 32:20, 168:1, 174:9
**direct** [11] - 64:10, 103:21, 104:18, 105:9, 148:25, 163:13, 163:16, 163:17, 165:1, 192:9, 204:13
**directed** [1] - 175:15
**directing** [2] - 221:2, 221:11
**directly** [4] - 65:11, 66:10, 124:10, 198:22
**director** [2] - 13:5, 13:9
**disabled** [2] - 126:6, 132:6
**disagree** [1] - 116:25
**disappear** [1] - 110:12
**disapproval** [1] - 66:24
**disassemble** [1] - 63:6
**disbelieve** [1] - 6:17
**discard** [1] - 83:13
**discernible** [1] - 95:23
**discerning** [1] - 188:9
**disclosed** [3] - 13:17, 42:18, 99:17
**disclosure** [3] - 57:5, 99:24, 100:1
**discovery** [2] - 30:8, 120:8
**discretion** [1] - 66:25
**discuss** [11] - 32:23, 38:14, 71:15, 86:17, 88:14, 124:25, 179:5, 180:22, 204:14, 210:11, 224:21
**discussed** [7] - 33:7, 96:19, 105:12, 161:19, 188:20,

201:23, 203:5
**discusses** [2] -
130:10, 198:4
**discussing** [5] -
48:19, 60:3, 128:22,
208:5, 217:14
**discussion** [8] - 3:14,
7:14, 38:12, 86:11,
165:9, 203:25,
219:3, 224:23
**discussions** [1] -
192:11
**disk** [1] - 44:23
**displays** [1] - 194:20
**dispositive** [1] -
200:10
**dispute** [1] - 145:24
**disputing** [1] - 158:23
**disregard** [1] - 136:4
**disregarded** [1] -
54:19
**disregarding** [1] -
136:24
**disregards** [1] - 137:4
**dissection** [1] - 18:25
**distribute** [1] - 63:15
**dived** [1] - 43:10
**diverge** [1] - 188:19
**divine** [2] - 24:6, 34:4
**divined** [1] - 118:7
**division** [1] - 169:12
**divvied** [1] - 75:19
**dixit** [1] - 54:2
**doc** [2] - 168:16,
168:18
**Doctor** [3] - 191:9,
204:8, 221:16
**doctoral** [1] - 168:14
**document** [6] - 37:1,
148:5, 163:10,
165:19, 166:5,
209:13
**documented** [2] -
28:17, 148:21
**documents** [10] -
5:23, 5:24, 12:15,
13:22, 21:5, 22:10,
148:2, 148:10, 210:6
**dog** [1] - 163:22
**dollar** [9] - 121:20,
124:10, 124:12,
125:17, 127:23,
131:11, 157:2,
157:3, 181:19
**dollars** [2] - 179:2,
183:2
**Dollars** [1] - 17:10
**dolly** [1] - 40:19
**done** [29] - 4:7, 4:8,
12:19, 15:25, 16:1,

16:4, 16:7, 46:2,
48:5, 58:24, 59:1,
59:22, 74:24, 77:1,
82:23, 83:16,
104:18, 105:6,
105:7, 119:1, 126:7,
129:20, 160:20,
165:14, 166:13,
177:20, 214:7, 214:8
**dongle** [30] - 47:8,
47:13, 47:17, 47:24,
48:22, 49:11, 51:1,
51:14, 51:19, 51:20,
51:21, 51:22, 52:16,
53:7, 53:8, 53:15,
54:8, 54:21, 58:9,
60:4, 60:6, 60:7,
60:11, 60:17, 61:8,
61:9, 61:13, 61:25,
223:6
**dongles** [10] - 47:2,
47:12, 47:18, 47:21,
48:20, 48:25, 51:16,
53:3, 60:12, 60:18
**door** [2] - 40:21, 40:23
**dots** [2] - 110:11,
110:12
**double** [1] - 171:12
**doubt** [1] - 135:2
**down** [25] - 22:12,
22:15, 40:4, 43:15,
52:6, 81:20, 112:5,
112:6, 121:20,
126:17, 144:11,
145:4, 147:1, 150:8,
157:6, 158:18,
167:14, 170:13,
195:23, 196:16,
201:20, 203:18,
217:19, 217:22,
221:5
**download** [1] - 5:19
**downloaded** [1] - 5:7
**Dr** [8] - 104:14,
104:17, 167:21,
168:4, 174:3,
174:11, 174:21,
190:25
**draw** [3] - 75:1,
129:12, 172:14
**drawing** [1] - 211:15
**drawn** [5] - 83:6,
210:12, 210:23,
211:19, 211:20
**drill** [1] - 67:6
**drive** [9] - 44:16,
44:17, 45:24, 46:11,
61:11, 162:18,
162:22, 165:5, 223:7
**driver** [3] - 140:14,

140:18, 140:20
**driving** [1] - 175:20
**drove** [1] - 33:17
**due** [2] - 21:16, 50:22
**duly** [2] - 10:9, 167:23
**duplicate** [1] - 45:23
**duplication** [1] - 44:23
**during** [11] - 32:13,
33:24, 36:15, 49:23,
60:15, 96:19,
110:10, 114:12,
118:16, 215:16,
215:19
**duties** [2] - 14:16,
19:5

---

# E

**e-mail** [4] - 4:23, 8:15,
202:22, 203:21
**e-r** [1] - 11:8
**early** [1] - 170:10
**earn** [1] - 132:1
**earned** [1] - 158:10
**earning** [1] - 158:22
**easier** [3] - 46:4,
114:21, 222:7
**easiest** [3] - 158:7,
203:17, 204:11
**easy** [1] - 46:1
**Eclipse** [1] - 16:13
**Edge** [1] - 173:17
**edification** [1] - 194:9
**editor** [1] - 173:17
**educated** [9] - 24:16,
24:17, 24:18, 29:16,
30:6, 30:21, 67:15,
119:24
**education** [4] - 12:3,
19:4, 19:6, 19:8
**educational** [2] -
11:10, 168:9
**effect** [2] - 42:24, 79:7
**effected** [1] - 137:23
**effectively** [1] - 223:10
**effectuate** [2] - 140:2,
141:2
**efforts** [1] - 166:22
**eight** [6] - 68:21,
210:23, 211:23,
217:9, 217:21
**either** [29] - 53:17,
64:4, 68:19, 70:7,
73:10, 74:6, 83:25,
88:8, 91:7, 102:8,
117:6, 117:7, 131:9,
136:23, 139:22,
140:2, 179:11,
183:4, 185:18,

185:25, 187:4,
187:5, 187:19,
187:21, 193:7,
207:15, 211:9,
221:12, 222:12
**elected** [1] - 144:19
**electrical** [1] - 168:12
**Electronic** [3] -
193:17, 198:23,
198:25
**electronic** [7] - 25:18,
26:11, 26:13, 36:25,
37:8, 75:22, 97:7
**electronically** [1] -
203:17
**element** [9] - 102:24,
133:24, 171:23,
172:1, 189:12,
198:14, 200:7,
206:6, 206:14
**elements** [7] - 116:1,
118:7, 133:20,
133:22, 134:5,
138:13, 194:18
**eligible** [1] - 215:4
**eliminate** [1] - 160:23
**eliminates** [5] -
184:19, 190:14,
206:2, 206:16,
206:20
**employed** [2] - 11:21,
11:23
**employer** [1] - 172:15
**employers** [1] - 16:11
**employment** [3] -
11:14, 12:3, 14:21
**enable** [1] - 126:2
**enabled** [1] - 216:15
**enclosed** [1] - 41:11
**enclosure** [3] - 40:13,
40:15, 48:10
**encrypted** [4] - 5:20,
47:6, 60:16, 162:3
**encryption** [3] - 53:6,
162:1, 162:2
**end** [20] - 7:9, 8:2,
25:1, 59:10, 82:16,
111:10, 126:16,
132:11, 144:4,
156:2, 178:17,
179:1, 179:3, 179:4,
187:6, 190:1, 194:3,
206:5, 214:1
**ended** [1] - 18:11
**ending** [1] - 58:6
**ends** [2] - 110:16,
188:22
**Enforcement** [3] -
5:13, 18:4, 33:2
**engage** [6] - 73:11,

90:13, 141:3,
147:10, 153:5,
154:11
**engages** [1] - 62:22
**engine** [1] - 211:20
**engineer** [5] - 11:11,
19:8, 19:18, 33:11,
37:20
**engineering** [2] - 12:9,
168:12
**engineers** [1] - 175:18
**enjoy** [2] - 200:3,
219:13
**enjoyed** [1] - 190:1
**ensure** [1] - 212:1
**enter** [8] - 4:5, 6:6,
9:1, 9:21, 18:9, 57:4,
58:7, 100:5
**entered** [2] - 8:24,
200:4
**entering** [1] - 6:18
**entire** [7] - 163:11,
163:21, 177:19,
207:20, 213:24,
213:25, 214:16
**entirely** [2] - 206:2,
206:16
**entirety** [2] - 78:21,
143:3
**entities** [2] - 15:23,
16:7, 65:6
**entitled** [1] - 128:14
**envelope** [4] - 47:20,
48:1, 48:23, 49:5
**envelopes** [3] - 48:8,
49:1, 49:2
**environment** [5] -
65:1, 127:7, 153:17,
154:21
**equally** [1] - 169:21
**equate** [2] - 97:7,
134:2
**equipment** [4] - 13:13,
17:5, 20:4, 46:23
**error** [2] - 26:1, 37:12
**especially** [1] - 75:14
**essentially** [2] -
170:12, 185:12
**establish** [2] - 31:7,
31:16
**established** [1] -
120:25
**establishments** [3] -
116:22, 199:13,
223:20
**estimate** [1] - 219:14
**et** [3] - 12:5, 39:15,
85:9
**ether** [1] - 54:1
**evaluate** [5] - 114:4,

120:16, 130:18,
180:5, 199:6
**evaluation** [7] - 15:1,
15:4, 22:1, 24:3,
67:1, 67:23, 134:20
**evaluations** [3] - 21:5,
22:11, 43:17
**evening** [1] - 24:25
**event** [1] - 186:17
**events** [1] - 172:9
**eventually** [6] - 102:8,
114:13, 124:7,
162:2, 169:8, 169:11
**evidence** [13] - 23:17,
45:23, 47:21, 49:1,
49:2, 54:3, 54:4,
54:7, 149:11,
150:15, 150:25,
203:3, 203:12
**evident** [1] - 47:4
**evidentiary** [7] - 3:12,
4:10, 33:10, 45:21,
48:8, 49:4, 58:24
**exact** [5] - 41:10,
42:10, 62:18, 97:14,
111:8
**exactly** [22] - 5:8,
52:8, 62:8, 114:3,
118:7, 138:24,
163:10, 182:3,
182:14, 183:14,
183:15, 183:16,
184:11, 184:13,
184:15, 184:25,
187:3, 191:14,
205:4, 205:8,
206:20, 207:1
**EXAMINATION** [7] -
11:2, 20:9, 32:20,
142:3, 168:1, 174:9,
191:7
**examinations** [2] -
12:17, 224:10
**examine** [7] - 21:18,
35:1, 142:1, 147:4,
167:1, 191:5, 196:20
**examined** [7] - 10:9,
51:12, 57:14, 57:15,
105:13, 162:20,
167:23
**example** [15] - 62:9,
66:13, 94:24, 97:19,
98:21, 101:17,
170:24, 172:2,
177:17, 183:6,
187:14, 206:11,
208:25, 211:16,
214:14
**exceeded** [1] - 185:25
**exceeds** [1] - 84:3

**excellent** [1] - 208:25
**exception** [3] - 125:4,
183:18, 183:19
**exceptions** [2] -
125:1, 125:3
**exclude** [4] - 29:14,
31:4, 203:2, 203:11
**excluded** [1] - 29:22
**exclusion** [2] - 7:20,
30:24
**excuse** [3] - 17:23,
140:19, 199:12
**exercise** [2] - 73:3,
81:9
**exhausted** [1] -
217:10
**Exhibit** [5] - 35:20,
36:1, 37:4, 37:23,
67:3
**exigence** [1] - 167:20
**exist** [1] - 126:5
**existing** [1] - 106:9
**exists** [1] - 96:25
**expand** [1] - 223:8
**expanded** [1] - 39:6
**expanding** [1] - 224:3
**expect** [3] - 46:25,
118:24, 189:4
**expected** [1] - 71:13
**experience** [6] - 12:3,
19:12, 45:11, 109:4,
119:17, 134:24
**expert** [46] - 3:4, 4:2,
5:2, 5:7, 9:19, 17:4,
18:4, 18:15, 18:20,
20:4, 20:13, 21:23,
22:18, 30:9, 30:23,
31:8, 31:20, 31:24,
32:17, 33:2, 39:17,
46:18, 52:16, 53:1,
57:16, 57:18, 58:6,
78:23, 84:5, 89:1,
109:15, 120:21,
122:10, 124:14,
124:16, 134:19,
137:24, 158:6,
171:4, 173:25,
174:3, 174:7,
199:11, 200:16,
209:8, 222:25
**expert's** [2] - 3:17,
104:7
**expertise** [14] - 19:7,
21:23, 21:25, 30:10,
32:12, 32:15, 46:21,
67:16, 76:14, 82:13,
95:21, 109:5,
112:14, 134:24
**experts** [2] - 5:22,
6:22

**expire** [2] - 90:1,
143:14
**expires** [1] - 102:15
**explain** [7] - 69:19,
73:5, 81:10, 177:14,
181:1, 197:1, 211:12
**explained** [1] - 98:9
**explaining** [1] -
201:19
**explanation** [1] -
210:3
**explanations** [1] -
157:20
**explicitly** [2] - 30:21,
217:13
**explore** [3] - 78:25,
128:19, 139:9
**explored** [1] - 4:1
**express** [1] - 64:4
**expressed** [1] -
190:19
**extensive** [1] - 50:21
**extensively** [2] -
109:21, 134:15
**extent** [10] - 38:5,
76:9, 76:10, 78:21,
90:18, 91:23,
179:15, 179:21,
181:21, 201:19
**extra** [4] - 120:22,
121:7, 121:14, 124:7
**extremely** [2] -
154:19, 184:18

**F**

**facility** [1] - 19:16
**fact** [15] - 28:7, 31:23,
47:12, 53:20, 66:2,
86:12, 91:25,
116:25, 117:1,
128:12, 145:25,
157:2, 158:24,
190:9, 193:7
**factor** [4] - 30:15,
43:7, 117:9, 206:11
**factors** [4] - 40:10,
41:4, 184:18, 190:8
**facts** [6] - 6:16, 31:25,
54:6, 196:25, 197:16
**fail** [1] - 152:9
**failed** [2] - 152:4,
152:7
**fair** [11] - 22:1, 23:4,
91:4, 127:13,
150:10, 151:6,
154:3, 166:6, 166:7,
187:3, 224:13
**fairly** [9] - 21:21,

24:15, 35:13, 42:1,
42:12, 44:20, 78:1,
106:20, 138:16
**fairness** [2] - 126:23,
127:9
**faith** [2] - 9:25, 10:1
**fall** [1] - 186:21
**familiar** [5] - 12:5,
14:15, 133:20,
171:5, 220:4
**family** [3] - 39:9,
217:4, 218:15
**far** [20] - 5:6, 6:22,
15:9, 18:13, 23:8,
23:19, 30:20, 49:14,
104:1, 114:16,
114:17, 122:10,
129:8, 135:15,
160:8, 207:3,
214:18, 223:7,
223:19, 224:3
**fashion** [9] - 48:12,
77:2, 105:14,
105:25, 129:7,
137:21, 157:18,
162:4, 178:1
**fast** [1] - 188:8
**favorite** [1] - 186:4
**favors** [1] - 138:22
**Fayette** [4] - 49:22,
50:17, 52:18, 54:22
**feature** [101] - 34:3,
34:13, 42:3, 63:13,
71:1, 77:21, 78:1,
78:3, 80:16, 87:5,
88:22, 89:4, 89:6,
89:9, 89:10, 89:16,
89:21, 90:8, 90:10,
91:8, 91:10, 91:17,
91:20, 92:17, 93:4,
93:16, 94:15, 96:18,
96:19, 96:22, 97:6,
97:21, 98:10, 99:7,
99:21, 99:23,
100:17, 103:14,
106:1, 106:15,
106:17, 107:10,
108:10, 109:6,
109:15, 109:17,
110:2, 110:16,
111:17, 112:17,
112:18, 113:4,
113:16, 114:6,
116:17, 117:15,
118:1, 118:11,
120:21, 125:3,
133:14, 133:17,
136:4, 137:4, 137:5,
141:3, 144:22,
153:5, 153:24,

154:6, 154:9,
154:11, 155:8,
155:15, 155:16,
160:18, 180:23,
180:24, 181:24,
182:2, 184:17,
185:10, 185:11,
189:11, 190:13,
191:22, 192:3,
192:9, 194:24,
194:25, 195:1,
204:16, 206:12,
206:16, 207:23,
208:23, 214:6,
214:11, 215:11,
218:20
**features** [6] - 109:16,
117:4, 138:25,
143:20, 180:3, 192:5
**feet** [1] - 41:9
**fellowship** [1] -
168:14
**few** [12] - 18:11, 24:25,
39:7, 45:10, 64:15,
107:19, 107:20,
161:7, 172:21,
189:25, 217:14
**field** [11] - 17:5, 20:4,
45:8, 46:5, 46:23,
109:5, 112:15,
116:21, 137:9,
137:13, 160:8,
190:20, 223:7,
223:14, 224:11
**fight** [1] - 193:2
**figure** [6] - 8:3,
115:18, 125:17,
148:17, 157:4, 158:4
**figures** [1] - 73:23
**file** [4] - 14:13, 45:1,
45:2, 148:7
**filed** [4] - 3:18, 51:7,
51:8, 51:10
**files** [2] - 63:5, 149:17
**fill** [10] - 126:2, 156:2,
156:4, 156:7,
156:10, 156:12,
156:17, 158:8,
158:11, 158:17
**fills** [1] - 157:23
**film** [1] - 76:5
**final** [4] - 24:24, 25:4,
166:25, 179:2
**finally** [1] - 67:1
**findings** [2] - 22:19,
179:5
**fine** [3] - 26:25, 32:11,
105:2
**fingerprint** [2] - 46:11,
46:12

**finish** [4] - 59:15, 139:15, 179:12, 197:14
**finished** [1] - 105:11
**finite** [4] - 135:23, 208:12, 208:13, 209:3
**firm** [1] - 19:24
**first** [39] - 3:10, 3:11, 4:10, 5:6, 33:7, 34:17, 39:24, 45:9, 49:12, 50:25, 60:9, 62:20, 68:2, 69:19, 73:23, 81:22, 81:23, 88:17, 98:9, 107:5, 107:6, 107:14, 107:16, 107:18, 110:19, 131:19, 164:7, 168:6, 169:2, 177:18, 188:6, 192:8, 198:25, 202:9, 204:13, 204:19, 217:8, 218:2, 222:11
**fish** [4] - 85:12, 85:13, 85:14, 85:15
**fish-type** [1] - 85:12
**fit** [2] - 66:7, 89:1
**fits** [1] - 109:17
**five** [18] - 41:9, 83:9, 83:10, 107:3, 107:4, 107:5, 107:6, 107:18, 107:21, 137:25, 149:1, 170:4, 172:10, 172:11, 184:7, 196:16, 215:23
**five-by-three** [1] - 170:4
**five-minute** [1] - 137:25
**flag** [2] - 183:22, 183:23
**flags** [2] - 183:20, 183:24
**flare** [1] - 125:8
**flashing** [1] - 94:1
**flew** [1] - 6:24
**flip** [1] - 211:4
**floor** [2] - 157:9, 157:10
**fly** [1] - 33:16
**flying** [2] - 18:11, 163:21
**focus** [1] - 33:20
**focused** [1] - 116:4
**fold** [2] - 83:25, 179:25
**folded** [6] - 170:17, 179:25, 180:8,

180:10, 211:3
**Foley** [3] - 25:19, 37:13, 37:14
**folks** [2] - 3:7, 104:2
**follow** [179] - 34:12, 42:3, 42:4, 42:7, 69:14, 71:1, 71:3, 73:25, 79:21, 80:9, 80:11, 80:16, 80:24, 81:1, 87:3, 87:4, 87:5, 88:14, 88:18, 88:21, 89:3, 89:6, 89:16, 89:21, 90:1, 90:4, 90:6, 90:10, 91:8, 91:10, 92:17, 93:4, 93:7, 93:16, 93:19, 93:21, 93:24, 94:1, 94:3, 94:5, 94:6, 94:9, 94:14, 94:15, 94:17, 94:21, 94:22, 95:16, 95:18, 96:15, 96:17, 96:18, 96:22, 97:2, 97:6, 97:21, 98:10, 98:12, 98:14, 99:7, 99:25, 100:17, 100:21, 100:24, 101:11, 101:12, 101:20, 101:21, 101:22, 102:13, 102:21, 102:22, 102:25, 103:14, 105:25, 106:15, 106:17, 107:8, 108:5, 108:9, 109:6, 109:15, 110:2, 111:16, 111:17, 111:22, 111:25, 112:5, 112:17, 112:18, 112:19, 113:4, 113:16, 114:6, 114:21, 116:17, 117:14, 117:19, 117:25, 118:11, 120:20, 121:14, 122:2, 122:14, 123:12, 125:3, 133:6, 133:7, 133:13, 133:17, 136:4, 136:16, 136:20, 136:24, 137:19, 141:3, 142:12, 142:13, 142:15, 142:16, 142:21, 143:9, 143:10, 143:12, 144:17, 144:20, 148:5, 153:2, 153:5, 153:9, 153:14, 153:24, 154:6, 154:11, 154:13,

155:8, 155:11, 155:15, 155:17, 155:21, 155:22, 160:17, 176:11, 176:13, 177:5, 177:7, 179:7, 185:10, 185:11, 185:19, 185:23, 188:14, 188:17, 190:17, 191:22, 192:2, 192:13, 192:15, 192:23, 204:16, 206:6, 206:12, 207:23, 208:25, 213:23, 214:5, 214:11, 214:17, 215:1, 215:5, 215:10, 215:17, 218:6, 218:12, 218:19
**followed** [4] - 107:24, 108:2, 147:13, 148:19
**following** [3] - 8:23, 11:15, 25:5
**follows** [2] - 10:9, 167:23
**footage** [1] - 165:6
**force** [3] - 175:11, 175:12, 187:19
**forced** [2] - 108:22
**forensic** [18] - 12:17, 24:5, 29:2, 34:15, 37:19, 43:15, 43:17, 43:18, 43:20, 43:23, 44:3, 44:23, 45:17, 67:1, 67:22, 148:20, 165:7, 166:13
**forensics** [1] - 45:11
**forfeit** [5] - 49:11, 50:2, 80:7, 80:25, 106:3
**forfeited** [6] - 47:25, 49:14, 50:11, 50:19, 52:1, 52:17
**forfeiture** [3] - 50:4, 50:6, 53:14
**Forfeiture** [1] - 50:9
**forget** [2] - 53:21, 125:16
**forgetting** [1] - 122:18
**form** [8] - 40:10, 41:4, 140:21, 171:2, 171:21, 172:1, 188:15, 190:3
**format** [2] - 170:3, 170:15
**forms** [1] - 77:5
**formula** [1] - 6:20
**forth** [1] - 147:5

**fortunate** [1] - 189:20
**forward** [5] - 4:15, 87:14, 162:4, 162:6, 162:8
**foundation** [4] - 31:6, 31:16, 32:5, 134:15
**foundational** [2] - 19:20, 20:1
**four** [8] - 41:8, 97:8, 149:1, 151:15, 173:11, 196:3, 211:7, 211:10
**fraction** [1] - 110:21
**frame** [5] - 41:11, 46:4, 161:12, 168:21
**framework** [1] - 13:15
**frameworks** [1] - 15:21
**frank** [1] - 168:6
**frankly** [1] - 178:20
**free** [11] - 85:16, 85:18, 86:7, 88:25, 180:12, 197:22, 197:23, 198:2, 199:19, 199:23
**freeze** [1] - 126:1
**frequencies** [2] - 170:16, 180:1
**frequency** [1] - 171:11
**Friday** [1] - 104:9
**front** [9] - 8:1, 21:12, 26:6, 40:14, 40:16, 40:21, 41:7, 83:11
**frozen** [1] - 223:11
**full** [4] - 15:10, 54:4, 68:10, 195:22
**fully** [1] - 99:25
**function** [2] - 30:20, 34:21
**functional** [1] - 39:13
**functionality** [2] - 42:14, 189:11
**functionally** [1] - 56:2
**functions** [1] - 212:3
**fundamentally** [1] - 118:23
**funding** [1] - 127:19
**furthermore** [1] - 52:7
**future** [2] - 206:19, 224:1

# G

**gaff** [1] - 175:10
**gain** [1] - 16:16
**gained** [1] - 165:7
**gambling** [39] - 11:17, 12:8, 14:18, 31:9, 43:3, 62:10, 65:9,

