UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POM OF PENNSYLVANIA, LLC, | |
| Plaintiff, | CIVIL ACTION NO. 23-CV-00579 |
| v. | |
| BBM NORTH AMERICA, INC., and PETER NIKIPER, | (MEHALCHICK, J.) |
| Defendants. | |

## MEMORANDUM

Presently before the Court is a motion to dismiss brought by Defendants BMM North America, Inc. ("BMM") and Peter Nikiper ("Nikiper") (collectively "Defendants"). (Doc. 15). On April 5, 2023, Plaintiff, POM of Pennsylvania, LLC ("POM") filed a complaint against Defendants. (Doc. 1). On May 9, 2023, POM filed the operative amended complaint ("Amended Complaint") asserting Count I – Violation of the Federal Computer Fraud and Abuse Act ("CFAA") (18 U.S.C. § 1030), Count II – Misappropriation and Misuse of Confidential Business Information, and Count III – Violation of the Pennsylvania Consumer Protection Against Computer Spyware Act ("Spyware Act"). (Doc. 14). For the following reasons, Defendants' motion to dismiss shall be **GRANTED**. (Doc. 15).

### I. BACKGROUND AND PROCEDURAL HISTORY

The following background and factual summary are derived from POM's Amended Complaint. (Doc. 14). POM distributes electronic games in Pennsylvania, which it characterizes as games of skill ("the Game"). (Doc. 14, ¶ 9). POM distributes the Game to small businesses such as bars and convenience stores. The Game resembles a puzzle, which when solved correctly by a player allows that player to win on each play at least 105% of the player's consideration. (Doc. 14, ¶ 11).

The Game runs on encrypted software that is confidential, including software and executable files contained within the Game's hard drive. (Doc. 14, ¶¶ 10, 21-30). The hard drive is located within a locked area within the Game's terminal, which entities that host the Game are contractually prohibited from accessing. (Doc. 14, ¶ 25). The executable file, which is protected by Linux Unified Key Setup ("LUKS") encryption, houses the Game's source code. (Doc. 14, ¶ 30). The security protecting the source code ensures third parties cannot access the financial accounting or influence gameplay. (Doc. 14, ¶¶ 32-34, 45-46). The confidential intellectual property associated with the Game is owned by POM's parent company, Pace-O-Matic, Inc. (Doc. 14, ¶¶ 21, 35-36). Pace-O-Matic has spent at least $40 million developing the Game and its intellectual property. (Doc. 14, ¶ 38). Only specified personnel within Pace-O-Matic can access the executable file and its encrypted code, and those individuals are subject to confidentiality and non-disclosure agreements. (Doc. 14, ¶¶ 39-43). The Game's hard drive also contains unencrypted data, which is also kept confidential. (Doc. 14, ¶¶ 47-52).

In addition to the hard drive, the Game terminal also includes a dongle (the "Dongle"), which is also stored in a locked area in the terminal. (Doc. 14, ¶¶ 10, 21-30). The Dongle includes confidential data related to the decryption process and location of the executable file. (Doc. 14, ¶¶ 57-58). Only specified personnel within Pace-O-Matic are aware of the Dongle's design ("Dongle Design Specifications") and security measures, and those individuals are subject to confidentiality and non-disclosure agreements. (Doc. 14, ¶¶ 64, 75). Access to the encrypted or non-encrypted confidential data in the executable file or access to the Dongle, or its firmware, could lead to malicious interference with the Game that would render it unfair

2

or place POM and Pace-O-Matic at a competitive disadvantage. (Doc. 14, ¶¶ 59-76)

Pursuant to its contract with Pace-O-Matic, POM must prevent any attempt to access any intellectual property related to the Game or its confidential information. (Doc. 14, ¶¶ 76-80). The right to use the Game's intellectual property is POM's main income source. (Doc. 14, ¶ 81).