67:17, 75:4, 77:5, 84:6, 97:22, 98:1, 111:5, 112:15, 117:2, 117:3, 117:5, 119:21, 127:24, 133:20, 146:12, 169:3, 169:5, 169:6, 171:22, 173:12, 189:18, 194:12, 194:13, 194:19, 194:22, 197:18, 198:10, 199:20, 199:21, 200:18
**game** [469] - 13:15, 13:19, 14:1, 15:13, 23:7, 24:11, 33:15, 34:11, 34:12, 34:13, 34:19, 42:10, 42:11, 42:12, 43:9, 46:15, 51:23, 53:23, 53:25, 54:6, 54:8, 54:21, 56:2, 62:21, 63:3, 63:5, 63:7, 63:9, 67:5, 67:20, 68:8, 68:13, 68:16, 68:18, 68:24, 69:1, 69:3, 69:4, 69:14, 69:17, 69:22, 69:24, 70:2, 70:11, 70:12, 70:17, 70:20, 71:2, 71:20, 72:3, 72:6, 73:8, 73:11, 74:17, 75:7, 75:9, 77:6, 77:23, 78:2, 78:3, 78:4, 78:8, 78:13, 78:15, 78:19, 78:21, 78:22, 79:4, 79:5, 79:6, 80:9, 80:24, 81:4, 82:5, 82:21, 82:22, 83:2, 83:3, 83:5, 83:18, 83:22, 84:18, 84:22, 84:25, 85:1, 85:11, 86:13, 86:25, 87:23, 88:12, 88:14, 88:18, 88:20, 88:22, 88:24, 88:25, 89:1, 89:3, 89:12, 89:22, 92:12, 92:20, 92:25, 93:1, 93:14, 93:23, 94:2, 96:11, 96:12, 96:19, 96:22, 97:7, 97:12, 98:15, 99:20, 99:23, 100:19, 100:23, 101:4, 101:8, 101:18, 101:20, 101:21, 103:10, 103:11, 103:18, 105:15, 106:3, 107:8, 107:10, 109:22, 110:15, 110:16,

111:2, 111:8,
111:11, 111:12,
111:21, 111:24,
112:4, 112:6,
112:16, 113:15,
114:5, 114:7, 114:8,
114:10, 114:14,
114:16, 115:10,
115:13, 115:25,
116:13, 116:14,
116:15, 116:17,
116:22, 117:4,
117:6, 117:13,
117:22, 118:3,
118:4, 118:5,
118:24, 121:2,
121:3, 121:24,
123:23, 125:1,
126:1, 126:3,
126:11, 126:15,
126:22, 127:2,
127:5, 127:6,
127:11, 127:12,
128:9, 129:7,
129:21, 129:22,
129:24, 130:3,
131:19, 131:25,
132:6, 132:12,
132:13, 132:21,
132:22, 132:23,
133:2, 133:3, 133:6,
133:9, 134:3, 134:5,
134:8, 134:20,
134:23, 135:1,
135:17, 135:18,
135:20, 135:25,
136:9, 136:16,
136:25, 137:1,
137:4, 137:5, 137:8,
137:24, 138:8,
138:14, 138:19,
138:20, 139:4,
139:18, 140:12,
140:15, 140:23,
141:5, 141:6,
141:15, 143:1,
143:3, 143:5, 143:6,
143:9, 143:16,
143:19, 144:21,
144:22, 145:3,
145:4, 145:15,
145:20, 145:25,
146:16, 146:25,
149:17, 149:22,
150:9, 151:19,
151:23, 151:24,
151:25, 152:16,
152:20, 153:19,
153:22, 153:25,
154:13, 155:10,
155:14, 155:19,

157:5, 157:6,
158:11, 158:12,
158:22, 159:22,
159:25, 160:5,
160:9, 160:16,
160:22, 161:1,
167:1, 170:13,
170:24, 170:25,
171:7, 171:10,
171:12, 171:14,
171:16, 171:20,
171:22, 171:23,
172:12, 172:22,
174:25, 175:4,
175:7, 175:11,
175:12, 175:16,
175:20, 175:25,
176:2, 176:3, 176:8,
176:16, 176:17,
176:19, 177:9,
177:13, 177:24,
177:25, 178:2,
178:10, 178:16,
178:20, 178:23,
178:24, 179:1,
179:3, 179:4, 179:6,
179:11, 179:12,
179:16, 179:21,
179:22, 179:24,
179:25, 180:1,
180:2, 180:3,
180:16, 180:18,
180:19, 182:1,
182:3, 182:9,
182:10, 182:20,
182:22, 182:23,
183:20, 184:4,
184:19, 185:3,
185:6, 186:3,
186:22, 186:25,
187:1, 187:8,
187:14, 187:21,
188:3, 188:4, 188:7,
188:19, 189:8,
189:11, 190:5,
190:6, 190:13,
191:12, 191:16,
191:17, 191:19,
191:21, 192:1,
192:2, 192:6,
192:12, 192:13,
192:14, 192:18,
193:2, 193:4, 193:7,
193:13, 193:14,
194:24, 195:1,
195:4, 195:5,
196:23, 197:4,
197:11, 198:3,
199:3, 199:6,
199:14, 199:24,
200:8, 200:21,

201:3, 201:4,
201:24, 204:15,
205:15, 205:16,
206:4, 206:8,
206:13, 206:22,
206:24, 206:25,
207:9, 207:16,
207:18, 207:25,
208:23, 209:2,
210:10, 210:25,
211:8, 211:9,
212:25, 213:11,
213:13, 213:14,
213:16, 213:19,
213:20, 213:24,
213:25, 214:1,
214:14, 214:19,
215:12, 215:16,
215:19, 215:20,
216:1, 216:5,
216:24, 216:25,
217:1, 217:2,
217:18, 218:6,
218:16, 218:17,
218:20, 218:21,
219:25, 220:5,
220:9, 220:13,
221:11
**Game** [3] - 19:13,
193:17, 198:23
**game's** [2] - 170:14,
185:20
**games** [94] - 14:10,
14:17, 14:18, 15:18,
16:5, 31:14, 53:20,
54:2, 55:19, 55:21,
58:21, 66:7, 68:4,
68:10, 68:18, 68:19,
70:24, 75:14, 75:15,
75:20, 75:22, 76:1,
77:22, 84:8, 84:23,
84:25, 85:21, 86:4,
86:5, 86:6, 86:11,
89:4, 89:17, 92:22,
94:4, 96:5, 96:9,
99:20, 109:13,
109:14, 114:1,
114:9, 125:6,
125:18, 132:14,
133:4, 134:11,
134:20, 137:3,
138:11, 138:21,
139:8, 141:7, 169:2,
169:12, 169:15,
169:20, 169:22,
170:7, 171:6,
171:20, 176:18,
176:23, 176:25,
177:2, 178:5, 178:6,
178:9, 178:14,
179:8, 179:10,

180:9, 189:23,
189:24, 190:2,
190:3, 190:16,
192:1, 208:17,
211:1, 211:2,
216:10, 216:18,
216:21, 216:23,
217:16, 217:23,
218:14, 218:15,
218:16, 220:7
**Gaming** [18] - 11:18,
16:5, 16:6, 16:11,
20:18, 43:5, 65:9,
65:11, 65:18, 65:21,
65:23, 66:3, 66:23,
95:11, 129:8,
169:11, 172:18,
172:22
**gaming** [43] - 12:6,
13:12, 14:17, 14:22,
15:16, 15:17, 15:23,
16:10, 16:23, 17:5,
19:7, 19:15, 20:4,
27:13, 30:12, 37:18,
41:6, 46:23, 64:25,
65:6, 95:21, 109:5,
130:3, 150:3, 157:9,
168:22, 169:1,
169:9, 169:13,
169:14, 170:20,
171:17, 172:15,
172:19, 174:3,
175:23, 181:4,
181:9, 190:21,
212:15, 218:14,
219:4
**gamut** [2] - 14:25,
86:9
**gatekeeping** [1] -
30:20
**gather** [1] - 177:10
**General** [7] - 4:5, 5:12,
9:12, 18:3, 63:18,
165:25, 204:5
**general** [1] - 63:25
**General's** [1] - 161:20
**generally** [13] - 9:11,
20:23, 20:24, 22:10,
45:8, 166:11,
169:23, 173:11,
181:17, 212:3,
216:14, 217:3, 217:4
**generate** [4] - 172:6,
172:13, 176:14,
211:24
**generated** [5] - 13:24,
74:21, 136:6, 159:6,
212:12
**generates** [3] - 85:23,
176:7, 211:24

**generating** [1] - 34:25
**generation** [1] - 43:9
**generator** [5] - 75:3,
119:2, 208:11,
208:14, 209:4
**generators** [1] -
149:20
**Georgia** [1] - 6:25
**given** [22] - 21:9,
23:22, 31:21, 33:9,
43:2, 62:16, 80:4,
80:15, 83:6, 83:7,
83:9, 85:24, 98:8,
99:13, 156:9,
160:12, 161:11,
161:14, 197:23,
211:6, 211:8
**goal** [4] - 5:15, 62:5,
62:7, 196:22
**gonna** [5] - 119:3,
155:25, 170:2,
182:21, 183:14
**govern** [1] - 63:5
**governing** [1] - 31:13
**grabbing** [1] - 47:17
**graduated** [1] - 11:11
**grains** [1] - 19:10
**granted** [1] - 23:10
**grave** [1] - 55:18
**grayed** [1] - 88:11
**greater** [5] - 43:8,
72:8, 90:2, 117:22,
181:16
**grid** [55] - 42:10,
42:11, 42:23, 72:12,
72:17, 72:24, 74:12,
74:17, 79:6, 79:9,
81:7, 83:2, 84:18,
86:21, 87:13, 88:13,
90:5, 92:23, 93:15,
93:20, 100:19,
101:4, 101:9, 102:3,
102:8, 103:18,
107:13, 107:20,
113:3, 113:15,
114:16, 133:5,
135:25, 139:20,
139:23, 141:2,
141:7, 141:9,
141:16, 176:10,
185:8, 192:6,
204:24, 207:6,
207:24, 211:5,
212:7, 212:9,
213:18, 214:2,
214:3, 215:16,
215:25, 217:18
**grids** [2] - 75:12,
219:18
**Grill** [1] - 18:18

**ground** [3] - 31:4, 31:5, 41:8
**groups** [1] - 16:15
**guaranteed** [6] - 127:18, 159:9, 159:17, 159:20, 160:1, 160:4
**guess** [12] - 24:16, 24:17, 24:19, 29:16, 30:7, 30:22, 77:7, 95:12, 119:24, 135:13, 165:20, 210:16
**guesses** [1] - 67:15
**guessing** [2] - 119:13, 135:7
**guesswork** [1] - 134:17
**guideline** [1] - 148:19
**guidelines** [3] - 147:8, 147:18, 147:19
**guilty** [1] - 50:1
**guy** [1] - 52:10

### H

**half** [5] - 41:9, 59:23, 104:2, 104:15, 104:18
**hand** [3] - 83:22, 99:11, 120:13
**handful** [1] - 140:24
**handled** [1] - 203:6
**handling** [1] - 58:18
**hands** [3] - 4:13, 52:11, 163:8
**happy** [1] - 181:23
**hard** [5] - 45:24, 162:17, 162:22, 165:5, 223:7
**hardware** [7] - 44:10, 46:7, 46:16, 52:5, 59:2, 67:9, 67:18
**hardwares** [1] - 44:8
**Harrisburg** [2] - 33:15, 33:17
**Harvard** [4] - 168:14, 168:17, 168:19, 169:4
**Harvard-Smithsonian** [2] - 168:17, 168:19
**HAVERSTICK** [55] - 3:8, 3:20, 6:10, 6:14, 7:11, 7:18, 7:22, 7:25, 9:24, 52:4, 53:13, 55:4, 55:8, 55:11, 55:15, 56:1, 56:5, 56:15, 56:24,

58:2, 58:17, 59:8, 104:7, 104:12, 104:17, 104:21, 122:24, 123:11, 167:19, 168:3, 174:2, 174:8, 174:10, 174:18, 174:20, 190:23, 191:4, 192:7, 192:17, 192:19, 193:1, 193:5, 194:2, 194:5, 199:17, 202:11, 209:14, 210:2, 210:5, 218:8, 221:18, 221:24, 223:22, 224:16, 224:20
**Haverstick** [1] - 3:21
**head** [6] - 17:15, 20:22, 63:24, 169:11, 169:12, 211:14
**heading** [1] - 193:23
**headquarters** [3] - 18:23, 60:10, 175:8
**hear** [9] - 53:24, 55:17, 57:1, 57:6, 104:25, 137:12, 166:21, 194:2, 203:8
**heard** [10] - 30:19, 64:21, 73:6, 78:23, 84:11, 134:17, 135:3, 136:9, 167:1, 188:12
**hearing** [11] - 3:10, 49:13, 50:21, 51:1, 119:7, 120:11, 136:3, 139:4, 142:25, 157:23, 202:10
**heart's** [1] - 175:9
**heaven's** [1] - 52:18
**held** [5] - 3:14, 45:22, 53:23, 165:9, 203:25
**helicopter** [1] - 85:7
**hello** [1] - 191:10
**help** [6] - 69:22, 70:19, 70:23, 71:5, 129:25, 176:16
**helpful** [1] - 66:14
**helps** [1] - 127:12
**Herrington** [2] - 64:10, 164:8
**hidden** [1] - 75:19
**high** [2] - 48:9, 113:11
**higher** [2] - 126:10, 132:4
**highest** [1] - 79:12
**highly** [2] - 53:16, 213:12

**himself** [1] - 10:14
**hint** [2] - 71:8, 218:21
**hinted** [1] - 61:12
**hired** [1] - 11:20
**history** [2] - 45:13, 58:20
**hit** [24] - 42:15, 42:16, 70:5, 71:21, 75:7, 78:5, 82:7, 82:9, 85:18, 86:1, 88:4, 101:5, 125:24, 125:25, 131:19, 143:13, 171:10, 181:3, 181:10, 181:12, 181:13, 181:14, 181:20, 219:3
**hits** [2] - 75:5, 172:7
**hmm** [4] - 69:18, 98:16, 144:2, 160:25
**hold** [34] - 13:6, 19:19, 83:8, 83:12, 126:25, 127:4, 127:25, 128:6, 128:8, 128:11, 128:14, 128:15, 129:13, 129:15, 129:18, 129:22, 130:1, 130:23, 130:24, 131:2, 131:13, 131:17, 131:21, 131:24, 132:1, 132:4, 132:5, 156:23, 157:1, 157:7, 159:2, 159:11
**holding** [1] - 45:21
**home** [3] - 163:20, 163:21, 170:24
**honest** [1] - 29:12
**Honor** [52] - 3:8, 3:22, 6:11, 7:18, 8:18, 9:19, 10:15, 29:13, 30:18, 31:2, 32:2, 32:9, 35:21, 49:9, 50:9, 52:4, 53:13, 54:12, 55:15, 57:23, 58:18, 77:3, 84:11, 90:17, 104:12, 104:25, 116:24, 120:9, 122:8, 122:25, 136:14, 137:7, 167:13, 167:19, 174:2, 181:2, 185:15, 186:13, 190:24, 192:7, 193:1, 193:10, 194:8, 197:13, 199:17, 201:8, 201:12, 209:14, 218:8,

220:14, 221:18, 224:16
**Honor's** [1] - 136:14
**hood** [6] - 21:19, 77:8, 91:24, 92:10, 92:12, 161:17
**hooked** [1] - 15:8
**hoop** [1] - 199:23
**hopefully** [1] - 212:20
**hopes** [1] - 124:10
**Hopkins** [1] - 168:13
**hopper** [2] - 156:15, 156:17
**horizontal** [3] - 79:9, 81:19, 81:23
**hour** [4] - 103:22, 104:15, 104:18, 189:6
**hourly** [1] - 189:4
**hours** [5] - 25:1, 46:2, 161:6, 161:7, 175:12
**house** [1] - 163:19
**housekeeping** [1] - 7:19
**human** [1] - 14:7
**hundred** [17] - 29:10, 98:20, 119:8, 138:14, 160:9, 160:15, 172:6, 177:21, 179:17, 179:20, 180:6, 187:1, 189:1, 199:10, 200:21, 206:9
**hundreds** [1] - 199:13
**hypothetical** [4] - 116:14, 122:14, 143:16, 158:7

### I

**i.e** [1] - 219:15
**icon** [2] - 205:17, 219:22
**icons** [2] - 206:4, 207:6
**Idaho** [1] - 16:2
**idea** [6] - 15:19, 52:13, 57:8, 85:20, 156:14, 169:23
**identical** [2] - 42:9, 46:13
**identified** [3] - 31:11, 55:23, 164:14
**identifies** [1] - 88:21
**identify** [4] - 23:9, 36:1, 47:15, 164:6
**idle** [1] - 87:23
**ignore** [1] - 137:8

**ignoring** [2] - 185:14, 185:15
**lll** [1] - 172:3
**ilk** [1] - 209:17
**illegal** [3] - 14:18, 167:5
**illicitly** [1] - 209:18
**image** [8] - 5:8, 26:14, 44:21, 45:1, 45:2, 46:6, 60:4, 62:5
**imaged** [1] - 162:19
**images** [4] - 6:2, 18:25, 165:7, 222:3
**imagine** [1] - 30:3
**imaging** [2] - 46:16, 46:22
**imagining** [1] - 204:24
**immediately** [7] - 11:15, 70:4, 70:5, 86:24, 95:18, 110:15
**immutable** [2] - 193:3, 193:5
**impact** [5] - 23:10, 130:25, 131:3, 146:21, 205:8
**implementation** [1] - 119:5
**implemented** [3] - 27:17, 66:12, 159:16
**implies** [2] - 186:15, 186:18
**important** [6] - 58:15, 60:14, 146:20, 184:18, 185:14, 192:13
**improper** [1] - 51:14
**improve** [1] - 188:5
**in-court** [1] - 17:3
**inclination** [1] - 71:8
**include** [6] - 61:3, 67:8, 146:13, 163:18, 170:21, 218:24
**included** [8] - 29:6, 29:9, 29:25, 30:1, 89:20, 109:11, 189:5, 209:12
**includes** [2] - 109:6, 218:25
**including** [8] - 14:17, 14:18, 49:24, 146:16, 171:8, 175:7, 177:5, 204:15
**income** [5] - 158:9, 158:19, 159:5, 159:17, 159:21
**inconclusive** [2] - 23:5, 23:6
**incorrect** [1] - 110:20
**increase** [2] - 71:22,

159:23
**independent** [1] - 116:16
**indicate** [2] - 90:19, 206:1
**indicated** [3] - 31:12, 36:22, 88:23
**indicates** [2] - 25:19, 157:4
**indicating** [1] - 93:10
**indication** [1] - 98:11
**indicative** [2] - 86:13, 160:22
**indistinguishable** [1] - 139:5
**individual** [7] - 75:20, 116:15, 125:8, 145:1, 197:18, 198:13
**individual's** [2] - 50:1, 160:8
**individuals** [2] - 192:12, 197:19
**indulgence** [3] - 41:19, 132:18, 164:2
**industry** [17] - 11:17, 15:18, 23:22, 24:10, 27:16, 41:7, 62:11, 67:17, 119:22, 126:20, 127:17, 128:22, 130:3, 130:20, 135:4, 135:5, 169:9
**info** [1] - 23:17
**information** [38] - 3:24, 4:21, 5:10, 6:1, 6:19, 8:7, 8:9, 8:13, 23:17, 29:15, 29:16, 30:3, 30:9, 31:21, 31:22, 43:2, 49:20, 50:25, 52:12, 53:19, 57:2, 57:3, 58:18, 60:18, 64:3, 66:23, 67:4, 74:23, 119:16, 128:3, 134:21, 138:24, 151:7, 155:18, 161:23, 162:15, 165:20, 186:23
**informed** [1] - 222:19
**inherent** [1] - 171:16
**initial** [2] - 111:4, 144:14
**initiate** [4] - 179:16, 179:20, 179:22, 191:16
**initiates** [1] - 172:4
**initiating** [1] - 96:18
**injunction** [5] - 3:11, 3:16, 8:17, 51:7,

53:11
**input** [3] - 74:11, 137:22, 156:3
**inputted** [1] - 213:17
**inquire** [1] - 196:19
**inquiry** [2] - 194:11, 200:7
**inside** [6] - 21:13, 46:16, 49:4, 132:12, 156:15, 163:19
**inside's** [1] - 44:15
**insofar** [2] - 113:24, 207:8
**inspect** [2] - 35:2, 220:23
**inspected** [2] - 9:20, 142:8
**inspecting** [1] - 106:16
**inspection** [23] - 30:13, 32:24, 33:15, 39:19, 46:15, 55:19, 63:15, 67:9, 132:21, 134:9, 138:9, 149:7, 150:17, 150:18, 151:5, 151:11, 161:10, 161:18, 161:22, 164:5, 164:11, 164:13, 216:3
**inspections** [2] - 53:1, 165:2
**instance** [3] - 82:6, 143:17, 154:6
**instances** [2] - 74:19, 165:21
**instant** [1] - 18:15
**instead** [4] - 37:21, 82:2, 92:22, 107:25
**Institute** [1] - 11:12
**instruction** [2] - 13:25, 155:21
**instructions** [7] - 47:14, 63:7, 63:10, 70:24, 71:2, 96:20, 151:4
**intellectual** [2] - 53:16, 54:15
**intend** [3] - 18:20, 18:22, 23:14
**intended** [4] - 51:7, 98:4, 219:23, 219:24
**intends** [1] - 5:2
**intention** [2] - 5:14, 223:13
**interact** [1] - 86:22
**interaction** [4] - 112:16, 113:13, 113:20, 118:5
**interacts** [1] - 82:5

**interconnected** [2] - 213:23, 214:13
**interest** [4] - 50:3, 66:18, 176:15
**interested** [2] - 13:19, 169:1
**interesting** [2] - 74:21, 177:12
**interests** [1] - 165:21
**interior** [1] - 40:24
**interject** [2] - 49:10, 98:13
**intermediate** [1] - 206:21
**intermission** [14] - 36:15, 107:2, 107:7, 107:9, 107:19, 107:20, 107:22, 107:24, 108:1, 108:2, 108:3, 110:3, 110:5, 110:13
**intermissions** [6] - 108:18, 108:21, 108:22, 108:25, 109:7, 110:10
**internal** [3] - 46:3, 148:4, 195:5
**internally** [2] - 47:8, 147:7
**International** [3] - 11:18, 16:12, 19:13
**international** [1] - 19:25
**Internet** [1] - 74:1
**interpreted** [1] - 14:9
**interruption** [1] - 111:6
**interwoven** [2] - 190:12, 190:17
**intrinsically** [2] - 194:12, 194:21
**introduce** [1] - 10:14
**introduced** [2] - 50:5, 67:2
**invasive** [1] - 15:1
**invented** [1] - 173:15
**inventing** [1] - 169:2
**inventor** [1] - 173:19
**inventoried** [1] - 48:5
**inverse** [1] - 127:4
**inverses** [3] - 126:24, 129:23, 159:12
**inverted** [1] - 82:1
**investigation** [7] - 21:10, 49:22, 49:23, 50:13, 61:22, 161:15
**investigations** [2] - 222:22, 223:19
**involve** [3] - 18:17, 50:15, 200:18

**involved** [11] - 13:12, 64:6, 64:18, 64:20, 116:1, 117:9, 134:3, 134:17, 134:25, 220:8, 220:13
**involvement** [1] - 82:21
**involves** [1] - 113:17
**involving** [2] - 16:23, 31:10
**IP** [6] - 5:4, 52:8, 57:6, 58:19, 58:20, 162:12
**ipse** [1] - 54:2
**irregular** [1] - 4:2
**irrelevant** [1] - 200:22
**issue** [26] - 7:23, 33:20, 50:16, 51:2, 51:4, 55:20, 56:18, 57:13, 64:24, 66:15, 88:22, 116:13, 122:9, 122:11, 142:8, 174:25, 181:5, 181:21, 186:14, 200:16, 200:18, 202:1, 202:23, 203:4, 221:4
**issued** [13] - 5:21, 8:22, 24:22, 24:24, 25:4, 26:20, 27:17, 27:24, 36:9, 37:17, 37:19, 146:14, 223:9
**issues** [8] - 8:16, 52:15, 130:18, 130:20, 198:15, 202:5, 202:24, 202:25
**issuing** [1] - 25:1
**IT** [2] - 11:15, 11:19
**items** [5] - 42:13, 63:12, 86:2, 87:3, 163:7
**iteration** [1] - 118:25
**itself** [15] - 50:18, 69:20, 116:15, 117:6, 145:3, 154:15, 160:6, 160:9, 160:16, 167:2, 199:22, 202:2, 203:9, 203:10, 220:11

## J

**jackpot** [4] - 43:20, 43:21, 78:5, 131:20
**January** [1] - 104:11
**Jarbola** [10] - 5:5, 7:12, 25:1, 51:3, 53:13, 122:1, 135:8,

147:24, 198:21, 200:1
**JARBOLA** [189] - 3:5, 5:6, 6:8, 7:16, 10:6, 10:11, 10:18, 10:21, 11:4, 13:3, 17:20, 17:23, 17:25, 18:1, 20:2, 29:23, 31:19, 32:19, 32:21, 35:19, 35:23, 35:24, 36:5, 36:12, 36:15, 36:19, 36:21, 37:22, 38:8, 38:10, 38:11, 41:18, 41:20, 49:18, 51:5, 52:24, 54:24, 55:13, 56:8, 57:11, 57:20, 57:23, 57:25, 58:5, 59:12, 59:16, 59:21, 60:2, 60:8, 61:1, 61:24, 76:13, 77:10, 78:16, 79:2, 84:5, 84:16, 84:21, 86:16, 88:23, 89:7, 89:14, 91:5, 91:15, 92:4, 92:16, 95:20, 96:4, 98:7, 99:16, 100:16, 103:6, 103:22, 104:3, 104:24, 105:4, 105:10, 106:14, 108:16, 109:12, 110:1, 112:13, 112:25, 113:2, 113:8, 113:12, 113:15, 113:19, 114:12, 114:23, 114:25, 116:19, 117:12, 117:21, 117:24, 120:3, 120:7, 120:19, 121:3, 121:8, 121:15, 121:18, 122:4, 122:6, 122:16, 122:19, 122:23, 124:15, 124:18, 124:21, 124:24, 128:5, 128:21, 129:17, 130:9, 130:13, 130:22, 132:17, 132:20, 133:1, 133:12, 134:19, 135:11, 135:17, 136:11, 137:6, 137:20, 138:7, 139:11, 139:12, 139:16, 140:19, 140:22, 141:20, 146:4, 167:13, 174:6, 191:2, 191:6, 191:8, 192:11, 192:18,