On December 9, 2019, the Bureau of Liquor Control Enforcement ("BLCE") seized three Games from Champions Sports Bar, LLC, in Dauphin County. (Doc. 14, ¶¶ 90-92). POM alleges the seizure occurred without a warrant and no charges have yet been filed as a result. (Doc. 14, ¶¶ 10, 21-30). On August 23, 2022, Champions and Capital Vending Company, Inc., which supplies the Game, filed a petition for return of property in the Court of Common Pleas of Dauphin County ("Underlying Case"). (Doc. 14, ¶ 95). BMM is a game testing laboratory that contracts with the Pennsylvania Gaming Control Board ("PGCB") to perform testing on games and Nikiper is the Director of Technical Compliance for BMM. (Doc. 14, ¶¶ 3-4). On November 4, 2022, the Commonwealth filed an expert report by BMM and Nikiper ("BMM Report"), which described an inspection and forensic examination that detailed the confidential hardware and software of the Game. (Doc. 14, ¶ 99-106). On November 22, 2022 Nikiper testified at an evidentiary hearing in the Underlying Case. (Doc. 14, ¶ 115). Nikiper described his inspection of the Game, including his request for a decryption key, to which Pennsylvania State Police ("PSP") responded by sending him three Dongles, one of which Nikiper attempted to make a copy of, but was unable to do so. (Doc. 14, ¶¶ 117-127). Nikiper attempted to decrypt the Game and access its confidential data and code. (Doc. 14, ¶¶ 117-127, 130). POM alleges he also left forensic copies of Game software at home unattended and on a portable hard drive in his backpack. (Doc. 14, ¶ 131). POM further

3

alleges that Nikiper's testimony demonstrates that he did not need to access the confidential information to assess the legality of the Game, and relied primarily on his examination of gameplay for the determination whether the Game is a game of skill or chance. (Doc. 14, ¶ 132). POM asserts that it has suffered economic harm, including diminished operability or inoperability of the hard drives and Dongles accessed by BMM and Nikiper, harm to POM's data and business, and costs of investigation and remediation. (Doc. 14, ¶¶ 147-155, 160-161, 170-173). It asks this Court for relief in the form of damages and injunctive relief. (Doc. 14, ¶¶ 155, 161, 173).

On May 9, 2023, POM filed the Amended Complaint asserting Count I – Violation of the Federal Computer Fraud and Abuse Act ("CFAA"), Count II – Misappropriation and Misuse of Confidential Business Information, and Count III – Violation of the Pennsylvania Consumer Protection Against Computer Spyware Act ("Spyware Act"). (Doc. 14). On June 12, 2023, Defendants filed a motion to dismiss the Amended Complaint on the grounds of immunity or failure to state a claim, as well as their brief in support. (Doc. 15, Doc. 16). On June 22, 2023, Plaintiff filed a brief in opposition to Defendants' motion to dismiss. (Doc. 17). Accordingly, the motion to dismiss is fully briefed and ripe for disposition. (Doc. 14; Doc. 15; Doc. 16; Doc. 17). This matter was reassigned to the undersigned judge on February 7, 2024.

## II.   MOTION TO DISMISS STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a defendant to move to dismiss for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To assess the sufficiency of a complaint on a Rule 12(b)(6) motion, a court must first take note of the elements a plaintiff must plead to state a claim, then identify mere conclusions

which are not entitled to the assumption of truth, and finally determine whether the complaint's factual allegations, taken as true, could plausibly satisfy the elements of the legal claim. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011). In deciding a Rule 12(b)(6) motion, the court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

After recognizing the required elements which make up the legal claim, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The plaintiff must provide some factual ground for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. Thus, courts "need not credit a complaint's 'bald assertions' or 'legal conclusions' . . . ." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). Nor need a court assume that a plaintiff can prove facts that the plaintiff has not alleged. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

A court must then determine whether the well-pleaded factual allegations give rise to a plausible claim for relief. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Palakovic v. Wetzel*, 854 F.3d 209, 219-20 (3d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted); *see also Sheridan v. NGK Metals*

5

*Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010). The court must accept as true all allegations in the complaint, and any reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994). This "presumption of truth attaches only to those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). The plausibility determination is context-specific and does not impose a heightened pleading requirement. *Schuchardt*, 839 F.3d at 347.