192:24, 193:24, 195:7, 195:14, 195:16, 195:20, 195:22, 195:25, 196:6, 196:9, 196:11, 196:14, 196:16, 196:18, 197:4, 197:7, 197:16, 198:24, 199:11, 199:16, 200:23, 201:8, 201:12, 202:4, 202:8, 202:13, 202:15, 202:21, 202:25, 203:5, 203:13, 204:6, 204:7, 204:19, 205:1, 209:11, 210:9, 218:18, 220:14, 220:17, 221:14, 222:10, 222:15, 223:13, 223:18, 224:7, 225:1

**Jarbola's** [1] - 201:19

**Jersey** [2] - 11:12, 11:16

**jewel** [1] - 70:10

**job** [5] - 12:12, 12:13, 193:3, 223:19, 224:2

**jobs** [1] - 173:2

**Johns** [1] - 168:12

**join** [1] - 193:10

**joined** [3] - 11:15, 172:22, 177:18

**judge** [3] - 17:13, 17:18, 114:12

**Judge** [44] - 3:6, 5:6, 10:11, 10:21, 17:16, 17:20, 20:2, 29:23, 31:19, 32:19, 36:5, 36:19, 37:22, 38:8, 51:5, 54:24, 56:8, 57:11, 59:12, 59:16, 78:16, 88:23, 103:22, 113:2, 116:19, 124:15, 132:19, 136:11, 139:11, 140:19, 141:20, 174:6, 191:6, 193:24, 195:7, 195:14, 199:16, 203:13, 204:6, 204:20, 209:11, 221:14, 223:13, 224:7

**judgment** [1] - 78:18

**judicial** [2] - 146:13, 146:15

**judicially** [2] - 177:25, 205:11

**judicious** [2] - 177:22, 178:1

**jumble** [2] - 183:9, 184:1

**jumped** [1] - 156:23

**jumps** [1] - 127:24

**juncture** [1] - 3:19

**jurisdiction** [5] - 20:14, 27:18, 28:8, 129:4

**jurisdiction's** [1] - 15:14

**jurisdictions** [5] - 14:16, 37:19, 77:24, 127:10, 128:25

**jury** [1] - 8:1

**justify** [1] - 53:20

## K

**Karen** [5] - 8:18, 64:10, 164:8, 164:17, 164:23

**keep** [2] - 131:16, 191:18

**keeping** [5] - 44:4, 110:8, 125:21, 179:2, 191:12

**keeps** [1] - 178:20

**Keno** [1] - 197:11

**kept** [4] - 48:6, 108:5, 127:5, 127:7

**key** [8] - 47:7, 47:9, 47:16, 47:17, 53:6, 60:13, 60:19, 61:13

**kick** [1] - 153:11

**kind** [27] - 15:8, 31:17, 40:3, 40:19, 44:13, 52:7, 60:13, 64:5, 71:9, 75:16, 87:18, 96:13, 110:6, 125:16, 125:23, 126:2, 159:1, 165:12, 165:14, 169:24, 169:25, 172:24, 175:20, 181:8, 190:17, 216:14, 219:3

**kinds** [4] - 14:24, 171:13, 215:24, 221:13

**Knock** [1] - 173:14

**Knock-Out** [1] - 173:14

**knowing** [3] - 94:4, 118:7, 129:4

**knowledge** [18] - 21:23, 24:1, 27:18, 28:3, 43:6, 49:12,

67:16, 76:17, 83:12, 86:7, 129:1, 129:8, 146:2, 150:3, 150:8, 155:18, 189:24, 190:2

**knowledge-based** [1] - 190:2

**known** [3] - 11:18, 79:25, 186:23

**knows** [7] - 4:3, 57:3, 58:15, 62:22, 192:16, 206:24, 207:3

## L

**lab** [1] - 16:12

**labelled** [1] - 69:25

**Laboratories** [3] - 11:18, 16:11, 19:13

**laid** [2] - 31:6, 31:16

**language** [6] - 14:7, 14:11, 14:13, 29:25, 30:1, 30:2

**Large** [6] - 176:21, 182:13, 217:2, 220:5, 220:8, 220:10

**large** [4] - 14:25, 43:21, 70:11, 72:21, 200:5

**large-type** [1] - 70:11

**larger** [1] - 16:20

**Las** [5] - 11:17, 104:14, 104:20, 104:21, 172:3

**last** [23] - 4:4, 10:18, 11:6, 11:7, 26:11, 26:17, 37:3, 38:16, 38:17, 38:20, 38:25, 39:1, 60:3, 70:15, 70:16, 110:20, 120:20, 130:13, 139:10, 151:17, 151:18, 168:6, 217:8

**late** [2] - 209:12, 210:4

**law** [24] - 29:19, 31:8, 31:15, 31:18, 31:20, 31:25, 36:10, 43:2, 114:13, 115:3, 115:11, 115:14, 115:23, 116:3, 116:25, 136:7, 137:3, 137:7, 146:10, 174:17, 200:10, 203:19, 203:21

**LAW** [1] - 202:17

**laws** [4] - 14:16, 27:14, 28:7, 146:12

**lawsuit** [1] - 10:23

**lawyers** [2] - 12:21, 12:22

**layer** [2] - 218:13, 218:16

**layers** [1] - 218:15

**layout** [1] - 48:10

**LCD** [2] - 40:14, 40:15

**LCE** [1] - 54:1

**lead** [2] - 67:19, 173:17

**learn** [3] - 162:2, 177:23, 188:5

**learned** [3] - 19:9, 58:9, 170:10

**learns** [1] - 171:3

**least** [13] - 4:17, 14:25, 54:18, 59:19, 76:24, 100:11, 128:24, 144:15, 145:18, 155:7, 189:9, 189:10, 201:21

**leave** [1] - 26:17

**led** [5] - 5:24, 12:17, 61:4, 67:21, 157:17

**left** [12] - 40:22, 49:2, 68:9, 110:16, 111:9, 122:20, 158:17, 172:20, 172:21, 183:23, 211:25, 218:3

**legal** [20] - 14:17, 27:22, 27:25, 28:10, 28:24, 32:2, 53:25, 56:2, 98:5, 117:5, 117:7, 134:14, 145:15, 145:20, 145:25, 167:5, 195:6, 200:20, 201:4, 201:24

**legalese** [1] - 30:1

**less** [8] - 80:14, 82:20, 94:13, 101:5, 101:10, 111:24, 158:18, 219:1

**lesson** [2] - 170:10

**letter** [5] - 8:22, 15:6, 15:8, 24:3

**level** [61] - 19:1, 19:20, 20:1, 24:5, 70:2, 70:3, 70:7, 70:12, 70:13, 71:20, 71:22, 71:24, 72:4, 72:7, 72:11, 72:12, 72:13, 73:4, 73:13, 74:4, 74:9, 74:17, 77:1, 81:10, 81:12, 82:14, 87:24, 100:21, 101:7, 101:18,

103:9, 112:15, 112:17, 113:3, 113:6, 113:10, 113:13, 113:19, 115:15, 117:14, 117:19, 118:4, 126:11, 127:2, 129:20, 130:10, 130:16, 131:6, 131:12, 134:2, 149:18, 156:20, 161:19, 171:4, 179:6, 182:9, 207:17, 213:1

**levels** [3] - 162:1, 182:6, 207:9

**lever** [1] - 144:1

**license** [1] - 158:3

**licensed** [1] - 158:4

**licensing** [5] - 60:12, 60:13, 60:18, 157:24, 158:2

**life** [1] - 19:23

**light** [3] - 97:8, 106:24, 107:12

**light-up** [1] - 107:12

**limine** [5] - 7:19, 25:23, 51:6, 53:10, 105:1

**limit** [31] - 72:15, 72:18, 72:20, 80:18, 100:3, 100:4, 100:8, 103:13, 103:17, 103:18, 125:17, 126:1, 126:19, 127:23, 131:9, 131:25, 143:24, 156:11, 156:21, 157:2, 157:3, 159:15, 205:3, 205:7, 205:12, 214:10, 214:24, 215:6, 215:8

**limitation** [1] - 126:4

**limitations** [1] - 30:16

**limited** [7] - 23:23, 24:1, 24:7, 42:6, 67:5, 109:22, 133:3

**limits** [2] - 127:14, 131:10

**line** [15] - 22:21, 43:8, 48:17, 69:9, 81:16, 81:23, 82:3, 82:8, 90:17, 139:2, 183:9, 194:16, 220:4

**lines** [9] - 79:8, 79:9, 79:10, 82:2, 82:10, 177:21, 196:16

**Liquor** [4] - 5:13, 18:4, 18:13, 33:2

**list** [3] - 68:8, 106:25, 119:2
**litigation** [2] - 49:15
**live** [3] - 83:4, 83:17, 221:10
**Living** [6] - 176:21, 182:13, 217:2, 220:4, 220:8, 220:10
**living** [1] - 70:11
**local** [1] - 11:16
**located** [4] - 44:19, 96:7, 96:8, 203:15
**location** [4] - 95:22, 124:3, 159:5, 163:14
**lock** [1] - 126:1
**locked** [4] - 163:4, 163:6, 163:14, 163:19
**locks** [1] - 158:11
**lockup** [1] - 43:20
**logic** [3] - 40:24, 199:18, 211:3
**logical** [4] - 178:19, 191:12, 192:13, 192:15
**logically** [2] - 213:23, 214:13
**long-term** [1] - 169:10
**look** [56] - 8:1, 13:15, 13:20, 15:2, 18:10, 18:11, 20:17, 20:21, 26:20, 27:24, 28:22, 33:7, 33:12, 35:11, 39:7, 43:11, 43:17, 44:8, 44:10, 48:7, 48:11, 51:18, 54:25, 63:2, 63:10, 68:10, 71:23, 83:18, 83:19, 87:22, 88:10, 89:20, 97:22, 125:13, 127:15, 132:14, 146:18, 146:20, 147:2, 150:8, 150:18, 150:20, 150:25, 154:8, 154:9, 157:11, 157:12, 166:16, 174:21, 183:12, 183:21, 194:9, 199:22, 213:24
**looked** [36] - 15:19, 20:19, 20:24, 21:12, 22:25, 33:18, 34:1, 34:2, 34:20, 35:11, 39:25, 40:2, 40:9, 40:19, 47:15, 55:20, 55:21, 55:22, 56:1, 59:3, 68:18, 68:23, 77:16, 91:9, 125:15, 125:17, 125:20,

125:21, 126:4, 145:10, 145:19, 146:9, 146:17, 150:2, 150:5, 150:7
**looking** [34] - 34:12, 36:6, 39:5, 39:24, 40:2, 45:2, 45:9, 45:13, 47:7, 52:16, 59:17, 60:24, 61:13, 65:2, 67:25, 70:11, 70:12, 73:14, 111:15, 113:11, 117:3, 122:9, 125:20, 129:5, 132:3, 138:13, 144:25, 150:4, 157:9, 159:22, 159:23, 171:10, 180:14, 193:15
**looks** [14] - 12:19, 13:16, 74:23, 76:18, 76:24, 82:24, 85:1, 87:20, 97:24, 113:24, 118:17, 131:13, 132:3, 138:16
**lose** [14] - 110:15, 112:8, 125:23, 136:16, 152:5, 158:17, 171:12, 182:21, 187:25, 205:23, 207:20, 213:9, 214:16
**loser** [4] - 73:20, 74:14, 80:19, 211:7
**losers** [2] - 73:19, 211:23
**losing** [36] - 74:6, 74:10, 74:11, 74:14, 75:18, 76:5, 80:10, 89:25, 93:20, 95:13, 95:15, 95:17, 98:14, 102:9, 102:12, 111:12, 111:14, 140:11, 141:7, 141:11, 142:11, 143:9, 143:10, 143:13, 144:4, 152:15, 152:19, 154:14, 207:13, 207:15, 211:19, 213:16, 213:18, 214:3, 214:15, 219:10
**loss** [18] - 100:19, 136:6, 151:19, 151:22, 152:7, 152:10, 152:13, 152:14, 152:24, 158:21, 181:7,

181:8, 181:9, 184:14, 184:15, 185:21, 187:13, 187:18
**losses** [1] - 132:4
**lost** [17] - 100:6, 103:8, 103:11, 111:4, 111:17, 111:21, 112:10, 123:2, 123:5, 123:22, 126:10, 126:15, 132:16, 157:6, 157:12, 159:24, 205:22
**lottery** [8] - 75:1, 75:14, 75:16, 76:4, 76:6, 76:21, 197:5, 200:4
**low** [1] - 113:10
**lower** [6] - 41:12, 126:9, 201:9, 202:6, 203:7, 211:25
**lowered** [1] - 70:8
**lowest** [3] - 70:3, 71:20, 121:20
**lunch** [1] - 103:23
**Lund** [1] - 195:9
**luxury** [1] - 70:10
**Luzerne** [4] - 201:1, 201:6, 201:9, 203:2

---

# M

**M.2** [1] - 44:17
**machine** [83] - 14:6, 14:12, 14:13, 15:2, 19:11, 22:22, 22:24, 23:1, 23:8, 24:16, 24:21, 28:4, 29:17, 31:11, 33:9, 34:11, 34:14, 34:22, 39:24, 40:25, 43:15, 43:22, 43:24, 44:4, 44:5, 44:24, 46:15, 46:16, 53:8, 53:9, 69:17, 69:20, 76:22, 92:8, 92:19, 121:10, 121:20, 121:21, 122:7, 122:17, 122:22, 123:3, 123:4, 123:12, 123:13, 123:15, 123:19, 129:18, 131:2, 131:15, 131:16, 143:25, 144:16, 156:15, 158:10, 158:19, 159:6, 169:20, 169:23, 171:22, 172:2, 172:3,

181:17, 186:5, 186:10, 186:11, 186:12, 187:3, 187:11, 189:19, 189:22, 194:11, 194:17, 194:20, 197:3, 202:2, 203:3, 203:9, 203:10, 208:16, 213:4, 213:7
**machine's** [1] - 45:24
**machines** [66] - 3:18, 9:8, 9:16, 9:19, 17:21, 18:5, 18:10, 18:12, 18:17, 18:22, 19:1, 19:14, 29:24, 30:13, 31:9, 31:14, 33:3, 33:8, 33:12, 33:18, 34:1, 34:2, 34:4, 35:15, 35:16, 39:20, 40:1, 40:3, 41:1, 41:2, 41:3, 41:16, 42:2, 44:2, 45:22, 46:7, 46:19, 49:25, 50:3, 51:4, 51:12, 51:16, 52:20, 53:2, 53:3, 55:24, 56:6, 64:14, 65:22, 87:9, 91:12, 91:13, 91:16, 105:13, 105:14, 109:16, 119:18, 129:2, 157:8, 157:10, 165:7, 208:9, 222:12, 222:13
**Machines** [3] - 193:17, 198:23, 198:25
**mail** [4] - 4:23, 8:15, 202:22, 203:21
**main** [19] - 40:10, 41:4, 44:12, 45:19, 48:13, 78:7, 78:14, 78:19, 79:3, 79:5, 88:24, 114:16, 135:18, 135:25, 136:5, 136:25, 193:11, 193:16
**major** [6] - 39:10, 39:12, 39:14, 56:8, 65:8
**majority** [2] - 40:24, 164:17
**manner** [3] - 109:11, 109:21, 195:3
**manuals** [2] - 21:6, 21:10
**manufacturer** [10] - 14:3, 15:3, 22:17, 24:4, 65:16, 65:19, 66:12, 92:7, 129:20, 166:18

**manufacturer's** [1] - 200:25
**manufacturer/ designer** [1] - 109:10
**manufacturers** [4] - 15:6, 65:2, 65:6, 65:8
**map** [2] - 44:7, 108:6
**mapped** [1] - 106:22
**mapping** [1] - 61:14
**mark** [3] - 35:19, 123:1, 174:15
**marked** [3] - 35:25, 40:11, 47:21
**markedly** [1] - 188:20
**market** [2] - 75:22, 170:8
**markets** [1] - 19:15
**marry** [2] - 63:12, 187:15
**massive** [1] - 39:13
**master's** [1] - 168:13
**match** [1] - 98:15
**material** [6] - 4:17, 10:1, 24:20, 209:18, 209:20, 209:25
**materials** [9] - 22:10, 23:10, 23:23, 24:18, 49:16, 90:21, 163:24, 209:16, 223:3
**math** [12] - 13:17, 13:22, 22:19, 22:24, 22:25, 129:21, 150:12, 169:5, 173:16, 175:24, 176:7, 216:22
**mathematic** [2] - 180:20, 185:1
**mathematical** [4] - 83:12, 126:21, 160:24, 179:9
**mathematically** [3] - 127:1, 175:20, 178:10
**mathematics** [7] - 170:3, 171:17, 173:4, 173:5, 174:4, 179:6, 190:21
**Matic** [45] - 18:5, 33:3, 33:19, 35:7, 35:15, 47:5, 47:14, 49:24, 53:17, 54:15, 61:18, 63:16, 64:14, 64:16, 64:22, 67:25, 129:2, 134:10, 138:10, 145:11, 157:25, 166:2, 166:6, 166:14, 175:8, 175:18, 177:16,

177:23, 180:16,
180:17, 180:18,
187:21, 187:23,
188:2, 188:4,
188:19, 188:25,
189:8, 190:5,
199:15, 201:14,
208:9, 208:16,
211:20, 220:25
**Matic's** [1] - 60:20
**matrix** [1] - 183:22
**Matt** [1] - 3:21
**matter** [12] - 3:11,
3:16, 7:19, 30:8,
62:20, 79:18, 102:7,
194:23, 194:25,
203:24, 204:3,
209:13
**matters** [3] - 4:12,
15:25, 195:1
**Matthew** [1] - 49:19
**maximize** [1] - 171:1
**maximum** [7] -
127:17, 127:18,
128:25, 158:9,
159:4, 211:4, 211:10
**McNally** [1] - 17:16
**mean** [62] - 9:14, 14:6,
27:7, 28:18, 49:12,
49:14, 52:6, 53:21,
54:19, 55:17, 59:4,
61:7, 66:6, 69:8,
75:13, 89:8, 90:14,
102:4, 113:5, 113:9,
115:2, 117:18,
121:6, 128:8, 136:3,
154:18, 156:7,
160:3, 160:7,
169:15, 170:5,
189:8, 189:20,
190:13, 192:20,
197:11, 198:9,
200:19, 203:7,
204:22, 205:10,
205:19, 206:5,
206:10, 207:16,
208:10, 208:18,
208:24, 209:14,
209:20, 211:12,
211:15, 212:6,
212:11, 215:18,
217:24, 217:25,
218:2, 218:4,
218:14, 220:24
**meaning** [3] - 24:17,
111:3, 223:2
**meaningful** [1] -
117:22
**means** [8] - 8:7, 19:22,
96:2, 113:7, 130:17,

135:14, 171:19,
187:1
**meant** [2] - 179:19,
207:3
**measure** [4] - 41:9,
100:10, 191:12,
193:13
**measurements** [1] -
171:9
**media** [24] - 21:13,
34:14, 34:15, 43:16,
43:25, 44:19, 44:24,
45:1, 45:3, 45:18,
45:24, 46:6, 46:17,
47:4, 47:7, 60:24,
61:5, 61:6, 61:23,
62:4, 62:6, 67:7,
222:4
**medium** [1] - 113:11
**meet** [6] - 12:16,
29:20, 29:24, 30:22,
32:16, 66:21
**meeting** [1] - 64:22
**meets** [5] - 12:15,
27:13, 28:7, 30:14,
66:21
**members** [1] - 58:13
**memorization** [1] -
154:24
**memory** [5] - 106:20,
141:4, 145:3,
154:23, 186:19
**mental** [1] - 204:24
**mentally** [1] - 204:24
**mention** [5] - 70:24,
71:1, 71:3, 71:6,
190:11
**mentioned** [22] -
20:12, 22:6, 48:22,
59:17, 71:16, 75:12,
88:8, 90:7, 91:6,
172:15, 176:21,
176:24, 177:12,
191:11, 205:2,
205:15, 210:22,
212:21, 217:11,
217:14, 219:14,
220:18
**menu** [8] - 34:7, 34:9,
68:2, 70:16, 126:16,
132:11, 207:8
**menues** [1] - 125:13
**merely** [1] - 117:8
**merits** [1] - 9:14
**message** [3] - 93:6,
110:13, 155:17
**messages** [6] - 93:2,
93:9, 93:22, 93:23,
93:25, 96:9
**messaging** [1] - 96:14

**met** [5] - 15:13, 19:25,
80:15, 126:6, 156:4
**metal** [2] - 40:13,
40:15
**meter** [3] - 178:24,
191:20, 191:23
**method** [2] - 75:23,
173:4
**methodology** [3] -
135:4, 147:4, 175:4
**methods** [1] - 12:10
**metric** [1] - 125:23
**metrics** [2] - 171:9,
176:15
**Michael** [2] - 18:8,
164:8
**microcontroller** [2] -
48:16
**microphone** [1] - 3:13
**microscope** [1] -
200:5
**mid** [1] - 169:1
**middle** [2] - 82:7,
212:1
**might** [53] - 15:7,
60:17, 60:19, 62:8,
66:8, 66:12, 74:7,
81:19, 81:20, 90:10,
90:19, 92:11, 103:2,
107:11, 109:10,
109:11, 119:24,
129:25, 142:11,
143:17, 146:13,
146:24, 155:23,
155:24, 157:14,
157:17, 160:8,
171:12, 171:23,
172:1, 172:5, 172:9,
180:2, 180:3,
181:17, 185:21,
185:22, 186:19,
186:20, 202:17,
211:17, 214:20,
215:3, 215:19,
218:15, 222:2
**Mikohn** [5] - 169:11,
172:15, 172:17,
172:25
**military** [2] - 85:1,
86:1
**million** [3] - 176:23,
178:5, 178:6
**mind** [1] - 204:23
**mine** [2] - 26:23, 196:4
**minimizing** [1] - 77:23
**minimum** [7] - 101:18,
127:11, 127:12,
127:17, 128:24,
159:9, 211:9
**Minnesota** [1] -

127:15
**minor** [9] - 35:10,
38:20, 39:11, 39:12,
39:15, 44:10, 44:12,
44:16
**minute** [5] - 27:5,
59:10, 137:25,
167:16, 199:25
**minutes** [6] - 103:24,
104:18, 214:8,
214:9, 214:21,
214:22
**mishandling** [1] -
58:20
**miss** [1] - 188:7
**Miss** [3] - 4:19, 4:22,
8:14
**Missouri** [1] - 16:6
**misspoke** [3] - 51:19,
51:25, 140:7
**mistake** [3] - 111:20,
205:20, 220:20
**model** [2] - 60:20,
180:11
**moment** [13] - 7:16,
36:12, 41:18, 51:20,
105:12, 122:17,
132:17, 178:21,
180:22, 182:5,
217:11, 220:14,
224:21
**moments** [1] - 217:14
**Monday** [2] - 25:5,
104:5
**money** [26] - 34:2,
50:2, 68:6, 73:18,
78:2, 78:3, 78:6,
124:7, 125:22,
127:3, 127:5,
131:25, 132:15,
132:16, 143:5,
144:16, 157:14,
159:24, 160:2,
171:13, 178:21,
182:1, 182:15,
189:2, 213:6
**money's** [1] - 144:3
**monitor** [3] - 40:18,
41:10, 41:12
**monkey** [9] - 186:4,
186:7, 186:25,
187:3, 188:18,
188:22, 188:23,
219:13, 219:15
**Monroe** [4] - 57:17,
57:19, 57:20, 57:22
**months** [2] - 18:11,
33:16
**Montreal** [1] - 197:11
**morning** [1] - 10:15

**most** [32] - 14:10,
22:16, 22:21, 35:13,
37:19, 39:10, 42:22,
42:23, 44:20, 65:8,
68:20, 68:22, 79:7,
79:11, 80:13, 90:5,
92:21, 92:22, 92:25,
94:12, 100:12,
101:18, 103:12,
132:12, 140:3,
178:19, 191:11,
192:12, 192:13,
192:15, 195:4, 199:5
**mostly** [1] - 92:21
**motion** [8] - 7:19,
25:23, 31:4, 51:6,
53:10, 53:11, 58:3,
78:20
**motions** [2] - 51:8,
105:1
**motivation** [1] -
198:13
**mount** [3] - 45:2,
61:10, 61:19
**mounted** [2] - 41:11,
61:15
**mouth** [2] - 30:3,
120:12
**move** [16] - 29:14,
37:23, 68:9, 68:19,
78:3, 84:3, 119:7,
126:14, 141:22,
162:4, 162:6, 162:8,
172:19, 182:24,
189:22, 190:24
**moved** [4] - 11:17,
38:17, 141:21,
189:22
**mSATA** [1] - 44:18
**mSATA-style** [1] -
44:18
**mud** [1] - 130:1
**multiple** [11] - 70:9,
72:20, 82:10, 114:8,
161:8, 164:11,
175:6, 184:7,
206:25, 215:22,
220:24
**multitude** [1] - 35:8
**must** [4] - 86:21,
158:11, 169:24,
194:11
**myriad** [1] - 52:15