**III.   DISCUSSION**

The parties dispute whether Plaintiff's claims are barred by the witness immunity doctrine. (Doc. 16, at 10; Doc. 17, at 14). Defendants argue that they are immune from civil liability for all claims because "BMM and Nikiper were retained as expert witnesses and therefore enjoy expert witness immunity for conduct relating to that retention," citing several Pennsylvania cases, including *LLMD of Michigan, Inc. v. Jackson-Cross Co.* (Doc. 16, at 10-13); 740 A.2d 186 (Pa. 1999). In response, POM avers that Defendants mischaracterize the cases they cite. (Doc. 17, at 8). POM contends that "an expert witness could be challenged for negligence 'in formulating' an opinion, but not for the substance of that opinion" (Doc. 17, at 8) (citing *LLMD of Michigan, Inc.*, 740 A.2d at 191), and would have this Court limit witness immunity solely to the protection of statements, and therefore open Defendants to civil liability for their conduct in preparing the BMM Report. (Doc. 17, at 9). POM reasons, without citing any caselaw in support, that Defendants' interpretation of the witness immunity doctrine would "give a witness carte blanche to engage in whatever [unlawful] conduct they choose in pursuit of their expert opinion." (Doc. 17, at 14). The Court disagrees.

6

Under Pennsylvania law,[1] the witness immunity doctrine applies to expert witnesses. *See Panitz v. Behrend*, 632 A.2d 562, 565 (Pa. Super. Ct. 1993) (applying witness immunity doctrine to an expert because "[t]he primary purpose of expert testimony is not to assist one party or another in winning the case but to assist the trier of the facts in understanding complicated matters."). "[N]o witness can be required to testify, and no witness should be expected to testify, to anything other than the truth as he [or she] sees it and according to what he [or she] believes it to be. The same is expected of expert witnesses." *Panitz*, 632 A.2d at 566 (quoting *Schaffer v. Donegan,* 585 N.E.2d 854, 860 (Ohio Ct. App. 1990), *jurisdictional motion overruled,* 564 N.E.2d 500 (Ohio 1990).

Next, the witness immunity doctrine is not limited to in-trial testimony. Pennsylvania courts have repeatedly extended witness immunity to cover acts or statements outside of formal testimony. *See Panitz*, 632 A.2d at 565 (recognizing that witness immunity includes not just in-court testimony but also "all communications issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought") (citation and quotation marks omitted); *see also Atiyeh v. Frederick Group, LLC*, 2019 WL 3823972 (Pa. Super. Ct. 2019) (affirming trial court's decision that witness immunity precluded claims related to a defendants' preparation of an appraisal of plaintiffs' property in

---

[1] The Court will apply state law in its analysis of Defendants' entitlement to immunity. *See Hughes v. Long,* 242 F.3d 121, 121-22 (3d Cir. 2001) (applying Pennsylvania law when concluding that expert witnesses in a state court custody proceeding were immune from liability for actions related to their testimony); *see also Hoffman v. Rashid*, 388 F. App'x 121, 122 (3d Cir. 2010) ("[A]s a witness who provided testimony at [] trial, he is cloaked with absolute immunity from liability. Both Pennsylvania law and federal law command this result."); *Keystone Alternatives LLC v. Athletes First, LLC*, No. 1:23-CV-01161, 2024 WL 3091965, at *7 (M.D. Pa. June 21, 2024) (citing both Pennsylvania in holding that "[w]itnesses are immune from civil liability based on their testimony—even if false—in judicial proceedings.")

7

an underlying eminent domain proceeding); *Moses v. McWilliams*, 549 A.2d 950, 960 (Pa. Super. Ct. 1988) (a doctor expert witness who gave confidential information to a defense attorney *ex parte* in civil trial was entitled to absolute immunity from civil liability for breach of confidentiality because the discussion occurred in the "judicial context," as it was as a part of the regular course of judicial proceedings and "pertinent and material to the litigation"). Finally, the witness immunity doctrine can apply to any cause of action or alleged tort. *See LLMD of Michigan, Inc. v. Jackson-Cross Co.*, 740 A.2d 186, 189-90 (Pa. 1999) (the witness immunity doctrine applies "in actions other than for defamation when the court has determined that the extension of immunity is in furtherance of the policy underlying the doctrine"); *Clodgo by Clodgo v. Bowman*, 601 A.2d 342, 345 (Pa. Super. Ct. 1992) ("Regardless of the tort contained in the complaint, if the communication was made in connection with a judicial proceedings [sic] and was material and relevant to it, the privilege applies.").