**N**

**name** [13] - 10:19,
11:5, 11:6, 11:7,
20:22, 37:4, 37:8,

52:18, 68:3, 168:5,
168:6
**Nancy** [1] - 168:7
**nature** [8] - 21:6,
28:12, 29:2, 33:10,
34:6, 67:6, 125:7,
170:3
**nauseam** [1] - 121:1
**NDA** [5] - 58:7,
165:13, 165:15,
165:19, 166:4
**near** [1] - 169:4
**nearest** [1] - 121:20
**necessarily** [9] - 8:25,
73:25, 152:24,
154:17, 154:21,
184:6, 187:18,
206:25, 211:1
**necessary** [1] - 194:18
**need** [26] - 24:18,
24:20, 33:5, 35:22,
47:7, 58:24, 78:12,
81:14, 90:21, 104:1,
105:8, 148:18,
148:20, 156:3,
156:11, 157:14,
172:12, 174:19,
178:2, 179:25,
180:13, 198:12,
211:21, 221:21,
224:18
**needed** [9] - 24:1,
48:1, 49:8, 73:14,
97:25, 141:3,
161:14, 162:22,
204:25
**needs** [8] - 29:15,
179:22, 179:24,
180:7, 180:8,
180:10, 211:3,
212:14
**negate** [1] - 97:25
**negative** [1] - 131:22
**negotiate** [2] - 7:5,
9:25
**net** [9] - 158:9, 158:19,
159:25, 180:19,
184:15, 186:2,
187:24, 213:9
**network** [1] - 171:3
**neural** [1] - 171:3
**Nevada** [2] - 16:5,
95:11
**never** [3] - 5:18, 46:9,
64:2
**new** [6] - 30:8, 83:10,
107:16, 156:12,
158:11, 173:14
**New** [1] - 11:12
**next** [80] - 3:3, 5:3,

6:18, 43:13, 69:16,
69:25, 70:1, 70:3,
70:4, 70:13, 70:18,
71:15, 71:16, 71:18,
71:21, 71:23, 71:24,
72:1, 72:3, 72:5,
72:8, 72:10, 72:12,
72:16, 72:17, 72:23,
72:24, 73:4, 73:9,
73:15, 73:17, 73:22,
74:7, 74:12, 74:16,
74:17, 75:5, 75:24,
76:24, 76:25, 77:15,
78:3, 81:2, 86:25,
87:23, 105:22,
105:23, 106:3,
107:10, 108:7,
110:7, 114:19,
118:25, 123:25,
124:13, 124:22,
135:24, 135:25,
138:18, 151:17,
181:24, 182:14,
184:21, 194:6,
194:16, 204:4,
207:13, 208:8,
209:3, 210:8, 212:8,
212:9, 213:9,
213:14, 213:16,
216:7
**next-to-the-last** [1] -
151:17
**nickle** [1] - 182:19
**Nickles** [4] - 18:8,
164:9, 164:16,
164:23
**night** [8] - 196:2,
196:8, 197:19,
197:20, 198:3
**NIKIP** [1] - 11:8
**Nikiper** [26] - 5:21,
10:7, 10:12, 10:13,
10:23, 10:24, 11:7,
11:9, 20:3, 20:12,
30:10, 30:20, 32:11,
35:25, 37:25, 51:11,
53:4, 58:11, 58:14,
58:15, 60:3, 105:11,
114:15, 142:5,
222:16, 222:19
**NIKIPER** [1] - 10:8
**Nikiper's** [2] - 29:14,
141:22
**nine** [22] - 42:10,
42:19, 42:20, 42:23,
69:4, 69:5, 69:6,
77:12, 77:16, 79:6,
81:2, 81:7, 92:23,
106:8, 106:22,
106:23, 107:13,

110:11, 110:12,
144:8, 219:18,
219:22
**nobody** [3] - 52:12,
53:14, 210:5
**nomenclature** [2] -
181:5, 219:3
**nominated** [1] - 169:7
**non** [2] - 57:5, 64:25
**non-disclosure** [1] -
57:5
**non-gaming** [1] -
64:25
**none** [1] - 218:2
**nonsubstantive** [1] -
25:2
**normal** [2] - 4:8,
153:17
**note** [5] - 44:4, 60:11,
73:3, 81:9, 131:6
**noted** [2] - 4:22, 125:1
**notes** [4] - 177:8,
177:9, 188:13, 209:7
**nothing** [17] - 57:13,
110:23, 140:4,
141:10, 143:24,
144:18, 153:25,
155:10, 155:13,
187:4, 187:5,
189:17, 198:14,
198:20, 214:15,
221:14, 223:20
**notice** [4] - 84:13,
110:11, 154:10,
209:12
**noticed** [1] - 103:3,
125:4
**notices** [1] - 27:16
**November** [12] -
24:25, 25:4, 25:20,
26:7, 26:23, 26:24,
36:9, 36:18, 38:13,
38:14, 104:5
**nowhere** [3] - 121:22,
121:24, 130:6
**Number** [4] - 35:20,
36:1, 37:24, 67:3
**number** [48] - 33:18,
49:23, 62:12, 62:14,
68:22, 72:21, 75:3,
75:17, 83:10, 96:11,
97:14, 106:25,
108:6, 108:7, 109:3,
119:1, 119:4,
125:24, 126:9,
126:10, 126:17,
128:13, 131:8,
131:22, 133:4,
148:24, 149:8,
149:10, 149:13,

149:19, 150:10,
151:5, 156:4, 157:6,
157:16, 157:20,
159:23, 161:25,
183:1, 186:21,
208:4, 208:11,
208:14, 209:4,
211:5, 217:23
**numbers** [11] - 75:5,
106:22, 106:25,
107:3, 107:4, 108:8,
128:11, 172:6,
172:14, 215:24
**numerical** [1] - 22:19
**numerous** [3] - 14:16,
35:7, 51:8

# O

**OAG** [1] - 63:22
**obfuscate** [1] - 181:21
**object** [17] - 32:6,
76:7, 77:4, 84:2,
84:19, 86:10, 88:19,
90:15, 91:1, 98:3,
112:20, 115:1,
119:6, 127:20,
130:5, 134:13, 192:7
**objected** [1] - 113:25
**objecting** [2] - 92:13,
209:24
**objection** [30] - 38:1,
38:3, 55:16, 78:11,
90:16, 90:23, 91:23,
95:25, 109:8,
109:19, 109:23,
113:24, 117:17,
120:18, 120:24,
121:6, 129:14,
139:4, 139:14,
140:16, 140:17,
141:23, 146:4,
191:1, 191:2,
192:10, 193:11,
204:3, 218:8
**objection's** [3] - 84:9,
128:20, 138:4
**objections** [2] - 90:25,
91:3
**objective** [5] - 69:3,
69:23, 79:5, 79:11,
97:11
**observable** [1] - 91:25
**observant** [4] -
154:16, 154:19,
155:23
**observations** [1] -
24:10
**observe** [5] - 24:8,
76:10, 87:20, 93:4,

103:17
**observed** [9] - 30:13,
67:9, 67:13, 69:20,
86:14, 125:11,
130:10, 195:3,
199:13
**observes** [1] - 128:1
**observing** [2] - 131:6,
158:24
**obtain** [1] - 197:21
**obtained** [1] - 50:4
**obviously** [1] - 116:24
**occasionally** [1] -
12:16
**occasions** [1] -
184:10
**occur** [8] - 18:7,
44:21, 63:16,
107:25, 108:2,
108:3, 179:16,
222:11
**occurred** [4] - 33:21,
33:24, 33:25, 53:12
**occurs** [2] - 58:12,
92:7
**October** [1] - 33:21
**oddball** [2] - 12:13,
12:20
**odds** [2] - 66:3, 66:13
**offer** [22] - 14:24,
16:13, 23:14, 24:18,
31:8, 31:17, 49:10,
55:2, 55:3, 56:22,
58:7, 78:24, 92:5,
98:5, 120:13,
120:15, 121:2,
128:3, 134:18,
137:4, 137:14, 195:8
**offered** [13] - 4:5,
21:22, 23:4, 23:14,
32:12, 94:23, 136:4,
158:6, 183:14,
185:19, 185:22,
218:6, 224:9
**offering** [10] - 23:20,
29:20, 32:2, 32:17,
76:9, 84:7, 120:15,
130:6, 190:1, 195:2
**office** [16] - 18:9,
18:12, 21:4, 26:12,
33:8, 34:16, 36:9,
37:18, 45:25, 46:4,
47:12, 87:9, 162:23,
163:2, 163:4, 222:5
**Office** [7] - 4:4, 5:12,
9:11, 18:3, 63:18,
161:20, 165:24
**officer** [1] - 172:21
**officers** [1] - 34:7
**offices** [3] - 4:21,

33:13, 33:18
**offs** [1] - 77:5
**often** [8] - 133:16,
160:7, 171:11,
192:2, 192:22,
194:23, 218:14
**Ohio** [1] - 16:13
**Olaf** [3] - 167:21,
168:6, 212:22
**OLAF** [2] - 167:22,
168:6
**old** [1] - 156:14
**on-site** [8] - 33:24,
149:7, 150:16,
150:18, 151:1,
151:5, 151:11, 164:5
**once** [22] - 5:19, 6:14,
37:25, 50:11, 79:14,
80:14, 82:5, 123:17,
125:25, 126:5,
156:11, 156:15,
158:3, 158:10,
179:17, 180:4,
180:6, 185:13,
205:10, 212:8,
217:8, 222:22
**one** [140] - 5:22, 7:18,
9:10, 14:25, 16:11,
16:12, 16:21, 17:2,
19:9, 24:24, 25:2,
26:3, 26:8, 29:3,
29:24, 31:10, 32:10,
35:4, 36:13, 38:18,
40:2, 40:3, 40:11,
42:19, 42:20, 42:25,
44:13, 44:14, 45:19,
47:11, 47:25, 48:7,
48:20, 51:9, 56:11,
62:15, 63:4, 64:2,
67:25, 68:14, 68:18,
69:6, 70:16, 71:22,
72:6, 72:14, 73:21,
74:6, 74:7, 74:19,
78:22, 80:7, 81:16,
82:2, 83:5, 84:25,
85:11, 85:19, 87:3,
91:9, 93:22, 93:25,
94:10, 94:15, 103:1,
106:8, 106:22,
106:24, 107:12,
107:14, 107:15,
107:16, 114:9,
114:18, 116:2,
119:4, 120:13,
124:25, 125:2,
125:12, 127:8,
138:18, 140:25,
142:8, 143:17,
144:18, 145:18,
148:25, 149:6,

151:5, 156:9, 160:3,
163:2, 164:1,
164:22, 167:9,
174:25, 176:21,
176:22, 177:18,
178:11, 179:20,
183:9, 183:18,
183:19, 184:18,
186:12, 187:8,
187:19, 190:8,
192:8, 193:8,
194:25, 195:22,
202:4, 202:24,
202:25, 204:22,
207:16, 207:22,
211:6, 211:10,
211:17, 211:21,
212:1, 212:25,
214:15, 216:25,
217:1, 219:18,
219:22, 222:2,
222:25
**one's** [1] - 127:21
**ones** [8] - 15:1, 20:24,
53:24, 55:20, 73:10,
73:22, 131:11
**ongoing** [1] - 222:21
**open** [6] - 40:22,
40:25, 47:23, 48:11,
150:20, 170:6
**opened** [1] - 48:3
**operate** [3] - 13:19,
21:24, 53:3
**operated** [1] - 198:3
**operates** [7] - 13:16,
15:2, 15:3, 15:4,
24:12, 28:4, 34:5
**operating** [5] - 13:15,
28:5, 129:6, 153:17,
166:5
**operation** [13] - 29:17,
127:8, 127:18,
127:19, 156:20,
157:14, 158:2,
158:12, 158:20,
196:21, 197:2,
198:6, 198:11
**operational** [2] -
125:10, 132:2
**operator** [9] - 124:4,
127:5, 132:13,
153:18, 156:11,
159:5, 159:17,
159:21, 160:1
**opine** [9] - 67:12,
67:14, 91:24,
109:16, 128:14,
130:19, 156:21,
159:20, 174:24
**opines** [1] - 76:10

**opining** [9] - 92:11,
92:13, 109:19,
127:25, 128:11,
129:15, 130:23,
139:6, 159:20
**opinion** [70] - 12:15,
17:22, 17:24, 23:13,
23:18, 23:19, 23:22,
24:1, 24:7, 29:20,
30:23, 31:8, 31:17,
31:22, 32:2, 32:17,
38:22, 57:24, 62:3,
66:20, 67:19, 74:22,
76:9, 78:7, 78:12,
78:18, 78:22, 78:24,
79:3, 84:5, 84:17,
88:24, 109:6,
109:21, 112:22,
120:13, 120:16,
120:21, 128:3,
129:11, 130:25,
134:9, 134:15,
134:18, 134:24,
136:5, 136:24,
136:25, 137:4,
138:9, 145:22,
146:16, 146:22,
146:23, 146:24,
151:1, 175:5,
178:16, 185:15,
189:7, 190:5,
193:17, 193:20,
196:12, 198:4,
200:19, 201:10,
201:24, 202:7,
204:14
**opinions** [8] - 23:4,
120:11, 121:2,
146:13, 146:15,
150:24, 190:19,
224:4
**opportunity** [17] -
32:15, 40:5, 41:21,
64:14, 68:12, 77:17,
84:23, 88:17, 89:15,
105:25, 106:2,
106:3, 110:6,
119:16, 154:10,
216:4, 222:18
**oppose** [1] - 90:17
**opposing** [2] - 22:14,
50:14
**optimal** [17] - 42:22,
42:24, 79:7, 79:11,
80:13, 80:22, 81:21,
87:16, 87:17, 90:5,
94:12, 101:10,
140:3, 141:18,
155:3, 173:12, 184:2
**optimally** [4] - 170:25,

176:9, 185:7, 185:18
**option** [38] - 34:3,
42:7, 66:9, 69:13,
71:17, 71:22, 79:21,
80:15, 80:24, 80:25,
87:15, 88:3, 89:18,
89:21, 90:1, 90:3,
90:6, 91:7, 91:8,
91:10, 92:6, 93:21,
94:5, 94:14, 94:21,
95:18, 102:13,
103:12, 111:25,
113:10, 142:11,
150:19, 153:3,
154:14, 155:15,
207:14
**options** [9] - 34:9,
68:2, 68:25, 71:19,
72:2, 73:15, 80:11,
92:24, 185:2
**order** [37] - 4:5, 4:12,
6:19, 7:5, 8:10, 8:11,
8:13, 8:16, 8:17,
8:22, 8:23, 8:24, 9:1,
9:8, 9:16, 14:8,
24:18, 33:6, 47:6,
48:4, 53:14, 57:4,
58:3, 58:8, 63:20,
64:5, 69:21, 83:14,
85:5, 85:15, 97:12,
158:11, 167:20,
206:4, 206:7, 209:1,
224:19
**ordered** [1] - 52:1
**orders** [3] - 8:6, 8:7,
50:5
**organizations** [1] -
16:19
**origin** [5] - 74:16,
151:4, 208:8,
208:10, 209:3
**original** [7] - 46:7,
101:6, 102:3, 102:7,
123:22, 133:5,
215:22
**origination** [1] - 140:5
**otherwise** [5] -
154:14, 160:22,
162:20, 163:1,
209:19
**outcome** [105] - 42:25,
43:9, 62:22, 70:1,
70:4, 70:8, 71:18,
72:3, 73:17, 74:4,
74:10, 74:14, 74:15,
76:5, 79:12, 79:13,
79:17, 79:19, 80:10,
80:12, 82:21, 82:22,
83:1, 83:8, 83:14,
86:20, 87:11, 87:12,

87:19, 88:9, 89:25,
90:2, 90:4, 94:9,
94:11, 95:1, 95:2,
95:7, 95:15, 95:17,
98:14, 100:20,
101:4, 102:1, 102:9,
102:13, 102:20,
105:19, 105:20,
106:7, 106:13,
115:3, 115:10,
116:4, 133:4,
133:11, 134:4,
134:6, 134:7,
137:22, 137:23,
140:1, 140:11,
140:14, 141:7,
141:8, 141:11,
141:12, 141:19,
142:11, 143:9,
143:10, 143:13,
152:15, 152:19,
152:21, 152:22,
152:24, 152:25,
154:15, 185:24,
186:19, 187:9,
187:12, 187:13,
187:16, 187:17,
199:19, 206:21,
207:13, 207:15,
210:11, 211:19,
213:16, 213:18,
214:3, 219:8, 219:25
**outcomes** [25] - 42:6,
74:5, 74:7, 74:11,
74:25, 75:4, 75:18,
85:21, 135:19,
135:23, 140:11,
176:7, 182:8, 183:4,
210:11, 210:19,
210:20, 210:21,
211:15, 211:16,
211:17, 211:20,
217:9, 217:17,
217:21
**outfit** [1] - 4:14
**output** [3] - 176:3,
176:4, 176:6
**outside** [8] - 5:12,
16:15, 66:9, 70:15,
77:25, 121:12,
123:8, 129:7
**outward** [1] - 40:9
**overall** [9] - 12:2,
23:11, 35:9, 46:14,
62:2, 68:24, 82:21,
180:10, 190:3
**overarching** [1] -
39:13
**overrule** [1] - 218:11
**overruled** [5] - 84:9,

84:15, 86:15, 128:20, 138:4
**overview** [1] - 33:14
**own** [4] - 65:16, 72:7, 123:3, 125:8
**owned** [3] - 49:25, 50:18, 51:20
**owner** [6] - 6:23, 52:12, 127:5, 162:12
**ownership** [1] - 50:3

## P

**p.m** [7] - 103:24, 103:25, 138:2, 138:2, 167:17, 167:17, 225:2
**Pace** [46] - 18:5, 33:3, 33:19, 35:7, 35:15, 47:5, 47:14, 49:24, 53:17, 54:15, 60:20, 61:18, 63:16, 64:14, 64:16, 64:22, 67:25, 129:2, 134:10, 138:10, 145:11, 157:25, 166:2, 166:6, 166:14, 175:8, 175:18, 177:16, 177:23, 180:16, 180:17, 180:18, 187:21, 187:23, 188:2, 188:4, 188:19, 188:25, 189:8, 190:5, 199:15, 201:14, 208:9, 208:16, 211:20, 220:25
**Pace-O-Matic** [45] - 18:5, 33:3, 33:19, 35:7, 35:15, 47:5, 47:14, 49:24, 53:17, 54:15, 61:18, 63:16, 64:14, 64:16, 64:22, 67:25, 129:2, 134:10, 138:10, 145:11, 157:25, 166:2, 166:6, 166:14, 175:8, 175:18, 177:16, 177:23, 180:16, 180:17, 180:18, 187:21, 187:23, 188:2, 188:4, 188:19, 188:25, 189:8, 190:5, 199:15, 201:14, 208:9, 208:16, 211:20, 220:25
**Pace-O-Matic's** [1] -

60:20
**paces** [1] - 14:4
**packaged** [1] - 47:19
**packaging** [1] - 48:3
**padded** [1] - 47:20
**page** [35] - 26:11, 26:17, 26:18, 27:22, 36:25, 37:24, 37:25, 69:12, 130:13, 147:2, 148:24, 151:17, 156:1, 159:15, 160:21, 193:22, 194:10, 194:15, 194:16, 195:17, 195:20, 195:21, 196:4, 204:13, 208:4, 210:10, 216:7, 216:22, 217:5, 218:24, 219:14, 220:3, 220:18
**pages** [2] - 69:12, 204:11
**paid** [5] - 71:6, 81:18, 152:23, 156:15, 181:15
**painting** [1] - 170:1
**palette** [1] - 170:6
**palms** [1] - 180:6
**papers** [3] - 12:14, 173:16, 193:18
**PAR** [2] - 175:23, 179:9
**paragraph** [17] - 27:4, 27:7, 27:12, 29:6, 29:10, 38:20, 38:25, 130:14, 151:17, 194:11, 194:14, 195:23, 196:2, 196:15, 205:2, 210:10, 217:8
**paragraphs** [1] - 196:3
**parlance** [2] - 95:10, 159:10
**part** [44] - 14:21, 22:21, 35:13, 44:20, 50:1, 78:8, 78:14, 78:15, 78:19, 78:22, 79:5, 81:13, 88:22, 89:12, 89:18, 92:21, 105:15, 113:6, 115:10, 130:12, 136:5, 136:20, 136:25, 144:21, 148:7, 148:9, 151:1, 151:23, 153:23, 154:2, 159:14, 159:19, 176:17, 181:5, 185:1, 187:17, 187:19,

188:3, 205:25, 215:4, 220:20
**partial** [1] - 184:14
**particular** [26] - 9:18, 15:12, 17:2, 20:18, 22:17, 28:12, 45:16, 47:21, 63:13, 63:18, 69:21, 71:20, 72:11, 72:12, 75:23, 78:9, 96:12, 100:23, 103:9, 147:10, 154:2, 167:9, 171:6, 175:14, 194:23, 221:3
**particularly** [1] - 35:11
**parties** [1] - 116:7
**partition** [4] - 41:12, 47:6, 60:16, 61:10
**parts** [2] - 77:6, 118:5
**partway** [1] - 178:18
**passed** [1] - 94:20
**passing** [1] - 52:13
**past** [2] - 119:8, 162:4
**patented** [3] - 4:16, 52:11, 53:16
**patents** [1] - 173:21
**paths** [1] - 180:8
**patience** [1] - 186:20
**patient** [4] - 177:24, 188:9, 189:7, 189:12
**patron** [3] - 62:9, 90:11, 93:8
**patrons** [4] - 109:14, 149:22, 149:23, 216:4
**pattern** [28] - 81:12, 82:15, 83:14, 97:9, 97:10, 97:12, 99:18, 99:19, 99:22, 100:5, 110:14, 118:15, 118:18, 133:8, 133:9, 139:23, 140:5, 140:25, 141:4, 141:5, 141:9, 141:10, 155:5, 183:11, 183:24, 186:20
**patterns** [6] - 82:11, 84:24, 140:13, 154:25, 188:7, 189:25
**pay** [17] - 22:17, 69:10, 71:4, 80:13, 94:18, 98:24, 99:4, 101:18, 156:18, 170:15, 171:8, 181:12, 183:6, 183:12, 211:10, 211:11, 219:5
**paying** [2] - 183:5,

214:16
**payline** [2] - 205:19, 211:21
**paylines** [7] - 155:3, 170:5, 210:24, 211:5, 211:10, 211:23, 212:2
**pays** [6] - 179:13, 183:7, 183:13, 184:12, 206:19
**PC** [1] - 52:5
**PEN51** [1] - 220:20
**PEN59** [1] - 220:19
**penalty** [1] - 28:14
**pending** [2] - 7:19, 222:2
**Pennsylvania** [34] - 16:1, 17:3, 18:5, 20:18, 29:19, 31:8, 31:18, 31:20, 33:12, 33:17, 35:5, 39:4, 43:3, 43:5, 52:2, 65:6, 65:9, 65:18, 65:21, 65:25, 66:14, 66:19, 66:22, 75:17, 129:8, 133:21, 133:25, 166:17, 174:25, 175:4, 175:7, 178:10, 181:11, 220:25
**penny** [4] - 213:8, 213:10, 213:13, 213:25
**people** [19] - 58:18, 78:2, 83:20, 85:9, 86:9, 154:19, 154:20, 164:14, 164:15, 181:6, 195:3, 195:4, 197:3, 199:18, 199:21, 200:2, 200:6, 200:21
**per** [9] - 53:21, 54:3, 54:11, 68:9, 161:5, 172:6, 194:13, 194:22, 200:18
**perceive** [2] - 8:14, 154:13
**percent** [82] - 29:10, 80:14, 82:20, 90:2, 94:13, 94:18, 94:20, 94:22, 95:6, 98:23, 99:2, 99:13, 100:22, 100:25, 101:2, 101:6, 101:11, 101:13, 101:14, 101:17, 103:7, 103:14, 103:18, 110:25, 112:23, 112:24, 115:6, 115:7, 115:9,

115:12, 115:18, 119:8, 120:22, 121:7, 121:9, 121:14, 127:10, 131:21, 134:3, 134:4, 134:6, 135:10, 136:10, 138:14, 153:7, 160:10, 160:15, 179:17, 179:20, 179:21, 180:21, 182:19, 185:9, 185:18, 185:21, 185:22, 185:24, 186:1, 186:2, 187:1, 188:24, 189:1, 189:2, 189:9, 189:10, 206:9, 206:18, 206:23, 207:2, 213:7, 214:12, 214:17, 214:24, 215:3, 215:7, 215:14, 215:15, 215:22, 218:25
**percentage** [30] - 100:20, 115:15, 127:2, 128:8, 128:11, 128:12, 128:14, 128:15, 129:13, 129:15, 129:18, 130:2, 130:24, 131:2, 131:12, 131:14, 131:17, 131:18, 132:5, 134:2, 135:12, 156:24, 157:1, 157:8, 158:24, 159:2, 159:11, 215:6
**percentages** [6] - 127:25, 128:7, 130:10, 130:16, 131:7, 160:11
**perform** [4] - 12:17, 64:17, 149:4, 173:3
**performance** [9] - 33:6, 68:5, 125:23, 131:15, 132:8, 148:11, 157:8, 157:11, 157:13
**performed** [6] - 150:17, 151:15, 161:18, 164:5, 165:1, 166:8
**performing** [2] - 148:4, 161:22
**performs** [1] - 189:19
**perhaps** [3] - 3:21, 4:1, 188:23