However, immunity from civil liability for a witness's tortious behavior is not limitless. Both Defendants and POM cite *LLMD of Michigan*. Defendants assert that the decision stands for the contention that an absolute witness privilege exists to encourage unintimidated testimony in courts. (Doc. 16, at 15). POM correctly notes that *LLMD of Michigan* "held an expert witness could be challenged for negligence 'in formulating" an opinion, but not for the substance of that opinion.'" (Doc. 17, at 8 (quoting *LLMD of Michigan,* 740 A.2d at 191)). *LLMD of Michigan* outlines the only limit to witness immunity that Pennsylvania courts have recognized. *LLMD of Michigan,* 740 A.2d at 191. "In *LLMD*, the Pennsylvania Supreme Court carved out an exception to the state's long standing principle that communications which are 'issued in the regular course of judicial proceedings and which are pertinent and material to the redress or relief sought' are immune from civil liability." *Hughes v. Long*, 242 F.3d 121,

8

129 (3d Cir. 2001) (quoting *Post v. Mendel,* 507 A.2d 351, 355 (Pa. 1986)). Notably, the court "stressed that experts were still immune from liability premised on the substance of an expert's opinion." *Hughes,* 242 F.3d at 129 (citing *LLMD of Michigan,* 740 A.2d at 191). Therefore, the only limit to the witness immunity doctrine applies to private experts facing malpractice suits for negligence in the formation of their opinions.

First, as alleged in POM's complaint, Defendants' BMM Report and the inspection of the Game carried out in authoring the BMM Report are covered by the immunity doctrine as out-of-trial communication or preparation related to the litigation. Defendants contracted with the PGCB to perform testing on games and Nikiper acted as an expert witness for the Commonwealth in the Underlying Case. (Doc. 14, ¶¶ 3-4, 98-99). Nikiper's inspection and forensic examination of the Game was in furtherance of the BMM Report that he authored and submitted as an expert witness in the Underlying Case. (Doc. 14, ¶ 99). His testimony and the BMM Report necessarily required him to conduct the forensic examination of the Game. (Doc. 14, ¶¶ 3-4, 98-99). As such, his conduct and communications, as alleged in POM's complaint, including preparation of the BMM Report, are covered by the witness immunity doctrine as a piece of communication outside of formal testimony, but pertinent and material to the Underlying Case. (Doc. 14, ¶¶ 3-4, 98-99); *see Panitz,* 632 A.2d at 565; *Atiyeh,* 2019 WL 3823972, at *3; *Moses,* 549 A.2d at 960.

Second, as alleged in POM's complaint, the BMM Report and Nikiper's actions related to his testimony are not the types of acts or communications that fall under the malpractice exception to witness immunity under *LLMD of Michigan* and its progeny. *LLMD of Michigan* dealt with a private expert that had been negligent in formulating his trial testimony related to the amount of lost profit in a civil lawsuit. *LLMD of Michigan,* 740 A.2d

at 191. Because of his error, his testimony was dismissed, and the plaintiff in that lawsuit collected less than one-third of the lost profit they were entitled to. *LLMD of Michigan,* 740 A.2d at 187. POM does not allege that Nikiper's testimony contained false information, nor that it lead to a diminished damages amount in the Underlying Case. (Doc. 14). POM's allegations that Nikiper did not rely on his forensic examination and Dongle inspection in determining whether the Game is based on skill and that he kept confidential information at home and in his backpack are unavailing. (Doc. 14, ¶ 131). POM does not allege how these facts constitute negligence in the course of formulating his opinion. (Doc. 14). Without more details as to how Nikiper's actions amount to negligence akin to professional malpractice, this Court will apply the witness immunity doctrine to Defendants' actions taken in preparing the BMM Report and other testimony. Accordingly, Defendants' motion to dismiss on grounds of witness immunity is **GRANTED**.

### IV.    LEAVE TO AMEND

The Third Circuit has instructed that if a complaint is vulnerable to dismissal for failure to state a claim, the district court must permit a curative amendment, unless an amendment would be inequitable or futile. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002). Further, "[a] district court has 'substantial leeway in deciding whether to grant leave to amend.'" *In re Avandia Mktg., Sales Practices & Products Liab. Litig.*, 564 F. App'x 672, 673 (3d Cir. 2014) (not precedential) (quoting *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000). The Court finds that amendment in this case may not be futile, and as such, will grant POM leave to amend.

### V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Doc. 15) is **GRANTED**,

and POM will be granted leave to file an amended complaint. An appropriate Order follows.

BY THE COURT:

Dated: September 9, 2024

s/ Karoline Mehalchick
**KAROLINE MEHALCHICK**
**United States District Judge**