**period** [9] - 34:11, 64:15, 77:21, 79:22, 79:25, 80:5, 93:20, 141:5, 151:19
**perjury** [1] - 28:14
**permanently** [3] - 112:8, 112:11, 112:12
**permission** [1] - 162:12
**permit** [1] - 84:15
**permitted** [2] - 120:8, 162:11
**permutation** [2] - 82:23, 118:19
**permutations** [1] - 119:15
**person** [11] - 73:23, 127:6, 142:17, 143:17, 163:12, 163:16, 193:6, 197:21, 221:10
**person's** [1] - 189:2
**personally** [2] - 142:22, 176:24
**perspective** [5] - 67:16, 118:17, 150:2, 150:5, 150:7
**Peter** [3] - 10:7, 11:7, 11:8
**PETER** [1] - 10:8
**Petitioner** [2] - 174:15, 190:24
**petitioner's** [1] - 57:16
**petitioners** [1] - 224:9
**Ph.D** [1] - 168:13
**phases** [2] - 178:14, 185:3
**phone** [3] - 106:21, 110:9, 153:19
**photograph** [1] - 85:13
**phrase** [3] - 115:17, 134:16, 156:2
**phrased** [1] - 115:16
**physical** [7] - 26:14, 33:15, 41:1, 48:4, 50:19, 63:9, 171:25
**physically** [1] - 14:4
**physics** [2] - 168:13, 168:14
**pick** [15] - 42:22, 62:11, 62:12, 62:14, 68:4, 68:8, 69:6, 86:6, 95:18, 96:23, 133:10, 176:5, 176:10, 212:1, 212:25
**picked** [2] - 70:3, 213:3

**picking** [2] - 119:4, 184:1
**picks** [4] - 62:17, 62:20, 63:1, 184:3
**picture** [1] - 85:15
**pictures** [3] - 48:9, 60:22, 165:6
**piece** [2] - 4:10, 150:23
**pieces** [1] - 13:20
**pirate** [5] - 70:10, 81:15, 81:16, 81:19, 81:20
**pirates** [3] - 69:10, 81:18
**pivot** [1] - 40:19
**place** [48] - 8:10, 42:18, 42:22, 42:24, 50:22, 73:1, 74:15, 77:17, 78:18, 79:6, 79:11, 79:16, 79:20, 81:14, 81:22, 82:10, 83:16, 86:22, 87:2, 87:14, 87:15, 87:16, 87:17, 88:13, 95:23, 105:20, 105:21, 106:8, 138:18, 139:20, 139:25, 140:3, 141:1, 141:17, 152:12, 155:2, 165:13, 165:15, 172:24, 173:1, 175:24, 185:7, 219:18
**placed** [3] - 78:22, 79:18, 139:6
**places** [3] - 86:14, 87:2, 156:8
**placing** [3] - 81:10, 82:19, 140:2
**plane** [1] - 85:7
**planning** [1] - 8:12
**plastic** [2] - 48:10, 49:3
**platform** [2] - 170:20, 177:19
**play** [260] - 23:8, 35:4, 35:6, 40:5, 41:15, 41:21, 41:25, 42:8, 42:11, 42:15, 42:16, 43:9, 44:3, 46:15, 51:24, 53:2, 56:18, 60:19, 63:5, 63:9, 67:5, 67:20, 68:1, 68:12, 68:14, 69:4, 69:14, 69:24, 70:5, 70:17, 70:18, 72:3, 73:16, 73:20, 74:6, 75:5, 75:7, 75:16, 76:23, 77:11, 77:13,

77:22, 77:24, 78:1, 78:3, 78:4, 79:20, 80:9, 80:11, 80:16, 80:24, 80:25, 81:2, 84:23, 84:25, 86:17, 86:21, 86:24, 86:25, 87:7, 87:10, 87:13, 87:20, 87:21, 87:22, 87:24, 88:1, 88:3, 88:4, 88:6, 88:10, 88:17, 88:18, 89:15, 89:21, 89:22, 90:8, 90:11, 91:8, 91:10, 91:17, 91:20, 93:11, 93:14, 94:22, 96:10, 96:11, 97:2, 98:9, 98:12, 99:3, 105:12, 105:14, 105:15, 105:17, 105:18, 105:22, 105:24, 105:25, 106:2, 106:3, 106:5, 106:16, 107:8, 108:17, 108:20, 108:24, 109:14, 109:20, 109:22, 110:2, 110:18, 112:9, 114:7, 116:16, 117:6, 118:16, 121:24, 123:1, 123:5, 123:12, 123:16, 123:17, 123:20, 124:5, 124:9, 124:10, 125:1, 126:3, 126:5, 126:15, 127:1, 130:3, 130:10, 130:11, 130:16, 131:6, 131:12, 131:15, 131:17, 131:20, 131:23, 132:21, 134:2, 134:8, 134:20, 134:23, 135:18, 136:10, 138:8, 138:14, 140:10, 142:9, 142:11, 143:1, 143:11, 143:12, 143:13, 143:17, 143:21, 144:7, 144:20, 149:22, 150:19, 151:2, 152:22, 154:11, 154:13, 155:8, 156:13, 157:5, 158:24, 159:22, 160:6, 160:16, 160:23, 167:6, 170:15, 170:16, 170:25,

171:3, 172:7, 175:8, 175:12, 175:15, 175:16, 176:11, 176:12, 178:17, 178:21, 178:25, 180:19, 182:9, 182:12, 182:21, 183:16, 185:2, 185:10, 185:13, 185:17, 185:23, 186:3, 186:5, 187:2, 187:5, 187:6, 187:22, 187:23, 187:24, 188:1, 188:18, 189:3, 189:9, 189:10, 189:13, 190:6, 190:10, 193:8, 194:25, 195:4, 195:5, 199:14, 199:22, 200:21, 205:23, 206:1, 206:2, 207:9, 207:15, 207:17, 211:8, 212:9, 212:14, 212:24, 213:1, 213:5, 213:9, 213:10, 214:19, 218:5, 218:17, 219:1, 219:15, 220:23, 221:2, 221:5, 221:12
**played** [60] - 34:3, 34:18, 34:21, 35:15, 39:4, 42:1, 42:9, 44:7, 68:25, 71:12, 72:6, 72:11, 72:14, 87:9, 89:24, 105:13, 110:4, 110:19, 114:15, 116:21, 116:22, 117:2, 121:3, 125:4, 126:9, 126:19, 131:14, 132:14, 137:9, 137:10, 137:13, 137:15, 137:16, 137:18, 137:19, 137:20, 153:16, 159:24, 175:6, 176:25, 177:2, 188:8, 192:1, 192:3, 194:24, 196:23, 196:24, 199:3, 199:6, 199:9, 199:10, 200:8, 202:2, 203:3, 203:8, 203:10, 212:17, 216:4, 220:24
**player** [151] - 21:11, 34:4, 34:22, 42:15, 42:21, 62:13, 62:16,

62:17, 62:20, 62:21, 62:25, 63:11, 67:16, 68:1, 68:4, 68:7, 68:11, 69:4, 69:6, 69:23, 70:1, 71:13, 71:19, 72:23, 73:3, 74:6, 74:11, 74:13, 75:5, 75:25, 76:2, 76:9, 76:10, 76:11, 80:1, 80:3, 81:5, 81:6, 81:9, 82:12, 82:18, 83:5, 85:23, 86:21, 86:24, 87:6, 90:13, 92:18, 93:10, 96:10, 106:24, 116:14, 117:8, 118:5, 118:6, 118:8, 118:17, 121:8, 121:16, 124:1, 126:22, 126:24, 126:25, 127:3, 127:9, 127:11, 127:13, 128:23, 128:25, 129:22, 131:17, 131:20, 132:3, 133:10, 138:17, 138:19, 139:13, 141:11, 141:16, 141:17, 144:22, 145:8, 150:2, 150:8, 153:3, 155:18, 158:16, 158:17, 159:11, 160:23, 172:4, 172:7, 176:5, 176:9, 176:11, 177:22, 177:25, 178:1, 180:15, 180:17, 181:18, 183:15, 184:2, 184:5, 184:9, 185:2, 185:7, 185:9, 185:13, 186:5, 186:7, 188:4, 188:18, 188:23, 188:25, 189:8, 189:13, 190:2, 191:24, 192:3, 205:17, 205:20, 206:20, 206:24, 207:1, 207:5, 207:12, 212:4, 212:5, 212:8, 212:10, 212:13, 212:17, 212:19, 212:21, 212:23, 213:24, 214:23, 215:15, 215:21, 217:9, 219:21, 219:24, 220:1
**player's** [9] - 42:18, 73:8, 81:13, 82:20,

82:24, 92:23, 97:11, 127:3, 134:7
**players** [25] - 13:16, 13:17, 82:4, 83:7, 96:14, 109:19, 125:23, 126:17, 132:12, 133:6, 133:16, 137:9, 154:5, 159:24, 160:5, 171:15, 186:24, 189:25, 191:18, 192:24, 193:8, 199:14, 205:16, 214:20, 214:21
**playing** [52] - 33:15, 34:10, 34:12, 43:1, 43:2, 43:12, 43:14, 46:1, 46:14, 46:22, 63:1, 71:20, 76:1, 76:14, 76:16, 78:5, 83:2, 83:3, 83:18, 84:18, 84:22, 88:5, 97:15, 99:20, 101:19, 105:16, 106:15, 122:25, 123:23, 126:13, 126:14, 139:13, 139:17, 139:19, 140:7, 140:9, 140:10, 142:17, 149:23, 157:5, 179:6, 180:15, 182:1, 186:25, 187:1, 188:6, 192:25, 197:3, 207:12, 214:17, 215:10, 221:1
**plays** [9] - 63:7, 72:6, 92:12, 171:3, 176:9, 177:25, 179:22, 180:18, 184:12
**plea** [1] - 50:1
**plug** [2] - 61:16, 61:19
**plugged** [1] - 48:18
**plus** [8] - 99:13, 107:3, 107:4, 107:14, 107:16, 122:6, 122:17
**point** [56] - 3:18, 15:11, 18:2, 18:14, 20:2, 22:2, 22:16, 29:13, 32:10, 32:11, 32:17, 33:1, 33:14, 34:7, 36:17, 47:24, 48:18, 49:9, 50:24, 51:11, 53:25, 61:11, 64:6, 68:6, 68:14, 92:18, 93:3, 93:5, 93:16, 94:7, 95:22,

97:2, 97:5, 97:8, 101:3, 106:7, 116:8, 118:12, 123:11, 123:23, 124:19, 140:5, 144:13, 150:13, 151:25, 159:14, 159:16, 166:18, 168:21, 185:20, 199:2, 204:20, 205:16, 209:24, 223:22
**pointed** [2] - 125:13, 138:25
**pointers** [1] - 60:16
**points** [6] - 149:1, 178:21, 191:13, 191:19, 192:14, 222:8
**poker** [16] - 83:3, 83:4, 83:16, 83:17, 83:18, 84:8, 84:13, 84:18, 169:22, 171:24, 187:14, 187:16, 187:18, 208:5, 208:16
**Poker** [3] - 193:17, 198:23, 198:25
**police** [21] - 9:11, 18:3, 18:12, 18:24, 33:8, 33:13, 33:18, 47:11, 49:7, 51:20, 58:14, 60:10, 63:22, 125:14, 156:10, 157:24, 161:20, 164:10, 164:20, 181:11, 222:16
**Police** [2] - 5:13, 52:3
**policies** [1] - 27:16
**pool** [14] - 74:25, 75:12, 75:15, 135:23, 182:8, 208:12, 208:13, 209:4, 210:12, 210:21, 210:22, 211:16, 217:10
**pools** [1] - 217:15
**pop** [1] - 97:1
**popular** [2] - 169:7, 171:14
**portable** [1] - 162:17
**portion** [21] - 58:24, 79:4, 88:25, 112:16, 113:3, 114:16, 115:25, 117:21, 118:3, 135:25, 137:8, 192:6, 192:13, 207:7, 207:25, 214:2, 215:7, 216:1, 217:18
**portions** [1] - 196:12

**position** [13] - 13:4, 14:15, 30:25, 38:18, 42:17, 93:1, 116:19, 135:18, 172:10, 184:1, 184:3, 198:24, 211:7
**positional** [1] - 69:2
**positioning** [2] - 42:13, 93:6
**positions** [1] - 13:6
**positive** [1] - 203:13
**possess** [1] - 83:12
**possesses** [1] - 222:4
**possession** [2] - 163:11, 163:12
**possibilities** [5] - 116:22, 196:20, 197:1, 197:21, 198:5
**possibility** [5] - 141:10, 153:19, 154:12, 161:1, 161:2
**possible** [22] - 44:1, 61:11, 70:13, 73:9, 79:8, 79:12, 82:8, 117:20, 119:15, 130:18, 140:1, 145:4, 149:13, 149:15, 149:20, 151:2, 160:24, 179:13, 183:4, 207:5, 212:2
**possibly** [3] - 29:8, 47:16, 73:24
**post** [3] - 168:14, 168:16, 168:18
**post-doc** [2] - 168:16, 168:18
**post-doctoral** [1] - 168:14
**posture** [1] - 53:21
**potential** [18] - 73:7, 74:3, 74:25, 79:10, 82:25, 83:14, 85:19, 86:23, 87:11, 118:6, 139:20, 141:17, 149:19, 150:10, 157:20, 211:1, 215:8, 219:8
**potentially** [10] - 53:16, 75:21, 79:16, 83:22, 132:1, 151:4, 161:3, 211:10, 211:11, 219:20
**pouch** [1] - 163:15
**Power** [2] - 197:6, 197:9, 197:10
**powered** [1] - 44:2
**practical** [6] - 33:11, 162:10, 196:21, 197:2, 198:6, 201:23

**practically** [3] - 116:21, 203:3, 203:8
**pre** [4] - 205:3, 205:4, 205:9, 205:11
**pre-reveal** [4] - 205:3, 205:4, 205:9, 205:11
**precluded** [1] - 224:10
**predetermine** [1] - 212:16
**predetermined** [16] - 62:24, 63:2, 72:25, 74:10, 74:25, 75:24, 76:22, 76:25, 77:1, 86:20, 88:9, 118:15, 135:20, 135:23, 212:14
**predeterministic** [1] - 118:19
**predicated** [2] - 67:3, 67:4
**predict** [1] - 213:25
**predominance** [1] - 134:1
**predominant** [9] - 30:15, 31:23, 43:7, 115:23, 117:7, 174:25, 178:11, 190:7, 206:11
**predominantly** [18] - 115:3, 115:5, 117:7, 131:4, 134:11, 134:12, 135:10, 135:13, 135:14, 138:11, 138:15, 167:5, 178:12, 190:4, 193:14, 208:24
**prefer** [2] - 90:17, 104:19
**preferences** [1] - 160:8
**preliminary** [3] - 6:13, 51:6, 53:11
**prepare** [3] - 37:1, 51:7, 65:17
**prepared** [6] - 25:13, 36:23, 67:2, 67:23, 174:11, 223:9
**preparing** [2] - 149:4, 163:24
**preprogrammed** [1] - 159:8
**preselected** [1] - 207:11
**presence** [2] - 116:1, 130:24
**present** [10] - 10:13, 34:13, 69:17, 93:12, 139:24, 164:6, 164:7, 164:9,

164:15, 164:16
**presented** [28] - 33:25, 42:20, 62:8, 62:10, 69:13, 81:4, 81:7, 82:17, 95:18, 96:15, 100:5, 106:24, 133:9, 140:1, 141:8, 143:12, 144:8, 152:15, 155:20, 183:4, 184:22, 196:1, 196:7, 213:18, 217:9, 219:7, 219:8
**presents** [2] - 85:20, 141:5
**preset** [1] - 125:25
**president** [1] - 6:24
**press** [36] - 70:17, 72:1, 72:16, 72:19, 72:21, 72:23, 76:23, 77:11, 77:22, 79:20, 86:24, 87:7, 87:10, 87:13, 87:24, 88:1, 88:6, 93:21, 94:9, 94:16, 96:10, 96:17, 97:1, 97:2, 97:3, 102:14, 103:3, 103:4, 105:18, 105:22, 106:4, 144:7, 144:17, 155:21, 155:22
**pressed** [1] - 94:21
**presses** [1] - 212:9
**pressing** [8] - 73:4, 81:2, 86:21, 93:19, 105:12, 105:17, 105:24, 106:2
**pretty** [10] - 16:8, 16:18, 27:23, 42:9, 44:11, 69:3, 125:6, 128:18, 170:6, 186:22
**prevent** [7] - 63:23, 153:18, 155:13, 177:9, 189:12, 189:15, 189:17
**prevents** [9] - 142:15, 143:19, 144:14, 144:15, 145:5, 145:7, 153:14, 153:22, 155:11
**preview** [12] - 180:23, 182:13, 182:15, 182:16, 183:10, 183:21, 184:17, 185:14, 190:13, 206:15, 206:19
**previews** [1] - 182:6
**previous** [8] - 13:6,

16:11, 43:6, 94:4, 103:10, 133:4, 145:17, 166:16
**previously** [4] - 16:22, 45:14, 58:13, 222:18
**prewritten** [1] - 73:25
**primarily** [2] - 62:3, 62:15
**primary** [9] - 3:21, 3:22, 16:20, 33:19, 140:14, 140:18, 140:20, 213:20, 213:21
**principle** [1] - 64:1
**principles** [2] - 147:8, 148:4
**print** [2] - 148:7, 203:18
**printed** [1] - 195:25
**printer** [4] - 40:17, 41:13, 41:14
**printout** [1] - 195:17
**privilege** [1] - 6:1
**privileged** [1] - 6:1
**privy** [2] - 28:13, 28:19
**prize** [7] - 75:15, 80:7, 80:13, 85:5, 85:15, 124:11, 139:20
**probabilities** [3] - 180:9, 180:15, 199:1
**probability** [2] - 179:23, 218:25
**problem** [4] - 188:15, 188:16, 196:1, 196:7
**procedures** [1] - 27:16
**proceed** [2] - 20:3, 32:18
**proceedings** [1] - 225:2
**process** [11] - 3:9, 5:9, 45:21, 46:14, 46:21, 46:23, 64:7, 64:21, 148:6, 169:17, 172:24
**processes** [2] - 47:15, 61:12
**produce** [2] - 12:18, 176:3
**product** [5] - 27:13, 172:3, 177:17, 177:23, 220:25
**professional** [10] - 29:21, 78:7, 79:3, 84:17, 129:11, 134:10, 134:16, 138:10, 141:13, 178:16
**profit** [8] - 159:9, 180:19, 186:2, 187:24, 213:9,

213:14, 214:1
**program** [15] - 14:11, 21:13, 34:14, 43:16, 44:19, 45:17, 45:24, 46:3, 46:6, 46:17, 47:3, 61:6, 62:6, 67:6, 75:8
**programmable** [1] - 48:16
**programmed** [3] - 19:14, 98:19, 128:7
**programming** [6] - 12:5, 19:1, 19:11, 21:24, 170:23, 173:4
**prohibiting** [1] - 143:23
**project** [2] - 26:12, 169:10
**promoted** [1] - 172:20
**prompt** [1] - 88:13
**proof** [4] - 49:10, 55:2, 56:22, 92:5
**proper** [5] - 37:25, 49:6, 152:1, 156:20
**properties** [1] - 216:22
**property** [6] - 50:10, 53:17, 54:15, 58:3, 78:20, 114:8
**proposed** [2] - 8:5, 114:2
**proposition** [4] - 111:13, 111:14, 111:15, 199:1
**proprietary** [3] - 4:16, 52:11, 57:3
**prosecution** [1] - 52:18
**protect** [1] - 57:5
**protected** [2] - 162:3, 209:19
**protecting** [1] - 165:21
**protection** [2] - 165:15, 166:6
**protections** [6] - 4:8, 4:25, 50:21, 52:9, 57:5, 209:20
**protective** [11] - 4:5, 6:19, 7:5, 8:6, 8:10, 8:17, 9:1, 9:8, 9:16, 58:8, 76:5
**prove** [1] - 83:25
**provide** [21] - 11:9, 14:22, 16:9, 18:4, 18:14, 18:20, 22:14, 33:2, 45:15, 49:20, 66:13, 66:20, 66:22, 114:13, 118:22, 120:4, 147:17, 148:18, 162:22,

166:6
**provided** [14] - 15:23, 16:22, 17:3, 40:23, 47:1, 64:5, 118:6, 141:9, 141:16, 143:10, 148:2, 149:16, 155:16, 222:16
**provides** [2] - 82:22, 148:8
**providing** [1] - 127:22
**provision** [1] - 63:21
**proxy** [3] - 221:1, 221:6, 221:7
**published** [3] - 27:15, 57:24, 202:16
**pull** [8] - 44:23, 52:5, 75:8, 75:15, 75:22, 143:25, 172:7, 218:1
**pulled** [3] - 26:19, 75:5, 106:21
**pulling** [2] - 46:2, 75:12
**pulse** [1] - 209:2
**purchase** [1] - 197:20
**pure** [4] - 128:18, 186:25, 187:1, 187:8
**purely** [1] - 83:16
**purport** [1] - 4:17
**purportedly** [2] - 49:11, 52:17
**purpose** [4] - 27:1, 53:19, 174:24, 185:16
**purposes** [6] - 5:18, 52:2, 53:18, 157:15, 201:23, 210:7
**pursuant** [1] - 30:8
**pursue** [1] - 161:15
**pursued** [1] - 166:22
**purview** [1] - 137:24
**push** [3] - 102:25, 107:2, 136:16
**pushed** [1] - 136:20
**put** [28] - 14:3, 14:4, 27:23, 28:10, 32:11, 34:2, 37:7, 50:21, 68:17, 74:15, 78:2, 78:3, 82:7, 123:3, 123:12, 126:2, 129:25, 152:12, 152:16, 172:24, 172:25, 181:8, 183:16, 185:13, 185:17, 212:14, 214:7, 221:21
**puts** [1] - 26:13
**putting** [2] - 30:2, 213:4
**puzzle** [62] - 69:25,

70:3, 70:8, 70:13, 70:18, 71:16, 71:21, 71:23, 71:24, 72:1, 72:5, 72:8, 72:10, 72:12, 72:16, 72:19, 72:23, 73:4, 73:9, 74:12, 74:14, 74:17, 76:24, 76:25, 77:15, 101:9, 105:22, 105:23, 106:6, 133:5, 141:1, 181:24, 182:14, 182:23, 182:24, 182:25, 183:5, 183:25, 184:14, 184:20, 185:18, 190:15, 192:6, 204:17, 205:20, 206:4, 206:21, 207:13, 208:8, 209:3, 211:2, 212:9, 213:19, 215:4, 215:7, 215:12, 215:16, 215:19
**puzzles** [2] - 135:24, 214:15

## Q

**qualifications** [2] - 20:6, 174:5
**Qualifications** [3] - 11:2, 20:9, 168:1
**qualified** [4] - 17:4, 30:11, 120:15, 137:14
**qualities** [1] - 194:21
**quantify** [1] - 82:14
**question's** [1] - 194:9
**questioned** [2] - 29:8, 148:22
**questioning** [2] - 122:12, 136:14
**questions** [14] - 12:13, 12:20, 20:8, 136:21, 141:21, 167:11, 186:4, 191:4, 194:7, 195:2, 202:5, 204:11, 209:21, 219:13
**quibble** [1] - 160:7
**quick** [2] - 7:18, 150:15
**quickly** [2] - 171:12, 202:12
**quite** [6] - 161:7, 169:8, 171:5, 186:9, 189:25, 208:18
**quote** [3] - 27:13, 89:6, 199:9

## R

**R&D** [2] - 172:23, 177:18
**R-u-b-l-e-y** [1] - 10:20
**racing** [1] - 86:8
**raise** [2] - 7:20, 70:6
**raised** [2] - 70:7, 202:5
**ran** [1] - 178:4
**random** [30] - 63:1, 74:23, 75:3, 75:5, 75:24, 75:25, 76:3, 76:18, 82:24, 118:6, 119:1, 138:17, 149:19, 171:20, 171:23, 172:1, 172:6, 172:9, 172:11, 172:14, 206:7, 206:14, 208:11, 208:13, 209:4, 212:4, 212:10, 212:15, 219:15, 219:24
**randomly** [11] - 77:2, 82:23, 118:16, 118:18, 139:19, 140:8, 140:9, 180:4, 210:12, 212:12, 219:17
**randomness** [5] - 62:23, 171:21, 186:16, 187:2, 206:10
**rapid** [12] - 137:20, 216:8, 216:11, 216:19, 216:21, 217:1, 217:2, 220:2, 220:5, 220:7, 220:12
**rapidly** [7] - 105:13, 105:17, 139:13, 139:17, 140:7, 140:10
**rare** [2] - 82:6, 184:10
**rate** [4] - 112:17, 113:6, 113:10, 114:18
**rather** [4] - 45:22, 177:12, 178:8, 194:20
**ratio** [1] - 128:12
**ratios** [1] - 150:11
**re** [2] - 90:24, 126:2
**re-ask** [1] - 90:24
**re-enable** [1] - 126:2
**reach** [5] - 6:13, 18:8, 45:10, 110:3, 178:9
**reach-out** [1] - 18:8
**reached** [5] - 9:2, 9:5,

22:2, 156:11, 158:10
**reaches** [1] - 132:5
**reaching** [1] - 175:5
**react** [1] - 58:22
**read** [16] - 12:7, 14:14,
17:22, 17:24, 20:13,
21:2, 27:5, 46:9,
74:1, 78:12, 83:20,
145:21, 145:22,
146:5, 146:23,
194:18
**readable** [3] - 14:7,
38:21, 61:10
**readily** [1] - 95:23
**reading** [5] - 47:16,
195:19, 196:13,
198:4, 204:18
**ready** [2] - 68:1,
209:15
**real** [1] - 150:14
**realize** [5] - 120:22,
121:7, 121:9,
121:17, 141:18
**realized** [1] - 158:20
**really** [16] - 4:13, 7:3,
54:5, 56:25, 57:1,
57:9, 83:24, 135:7,
136:6, 175:22,
183:3, 189:25,
195:5, 205:7, 220:3
**reason** [7] - 6:17,
51:15, 58:10, 59:23,
109:20, 145:24,
206:16
**reasonable** [4] -
29:21, 134:9, 138:9,
190:20
**reasons** [1] - 45:19
**receipt** [2] - 40:17,
41:14
**receive** [5] - 8:21,
37:25, 100:18,
100:21, 214:10
**received** [6] - 11:13,
47:19, 163:9,
175:21, 176:18,
214:25
**receiving** [1] - 48:3
**recent** [3] - 15:17,
16:16, 200:10
**recently** [2] - 4:4,
172:17
**recess** [8] - 59:11,
59:13, 103:23,
103:25, 138:1,
138:2, 167:16,
167:17
**recipe** [1] - 170:14
**recognition** [5] -
81:12, 82:16,

140:25, 141:4,
186:20
**recognize** [2] - 155:2,
155:6
**recognized** [1] - 17:4
**recognizing** [1] -
154:25
**recommended** [1] -
45:12
**reconvene** [1] -
103:24
**record** [17] - 3:14, 8:5,
11:5, 32:10, 45:4,
58:25, 59:5, 59:7,
81:25, 162:23,
165:1, 165:2, 165:9,
168:5, 203:25,
221:22, 224:22
**recorded** [1] - 148:21
**recording** [1] - 34:23
**recovering** [1] -
144:14
**redeem** [1] - 121:19
**redemption** [1] -
121:23
**redid** [1] - 177:19
**redirect** [2] - 167:12,
221:17
**rediscuss** [1] - 220:3
**reduce** [1] - 217:23
**reel** [6] - 75:6, 75:7,
75:9, 79:14, 172:9
**reels** [4] - 75:10,
77:19, 170:4, 172:11
**refer** [4] - 34:24, 89:4,
102:5, 220:3
**referenced** [3] - 49:13,
50:14, 117:25
**referred** [3] - 22:24,
133:22, 220:21
**referring** [2] - 171:21,
182:22
**refers** [1] - 89:3
**refill** [1] - 158:5
**reflect** [1] - 178:24
**refresh** [1] - 158:5
**refreshing** [1] - 156:19
**regard** [3] - 8:23, 9:22,
31:17
**regarding** [27] - 5:9,
5:24, 12:5, 18:5,
30:6, 30:12, 39:17,
43:2, 49:10, 49:20,
50:6, 51:12, 51:13,
52:15, 57:14, 58:8,
67:1, 85:16, 89:23,
105:1, 120:20,
129:2, 133:24,
197:17, 218:24,
222:11, 222:21

**regardless** [3] - 99:10,
102:9, 217:19
**regulated** [2] - 65:3,
139:7
**regulation** [1] - 129:1
**regulations** [12] -
12:8, 12:11, 12:16,
13:14, 15:14, 20:13,
27:14, 66:22, 129:9,
146:10, 146:12,
169:24
**regulator** [2] - 65:20,
66:7
**regulators** [1] - 179:10
**regulatory** [8] - 13:15,
13:18, 15:12, 15:21,
45:10, 66:8, 128:23,
139:7
**relate** [2] - 20:24,
76:19
**related** [2] - 33:3,
66:14
**relation** [2] - 10:21,
51:6
**relationship** [3] -
65:14, 66:11, 66:15
**relative** [1] - 115:24
**relatively** [2] - 44:15,
125:1
**relax** [1] - 110:6
**relevance** [5] - 115:2,
119:9, 120:1, 120:5,
192:22
**relevant** [4] - 12:3,
68:5, 120:7, 195:6
**relied** [5] - 31:12,
147:14, 148:3,
148:11, 209:8
**rely** [2] - 17:17, 167:9
**relying** [1] - 55:19
**remain** [1] - 124:4
**remaining** [1] - 121:21
**remember** [1] - 213:19
**remind** [1] - 105:7
**remove** [2] - 49:4,
97:25
**removed** [3] - 34:14,
38:18, 49:1
**render** [1] - 134:24
**renewing** [1] - 117:16
**repeat** [6] - 97:11,
107:13, 108:7,
138:6, 141:4, 141:6
**rephrase** [2] - 113:8,
151:25
**replace** [2] - 81:17,
111:7
**replaced** [4] - 69:7,
110:13, 217:9,
217:21

**replicate** [3] - 97:9,
99:18, 99:19
**report** [118] - 3:18,
5:11, 5:25, 15:1,
15:5, 23:5, 23:9,
23:14, 24:5, 24:22,
24:23, 24:24, 25:11,
25:17, 25:20, 25:22,
26:3, 26:20, 27:24,
28:12, 28:16, 29:2,
29:10, 30:4, 32:22,
34:25, 36:8, 36:18,
36:22, 37:1, 37:20,
38:13, 38:23, 51:21,
51:23, 54:4, 56:10,
56:17, 57:16, 58:6,
61:3, 62:1, 67:2,
67:3, 67:4, 67:19,
67:23, 69:21, 73:3,
81:9, 84:4, 84:12,
86:11, 88:21, 89:3,
89:5, 89:20, 115:6,
115:17, 117:25,
121:12, 121:23,
121:24, 122:9,
122:10, 124:17,
124:20, 124:25,
127:22, 128:2,
128:5, 130:6, 130:8,
130:9, 130:12,
130:15, 131:6,
135:6, 136:8,
141:22, 146:5,
146:18, 146:22,
147:2, 148:2, 148:8,
148:9, 148:12,
149:4, 150:25,
156:21, 159:8,
159:15, 163:25,
174:11, 174:21,
174:24, 176:21,
180:12, 180:14,
181:7, 188:21,
189:5, 190:25,
204:8, 209:9,
209:22, 212:21,
214:7, 218:10,
220:18, 220:23,
223:8, 223:21
**reporter** [2] - 10:19,
221:22
**reports** [10] - 12:18,
27:1, 27:23, 28:11,
28:21, 37:17, 37:18,
37:19, 65:17, 65:18
**represent** [2] - 7:4,
219:24
**representative** [5] -
176:20, 213:11,
213:13, 217:2, 217:4

**represented** [2] - 6:16,
211:18
**representing** [1] -
31:3
**represents** [1] - 158:9
**request** [3] - 37:24,
47:10, 209:13
**requested** [2] - 60:21,
65:19
**requests** [1] - 5:23
**require** [5] - 82:15,
118:4, 126:1,
156:17, 211:1
**required** [17] - 20:17,
20:20, 64:3, 79:19,
84:25, 97:17,
105:21, 106:7,
107:7, 112:18,
117:14, 139:21,
143:11, 143:12,
172:9, 223:1, 223:11
**requirement** [5] -
42:18, 111:5, 111:6,
129:6, 211:3
**requirements** [8] -
19:25, 27:14, 27:17,
28:4, 28:7, 126:23,
147:10, 147:11
**requires** [2] - 82:15,
97:22
**requiring** [1] - 63:20
**reschedule** [1] - 59:25
**reservations** [1] -
64:21
**reserved** [1] - 39:12
**residue** [1] - 4:11
**resolution** [2] - 48:9,
179:2
**respect** [8] - 8:16,
8:23, 9:8, 9:16,
177:15, 179:5,
180:23, 220:25
**respectfully** [1] -
200:17
**respond** [3] - 114:11,
121:5, 198:7
**responding** [1] -
205:2
**response** [7] - 8:22,
84:3, 119:19, 130:7,
136:14, 192:10,
222:17
**responses** [1] - 51:10
**responsibilities** [1] -
13:9
**responsibility** [1] -
12:7
**rest** [2] - 184:1, 184:12
**restate** [1] - 109:18
**result** [6] - 77:15,

144:4, 183:17,
184:13, 189:13,
194:19
**results** [5] - 22:20,
63:15, 186:5, 188:19
**retained** [7] - 10:24,
18:14, 35:2, 39:16,
46:18, 50:4
**retention** [2] - 150:11,
162:23
**return** [18] - 10:1,
58:3, 78:20, 114:8,
126:24, 126:25,
127:9, 127:10,
127:19, 128:23,
128:25, 129:22,
131:17, 131:20,
159:11, 185:2,
188:22, 188:23
**returned** [2] - 8:8,
222:5
**reveal** [6] - 70:1, 76:5,
205:3, 205:4, 205:9,
205:11
**revealed** [1] - 70:14
**revenue** [1] - 157:15
**reverse** [1] - 4:12
**review** [57] - 5:19,
12:2, 12:14, 14:2,
14:22, 15:24, 16:10,
18:24, 22:9, 22:11,
29:7, 30:9, 30:12,
33:6, 33:24, 39:20,
46:18, 48:20, 54:21,
54:23, 55:7, 56:11,
57:15, 61:25, 64:9,
64:14, 65:22, 72:16,
72:19, 72:24, 86:5,
112:14, 117:13,
118:10, 118:14,
118:21, 119:10,
119:14, 119:17,
120:2, 120:6,
124:21, 132:7,
149:10, 149:19,
149:22, 150:10,
150:15, 151:9,
161:6, 177:13,
177:14, 177:21,
196:22, 222:2,
222:18, 222:20
**reviewed** [10] - 25:11,
27:13, 28:3, 57:16,
57:18, 148:11,
163:23, 163:24,
216:16, 222:22
**reviewing** [5] - 64:13,
84:6, 96:5, 178:8,
196:22
**reviews** [6] - 4:7,

14:24, 15:15, 16:4,
21:4, 66:2
**revised** [1] - 25:4
**reward** [4] - 97:23,
97:24, 133:23,
194:20
**rights** [1] - 54:15
**risk** [1] - 97:23
**RNG** [15] - 21:15,
74:24, 75:2, 75:3,
75:4, 75:6, 75:8,
172:1, 172:5,
197:12, 208:15,
208:19, 208:21,
208:22, 209:1
**RNGs** [2] - 172:8,
172:9
**road** [1] - 4:15
**role** [3] - 12:7, 20:13,
60:19
**roll** [1] - 186:17
**ROMANO** [4] - 8:18,
8:21, 9:10, 9:18
**Romano** [6] - 4:19,
4:22, 8:14, 8:18,
64:11, 164:8
**room** [4] - 40:4, 163:4,
163:6
**rose** [1] - 126:10
**rotate** [3] - 69:5,
77:12, 87:2
**rotating** [2] - 87:3,
93:22
**roughly** [2] - 100:13,
178:4
**round** [17] - 62:13,
101:2, 107:10,
107:12, 107:14,
107:16, 107:22,
107:23, 107:24,
107:25, 108:1,
108:2, 108:18,
110:20, 122:5
**rounded** [1] - 101:3
**rounds** [16] - 97:11,
97:14, 97:15, 97:17,
99:25, 100:2, 103:8,
107:5, 107:6,
107:18, 107:21,
107:22, 110:19,
111:20, 119:1,
121:20
**row** [5] - 69:10, 81:14,
81:15, 81:18
**RTM** [1] - 188:23
**RTP** [2] - 188:22,
188:25
**RUBLEY** [2] - 10:15,
10:20
**Rubley** [1] - 10:16

**rule** [1] - 145:19
**rules** [27] - 4:14, 12:8,
12:11, 12:16, 13:14,
15:2, 15:14, 15:18,
20:13, 34:12, 42:18,
42:22, 66:21, 69:22,
71:7, 85:24, 94:16,
97:5, 97:10, 98:9,
98:11, 129:9, 146:9,
146:12, 151:24,
170:15, 171:7
**run** [5] - 13:25, 86:9,
104:13, 149:17,
163:22
**running** [2] - 52:9,
172:5
**runs** [1] - 14:25

## S

**safe** [3] - 163:5, 163:6,
222:5
**sake** [2] - 212:23,
218:23
**sanctions** [1] - 54:18
**sand** [1] - 19:10
**Santa** [1] - 168:11
**sat** [1] - 150:8
**satisfied** [1] - 55:2
**Saturday** [1] - 209:15
**saw** [9] - 18:23, 18:24,
40:10, 42:4, 68:2,
68:22, 77:15,
131:11, 157:3
**SC** [1] - 168:7
**scale** [1] - 200:5
**scenario** [5] - 82:4,
101:6, 111:3,
111:20, 219:11
**scenarios** [1] - 91:16
**schedule** [1] - 22:17
**scheduled** [1] - 59:23
**schedules** [1] - 104:2
**scheduling** [4] -
18:11, 203:24,
224:17, 224:18
**scheme** [7] - 66:8,
157:24, 158:2,
196:20, 197:1,
197:17, 198:5
**schemes** [1] - 188:10
**Schoppe** [2] - 104:24,
122:9
**Science** [2] - 11:12,
11:13
**scientific** [2] - 173:3,
190:20
**scope** [5] - 121:12,
148:24, 149:3,

192:8, 193:14
**score** [5] - 171:1,
178:20, 179:2,
191:12, 191:18
**scratch** [3] - 76:4,
76:22, 77:5
**scratch-off** [2] - 76:4,
76:22
**scratch-offs** [1] - 77:5
**scratching** [1] - 76:4
**screen** [26] - 34:5,
40:13, 40:15, 68:2,
68:3, 68:9, 69:5,
69:15, 70:16, 71:5,
88:9, 92:19, 93:3,
93:12, 96:6, 96:23,
97:5, 111:7, 111:10,
183:21, 191:20,
211:18, 212:17,
221:12
**screens** [1] - 68:20
**script** [1] - 62:19
**scroll** [1] - 68:7
**se** [6] - 53:21, 54:3,
54:11, 194:13,
194:22, 200:18
**seal** [2] - 49:6, 49:7
**sealed** [4] - 47:22,
47:23, 49:5, 49:23
**search** [2] - 7:22,
50:23
**second** [10] - 25:16,
38:17, 39:1, 40:1,
42:17, 164:16,
164:18, 164:24,
172:6, 205:15
**second-to-last** [2] -
38:17, 39:1
**seconds** [6] - 100:14,
102:18, 107:19,
107:20, 109:1, 214:8
**secret** [2] - 4:25, 6:20
**secrets** [1] - 209:19
**Section** [1] - 204:13
**section** [1] - 114:19
**sections** [1] - 218:21
**security** [16] - 47:1,
47:8, 47:16, 53:15,
54:8, 57:13, 58:9,
60:4, 60:7, 60:11,
60:17, 60:20, 61:8,
61:9, 61:13, 162:1
**see** [73] - 7:9, 9:3,
23:18, 24:6, 27:19,
27:20, 44:6, 45:11,
47:11, 49:3, 54:9,
59:22, 60:23, 61:13,
63:4, 68:20, 71:21,
73:17, 73:21, 74:7,
74:13, 74:20, 76:23,

77:7, 77:16, 78:5,
81:13, 85:3, 85:14,
85:17, 86:4, 86:6,
96:9, 96:15, 96:25,
98:11, 105:6,
118:24, 126:14,
126:15, 126:16,
133:8, 133:15,
135:5, 138:19,
146:19, 146:24,
149:1, 151:20,
155:24, 156:24,
157:2, 157:4, 157:5,
159:24, 160:24,
164:3, 175:13,
176:3, 178:2, 178:4,
182:14, 183:3,
183:7, 183:11,
183:22, 183:24,
184:21, 184:22,
202:8, 203:23,
211:13, 221:3
**seeing** [4] - 6:13,
60:15, 128:11,
157:16
**seek** [1] - 30:23
**seeking** [1] - 162:13
**seem** [2] - 101:1,
181:22
**sees** [4] - 63:11, 89:1,
127:23, 128:13
**seize** [1] - 49:16
**seized** [17] - 8:7,
18:18, 49:24, 50:17,
53:20, 53:25, 55:21,
59:1, 134:10,
138:10, 149:7,
149:11, 149:24,
150:16, 150:17,
151:5, 151:10
**seizing** [1] - 58:20
**seizure** [1] - 7:22
**select** [10] - 70:17,
70:19, 70:20, 95:16,
98:14, 151:25,
153:3, 207:10,
213:15, 219:22
**selected** [4] - 71:19,
88:3, 192:23, 213:15
**selecting** [4] - 69:13,
70:23, 82:14, 219:18
**selection** [11] - 77:16,
79:23, 80:4, 80:12,
80:13, 80:17, 80:22,
80:23, 90:5, 151:18,
218:20
**sell** [1] - 65:2
**semi** [1] - 87:16
**seminal** [1] - 200:15
**send** [4] - 33:11,

203:18, 203:19, 203:21
**sense** [5] - 152:24, 158:12, 158:14, 181:22, 186:15
**sensitive** [4] - 53:16, 57:3, 161:23, 161:24
**sensitivity** [1] - 50:22
**sent** [3] - 10:23, 47:12, 57:2
**sentence** [5] - 38:16, 38:17, 39:1, 151:18, 217:8
**sentences** [1] - 25:3
**sentencing** [1] - 50:2
**separate** [12] - 5:17, 22:7, 22:23, 48:23, 50:17, 54:20, 88:20, 89:4, 114:8, 182:12, 210:12, 224:19
**separately** [3] - 64:1, 114:6, 122:10
**separating** [1] - 11:19
**September** [1] - 39:20
**sequence** [2] - 98:15, 108:7
**serial** [4] - 48:14, 48:15, 48:17, 48:18
**series** [5] - 57:16, 216:24, 220:2, 220:5, 220:7
**serious** [1] - 7:1
**seriously** [3] - 7:3, 58:22
**serves** [1] - 170:17
**service** [1] - 126:11
**services** [5] - 15:11, 16:14, 33:3, 64:17, 65:19
**set** [15] - 13:25, 34:1, 40:1, 52:15, 126:21, 127:18, 128:23, 129:18, 147:4, 147:7, 151:4, 156:12, 160:13, 169:24, 172:13
**seven** [2] - 109:2, 211:19
**several** [11] - 72:19, 72:24, 85:5, 86:2, 145:10, 164:19, 168:20, 169:6, 172:20, 193:12, 218:17
**shape** [3] - 82:9, 93:2, 162:4
**share** [5] - 5:14, 63:14, 64:2, 64:4, 157:15
**shared** [4] - 5:10,

5:12, 63:19, 65:19
**sharing** [2] - 5:14, 165:20
**sheets** [2] - 175:23, 179:9
**shifted** [1] - 40:20
**ship** [2] - 85:4, 85:5
**shipped** [2] - 33:9, 54:7
**shipping** [2] - 48:5, 57:7
**shoehorn** [1] - 134:16
**short** [3] - 47:10, 141:5, 214:8
**shortly** [1] - 21:16
**shoulder** [1] - 34:23
**show** [15] - 22:19, 25:20, 51:14, 68:8, 70:1, 70:4, 71:23, 85:25, 94:3, 99:23, 133:3, 133:6, 148:22, 187:24, 200:3
**showed** [3] - 71:5, 111:10, 164:17
**showing** [1] - 35:25
**shown** [10] - 34:7, 40:8, 41:1, 62:13, 68:1, 80:2, 82:11, 85:23, 96:16, 148:22
**shows** [3] - 68:3, 68:4, 71:18
**shuffle** [2] - 210:17, 217:25
**shuffled** [2] - 75:19, 210:15
**shuffling** [2] - 83:15, 171:23
**shut** [1] - 43:15
**side** [12] - 40:4, 40:17, 68:19, 85:4, 93:1, 116:12, 166:14, 169:20, 179:11, 211:4
**sidebar** [2] - 203:23, 203:25
**sides** [1] - 120:12
**sign** [3] - 9:10, 25:16, 107:3
**signal** [1] - 48:15
**signature** [15] - 25:18, 25:21, 25:25, 26:10, 26:13, 26:14, 36:25, 37:3, 37:4, 37:8, 37:21, 37:24, 37:25, 38:4, 174:22
**signed** [4] - 25:19, 26:9, 37:18, 165:16
**significance** [1] - 129:12

**significantly** [1] - 138:20
**silicon** [1] - 19:10
**silly** [1] - 199:20
**similar** [24] - 27:17, 35:9, 44:12, 46:22, 51:13, 51:17, 53:24, 56:17, 68:25, 69:1, 80:6, 99:21, 125:2, 125:7, 157:18, 165:13, 165:15, 166:4, 173:3, 173:6, 188:10, 201:4, 201:22, 210:14
**similarly** [3] - 179:1, 208:7, 224:8
**Simon** [3] - 97:7, 98:15, 206:7
**simple** [2] - 25:3, 116:13
**simpler** [1] - 147:3
**simply** [2] - 73:14, 82:25
**simulate** [3] - 171:8, 176:18, 185:6
**simulated** [3] - 176:23, 178:9, 185:6
**simulates** [1] - 176:2
**simulation** [1] - 216:25
**simulations** [3] - 176:14, 178:4, 178:8
**simulator** [1] - 176:2
**single** [24] - 34:19, 34:21, 68:14, 69:12, 82:8, 85:18, 114:8, 114:9, 116:5, 116:16, 142:23, 143:1, 143:21, 144:21, 144:23, 145:5, 145:6, 152:23, 160:6, 160:10, 160:16, 189:13, 200:9, 201:25
**SIQ** [1] - 16:17
**sit** [4] - 108:6, 110:6, 145:4, 221:5
**site** [8] - 33:24, 149:7, 150:16, 150:18, 151:1, 151:5, 151:11, 164:5
**sites** [1] - 199:14
**sitting** [5] - 21:12, 76:14, 76:16, 138:17, 166:15
**situation** [8] - 74:9, 75:21, 80:8, 87:6, 88:10, 166:9, 205:18, 219:6

**six** [5] - 68:9, 68:18, 149:1, 151:14, 182:6
**size** [1] - 210:22
**skill** [139] - 15:15, 15:18, 15:19, 15:20, 16:23, 18:5, 20:25, 23:7, 30:14, 31:14, 35:5, 39:4, 43:8, 62:3, 73:4, 73:7, 73:13, 73:22, 73:24, 73:25, 74:10, 74:22, 81:10, 82:14, 82:15, 82:24, 83:5, 83:11, 83:17, 84:17, 99:6, 99:8, 99:9, 101:24, 109:14, 112:17, 112:24, 113:3, 113:6, 113:10, 113:13, 113:18, 114:5, 114:18, 115:3, 115:9, 115:13, 115:24, 116:1, 116:8, 116:11, 117:5, 117:7, 117:9, 117:14, 117:19, 117:22, 118:1, 118:5, 128:9, 130:25, 131:4, 134:2, 134:7, 134:11, 134:25, 135:10, 136:17, 137:22, 138:11, 138:15, 140:14, 140:23, 140:24, 145:15, 145:20, 145:25, 154:15, 154:17, 154:21, 154:23, 154:24, 154:25, 155:1, 155:5, 167:5, 174:25, 175:1, 175:4, 175:7, 176:12, 176:17, 178:10, 178:11, 178:12, 186:14, 186:17, 186:22, 187:15, 188:3, 188:15, 190:7, 190:12, 190:16, 193:7, 194:20, 198:15, 199:24, 200:7, 201:4, 201:24, 205:25, 206:3, 206:9, 207:6, 208:17, 209:2, 213:13, 213:17, 216:7, 216:8, 216:19, 216:21, 217:1, 217:2, 217:19, 220:2,

220:5, 220:8, 220:11, 220:12, 220:13, 220:25
**skill-based** [1] - 15:18
**skilled** [1] - 160:23
**skillful** [27] - 177:24, 180:15, 180:17, 183:15, 184:2, 184:5, 184:9, 185:7, 185:12, 186:5, 186:7, 188:18, 188:25, 189:3, 189:7, 189:12, 206:1, 206:2, 206:20, 206:23, 207:1, 207:12, 212:19, 212:21, 212:23, 213:24, 215:21
**skillfully** [2] - 185:2, 200:9
**skills** [3] - 216:11, 216:24, 220:7
**sleep** [1] - 80:6
**slight** [2] - 22:19, 44:18
**slightly** [1] - 77:13
**slot** [24] - 76:22, 77:21, 87:9, 119:17, 131:15, 131:16, 143:25, 156:15, 157:8, 169:20, 169:23, 171:22, 172:2, 172:3, 179:10, 186:5, 186:10, 186:11, 187:3, 187:11, 189:19, 189:22
**slots** [3] - 169:22, 189:23, 190:3
**Slovenia** [1] - 16:17
**slowly** [1] - 217:10
**small** [1] - 48:15
**smaller** [2] - 40:14, 41:2
**Smithsonian** [2] - 168:17, 168:19
**software** [49] - 4:6, 4:9, 5:19, 6:3, 6:21, 19:23, 20:1, 21:19, 22:13, 23:9, 32:13, 35:4, 35:10, 35:13, 39:3, 39:10, 39:23, 40:6, 41:22, 41:25, 43:12, 47:5, 50:20, 52:5, 52:10, 52:12, 55:21, 57:15, 58:6, 59:1, 60:4, 61:23, 62:4, 67:10, 67:18, 90:8, 91:7, 91:20,

145:11, 145:14, 146:17, 157:25, 162:12, 170:24, 171:2, 171:5, 175:10, 216:11, 216:13

**softwares** [1] - 60:12

**solely** [2] - 120:3, 167:9

**solve** [1] - 133:5

**solves** [1] - 170:24

**solving** [2] - 188:15, 188:16

**someone** [10] - 43:21, 50:18, 74:1, 92:11, 115:12, 122:1, 145:4, 153:18, 161:2, 219:17

**sometimes** [6] - 12:22, 71:4, 85:7, 156:22, 181:16

**somewhat** [4] - 125:7, 169:21, 186:14, 197:7

**somewhere** [4] - 21:2, 88:13, 100:14, 106:8

**sorry** [11] - 78:13, 91:23, 132:23, 150:14, 158:16, 159:13, 179:18, 181:25, 184:17, 186:11, 217:5

**Sorry** [1] - 100:6

**sort** [6] - 3:22, 6:18, 16:10, 178:17, 193:9, 205:7

**Sotto** [3] - 7:14, 165:9, 224:23

**sought** [1] - 30:7

**sound** [1] - 157:19

**sounds** [4] - 114:2, 119:7, 151:13, 223:17

**source** [32] - 13:21, 13:24, 14:12, 21:5, 21:10, 22:9, 22:15, 44:1, 44:24, 45:3, 63:2, 74:20, 118:6, 118:21, 118:24, 119:10, 119:17, 120:2, 120:4, 128:6, 130:17, 149:13, 149:16, 149:18, 166:21, 177:13, 177:14, 177:15, 177:16, 178:3

**South** [1] - 11:16

**space** [10] - 40:24,

65:9, 94:3, 172:19, 176:6, 181:9, 189:22, 189:25, 212:15, 218:14

**speaking** [2] - 9:20, 33:23

**spec** [1] - 170:13

**specific** [17] - 19:5, 49:7, 50:10, 61:14, 61:20, 69:24, 71:24, 72:4, 75:15, 83:8, 93:18, 116:15, 129:3, 129:22, 146:16, 146:17, 175:10

**specifically** [13] - 40:11, 46:8, 58:16, 65:17, 66:1, 66:11, 85:17, 118:8, 159:14, 163:3, 165:15, 169:4, 218:13

**specification** [1] - 170:13

**specify** [1] - 97:14

**spectrum** [1] - 16:8

**speculate** [1] - 153:21

**speculating** [2] - 77:4, 90:19

**speculation** [9] - 76:8, 96:1, 98:3, 109:9, 112:21, 119:8, 119:9, 119:21, 128:18

**speculative** [2] - 109:23, 121:12

**spell** [1] - 10:18

**spelled** [2] - 11:8, 127:22

**spelling** [1] - 11:5

**spend** [3] - 182:19, 214:20, 214:22

**spent** [1] - 206:17

**spin** [4] - 42:16, 85:19, 86:7, 180:5

**spinning** [4] - 75:10, 77:14, 79:15, 93:16

**spins** [3] - 85:16, 180:4, 180:6

**Sports** [1] - 31:3

**spot** [6] - 62:16, 79:12, 140:4, 141:18, 176:5, 176:10

**spreadsheets** [1] - 175:22

**sprinkled** [1] - 208:17

**square** [1] - 152:1

**SSD** [1] - 44:17

**SSD-type** [1] - 44:17

**staff** [1] - 26:12

**stage** [2] - 29:19, 98:3

**stages** [1] - 128:18

**stand** [1] - 198:25

**standard** [10] - 29:20, 29:25, 30:1, 30:22, 31:13, 32:16, 116:20, 179:14, 195:6

**standards** [3] - 27:15, 27:16, 29:24

**standing** [4] - 55:16, 90:16, 90:25, 91:3

**standpoint** [2] - 13:21, 109:10

**stands** [1] - 41:8

**standup** [1] - 41:2

**start** [11] - 43:23, 77:12, 85:14, 148:15, 158:16, 169:24, 170:6, 172:18, 178:23, 179:12, 182:24

**started** [9] - 39:5, 40:2, 40:3, 43:4, 43:11, 44:3, 55:1, 169:13, 169:14

**starting** [2] - 111:3, 211:7

**starts** [4] - 27:7, 187:15, 195:24, 196:2

**state** [32] - 6:15, 9:11, 11:5, 12:18, 18:3, 18:12, 18:23, 33:8, 33:12, 33:17, 43:21, 47:11, 47:25, 49:7, 49:14, 51:20, 57:8, 58:13, 60:10, 63:22, 111:8, 125:14, 137:8, 139:3, 156:9, 157:24, 161:20, 164:9, 164:20, 168:5, 222:16

**State** [7] - 5:12, 16:1, 16:6, 52:2, 66:22, 127:15, 127:16

**statement** [7] - 21:21, 27:21, 28:1, 28:9, 143:2, 151:12, 151:21

**States** [6] - 16:8, 16:18, 19:15, 19:24, 65:4, 173:22

**states** [3] - 17:1, 146:5, 196:12

**stats** [1] - 68:5

**status** [8] - 87:1, 92:21, 93:2, 93:6, 93:9, 96:9, 96:13

**statute** [2] - 21:1, 21:3

**statutes** [3] - 12:8, 20:21, 31:11

**statutorily** [1] - 20:20

**statutory** [1] - 31:14

**stay** [4] - 121:21, 122:21, 123:5, 151:6

**staying** [1] - 83:21

**stays** [2] - 121:9, 123:18

**step** [3] - 6:18, 167:6, 167:14

**stick** [1] - 94:23

**still** [22] - 4:16, 55:5, 55:9, 82:4, 87:14, 87:17, 101:6, 110:21, 112:6, 123:3, 123:22, 162:22, 185:14, 190:3, 199:1, 204:8, 206:8, 207:22, 217:3, 222:4, 223:19

**stop** [4] - 42:17, 75:10, 75:11, 77:14, 77:19, 77:20, 77:23, 105:19, 107:18, 144:18, 165:14

**stopped** [3] - 21:16, 69:6, 93:16

**stopping** [1] - 172:10

**stops** [4] - 75:6, 75:9, 79:14, 172:10

**storage** [12] - 21:13, 34:14, 43:16, 44:19, 45:18, 45:24, 46:3, 46:6, 47:4, 61:6, 62:6, 67:7

**story** [1] - 144:4

**straight** [1] - 108:1

**strategies** [1] - 153:14

**strategy** [10] - 73:7, 73:14, 73:25, 153:8, 153:23, 154:1, 173:12, 186:19, 189:23, 190:2

**stream** [1] - 172:8

**street** [1] - 52:6

**strictly** [1] - 109:22

**strike** [5] - 84:3, 119:7, 153:12, 154:4, 157:22

**strive** [1] - 165:23

**strongly** [1] - 138:22

**structure** [3] - 75:15, 151:1, 157:25

**stuff** [1] - 181:4

**style** [4] - 44:18, 130:3, 170:3, 172:3

**styles** [1] - 119:5

**subject** [3] - 49:15,

56:12, 92:1

**subjectively** [1] - 109:9

**submissions** [1] - 13:21

**submit** [6] - 5:25, 29:19, 30:11, 32:16, 114:14, 198:19

**submitted** [2] - 38:13, 38:14

**subpoena** [9] - 5:21, 147:20, 147:23, 148:1, 148:10, 209:12, 209:15, 209:24, 222:17

**Subsection** [1] - 219:14

**subsequent** [2] - 168:16, 210:11

**subset** [2] - 211:1, 211:2

**substance** [3] - 32:22, 38:22, 209:22

**substantial** [1] - 40:18

**substantially** [5] - 51:13, 51:17, 53:24, 56:17, 125:2

**substitute** [2] - 37:24, 152:1

**substitution** [1] - 38:7

**success** [1] - 180:15

**successful** [4] - 97:13, 120:23, 145:2, 189:21

**successfully** [23] - 97:17, 98:17, 100:18, 102:22, 103:7, 106:17, 108:9, 110:19, 133:17, 142:13, 142:21, 143:8, 143:19, 153:6, 153:8, 153:23, 155:12, 160:19, 161:10, 170:7, 185:11, 214:11, 220:9

**suddenly** [1] - 117:4

**sue** [1] - 58:14

**sued** [1] - 58:13

**sufficient** [2] - 31:6, 31:16

**sufficiently** [1] - 145:8

**suggest** [2] - 6:10, 154:5

**sum** [2] - 78:2, 184:16

**summary** [1] - 204:14

**summing** [1] - 133:19

**summons** [1] - 10:22

**super** [5] - 60:13,

216:7, 216:24,
217:1, 220:11
**Superior** [3] - 195:17,
199:5, 200:17
**supplement** [1] -
223:8
**support** [1] - 24:11
**supported** [3] - 136:7,
136:8
**suppose** [2] - 8:1,
55:17
**supposed** [6] - 28:5,
50:10, 50:11, 53:17,
69:23, 74:2
**Supreme** [1] - 200:12
**suspect** [2] - 4:20,
44:24
**suspicion** [1] - 60:23
**sustain** [2] - 90:23,
204:2
**sustained** [15] - 76:12,
77:9, 84:20, 92:15,
96:3, 98:6, 109:24,
117:23, 120:18,
129:16, 130:21,
140:18, 140:20
**swarming** [1] - 85:2
**swim** [1] - 85:14
**switch** [2] - 34:8,
132:12
**sworn** [2] - 10:9,
167:23
**symbol** [34] - 42:19,
42:21, 42:24, 69:8,
71:5, 71:10, 75:10,
77:18, 79:6, 79:18,
79:20, 81:10, 81:14,
81:17, 82:10, 82:14,
82:20, 86:22, 87:14,
88:13, 105:20,
105:21, 106:8,
110:8, 139:21,
139:25, 140:2,
141:1, 152:12,
183:13, 184:12,
205:5, 206:19
**symbols** [36] - 42:11,
42:16, 42:19, 42:20,
42:23, 62:12, 62:14,
62:17, 69:4, 69:5,
69:7, 69:9, 77:12,
77:14, 77:17, 77:23,
79:7, 81:3, 81:7,
81:13, 81:15, 82:11,
85:2, 85:3, 85:25,
92:23, 106:9, 144:8,
176:5, 183:3, 183:5,
188:10, 206:15,
207:25, 212:6,
212:12

**system** [4] - 85:20,
85:22, 85:23, 173:15
**Systems** [1] - 172:22

**T**

**tab** [2] - 75:15, 75:22
**table** [9] - 71:4, 119:2,
169:20, 169:22,
170:15, 171:22,
171:25, 179:11,
183:12
**Tableau** [3] - 44:22,
45:4, 61:5
**TABLEAU** [1] - 45:5
**tables** [1] - 171:8
**tabletop** [3] - 40:12,
41:5, 41:22
**talks** [3] - 115:6,
115:24, 124:14
**tampering** [1] - 54:14
**tank** [3] - 85:9, 211:25
**tanks** [2] - 211:18,
211:22
**tap** [11] - 77:13, 85:4,
85:8, 85:10, 85:14,
86:2, 86:25, 87:4,
88:11, 94:4, 94:5
**tape** [1] - 41:9
**tapping** [1] - 108:8
**taps** [1] - 62:16
**task** [2] - 152:8, 152:9
**tasks** [1] - 173:3
**taught** [1] - 169:6
**taxation** [1] - 157:15
**taxed** [1] - 157:15
**TD3** [1] - 44:22
**teach** [1] - 169:3
**team** [1] - 170:18
**technical** [7] - 13:5,
13:9, 27:15, 149:10,
150:15, 150:23,
151:9
**technically** [1] -
181:14
**technologic** [2] -
142:20
**technological** [1] -
154:1
**Technology** [1] -
11:12
**technology** [1] - 32:13
**templates** [1] - 28:21
**temporarily** [1] - 204:3
**ten** [6] - 11:24, 59:10,
68:22, 167:16,
184:7, 215:23
**ten-minute** [2] - 59:10,
167:16

**tend** [2] - 171:6
**tender** [3] - 20:3,
173:25, 174:3
**term** [6] - 63:25,
115:23, 126:20,
127:8, 156:6, 169:10
**terminology** [4] -
156:9, 156:14,
156:19, 159:3
**terms** [20] - 6:4, 8:5,
26:18, 115:7,
115:17, 126:21,
126:23, 152:16,
152:18, 173:10,
178:20, 179:8,
179:9, 181:6, 183:2,
209:22, 216:25,
224:16
**test** [12] - 12:10, 14:4,
16:12, 30:15, 31:23,
43:7, 133:25, 134:1,
147:8, 196:17,
196:18
**tested** [1] - 129:3
**tester** [2] - 19:20, 20:1
**testified** [17] - 10:9,
22:6, 29:14, 31:10,
32:12, 32:14, 53:1,
57:13, 90:20,
114:15, 136:1,
136:3, 136:9,
137:15, 166:17,
167:23, 206:2
**testifies** [2] - 31:21,
224:1
**testify** [22] - 5:8,
25:13, 30:10, 30:11,
31:25, 51:11, 51:16,
51:18, 58:11, 58:16,
92:6, 121:19, 128:7,
135:20, 135:22,
137:21, 146:5,
148:3, 222:25,
223:2, 223:11
**testifying** [2] - 223:2,
223:23
**testimony** [34] - 7:9,
7:20, 16:22, 17:3,
18:5, 18:15, 18:21,
29:14, 30:23, 31:4,
38:5, 54:18, 54:20,
55:16, 84:7, 90:18,
104:14, 105:1,
105:12, 127:22,
128:2, 135:6, 135:9,
135:15, 136:8,
137:13, 156:2,
166:22, 174:12,
192:20, 203:8,
203:9, 223:10,

223:25
**Testing** [1] - 16:13
**testing** [16] - 4:14,
13:13, 14:6, 15:11,
17:5, 19:2, 19:16,
19:18, 19:23, 20:4,
20:14, 43:5, 46:23,
95:21, 119:17,
147:10
**Testlabs** [1] - 11:25
**tests** [1] - 165:1
**text** [9] - 27:23, 27:25,
28:10, 28:24, 29:4,
38:21, 93:8, 96:10,
96:15
**THE** [363] - 3:3, 3:7,
3:13, 3:16, 5:5, 6:6,
6:9, 6:12, 7:8, 7:12,
7:17, 7:21, 7:24,
8:20, 9:7, 9:13, 10:5,
10:17, 11:1, 12:20,
12:22, 12:24, 12:25,
13:1, 13:2, 17:7,
17:8, 17:11, 17:12,
17:13, 17:14, 17:16,
17:17, 17:19, 17:22,
17:24, 20:6, 25:6,
25:9, 25:22, 25:25,
26:3, 26:7, 26:10,
26:12, 26:23, 27:2,
27:7, 27:10, 28:18,
28:20, 29:5, 29:7,
29:9, 29:11, 30:16,
30:25, 31:24, 32:3,
32:6, 32:18, 35:14,
35:17, 35:18, 35:22,
36:4, 36:7, 36:8,
36:10, 36:14, 36:17,
36:20, 37:3, 37:5,
37:6, 37:7, 37:10,
37:11, 37:13, 37:14,
37:16, 37:17, 38:1,
38:6, 38:9, 51:3,
52:21, 54:23, 55:1,
55:7, 55:9, 55:14,
55:24, 56:4, 56:6,
56:14, 56:19, 56:22,
57:10, 57:19, 57:22,
57:24, 58:4, 59:6,
59:9, 59:15, 59:19,
59:22, 60:7, 60:9,
61:7, 61:9, 76:12,
77:9, 78:14, 78:25,
84:9, 84:14, 84:20,
86:15, 89:5, 89:8,
89:10, 89:11, 89:12,
89:13, 90:23, 91:3,
91:11, 91:13, 92:3,
92:15, 94:8, 94:10,
94:25, 95:2, 95:4,

95:5, 95:7, 95:8,
95:9, 95:10, 95:12,
95:14, 95:15, 95:17,
95:19, 96:2, 98:6,
98:13, 98:16, 98:17,
98:18, 98:21, 98:23,
98:25, 99:1, 99:3,
99:4, 99:6, 99:7,
99:10, 99:12, 99:15,
100:3, 100:4, 100:7,
100:9, 100:11,
100:13, 100:15,
101:23, 101:25,
102:1, 102:2, 102:4,
102:5, 102:7,
102:11, 102:12,
102:14, 102:16,
102:17, 102:19,
102:21, 102:24,
103:1, 103:5,
103:20, 103:23,
104:1, 104:4, 104:9,
104:11, 104:16,
104:20, 104:23,
105:3, 105:5, 106:4,
106:6, 106:10,
106:12, 108:13,
108:14, 108:15,
109:23, 111:2,
111:5, 111:12,
111:14, 111:19,
111:23, 112:1,
112:2, 112:3, 112:7,
112:8, 112:10,
112:11, 112:12,
112:23, 113:1,
113:5, 113:9,
113:14, 113:17,
113:22, 114:11,
114:20, 114:24,
115:5, 115:11,
115:16, 115:20,
116:7, 116:11,
117:10, 117:18,
117:23, 119:10,
119:12, 119:13,
119:15, 119:19,
120:1, 120:5,
120:18, 121:5,
121:13, 121:16,
122:1, 122:5,
122:13, 122:18,
122:21, 123:7,
123:9, 123:25,
124:6, 124:13,
124:16, 124:19,
124:23, 128:19,
129:16, 130:12,
130:21, 135:8,
135:13, 136:15,
136:19, 137:15,

137:17, 137:25,
138:4, 138:6, 139:9,
139:15, 140:18,
140:20, 141:23,
142:1, 167:12,
167:14, 167:15,
167:16, 174:5,
174:7, 174:16,
174:19, 191:1,
191:3, 191:5,
192:10, 192:22,
193:4, 193:18,
193:21, 194:1,
194:4, 195:12,
195:15, 195:19,
195:21, 195:24,
196:4, 196:7,
196:10, 196:13,
196:15, 196:17,
196:25, 197:6,
197:8, 197:10,
197:14, 198:8,
198:17, 198:21,
199:8, 199:15,
200:14, 201:6,
201:9, 201:13,
201:16, 202:1,
202:6, 202:9,
202:14, 202:17,
202:19, 202:23,
203:2, 203:7,
203:19, 203:21,
203:23, 204:2,
204:18, 204:21,
204:22, 209:23,
210:4, 210:7,
218:11, 218:12,
220:16, 221:17,
221:19, 221:20,
221:21, 222:8,
222:14, 223:4,
223:15, 223:17,
224:6, 224:12,
224:15, 224:18,
224:21
**theater** [3] - 197:19,
197:20, 198:3
**theme** [27] - 34:20,
69:22, 70:10, 70:11,
70:13, 70:17, 70:21,
71:20, 73:9, 74:18,
78:8, 78:15, 79:4,
85:1, 85:12, 86:1,
88:14, 88:18, 88:20,
92:20, 96:22,
127:21, 170:2,
207:18, 218:6
**themes** [23] - 34:11,
42:12, 68:8, 68:13,
68:16, 68:18, 68:25,
69:1, 69:13, 69:17,

70:9, 70:12, 70:20,
71:2, 84:22, 85:11,
92:25, 93:1, 96:19,
114:9, 218:7, 218:21
**themselves** [1] - 77:20
**theoretical** [5] -
116:21, 131:24,
196:20, 197:1, 198:5
**theoretically** [4] -
117:1, 196:24, 199:7
**there'd** [1] - 85:7
**thereby** [2] - 77:23,
97:21
**therefore** [9] - 29:21,
128:13, 128:15,
132:4, 152:10,
152:13, 156:23,
182:20, 191:17
**thereunder** [1] - 27:15
**they've** [6] - 4:3, 59:3,
83:6, 223:4, 223:5
**thinks** [1] - 139:7
**third** [5] - 16:21, 27:4,
47:23, 47:24, 195:22
**thousand** [2] - 131:21,
177:21
**thousands** [1] -
199:12
**threatened** [1] - 58:14
**threats** [1] - 10:22
**three** [70] - 9:22,
16:19, 16:20, 18:17,
33:20, 35:17, 42:11,
42:23, 47:1, 51:9,
68:20, 69:9, 69:10,
75:9, 79:9, 79:10,
81:15, 81:17, 81:18,
83:13, 89:17, 91:11,
91:13, 91:16, 104:4,
107:16, 133:20,
133:22, 149:1,
170:4, 173:10,
176:10, 183:7,
183:20, 183:22,
183:24, 185:8,
188:8, 194:18,
194:21, 196:2,
204:24, 205:10,
206:15, 206:22,
210:24, 211:5,
211:18, 211:22,
212:7, 215:23, 218:2
**three-by-three** [14] -
42:11, 42:23, 79:9,
170:4, 176:10,
183:22, 185:8,
188:8, 204:24,
205:10, 206:15,
206:22, 211:5, 212:7
**three-reel** [1] - 75:9

**threshold** [8] - 52:21,
94:20, 115:6, 126:5,
126:11, 127:12,
127:14, 132:5
**throughout** [6] -
19:15, 88:21,
190:13, 190:18,
193:2, 207:18
**throw** [2] - 83:10,
199:19
**throws** [1] - 199:24
**ticket** [10] - 41:13,
76:4, 76:6, 197:20,
197:21, 197:22,
197:23, 198:2
**tickets** [1] - 200:2
**tie** [1] - 63:11
**time-out** [2] - 93:20,
100:6
**timer** [2] - 80:2, 89:25,
99:19, 99:22,
102:14, 143:14
**title** [7] - 17:9, 170:18,
182:9, 182:10,
207:16, 212:25,
213:1
**titled** [1] - 165:19
**titles** [10] - 173:9,
176:20, 178:7,
182:4, 189:21,
189:22, 207:9,
216:14, 216:16,
218:17
**today** [34] - 6:25, 7:3,
9:3, 10:4, 23:14,
23:23, 25:13, 29:15,
46:11, 51:2, 51:11,
56:18, 59:15, 67:23,
88:22, 104:19,
120:11, 123:17,
138:21, 142:9,
147:17, 163:9,
174:13, 188:13,
190:19, 198:16,
200:7, 210:7,
222:17, 223:2,
223:10, 223:12,
223:23, 223:25
**today's** [1] - 5:18
**together** [4] - 15:7,
26:13, 63:12, 187:15
**toggling** [2] - 34:8,
132:11
**tomorrow** [1] - 5:3
**tonight** [1] - 59:20
**took** [10] - 5:7, 8:2,
10:1, 44:21, 48:9,
161:6, 162:20,
165:6, 177:8, 195:7
**top** [10] - 17:14, 20:22,

40:16, 63:24, 81:19,
81:22, 183:23,
211:13, 218:13,
218:15
**topic** [1] - 218:9
**total** [9] - 94:11,
100:19, 101:14,
161:6, 181:8, 181:9,
182:6, 184:14,
185:21
**totally** [3] - 119:22,
140:12, 200:6
**touch** [15] - 92:18,
93:3, 93:5, 93:7,
93:16, 94:1, 94:7,
95:22, 97:2, 97:4,
97:5, 97:8, 118:12,
155:17, 155:23
**touched** [1] - 49:1
**touching** [1] - 55:8
**towards** [3] - 132:4,
156:1, 158:21
**track** [13] - 108:5,
110:8, 125:22,
126:12, 131:16,
132:8, 133:13,
133:16, 191:19,
191:20, 191:22,
192:2, 192:5
**tracked** [4] - 132:22,
133:2, 192:16,
192:18
**tracking** [1] - 192:14
**traction** [1] - 16:16
**trade** [3] - 4:25,
209:19
**trademarked** [2] -
4:16, 5:4
**traditional** [3] - 187:3,
187:11, 208:5
**training** [9] - 19:4,
19:6, 52:2, 53:18,
53:19, 109:4
**transition** [1] - 168:22
**transpiring** [1] - 34:24
**travel** [2] - 167:21,
209:16
**Travis** [4] - 25:19,
37:7, 37:13, 37:14
**Travis's** [1] - 25:25
**treasure** [1] - 81:21
**treat** [2] - 63:17, 64:1
**treated** [1] - 223:23
**trial** [4] - 147:20,
147:23, 201:21,
201:22
**Tribal** [1] - 127:16
**tribal** [1] - 16:7
**tribe** [1] - 127:19
**tried** [7] - 16:16,

100:10, 108:14,
125:15, 150:7,
209:17, 211:12
**tries** [1] - 134:1
**trigger** [4] - 172:12,
183:19, 183:24,
215:20
**triggered** [3] - 42:3,
184:11, 206:24
**triggers** [1] - 183:20
**trivia** [2] - 86:8, 189:24
**true** [8] - 152:24,
186:15, 187:25,
206:3, 215:14,
215:18, 220:10
**truly** [6] - 73:22,
192:15, 196:23,
199:6, 199:9, 205:3
**try** [20] - 18:25, 21:14,
44:4, 44:6, 53:2,
54:9, 60:22, 61:4,
61:21, 62:7, 63:4,
69:9, 79:7, 83:21,
108:5, 108:13,
112:9, 125:20,
160:10, 165:23
**trying** [18] - 6:23, 17:8,
43:19, 43:25, 45:22,
53:9, 53:19, 62:5,
97:25, 114:3,
117:17, 129:23,
135:8, 150:24,
152:16, 218:1,
223:8, 224:4
**Tufts** [1] - 169:4,
169:7
**turn** [12] - 14:13, 78:2,
78:4, 81:14, 81:24,
151:17, 154:14,
180:4, 180:7,
193:22, 194:17,
222:22
**turned** [3] - 34:13,
43:22, 68:1
**turning** [1] - 43:24,
63:23, 135:24,
210:14
**Two** [3] - 193:16,
198:22, 198:25
**two** [50] - 16:20,
24:23, 39:17, 40:10,
41:4, 41:15, 46:12,
47:20, 48:13, 48:25,
62:15, 63:6, 63:12,
68:20, 70:6, 70:16,
74:6, 79:10, 81:13,
82:2, 83:13, 89:4,
107:15, 107:16,
113:13, 113:14,
113:20, 114:1,

126:23, 137:3, 139:11, 148:25, 151:9, 151:14, 163:1, 164:13, 164:21, 175:12, 176:20, 178:7, 183:1, 183:3, 183:8, 186:17, 187:22, 195:22, 199:18, 210:24, 222:8, 222:12
**type** [20] - 16:14, 16:19, 24:2, 43:7, 43:16, 43:20, 44:17, 45:7, 61:18, 66:15, 69:8, 70:11, 75:23, 85:12, 111:6, 157:16, 166:14, 209:20, 210:25, 211:9
**types** [5] - 12:4, 14:17, 14:18, 96:5, 147:8
**typical** [3] - 95:10, 186:22, 210:22
**typically** [22] - 13:20, 14:8, 15:4, 35:1, 37:20, 39:10, 39:12, 43:16, 64:24, 65:1, 68:21, 96:9, 96:10, 97:22, 128:24, 129:20, 170:19, 171:20, 172:2, 172:14, 179:11, 181:10

## U

**u-r-a** [1] - 168:8
**U.S** [5] - 16:15, 16:17, 17:9, 77:25
**ultimate** [6] - 62:7, 65:20, 67:19, 77:14, 116:2, 154:15
**ultimately** [20] - 32:2, 50:11, 61:2, 62:4, 64:17, 66:20, 134:8, 135:19, 135:21, 135:22, 137:9, 137:11, 137:23, 139:18, 139:22, 140:4, 155:12, 155:16, 169:12, 176:1
**umbrella** [1] - 139:8
**unable** [2] - 51:23, 162:8
**unachievable** [1] - 188:14
**uncommon** [1] - 218:16

**under** [22] - 13:15, 21:19, 28:5, 28:14, 42:6, 65:22, 77:8, 91:24, 92:10, 92:12, 104:18, 119:25, 139:7, 161:17, 166:5, 166:8, 186:22, 193:22, 194:10, 194:15, 195:6, 219:14
**under-the-hood** [1] - 161:17
**undergrad** [1] - 168:11
**underlying** [7] - 21:24, 32:13, 50:20, 53:5, 138:24, 175:23, 197:16
**underneath** [1] - 92:23
**underpinnings** [1] - 173:6
**undersigned** [1] - 27:8
**understandably** [1] - 158:18
**understood** [5] - 64:8, 71:15, 161:22, 161:25, 212:4
**underwater** [1] - 85:11
**unique** [4] - 125:8, 181:4, 182:8, 182:11
**unit** [5] - 40:13, 44:14, 45:16, 164:10
**United** [6] - 16:8, 16:18, 19:15, 19:24, 65:3, 173:22
**units** [1] - 191:16
**University** [3] - 168:12, 168:15, 169:4
**UNIX** [1] - 61:19
**unless** [9] - 8:9, 36:16, 63:20, 64:3, 72:21, 95:24, 124:19, 154:8, 199:9
**unlocked** [2] - 40:21, 40:23
**unpublished** [2] - 202:17, 202:19
**unquote** [2] - 89:6, 199:9
**unrelated** [1] - 52:17
**unsanctioned** [1] - 50:23
**unsealed** [1] - 50:4
**unskilled** [1] - 219:21
**unsuccessful** [1] - 142:22
**unusual** [1] - 4:7

**up** [69] - 6:24, 8:2, 12:13, 15:9, 15:20, 18:11, 19:10, 22:21, 26:19, 29:5, 34:1, 40:22, 43:8, 43:24, 48:3, 48:11, 53:19, 75:16, 75:19, 81:24, 85:25, 86:9, 94:3, 97:1, 97:5, 97:8, 101:3, 101:12, 104:14, 106:24, 107:12, 117:6, 124:12, 126:1, 126:17, 129:10, 131:19, 133:19, 139:2, 144:16, 150:20, 150:21, 150:24, 153:8, 157:7, 164:3, 164:17, 167:6, 169:11, 169:12, 176:2, 176:24, 178:17, 183:12, 184:16, 188:16, 188:22, 193:12, 203:11, 213:2, 213:4, 213:7, 214:1, 217:25, 218:3, 224:4
**updated** [2] - 25:4, 191:18
**upper** [2] - 127:14, 211:25
**upright** [3] - 41:6, 41:15
**upside** [1] - 123:21
**USB** [6] - 47:17, 48:13, 48:14, 48:15, 61:14, 61:20
**user** [2] - 19:12, 21:10
**utilize** [4] - 21:25, 28:22, 189:23, 207:6
**utilized** [6] - 84:18, 133:25, 140:23, 140:24, 155:11, 220:1
**utilizes** [1] - 157:25

## V

**valuable** [3] - 57:6, 155:4, 170:10
**valuate** [1] - 178:16
**value** [13] - 62:16, 62:21, 63:2, 78:18, 78:22, 85:9, 97:18, 99:1, 125:24, 157:2, 157:3, 158:3
**valued** [1] - 54:14
**values** [2] - 62:18, 131:11

**Vancura** [8] - 104:14, 167:21, 168:4, 168:7, 174:3, 174:11, 174:21, 190:25
**VANCURA** [1] - 167:22
**Vancura's** [1] - 104:17
**varied** [1] - 92:20
**varies** [1] - 126:22
**various** [32] - 5:23, 6:2, 10:22, 12:4, 12:8, 12:16, 12:23, 15:21, 16:7, 16:15, 28:21, 39:3, 43:12, 44:8, 49:24, 55:21, 57:7, 58:13, 68:13, 68:24, 69:12, 69:17, 69:19, 77:24, 84:22, 110:11, 118:4, 138:13, 173:2, 175:18, 199:13, 204:14
**vary** [4] - 68:17, 131:18, 167:6, 186:5
**Vegas** [5] - 11:17, 104:14, 104:20, 104:22, 172:3
**Vegas-style** [1] - 172:3
**Vending** [1] - 3:22
**vendor** [2] - 49:25, 92:7
**verbiage** [1] - 63:25
**verification** [1] - 130:7
**verified** [1] - 175:16
**verify** [1] - 175:15
**versa** [1] - 114:24
**version** [36] - 19:25, 24:24, 25:16, 25:20, 35:4, 39:10, 39:11, 39:13, 39:14, 39:23, 40:2, 55:22, 55:23, 56:11, 56:17, 57:15, 58:6, 90:8, 91:11, 92:1, 145:14, 146:17, 175:15, 182:3, 190:16, 216:13, 220:11, 220:12, 220:21, 220:22, 221:3
**version's** [1] - 39:15
**versions** [31] - 24:23, 25:6, 25:7, 33:19, 35:7, 35:10, 35:12, 39:4, 39:6, 39:7, 39:8, 39:9, 40:1, 40:11, 41:24, 42:4, 42:5, 43:13, 43:14, 55:21, 57:7, 59:1,

89:19, 91:7, 91:9, 91:20, 145:10, 145:17, 175:7, 175:16, 220:24
**versus** [31] - 15:16, 16:23, 20:25, 23:7, 30:14, 43:8, 62:10, 63:11, 66:12, 101:23, 112:24, 113:3, 114:5, 115:9, 115:24, 128:9, 130:25, 134:2, 143:17, 176:17, 181:3, 181:4, 186:14, 193:16, 194:25, 198:15, 198:22, 199:6, 200:7, 216:7, 219:3
**vertical** [3] - 79:10, 81:23, 210:24
**vested** [1] - 66:18
**vet** [1] - 163:22
**via** [1] - 203:21
**vice** [1] - 114:24
**victory** [1] - 168:7
**video** [21] - 34:1, 34:22, 75:7, 83:3, 83:4, 84:6, 84:8, 84:13, 84:18, 123:23, 165:6, 169:22, 171:24, 187:14, 187:16, 187:18, 208:5, 208:16, 221:6, 221:7
**videoconference** [1] - 221:2
**videotaping** [1] - 46:14
**view** [13] - 23:15, 72:10, 85:13, 149:23, 170:7, 177:22, 182:25, 183:5, 184:18, 190:12, 190:14, 206:15, 216:4
**virtual** [1] - 75:7
**virtually** [1] - 45:3
**visible** [4] - 79:25, 83:19, 93:8, 99:20
**visits** [3] - 199:12, 199:13, 224:11
**visualization** [1] - 204:16
**visualizing** [1] - 204:24
**voce** [3] - 7:14, 165:9, 224:23
**voir** [2] - 26:17, 32:14
**volatility** [2] - 130:2, 130:20

**VP** [1] - 172:22

## W

**wager** [33] - 72:7, 72:11, 72:12, 72:13, 73:18, 74:4, 74:9, 74:17, 80:14, 88:2, 92:24, 94:13, 94:19, 98:24, 99:2, 99:13, 100:20, 101:7, 101:11, 103:9, 153:7, 179:16, 179:21, 181:13, 181:16, 181:19, 182:9, 183:7, 184:8, 185:9, 207:14, 211:17, 213:6
**wagered** [12] - 90:3, 95:3, 97:19, 100:22, 100:24, 100:25, 101:5, 103:11, 111:24, 132:15, 157:11, 215:16
**wagering** [1] - 219:7
**wagers** [1] - 103:8
**wait** [2] - 107:8, 199:25
**waiting** [2] - 47:13, 58:2
**walk** [8] - 74:8, 123:4, 123:21, 124:6, 143:13, 207:15, 213:4, 213:6
**walked** [1] - 144:16
**walking** [1] - 144:15
**wants** [5] - 4:19, 104:13, 177:22, 177:23, 177:24
**watch** [1] - 59:17
**watches** [1] - 177:25
**watching** [2] - 34:23, 110:7
**ways** [8] - 62:15, 120:17, 124:9, 129:25, 151:3, 179:13, 188:16, 224:14
**week** [1] - 4:4
**weekend** [2] - 163:20, 163:21
**weeks** [1] - 161:8
**weigh** [1] - 74:22
**weighed** [1] - 203:9
**weighing** [1] - 199:1
**weighs** [1] - 190:9
**weight** [1] - 30:17
**weighted** [1] - 119:2
**well-shuffled** [1] -

210:15
**whatever's** [1] - 203:17
**whatnot** [5] - 87:9, 111:8, 126:8, 145:3, 150:22
**whereas** [4] - 39:12, 66:8, 118:5, 134:6
**white** [2] - 12:14, 48:1
**whole** [6] - 40:21, 121:20, 124:12, 125:8, 182:22, 196:15
**wholeheartedly** [1] - 154:17
**wild** [38] - 42:19, 42:20, 69:7, 73:1, 74:15, 77:17, 79:6, 79:11, 79:16, 79:18, 81:10, 81:14, 81:17, 82:7, 82:10, 82:14, 82:19, 86:22, 87:2, 87:14, 88:13, 105:20, 105:21, 106:8, 139:20, 139:25, 140:2, 141:1, 141:18, 152:1, 155:3, 180:5, 185:7, 204:25, 205:5, 211:6, 219:18
**wilds** [1] - 180:7
**William** [1] - 10:16
**willing** [6] - 6:6, 7:2, 9:1, 9:25, 22:14, 58:7
**win** [84] - 72:25, 74:15, 79:7, 80:6, 82:25, 87:16, 87:18, 94:18, 94:19, 94:25, 96:11, 98:17, 98:22, 102:23, 103:13, 106:5, 106:11, 110:24, 112:9, 114:21, 120:22, 121:14, 122:2, 122:14, 124:11, 131:20, 136:6, 136:17, 139:19, 139:22, 141:2, 143:6, 143:14, 144:23, 145:4, 160:23, 171:11, 177:7, 180:18, 181:3, 181:15, 181:16, 181:18, 182:20, 182:21, 183:9, 184:6, 184:11, 184:15, 185:20, 186:2, 187:12, 187:16,

187:22, 187:23, 189:8, 190:6, 190:9, 205:17, 205:18, 205:22, 206:25, 207:2, 207:22, 211:1, 211:17, 213:8, 213:9, 214:15, 215:3, 215:15, 215:19, 215:21, 215:22, 218:5, 218:25, 219:1, 219:3, 219:4
**window** [1] - 49:3
**winnable** [3] - 82:2, 82:3, 142:19
**winner** [6] - 73:18, 73:19, 74:7, 80:21, 105:19
**winning** [71] - 42:24, 73:9, 73:10, 74:3, 74:5, 74:14, 75:17, 76:5, 79:12, 79:13, 79:17, 79:19, 79:20, 80:12, 82:25, 86:20, 86:23, 87:11, 87:12, 87:19, 88:9, 90:2, 90:4, 94:8, 94:11, 94:12, 95:1, 95:2, 95:7, 95:12, 99:11, 102:1, 102:9, 102:20, 105:20, 106:7, 106:13, 111:15, 116:5, 133:10, 135:21, 135:22, 136:10, 137:10, 137:21, 139:18, 139:20, 139:23, 140:1, 140:11, 141:12, 141:14, 141:15, 141:17, 141:18, 142:15, 145:6, 154:15, 205:19, 211:21, 212:17, 214:3, 215:8, 217:16, 217:18, 217:22, 219:8, 219:10
**wins** [2] - 43:21, 158:16
**wishes** [1] - 3:10
**withdraw** [3] - 146:6, 157:22, 193:24
**withdrawn** [1] - 194:9
**witness** [19] - 3:3, 7:13, 10:8, 20:4, 30:16, 31:7, 31:17, 49:19, 55:17, 55:19, 104:23, 105:6, 105:7, 122:11,

122:12, 124:13, 124:22, 167:22, 204:4
**WITNESS** [68] - 12:22, 12:25, 13:2, 17:8, 17:12, 17:14, 17:17, 25:25, 26:12, 28:20, 29:7, 29:11, 35:17, 36:8, 37:5, 37:7, 37:11, 37:14, 37:17, 55:14, 60:9, 61:9, 89:10, 89:12, 91:13, 94:10, 95:2, 95:5, 95:8, 95:10, 95:14, 95:17, 98:16, 98:18, 98:23, 99:1, 99:4, 99:7, 99:12, 100:4, 100:9, 100:13, 101:25, 102:2, 102:5, 102:11, 102:14, 102:17, 102:21, 103:1, 106:6, 106:12, 108:14, 111:5, 111:14, 111:23, 112:2, 112:7, 112:10, 112:12, 119:12, 119:15, 138:6, 167:15, 197:10, 204:22, 218:12, 221:20
**witness's** [1] - 22:18
**witnessed** [1] - 28:17
**witnesses** [4] - 104:6, 195:3, 199:10, 224:8
**won** [38] - 94:2, 96:12, 97:20, 99:5, 101:10, 111:16, 111:23, 111:24, 112:4, 115:4, 116:16, 123:12, 126:9, 126:15, 132:15, 142:9, 142:16, 143:1, 143:3, 157:5, 157:12, 160:6, 160:9, 160:15, 160:16, 179:3, 181:18, 185:9, 185:18, 185:21, 185:22, 200:9, 201:25, 212:2, 214:18, 215:7
**wondering** [1] - 115:20
**wood** [1] - 41:11
**word** [3] - 38:18, 121:23, 160:4
**words** [4] - 30:2, 176:13, 178:15, 189:1

122:12, 124:13, 124:22, 167:22, 204:4
**work-client** [1] - 6:1
**works** [29] - 12:19, 13:17, 14:6, 15:7, 15:9, 19:9, 21:14, 21:16, 24:3, 24:4, 24:16, 24:21, 34:5, 45:20, 52:14, 53:8, 60:23, 62:8, 62:9, 63:13, 119:22, 126:22, 146:25, 159:22, 176:6, 184:4, 210:19, 211:13
**world** [4] - 19:15, 168:22, 181:19, 189:19
**worldwide** [1] - 173:23
**worries** [1] - 13:2
**worry** [1] - 63:14
**worse** [3] - 187:5, 187:7, 187:10
**worth** [4] - 83:21, 179:24, 180:10, 183:10
**wrap** [1] - 164:3
**wrestling** [1] - 135:16
**writ** [1] - 10:22
**write** [4] - 29:4, 37:1, 46:8, 197:8
**writing** [1] - 165:13
**written** [10] - 46:10, 64:4, 112:16, 146:12, 146:22, 147:18, 148:5, 170:24, 171:2, 173:10
**wrote** [5] - 30:4, 37:20, 146:3, 169:2, 176:2

## Y

**Yahtzee** [2] - 170:25, 173:13
**year** [3] - 187:6, 187:8
**yearly** [1] - 119:18
**years** [12] - 11:24, 15:17, 16:16, 53:20, 54:10, 64:15, 67:17, 119:18, 168:20, 169:6, 172:20, 172:21
**yield** [1] - 24:2
**yourself** [3] - 27:5, 170:9, 177:13

## Z

**zero** [9] - 100:20, 110:21, 111:3, 181:9, 185:21, 185:24, 211:9, 214:18, 219:5
**zippered** [1] - 163:15
**Zoom** [1] - 221:8

# EXHIBIT I



COMMONWEALTH'S
EXHIBIT

PENGAD 800-631-

# Expert Report of Daniel P. Lopresti

## A. Personal and Professional Background

I, Daniel P. Lopresti, declare:

1. I have been retained by Andrew J. Throckmorton, Assistant District Attorney for Monroe County. I am being compensated for my time at my standard rate of $300.00 per hour, plus actual expenses. My compensation is not dependent in any way upon any outcome in these proceedings.

2. My qualifications for forming the opinions set forth in this report are summarized below and explained in more detail in my current curriculum vitae, provided as a separate attachment.

3. I am a Full Professor in the Department of Computer Science & Engineering ("CSE") at Lehigh University in Bethlehem, PA, and have been since May 2009. From July 2009 through June 2019, I also served as Chair of the CSE Department, except for a period from July 2014 to June 2015 when I served as the interim Dean of Engineering and another person served as interim Chair of the CSE Department. In July 2015, I was named Director of the Lehigh Data X strategic initiative focused on interdisciplinary data science, a role I held until June 2020. From July 2014 through June 2015, I served as Interim Dean of the P. C. Rossin College of Engineering and Applied Science at Lehigh. From 2003 to 2009, I was an Associate Professor in the CSE Department. The courses that I have taught at Lehigh include big data analytics, artificial intelligence theory and practice, AI for social good, software product management, issues in cybersecurity, data mining, research methods, and operating system design. My research areas include computer security, biometric security, pattern and optical character recognition, document image analysis, machine learning, and electronic voting systems.

4. From December 2002 to June 2003, I held a courtesy appointment as a Visiting Research Scientist at the Palo Alto Research Center, and from February 2003 to June 2003 I also held courtesy appointments as a Research Fellow in the Information Security Institute at Johns Hopkins University, and as a Visiting Research Associate Professor at Rensselaer Polytechnic Institute.

5. From October 1997 to December 2002, I was a Member of Technical Staff at Bell Labs/Lucent Technologies, conducting research in the areas of computer security, document image analysis, optical character recognition, and pen computing, and where I also collaborated with colleagues on the development of text-to-speech ("TTS") technologies.

6. From June 1991 to October 1997, I was a Principal Scientist at the Matsushita Information Technology Laboratory in Princeton, NJ, conducting research in the areas of

optical character recognition, pen computing, document analysis, and document processing systems.

7. From September 1986 to May 1991, I was an Assistant Professor of Computer Science at Brown University in Providence, RI, conducting research in parallel computing and computer-aided design of VLSI. The courses that I taught at Brown included VLSI design, parallel computing, parallel computer architectures, discrete math, and computational molecular biology.

8. From 2009 through 2013, I served as Chair of Technical Committee 11 of the International Association for Pattern Recognition ("IAPR"). Technical Committee 11 is known as the "Reading Systems" committee and its goal is to understand and develop systems that can analyze media containing character symbols and return an encoded representation of the text content and structure. From 2018 through 2021, I served as Treasurer of IAPR, and in 2021 I was elected President of IAPR. I have served as a member of the IAPR Executive Committee since 2018.

9. Since 2015, I have served as an appointed member on the Council for the Computing Community Consortium ("CCC") of the Computing Research Association ("CRA"). I assumed the role of Vice Chair of CCC effective July 2020. The role of the CCC is to catalyze the United States computing research community to pursue high-impact research, conduct activities that strengthen the research community, articulate compelling research visions, and align those visions with key national and global challenges. While on the CCC Council, I have served on, and also co-chaired, the Cybersecurity and Cybercrime Task Force. I currently serve on the Security, Integrity, and Trust Task Force.

10. I received a B.A. in Mathematics and Engineering Science from Dartmouth College in 1982, an M.S.E. in Electrical Engineering and Computer Science from Princeton University in 1983, an M.A. in Electrical Engineering and Computer Science from Princeton University in 1984, and a Ph.D. in Computer Science from Princeton University in 1987.

11. I have authored over 150 publications. I am also a named inventor on 24 United States patents.

12. I have also taught many courses involving software development and/or computer programming over the past two decades, at both the undergraduate and graduate levels.

13. I am a member of several technical associations, and have conducted various activities for them, attended their conferences, and published papers and proceedings in their technical publications. These include the Institute of Electrical and Electronics Engineers ("IEEE"), the Association for Computing Machinery ("ACM"), the International Association for Pattern Recognition ("IAPR"), and the Association for the Advancement of Artificial Intelligence ("AAAI").

14. I have served as an expert witness in more than 10 cases involving intellectual property disputes between technology companies. In one of these cases, Nuance Communications v. Abbyy Software, No. 3:08-cv-02912 (U.S. District Court for the Northern District of California), 2008 – 2013, I participated in an extensive source code analysis as part of my expert witness work.

## B. Materials Reviewed and Considered

15. In arriving at my opinions, I reviewed the following materials provided to me by Assistant District Attorney Throckmorton:
- Petition 1-20
- Petition 21-65
- Time Stamped Motion to Dismiss
- Commonwealth's Reply in Opposition to Return of Property
- Commonwealth's Brief in Support of its Reply
- Report of David Schoppe
- I viewed a demonstration of a Pace-O-Matic device in operation given by Assistant District Attorney Throckmorton via video conference.

I reserve the right to amend this report if other evidence becomes available.

## C. My Expert Opinions

16. I have been asked to offer my expert opinion on one specific question in the matter at hand. This is whether it is necessary to examine computer source code to draw conclusions about the basic functionality of Pace-O-Matic devices that were seized by detectives from Monroe County from Smokin' Joe's Tobacco Shop in October 2021.

17. Before providing my opinions, I will first provide an explanation of source code and the role it plays in computing devices and the software development process.

18. Oxford Languages defines "source code" as "a text listing of commands to be compiled or assembled into an executable computer program." Here, the "text listing of commands" corresponds to the specification authored by a human programmer, while the "executable computer program" corresponds to the low-level instructions that are implemented in the computer hardware. The translation from the human-understandable text listing to the executable computer program is performed automatically by another piece of software known as a compiler or assembler. Microsoft Visual C++ is one example of a popular compiler that can make the translation from a particular high-level language, C++ in this case, into an executable computer program. The compiled program could then be executed on a computer running, say, the Microsoft Windows operating system.

19. Human programmers write source code in high-level languages like C++ because it is easier for us to read and understand than the low-level instructions that are required by

the computer hardware. The translation process performed by the compiler or assembler is direct and automatic, and there is no information "hidden" in the source code that is not also carried forward into the executable code.

20. Many devices in our day-to-day environment contain computer hardware and software as essential components, including cell phones, smart watches, HDTVs, etc. They all run software that is typically programmed in a high-level language, hence they all utilize source code that was authored by a human programmer and compiled or assembled down into executable code. We interact with these devices and recognize their basic functionality without considering the underlying computer hardware and software, or the programming that was involved in developing them.

21. In my review of the document titled "Report of David Schoppe," I understand that Mr. Schoppe is an Enforcement Officer 3 and CAGE Unit Supervisor. I understand that he inspected the seized Pace-O-Matic devices and conducted his own gameplay using the devices. He did not have access to the underlying source code.

22. Conclusions about the functionality of a computing device like the Pace-O-Matic can be drawn without examining source code. For example, in his report, Mr. Schoppe concludes "The pre-reveal or "next puzzle" feature decision is completely in the control of the device; it shows the next predetermined win, hit or loss." In my opinion, based on the evidence I have been provided, there is no reason to believe that an examination of the source code would lead to a different conclusion.

23. In his report, Mr. Schoppe also concludes "When the play button is pressed to engage gameplay, the device displays a preset win, hit or loss." Again, in my opinion there is no reason to believe that an examination of the source code would lead to a different conclusion.

24. In his report, Mr. Schoppe also concludes "Once a preset win, hit or loss is displayed by pressing the play button, the player can touch the screen to earn the maximum preset amount of points." Again, in my opinion there is no reason to believe that an examination of the source code would lead to a different conclusion.

25. In his report, Mr. Schoppe also concludes "The player can the play the slot machine game and cash out without playing the follow-me game." Again, in my opinion there is no reason to believe that an examination of the source code would lead to a different conclusion.

26. In his report, Mr. Schoppe also concludes "The knock-off feature decides if a player can cash out all the points the player earned because it rounds down to the next dollar cash out." Again, in my opinion there is no reason to believe that an examination of the source code would lead to a different conclusion.

27. A good analogy might be what we do when purchasing a car. To fully understand a particular car and all of its capabilities and possible defects, including the decisions made by the engineers and the materials used by the manufacturer, we would have to disassemble the engine and transmission, remove and trace all of the electrical wiring connections, etc. This would be equivalent to studying the source code of a computing device. Usually, however, we are satisfied with a visual inspection of the exterior and interior of the car along with taking it for a test drive to confirm that its performance meets our expectations. When we do this, we exercise the car's functionality in ways we consider important in deciding whether it will serve our purposes and ultimately whether or not we will purchase it.

March 23, 2022

Daniel P. Lopresti